UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

In re AMTRUST FINANCIAL SERVICES,    :    Civil Action No. 1:17-cv-01545-(LAK)
INC. SECURITIES LITIGATION          :
—————————————————————  :    <u>CLASS ACTION</u>
                                        :

This Document Applies To:           :

    All Cases                      :    <u>DEMAND FOR JURY TRIAL</u>

—————————————————————————— x

CONSOLIDATED AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ..................................................................................1

JURISDICTION AND VENUE ............................................................................5

PARTIES ..............................................................................................................6

CLASS ACTION ALLEGATIONS ....................................................................11

SUBSTANTIVE ALLEGATIONS .....................................................................13

The Company and Its Business ................................................................13

AmTrust's Growth Through Offerings and Acquisitions .....................15

During the Class Period, AmTrust Reported Significant Growth in Warranty Contract Fee Revenue Generation ........................................17

AmTrust Begins to Shed Light on Its Accounting...........................................19

AmTrust Admits that a Restatement Is Necessary ...................................21

AmTrust Admits the Financial Statements It Issued During the Class Period Violated GAAP ........................................................22

Government Investigations of AmTrust's Accounting Are Disclosed ......23

AMTRUST'S MATERIALLY INACCURATE FINANCIAL REPORTING...........................24

I.        Improper Recognition and Reporting of Warranty Revenue ....................28

II.        Improper Recognition and Reporting of Accrued Compensation Expense29

III.        Improper Accounting and Reporting of Deferred Acquisition Costs..........29

IV.        Improper Accounting and Reporting of Foreign Currency Gains and Losses30

V.        Improper Accounting and Reporting of Software Costs ............................30

VI.        Improper Accounting and Reporting of Interest Expense..........................31

VII.        Improper Accounting and Reporting of Intercompany Transactions..........31

VIII.        Improper Accounting and Reporting of Various Other Accounting Matters31

AmTrust Admits Its Internal and Disclosure Controls Were Ineffective ......36

ALLEGATIONS UNDER THE SECURITIES ACT ...................................................41

    AmTrust's Public Offerings......................................................................................41

    The Offering Materials Contained Inaccurate  Statements of Material Fact and Omitted Material  Information Required to Be Disclosed Therein ..................................................43

    The Offering Materials Included BDO's Inaccurate Audit Opinions..............................57

COUNT I .....................................................................................................................69

    For Violation of Section 11 of the Securities Act Against All Defendants ......................69

COUNT II ....................................................................................................................70

    For Violation of Section 12(a)(2) of the Securities Act  Against AmTrust and the Underwriter Defendants ...................................................................................................70

COUNT III ...................................................................................................................72

    For Violation of Section 15 of the Securities Act  Against the Officer Defendants, and the Director Defendants ................................................................................................72

EXCHANGE ACT ALLEGATIONS ...........................................................................73

    AmTrust Knowingly Falsified Its Financial Statements................................................73

    AmTrust Dismisses BDO from Its Auditing Duties ......................................................87

    FBI, SEC, and NYDFS Investigations of AmTrust's Accounting Are Reported by *The Wall Street Journal* ...................................................................................................87

MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD ........................................................................................................88

    Fourth Quarter 2012 and Full Year 2012 Financial Results............................................88

    Second Quarter 2013 Financial Results .......................................................................98

    Third Quarter 2013 Financial Results .........................................................................100

    December 16, 2013 Conference Call............................................................................103

    February 10, 2014 *Barron's* Article ...........................................................................104

    Fourth Quarter 2013 and Full Year 2013 Financial Results...........................................105

    First Quarter 2014 Financial Results ..........................................................................110

Second Quarter 2014 Financial Results .......................................................113

Third Quarter 2014 Financial Results ........................................................115

Fourth Quarter 2014 and Full Year 2014 Financial Results...........................118

First Quarter 2015 Financial Results ..........................................................121

Second Quarter 2015 Financial Results .......................................................123

Third Quarter 2015 Financial Results ........................................................127

Fourth Quarter 2015 and Full Year 2015 Financial Results...........................128

First Quarter 2016 Financial Results ..........................................................132

Second Quarter 2016 Financial Results .......................................................134

Third Quarter 2016 Financial Results ........................................................136

The Company's Financial Statements Filed During the Class Period Were Materially
False and Misleading ...........................................................................   141

The February 27, 2017 Disclosure of "Immaterial Corrections" ...................141

The March 16, 2017 Announcement of a Restatement .................................149

April 4, 2017...........................................................................................151

The April 11, 2017 Revelation of Government Investigations ......................151

ADDITIONAL SCIENTER ALLEGATIONS ......................................................152

(a) AmTrust's Internal Control Deficiencies ..............................................152

(b) The Nature of AmTrust's Fraud...........................................................154

(c) Ongoing Investigations by the SEC, FBI and NYDFS ...........................157

(d) Prior Experience With Accounting Improprieties...................................158

(e) The AmTrust Defendants' Motive to Commit Fraud..............................160

(f) AmTrust's Audit Committee's Conflicted Chairman...............................167

(g) The AmTrust Defendants' Positions and Access to Information...............168

(h) Defendant Pipoly's Removal as CFO ...................................................171

NO SAFE HARBOR ................................................................................................172

APPLICATION OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET ..........173

LOSS CAUSATION/ECONOMIC LOSS ................................................................174

COUNT IV ..........................................................................................................177

    For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against the AmTrust
    Defendants    177

COUNT V ............................................................................................................180

    For Violations of §20(a) of the Exchange Act Against the Officer Defendants ..............180

PRAYER FOR RELIEF .........................................................................................180

JURY DEMAND ..................................................................................................181

Lead Plaintiff New England Carpenters Guaranteed Annuity and Pension Funds ("Lead Plaintiff") and Plaintiffs Sharon Albano ("Albano"), Jupiter Capital Management ("Jupiter Capital"), Irving Lichtman Revocable Living Trust ("ILRLT") and Stanley Newmark ("Newmark") (collectively with Lead Plaintiff, "Plaintiffs"), on behalf of themselves and all other persons similarly situated, by their undersigned attorneys, make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Plaintiffs' counsel.  The investigation included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by AmTrust Financial Services, Inc. ("AmTrust" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by the Company.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of: (i) AmTrust common stock issued pursuant and/or traceable to the Company's $320,000,000 public offering conducted on or about November 11, 2015 (the "November 2015 Common Stock Offering") and/or AmTrust's 6.95% Non-Cumulative Preferred Stock, Series F issued pursuant and/or traceable to the Company's $287,500,000 public offering conducted on or about September 27, 2016 (the "September 2016 Series F Preferred Stock Offering"), seeking to pursue remedies under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (15 U.S.C. §§77k, 77l(a)(2) and 77o) (the "Securities Act"); and (ii) AmTrust securities between February 14, 2013 and April 10, 2017, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      As detailed herein, AmTrust, a multinational special property and casualty insurer, has admitted that its financial statements since 2012 were materially misstated in numerous respects and require restatement.  AmTrust has now stated that its earnings and press releases, to the extent that they relate to the restated periods "should no longer be relied upon."  These misstatements are the basis for Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark's claims under the Securities Act as the Company's Registration Statement and incorporated prospectus supplements (the "Offering Materials") – which incorporated by reference AmTrust's financial statements and related financial disclosures – admittedly contained inaccurate statements of material fact and omitted material information that was required to be disclosed.  Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark bring Securities Act claims against the AmTrust Defendants, the Director Defendants, the Underwriter Defendants and BDO USA, LLP ("BDO"), AmTrust's auditor.

3.      Separately, Plaintiffs allege claims under the Exchange Act for fraud against the AmTrust Defendants for intentionally and/or recklessly carrying out a multi-year accounting fraud. Throughout the Class Period, AmTrust reported explosive growth and strong financial results. AmTrust has now admitted that each of the financial statements it issued to investors and filed with the SEC during the Class Period – for the years ended December 31, 2012, 2013, 2014, 2015 and 2016, as well as each interim period during 2015 and 2016 – was materially misstated, presented in violation of Generally Accepted Accounting Principles ("GAAP") and "should no longer be relied upon."

4.      In connection with the foregoing, AmTrust has also represented that:

•      Based upon a review conducted by the Audit Committee and its advisors, the Company's financial statements and any related statements by the AmTrust Defendants about AmTrust's operating performance set forth in SEC filings, press releases, investor presentations and conference calls over more than a five year period should "no longer be relied upon;"

- The AmTrust Defendants' representations about the Company's financial operating performance during the Class Period were materially misstated due to numerous and varied accounting improprieties; and

- The Company's internal controls over financial reporting were riddled with material weaknesses that contributed to the material misstatements of its Class Period financial statements.

5. Amtrust has further announced that its financial restatement is "largely relate[d] to the timing of recognition of revenue [on] the Company's service and fee business." As detailed herein, such revenue was largely derived from AmTrust's Warrantech business ("Warrentech"), which it acquired in 2010 through its subsidiary, AMT Warranty Corp. ("AMT Warranty").

6. Prior to its acquisition, Warrantech was a publicly traded company that filed periodic reports with the SEC pursuant to the Exchange Act. As detailed herein, such reports reveal that the SEC required Warrantech to record service revenue on a straight-line basis over the life of the service contracts. Prior thereto, Warrantech recognized revenue on such contracts at the time of sale.

7. Nonetheless, after being acquired by the Company, AmTrust changed Warrantech's policy of revenue recognition back to the time of sale, which, in part, has given rise to AmTrust's financial restatement at issue in this case. Indeed, the AmTrust Defendants knew, or recklessly disregarded, that such policy of revenue recognition was improper because the SEC had previously criticized Warrantech for it when Warrantech was a public company. Moreover, the AmTrust Defendants would have known of the SEC's admonition of Warrantech's revenue recognition on warranty fee revenue practices because: (i) Warrantech's Chairman and CEO at the time of the SEC admonition later became Chairman of AMT Warranty, AmTrust's subsidiary, after the acquisition; and (ii) at the very least, they would have learned of it during the due diligence review of Warrantech's SEC filings before AmTrust acquired it.

8. As detailed herein, the AmTrust Defendants understood that Warrantech's improper revenue recognition policy would help AmTrust post exceptional operating results during the Class

Period.  Indeed, during the Class Period, the Company's Chief Financial Officer ("CFO") highlighted the importance of such income, stating that it helped AmTrust's business model to be "differentiated" from that of its peers.  AmTrust has now admitted that this income was cumulatively overstated by more than $214 million, or 13.35%, during the Class Period.

9.  AmTrust has also admitted, despite its repeated representations and the Chief Executive Officer ("CEO") and CFO's certifications to the contrary during the Class Period, that its system of internal control over financial reporting was riddled with "material weaknesses" and that its disclosure controls were "not effective" during the Class Period.

10.  On February 27, 2017, AmTrust surprised the market by revealing that it expected to make certain "*immaterial corrections*"[1] to its financial statements in each year dating back to the fiscal year ended December 31, 2012.  These errors included, *inter alia*, "accruing for bonuses paid (which also impacted prior periods), adjusting foreign currency transactions gain and loss and deferring a portion of warranty contract revenue associated with administration services previously recognized upfront, based on management's interpretation of accounting guidance related to multiple-element revenue recognition."  The Company also reported that it had "identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016."

11.  Then, just two weeks later, on March 16, 2017, AmTrust announced that its Audit Committee had determined that its consolidated financial statements for the years ended December 31, 2014 and 2015 (including each of the four quarters of 2015) and the first three quarters of 2016 "*should be restated and should no longer be relied upon*."  In addition, AmTrust reported that its "earnings and press releases and similar communications, to the extent that they relate to the periods covered by these financial statements, as well as the Company's fourth quarter and fiscal 2016

---

[1]   All emphasis is added unless otherwise noted.

earnings release dated February 27, 2017, ***should no longer be relied upon***."  The Company also stated that the audit reports issued by BDO for the years ended December 31, 2014 and 2015, including reports regarding the effectiveness of AmTrust's internal control over financial reporting on those dates, "***likewise should also no longer be relied upon***."

12.     Finally, on April 11, 2017, *The Wall Street Journal* reported that the Federal Bureau of Investigation ("FBI"), SEC and the New York Department of Financial Services ("NYDFS") were each conducting investigations into AmTrust's accounting practices.  According to the article, a former BDO auditor-turned-whistleblower was assisting the FBI in its investigation and observed, *inter alia*, "seemingly unsupported adjustments to financial schedules by a senior AmTrust executive."

13.     The market's reaction to these startling revelations was swift and severe.  The trading prices of AmTrust securities collapsed in response to revelations of AmTrust's accounting woes.  In response to each of these revelations, the price of AmTrust common stock fell as follows: (i) on February 27, 2017, shares of AmTrust common stock fell from $27.66 per share the previous trading day, to close at $22.34 per share, down approximately $5.32 per share, or ***19.2%***; (ii) on March 17, 2017, shares of AmTrust common stock fell from $21.61 per share the previous day, to close at $17.58 per share, down approximately $4.03 per share, or ***18.6%***; and (iii) on April 11, 2017, shares of AmTrust common stock fell from $18.87 per share the previous day, to close at $15.30 per share, down approximately $3.57 per share, or ***18.9%***.  As a result of Defendants' wrongful acts and omissions, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331; Section 27 of the Exchange Act (15 U.S.C. §78aa); and Section 22 of the Securities Act (15 U.S.C. §77v).

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and Section 22 of the Securities Act (15 U.S.C. §77v) as the alleged misconduct was transacted in and emanated in large part from this District and AmTrust and other defendants are located here.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

17.     Lead Plaintiff New England Carpenters Guaranteed Annuity and Pension Funds, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased the common stock of AmTrust during the Class Period, and was damaged thereby.  An updated certification for Lead Plaintiff that covers its purchases and sales of AmTrust stock during the Class Period will be forthcoming.  Attached are the purchases and sales for Lead Plaintiff during the Class Period that will be included in the forthcoming certification.

18.     Plaintiff Albano, as set forth in her certification previously filed with the Court and incorporated herein by reference, purchased shares in and traceable to the November 2015 Common Stock Offering.  Plaintiff Albano purchased her shares directly from Defendant Morgan Stanley & Co. LLC (defined herein).

19.     Plaintiff Jupiter Capital, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased AmTrust securities on the open market and pursuant and/or traceable to the November 2015 Common Stock Offering.  Plaintiff Jupiter Capital purchased its shares in the November 2015 Common Stock Offering directly from Defendant Citigroup Global Markets Inc. (defined herein).

20.     Plaintiff ILRLT, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased shares in and traceable to the September 2016 Series F Preferred Stock Offering.  Plaintiff ILRLT purchased its shares in the September 2016 Series F Preferred Stock Offering directly from RBC Capital Markets, LLC (defined herein).

21.     Plaintiff Stanley Newmark ("Newmark"), as set forth in his certification previously filed with the Court and incorporated herein by reference, purchased AmTrust securities on the open market and/or traceable to the September 2016 Series F Preferred Stock Offering.

22.     Defendant AmTrust is a multinational specialty property and casualty insurer whose products include workers' compensation, commercial automobile insurance, general liability and extended service and warranty coverage.  AmTrust's principal executive offices are located in this District at 59 Maiden Lane, 43rd Floor, New York, New York, 10038.  As of March 31, 2017, the Company had more than 170 million shares of common stock issued and outstanding which actively traded throughout the Class Period on the NASDAQ, an efficient market, under the ticker symbol "AFSI."

23.     Defendant Barry D. Zyskind ("Zyskind"), a founding stockholder of the Company, served, at all relevant times as AmTrust's President and CEO.  Zyskind has held these positions since 2000.  In addition, Zyskind has served as a director on the Company's Board of Directors since 1998 and as the Chairman of AmTrust's Board of Directors since May 2016.  Defendant Zyskind is the son-in-law of Michael Karfunkel, one of AmTrust's co-founders.  In addition, Zyskind signed the 2015 Registration Statement (defined below).  Before joining AmTrust, Zyskind was an investment banker at Janney Montgomery Scott, LLC in New York.  He earned an MBA from New York University's Leonard N. Stern School of Business.

24.     Defendant Ronald E. Pipoly Jr. ("Pipoly") served as AmTrust's CFO and Executive Vice President during the Class Period.  Pipoly served in these roles from 2005 until he was replaced on June 5, 2017, following the revelation of myriad of accounting and internal control manipulations by the Company.  In addition, Pipoly signed the 2015 Registration Statement.

25.     Zyskind and Pipoly are referred to herein as the "Officer Defendants."

26.     Collectively, AmTrust and the Officer Defendants are referred to herein as the "AmTrust Defendants."

27.     Defendant BDO is the United States Member Firm of BDO International, a global accounting network, which provides its clients with advisory, audit, assurance, consulting, and tax services.  Headquartered in Chicago, Illinois, BDO operates out of more than 60 offices across the U.S.  During the Class Period, BDO issued unqualified audit opinions on AmTrust's financial statements and its system of internal controls over financial reporting for each of the years ended December 31, 2012, 2013, 2014 and 2015, which were incorporated by reference into the materially inaccurate Offering Materials noted herein.

28.     Defendant Donald T. DeCarlo ("DeCarlo") is, and at all relevant times was, a Director of AmTrust.  DeCarlo signed the 2015 Registration Statement.

29.     Defendant Susan C. Fisch ("Fisch") is, and at all relevant times was, a Director of AmTrust.  Fisch signed the 2015 Registration Statement.

30.     Defendant Abraham Gulkowitz ("Gulkowitz") is, and at all relevant times was, a Director of AmTrust.  Gulkowitz signed the 2015 Registration Statement.

31.     Defendant George Karfunkel, a founding stockholder of the Company, is, and at all relevant times was, a Director of AmTrust.  George Karfunkel signed the 2015 Registration Statement.

32.     Defendant Jay J. Miller ("Miller") was, during the Class Period until his retirement effective August 1, 2016, a Director of AmTrust.  Miller signed the 2015 Registration Statement.

33.     Defendants referenced in ¶¶28-32 above are referred to herein as the "Director Defendants."

34.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a large integrated financial services institution that, through subsidiaries and divisions, provides commercial and investment banking services, commercial loans to corporate entities, and acts as an underwriter in the sale of corporate securities.  Citigroup acted as an underwriter in connection with the November 2015 Common Stock Offering.

35.     Defendant Keefe, Bruyette & Woods, Inc. ("KBW") is an integrated financial services institution that, through its subsidiaries, divisions and/or affiliates, provides commercial and investment banking services and advisory services, including acting as an underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies.  KBW acted as an underwriter in connection with the September 2016 Series F Preferred Stock Offering.

36.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions, and individuals.  Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions.  Morgan Stanley acted as an underwriter in connection with both the November 2015 Common Stock Offering and the September 2016 Series F Preferred Stock Offering.

37.     Defendant RBC Capital Markets, LLC ("RBC") is an international corporate and investment bank that provides products and services to institutions, corporations, governments and high net worth clients around the world, and acts as an underwriter in the sale of corporate securities. RBC acted as an underwriter in connection with September 2016 Series F Preferred Stock Offering.

38.     Defendant UBS Securities LLC ("UBS") is a global investment banking and securities firm which provides a range of financial services, including advisory services, underwriting, financing, market making, asset management, brokerage and retail banking on a global level.  UBS acted as an underwriter in connection with September 2016 Preferred Stock Offering.

39.     Defendants referenced in ¶¶34-38 above are referred to herein as the "Underwriter Defendants."  Pursuant to the Securities Act, the Underwriter Defendants are liable for the inaccurate and incomplete statements in the Offering Materials, including for the following reasons:

(a)     the Underwriter Defendants are investment banking houses that specialize in *inter alia*, underwriting public offerings of securities.  Together with AmTrust representatives, the Underwriter Defendants solicited investors to participate in the Offerings;

(b)     the Underwriter Defendants also assisted AmTrust, the Officer Defendants, and the Director Defendants in planning the Offerings, and purportedly conducted an investigation of the business and operations of AmTrust, an undertaking known as "due diligence."  During the course of their "due diligence," the Underwriter Defendants had access to confidential corporate information concerning AmTrust's operations and financial prospects; and

(c)     the Underwriter Defendants assisted in pricing the Company's common and preferred stock in connection with the Offerings, as well as in drafting and preparing the Offering Materials and causing the Offering Materials to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiffs and the Classes (defined below).

40.     Defendants referenced in ¶¶22-24, 27-32, 34-38 above are collectively referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers: (i) of AmTrust securities pursuant and/or traceable to the November 2015 Offering and the September 2016 Series F Preferred Stock Offering and who were damaged thereby, seeking to pursue remedies under the Securities Act (the "Securities Act Class"); and (ii) of AmTrust securities during the Class Period who were damaged thereby, seeking to pursue remedies under the Exchange Act (the "Exchange Act Class," and together with the Securities Act Class, the "Classes").

42.     Excluded from the Classes are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Classes are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AmTrust's publicly traded securities were actively traded, with AmTrust common stock actively traded on the NASDAQ and AmTrust preferred stock actively traded on the New York Stock Exchange ("NYSE").  While the exact numbers of members of the Classes are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Classes.  Record owners and other members of the Classes may be identified from records maintained by AmTrust and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiffs' claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Classes are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants misrepresented material facts about the business, operations, financial performance and/or management of AmTrust;

        (c)     whether the prices of AmTrust securities were artificially inflated during the Class Period;

        (d)     whether the Offering Materials issued by Defendants to the investing public in connection with the Offerings negligently omitted and/or misrepresented material facts about AmTrust and its business, operations and management; and

        (e)     the extent of injuries sustained by members of the Classes and the appropriate measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress

the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

48.     Defendant AmTrust was co-founded in 1998 by brothers Michael and George Karfunkel.  AmTrust underwrites and provides property and casualty insurance both in the United States and internationally.  The Company became publicly traded on the NASDAQ Global Market in November 2006.

49.     The Company operates in the U.S., Bermuda, and Europe and classifies its business operations into three reportable divisions: (1) Small Commercial Business; (2) Specialty Risk and Extended Warranty; and (3) Specialty Program.

50.     In its Small Commercial Business segment, AmTrust provides workers' compensation, commercial package, and other commercial insurance lines through wholesale agents, retail agents, and brokers.  According to the Company's website, AmTrust is the third largest workers' compensation insurance company in the United States by market share.

51.     AmTrust's Specialty Risk and Extended Warranty segment offers coverage for consumer and commercial goods and custom-designed coverages, including accidental damage plans and payment protection plans that are offered in connection with the sale of consumer and commercial goods, as well as for certain property, casualty, and specialty liability risks.

52.     The Company's Specialty Program segment writes commercial insurance for various classes of insureds through general and other wholesale agents.

53.     The Company does a significant amount of its business in the United States, Bermuda, and Europe with other companies that are controlled by either the Company's founders or individuals related to its founders.

### The Karfunkel Family

54.     Since 2000, Michael Karfunkel's son-in-law, Defendant Barry Zyskind, has served as AmTrust's President and CEO.  Zyskind became Chairman of AmTrust's Board of Directors in May 2016.

55.     The Karfunkel family retains substantial control over the Company.  As reported in AmTrust's most recent annual report on Form 10-K for the year ended December 31, 2016, which was filed with the SEC on April 4, 2017 (the "2016 Form 10-K"), "[b]ased on the number of shares outstanding as of December 31, 2016, Barry D. Zyskind, Leah Karfunkel [Michael Karfunkel's widowed wife], and George Karfunkel, *directly or indirectly, collectively own or control approximately 49% of our outstanding common stock*."  In addition, the 2016 Form 10-K stated that, "these stockholders, acting together, have the ability to control all matters requiring approval by our stockholders, including the election and removal of directors, amendments to our certificate of incorporation and bylaws, any proposed merger, consolidation or sale of all or substantially all of our assets and other corporate transactions."

56.     The Karfunkel family has also set up several non-profit private foundations which maintain substantial positions in AmTrust common stock.  The propriety of these purportedly charitable foundations organized by the Karfunkel family has been called into question.  On May 18, 2016, the Southern Investigative Reporting Foundation ("SIRF") issued a report titled "Barry Zyskind's High Stakes Three Card Monte Game," which noted that in late 2016, Defendant Zyskind transferred $378.2 million worth of his personally held AmTrust stock to a charitable foundation called "Gevurah from Teferes" that he set up in 2006.

57.     The SIRF report charged that a stock transfer of the size carried out by Defendant Zyskind, combined with the AmTrust stock holdings of other charitable foundations, would violate IRS rules based on, *inter alia*, excess business holdings, which regulates how much of one company

a private foundation can own.  The SIRF report suggests that Defendant Zyskind carried out this transfer in an effort to circumvent massive tax liabilities while at the same time maintaining his large ownership stake in the Company.

**AmTrust's Growth Through Offerings and Acquisitions**

58.     By repeatedly beating analyst's earnings estimates during the Class Period, AmTrust's stock price rose, which enabled the Company to raise substantial sums of money through securities offerings so that it could fund its pattern of rampant acquisitions.  For example, on August 7, 2014, the Company reported its financial results for the period ended June 30, 2014.  As noted by Compass Point Research & Trading LLC ("Compass Point") in a report issued the same day, entitled "Fee Income and Investment Income Driving Earnings Beat,"  AmTrust beat earnings estimates by reporting EPS of $1.34 versus the consensus estimate of $1.00.  Compass Point noted that "[f]ee income of $99.5M was $7M higher than our estimate as recent acquisitions and lower expense margins drove the beat."  Just over a month later, on September 6, 2014, the Company earned net proceeds of $80 million from the closing of the public offering on its Series C Preferred Stock, which it stated that it would use for, *inter alia*, "strategic acquisitions."  Shortly thereafter, on October 1, 2014, AmTrust completed yet another transaction acquiring Comp. Options Insurance Co. for $34.3 million.

59.     Similarly, on August 4, 2015, the Company again reported positive financial results for the period ended June 30, 2015.  As described by JMP Securities in an analyst report issued the same day, entitled "Q2 Earnings Beat Driven by Tax Benefit; Fee Income Growth Likely to Accelerate as Pending Acquisitions Close," the Company's "Operating EPS of $1.55 beat our $1.43 estimate and consensus of $1.34. . . ."  Shortly thereafter, on September 16, 2015, the Company earned net proceeds of $120.9 million from the closing of its public offering of its 7.50% Subordinated Notes due 2055, which the Company stated "[w]e intend to use a portion of the net

proceeds from this offering to finance our previously announced Warranty Solutions and Nationale Borg acquisitions. . . ."  A mere ten days later, on September 25, 2015, the Company completed its acquisition of Warranty Solutions for $156.2 million.

60.     This pattern continued when, on February 10, 2016, the Company reported positive financial results for the fourth quarter 2015 and full year, the periods ended December 31, 2015.  As described by Compass Point in a report issued the next day, "[t]he Company beat estimates for the quarter on higher fee income and a higher investment yield, which should carry forward to later years."  Compass Point added that "[o]perating EPS was $0.72 versus the consensus estimate of $0.67. . . ."  Approximately one month later, on March 15, 2016, the Company closed its public offering of its Series E Preferred stock earning net proceeds of $125 million.  In the corresponding prospectus supplement, the Company stated that "we intend to use the net proceeds of this offering for general corporate purposes, which may include working capital, capital expenditures and/or strategic acquisitions."  Using this capital, the next month, on April 18, 2016, the Company acquired Republic Companies Inc. for $233 million.

61.     These acquisitions drove the Company to extraordinary growth over a four year period.  In 2016, AmTrust's gross written premiums totaled **$7.95 billion** – a stunning increase from the **$2.75 billion** in gross written premiums the Company reported for 2012, and a far cry from the paltry **$27.5 million** in gross premiums the Company wrote in 2002.

62.     The Company's rapid growth helped AmTrust surpass the performance of its peers during the Class Period.  As stated by analysts at Compass Point in their report issued on October 26, 2015, "[w]e continue to expect the AFSI franchise to outperform its peers on an operating basis which should allow the company to trade at a premium to the [property and casualty] industry given its high [return on average tangible equity]."  The Compass Point report also noted that "[d]espite

compressing prices in the [property and casualty] market, the company's low expense ratio allows AFSI to significantly outperform its peers, and allows for significant improvement of acquired companies."

63.     As the Company reported positive financial results, the price of AmTrust common stock skyrocketed.  At one point, on August 5, 2015, AmTrust's common stock price closed 130% higher than the closing price on the first day of the Class Period, reaching an all-time high price at just under $35 per share.

**During the Class Period, AmTrust Reported Significant**
**Growth in Warranty Contract Fee Revenue Generation**

64.     According to the 2016 Form 10-K, the Company's extended warranty business covers select consumer and commercial goods and other risks, including, automotive, consumer electronics and appliances, commercial equipment, and recreational vehicle and power sports.

65.     Through its extended warranty business, AmTrust issues policies that provide for "payment or replacement of goods to meet our clients' contractual liabilities to the end purchasers of the warranty under contracts that have coverage terms with durations ranging from one to 120 months depending on the type of product."

66.     During the Class Period, the gross written premiums reported for the Specialty Risk and Extended Warranty Segment as a percentage of AmTrust's total gross written premiums were as follows: 40.7% (2012), 36.7% (2013), 32.5% (2014), 31.8% (2015), and 31.7% (2016).

67.     AmTrust also serves as a third party administrator for its extended warranty business, providing claims handling and call center services to both the consumer products and automotive industries in the United States, Canada, Europe and Asia through various subsidiaries, including AMT Warranty Corp., and Car Care Plan Limited (Holdings), as well as AmTrust International Limited – a subsidiary of AmTrust Europe Limited.

68.    In August 2010, through the Company's wholly-owned subsidiary, AMT Warranty, AmTrust acquired 100% of the issued and outstanding capital stock of Warrantech.  Warrantech provides extended service plans ("ESPs") and warranty programs for retailers, dealers, distributors, and manufacturers in numerous consumer and automotive markets.

69.    On September 25, 2015, AmTrust  acquired all of the issued and outstanding stock of Warranty Solutions from Wells Fargo for approximately $156.2 million in cash.  Warranty Solutions designs, markets, administers and underwrites vehicle service contracts for new and used automobiles through a national network of more than 70 active agencies and 1,500 franchised and independent dealers.

70.    AmTrust generates certain fee revenues from product warranty registration and claims handling – services it provides to unaffiliated third party retailers, manufacturers and dealerships.

71.    The Company's overall reported service and fee income grew dramatically during the Class Period.  Specifically, the Company's service and fee income[2] **_nearly quadrupled_**– from $138.6 million in 2012 to $537.9 million in 2016.  An analyst at Compass Point noted in a May 3, 2016 report, that "[f]ee income continues to grow at a faster pace than our estimate . . . ."

72.    A substantial portion of the fee income earned by the Company is directly connected to its warranty business.  As Defendant Pipoly reported during AmTrust's February 27, 2017 earnings call with investors and analysts, "the acquisition of Warrantech has been a major part of the Company's fee generation."  Defendant Pipoly went on to state that, "[s]o Warrantech in terms of our fee business, this year it's about $540 million, Warrantech represents roughly 40% of that.  And

---

[2]    AmTrust generates service and fee income from, _inter alia_, the Company's Specialty Risk and Extended Warranty business which generates fee revenue for product warranty registration and claims handling services provided to third party retailers, manufacturers and dealerships.

again that's all of their fees, so the administrative fees – it probably represents maybe about 80% of their topline revenue."

73.     As would later be revealed to the market, however, the Company's extraordinary growth and performance during the Class Period, including, *inter alia*, the substantial fee revenue generation in its Specialty Risk and Extended Warranty segment, resulted from inaccurate financial reporting over a period of at least five fiscal years.

## AmTrust Begins to Shed Light on Its Accounting

74.     Before the opening of trading on February 27, 2017, AmTrust issued a press release announcing its financial results for the fourth quarter 2016 and full year December 31, 2016 (the "2/27/17 Press Release"), which it filed with the SEC on Form 8-K.  In the 2/27/17 Press Release, the Company announced that it would be delaying the filing of its annual report on Form 10-K for the year ended December 31, 2016 and that it expected to make certain corrections to its financial statements in each year dating back to fiscal year ended December 31, 2012.

75.     In addition, in the 2/27/17 Press Release, the Company specifically identified several accounting errors during the three months ended December 31, 2016, and relating to prior periods in 2016 and 2015.  These errors included "accruing for bonuses paid (which also impacted prior periods), adjusting foreign currency transactions gain and loss and deferring a portion of warranty contract revenue associated with administration services previously recognized upfront, based on management's interpretation of accounting guidance related to multiple-element revenue recognition."

76.     The Company also reported that it had "identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016, specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient

complement of corporate accounting and corporate financial reporting resources within the organization."

77.     That same day, during the Company's quarterly conference call with analysts and investors, Defendants Zyskind and Pipoly were asked about the accounting errors and the reasons for the delayed filing of the 2016 Form 10-K.  According to Defendant Zyskind, the 10-K filing was delayed because it was "simply taking us more time to complete the work required for KPMG to complete its audit."

78.     At that time, however, AmTrust did not issue a formal restatement of its financial statements for any prior quarterly or annual periods, or reveal that any government investigations into its accounting practices had commenced.  In fact, as noted in the 2/27/17 Press Release, the Company disclosed that it expected to make "***immaterial corrections*** to errors in its financial statements for fiscal years ended December 31, 2015 and 2014 and certain financial information for fiscal years ended December 31, 2013 and 2012 for inclusion in the Form 10-K and these processes have not been completed."

79.     In addition, during the course of the conference call, Defendant Pipoly reported that AmTrust was adding a host of new positions to its financial leadership team, including Deputy Chief Financial Officer, Chief Accounting Officer, head of Investment Accounting, CFO for AmTrust international operations, and CFO for AmTrust North American insurance operations.

80.     Analysts expressed disappointment following the Company's revelation of accounting misstatements during prior periods, the identification of material weaknesses in the Company's internal controls, and the news that the Company would be delaying the filing of its Form 10-K.

81.     In reaction to this news, the price of AmTrust's common stock fell precipitously, falling $5.32 per share, or 19.2%, from $27.66 per share on Friday, February 24, 2017 to close at $22.34 per share on Monday, February 27, 2017.  This decline wiped out over $900 million in Company market capitalization in just one trading day.

**AmTrust Admits that a Restatement Is Necessary**

82.     On March 16, 2017, after the market closed, AmTrust reported in a press release, which it filed with the SEC on Form 8-K (the "3/16/17 Press Release"), that the release of the 2016 Form 10-K would be further delayed.  The Company stated that more time was needed to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016.

83.     AmTrust also disclosed that its Audit Committee, after consulting with management and its current and former independent auditors, determined that its consolidated financial statements for the years ended December 31, 2014 and 2015 (including each of the four quarters of 2015) and the first three quarters of 2016 "***should be restated and should no longer be relied upon***."   In addition, AmTrust reported that its "earnings and press releases and similar communications, to the extent that they relate to the periods covered by these financial statements, as well as the Company's fourth quarter and fiscal 2016 earnings release dated February 27, 2017, ***should no longer be relied upon***."

84.     The Company also reported that the audit reports issued by BDO for the years ended December 31, 2014 and 2015, including the reports on the effectiveness of AmTrust's internal control over financial reporting on those dates "***likewise should no longer be relied upon***."

85.     In the 3/16/17 Press Release AmTrust stated that the restatement related to, among other things, the Company's "upfront recognition of a portion of warranty contract revenue

- 21 -

associated with administration services" and "bonuses that were expensed in the year paid but that should have been accounted in the year earned."  AmTrust stated, as follows:

> The Company is restating its financial statements and related disclosures primarily to correct two errors reported in its historical consolidated financial statements.  These errors relate to: (1) upfront recognition of a portion of warranty contract revenue associated with administration services, based on the interpretation of ASC 605, Revenue Recognition, used in the previously filed financial statements related to multiple-element revenue recognition, instead of deferring recognition of the revenue over the life of the contract; and (2) bonuses that were expensed in the year paid but that should have been accrued in the year earned based on ASC 710, Compensation, and ASC 270, Interim Reporting.  The first error will be reflected entirely within the results of operations for our Specialty Risk and Extended Warranty segment, while the second error will be reflected within the results of operations of all of our segments.

> The Company will also make other miscellaneous adjustments that had been previously identified but not corrected because they were not material, individually or in the aggregate, to its previously issued consolidated financial statements.  In addition, the Company expects to have certain other non-cash corrections related to deferred acquisitions costs and the capitalization of software development costs in 2016.

86.     Analysts were quick to react to the news that a formal restatement was indeed necessary.  As noted in a report issued by SunTrust Robinson Humphrey on March 16, 2017, "[t]o be clear, this is now a Big R restatement, which is necessary when an error is material to prior period statements (materiality defined as influencing the economic decisions of users)."

87.     In reaction to the news that a formal restatement was necessary, AmTrust's share price fell $4.03, or 18.6%, from $21.61 per share on Thursday, March 16, 2017 to $17.58 per share on Friday, March 17, 2017, on unusually high trading volume of more than 13 million shares traded.

**AmTrust Admits the Financial Statements It Issued During the Class Period Violated GAAP**

88.     On April 4, 2017, AmTrust filed the 2016 Form 10-K wherein the Company restated its financial results for the years ended December 31, 2012, 2013, 2014, 2015 and 2016, as well as providing restated information related to each interim period during 2015 and 2016.

89.     As stated in the 2016 Form 10-K, AmTrust restated its Class Period financial statements to correct the Company's improper accounting and reporting of: (i) warranty revenue on extended service plans; (ii) accrued compensation expense; (iii) acquisition costs; (iv) foreign exchange gains and losses; (v) software costs; (vi) interest expense; (vii) intercompany transactions; and (viii) various other accounting matters.

90.     In addition, in the 2016 Form 10-K, AmTrust admitted to the existence of "material weaknesses in internal control over financial reporting."

91.     The quantitative impact of the AmTrust Defendants' financial misrepresentations on several income-related metrics reported by AmTrust in its financial statements issued during the Class Period was substantial, including *inter alia*, net income, net income attributable to AmTrust common stockholders, income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest, income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest, diluted EPS, and acquisition costs and other underwriting expenses.

**Government Investigations of AmTrust's Accounting Are Disclosed**

92.     On April 11, 2017, *The Wall Street Journal* published an article titled "*Secret Recordings Play Role in SEC Probe of Insurer AmTrust*," (the "April 2017 WSJ Article") reporting that the FBI, SEC and the NYDFS were each investigating AmTrust's accounting.  According to the article, a former BDO auditor-turned-whistleblower was assisting the FBI in its investigation.  *The Wall Street Journal* noted that the former BDO auditor had walked around BDO's New York offices in 2014 initiating conversations with his/her colleagues about BDO's audits of AmTrust. Unbeknownst to his/her colleagues, the whistleblower was recording each of the conversations for the FBI.  According to the article, the "clandestine recordings described to *The Wall Street Journal*

- 23 -

by the BDO auditor, were part of a continuing federal investigation now being led by the Securities and Exchange Commission."

93.     The April 2017 WSJ Article noted that the whistleblower was working with Harry Markopolos, the forensic accountant who had alerted the SEC about Bernard Madoff's Ponzi scheme well before it was revealed to the public.

94.     The article also reported that the NYDFS was conducting a "non-routine examination" of the Company's New York unit.

95.     Following the publication of the April 2017 WSJ Article, analysts expressed their concerns about the news that the Company's accounting was being investigated.  For example, on April 12, 2017, Compass Point issued a report stating that "[t]he WSJ article yesterday put significant pressure on AFSI shares.  The reporting that the FBI/SEC had approved for a BDO whistleblower to record conversations about AFSI added fuel to the speculation that there are future accounting problems the company might have to address."  Compass Point went on to state that "[t]he historical issues surrounding AFSI are rather polarizing, from their rapid growth and outperformance of peers, to the myriad of theses surrounding perceived accounting irregularities, and accounting and reserving practices."

96.     In reaction to the revelation of the federal and state investigations concerning the Company's accounting practices, AmTrust's shares fell $3.57 per share, or 18.9%, from $18.87 per share on Monday, April 10, 2017 to $15.30 per share on Tuesday, April 11, 2017, on unusually high trading volume of more than 23 million shares traded.

**AMTRUST'S MATERIALLY INACCURATE FINANCIAL REPORTING**

97.     SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are "presumed to be misleading and inaccurate."  17 C.F.R.

§210.4-01(a)(1).  Regulation S-X also requires that interim financial statements filed with the SEC comply with GAAP.  17 C.F.R. §210.10-01(a).

98.     As detailed herein, AmTrust has now admitted that each of the financial statements it issued to investors and filed with the SEC during the Class Period was materially inaccurate, presented in violation of GAAP and "should no longer be relied upon."  Accordingly, each of the financial statements AmTrust issued to investors and filed with the SEC during the Class Period are presumed to be misleading and inaccurate pursuant to the SEC's Regulation S-X.

99.     Specifically, AmTrust has now admitted that the financial statements it issued to investors and filed with the SEC for each of the years ended December 31, 2012, 2013, 2014, 2015 and 2016, as well as each interim period during 2015 and 2016 were materially misstated.[3]

100.     In fact, AmTrust has admitted that the magnitude of its financial inaccuracies prior to and during the Class Period was sufficient to reduce its September 30, 2016 retained earnings, *i.e.*, its accumulated undistributed net income as of that date, by approximately **17%**, or $229.0 million, from $1.592 billion to $1.363 billion.  Said another way, AmTrust has admitted that its financial inaccuracies were sufficient to cause a nearly 17% overstatement in the amount of the undistributed net income accumulated by the Company *from its inception* through September 30, 2016.

101.     Indeed, the Company's financial restatements establish that ***AmTrust itself*** has concluded that the financial statements it issued to investors and filed with the SEC during the Class Period were materially misstated, as only materially misstated financial statements are to be corrected and re-reported on a retroactive basis.[4]

---

[3]    While AmTrust has not restated its financial statements for the interim periods prior to 2014, it is reasonable to infer, in light of the Company's restatements of its annual financial statements, that AmTrust's interim financial statements were materially misstated throughout the Class Period.

[4]    *See, e.g.*, Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections*, SEC Codification of Staff

102. AmTrust has also acknowledged that its multi-year financial inaccuracies were the result of numerous and varied accounting misstatements and violations of GAAP, which it has generally summarized as follows:

(a)    the improper reporting of warranty revenue on extended service plans;

(b)    the improper reporting of accrued compensation expense;

(c)    the improper reporting of acquisition costs;

(d)    the improper reporting of foreign exchange gains and losses;

(e)    the improper reporting of software costs;

(f)    the improper reporting of interest expense;

(g)    the improper reporting of intercompany transactions; and

(h)    the improper reporting of other accounting matters.

103. Thus, there is no dispute that AmTrust's financial statements and financial disclosures were materially inaccurate at all relevant times.

104. In addition, AmTrust has admitted, despite repeated representations to the contrary during the Class Period, that its system of internal control over financial reporting was riddled with "material weaknesses."[5] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement in an entity's financial statements will not be prevented or detected on a timely basis.

---

Accounting Bulletins ("CSAB") Topic 1M *Financial Statements, Materiality* and Topic 1-N, *Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements.*

[5]    The 2016 Form 10-K states that AmTrust's internal controls were not effective as of December 31, 2016. Given the Company's attestations throughout the Class Period that its internal controls had not changed, it is reasonable to infer that AmTrust's internal controls were inadequate throughout the Class Period.

In addition, AmTrust has admitted, despite repeated representations to the contrary during the Class Period, that its disclosure controls were "not effective" during the Class Period.

105.     As set forth in Section 13 of the Exchange Act, the AmTrust Defendants were responsible for: (i) presenting AmTrust's business activities in a manner that accurately and fairly reflected its transactions; and (ii) maintaining a system of internal accounting controls sufficient to provide reasonable assurances that AmTrust's financial statements conformed to GAAP:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall --
>
> > A.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
> >
> > B.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that --
> >
> > > i.     transactions are executed in accordance with management's general or specific authorization;
> > >
> > > ii.     transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;
> > >
> > > iii.     access to assets is permitted only in accordance with management's general or specific authorization; and
> > >
> > > iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**AmTrust Admits the Financial Statements It Issued During the Class Period Violated GAAP**

106.     Throughout the Class Period, AmTrust's Forms 10-K, signed by Defendants Zyskind and Pipoly and the Director Defendants, represented that AmTrust's financial reporting was presented in conformity with GAAP, stating, in pertinent part, and in all material respects, as follows:

- 27 -

The consolidated financial statements of the Company have been prepared in conformity with accounting principles generally accepted in the United States of America. The consolidated financial statements include the accounts of the Company and its domestic and foreign subsidiaries. The Company uses the equity method of accounting . . . . All significant intercompany transactions and accounts have been eliminated in the consolidated financial statements.

107. Now, AmTrust has admitted that the foregoing were untrue statements of material fact at the time they were made.

108. In the 2016 Form 10-K, AmTrust admitted that its multi-year, financial misstatements were the result of numerous and varied accounting inaccuracies and violations of GAAP. According to the 2016 Form 10-K, AmTrust has restated the financial statements it issued to investors and filed with the SEC during the Class Period to correct the Company's improper accounting and reporting of: (i) warranty revenue on extended service plans; (ii) accrued compensation expense; (iii) acquisition costs; (iv) foreign exchange gains and losses; (v) software costs; (vi) interest expense; (vii) intercompany transactions; and (viii) various other accounting matters.

I.      **Improper Recognition and Reporting of Warranty Revenue**

109. GAAP, as set forth in ASC Topic No. 605, *Revenue Recognition*, provides that, since sellers of extended warranty or product maintenance contracts (a/k/a extended service plans, or ESPs) have an obligation to the buyer to perform services throughout the contract period, revenue associated therewith is to be recognized over the period in which the seller is obligated to perform services pursuant thereto.

110. In the 2016 Form 10-K, AmTrust admitted that its financial statements during the Class Period were presented in violation of GAAP by improperly reporting revenue on ESPs at the time of sale, stating, in pertinent part, as follows:

**The Company has historically recognized the majority of revenue related to administration services at the time of the sale of ESP** [extended service plans]**. However, the Company revised its application of the revenue recognition guidance to record revenue related to administration services on a straight-line**

- 28 -

basis over the term of the ESP contracts. **This correction of an error**, which created an overstatement of service and fee income and an overstatement of other expenses that were also recognized upfront in current periods, **required a restatement of the Company's previously issued financial statements**.

## II.      Improper Recognition and Reporting of Accrued Compensation Expense

111.    GAAP requires expenses to be recorded in the period they are incurred.  *See* FASB ASC Topic 450-20, *Loss Contingencies and Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises*, ¶¶85-87.

112.    In the 2016 Form 10-K, AmTrust admitted that its financial statements during the Class Period were presented in violation of GAAP by failing to timely accrue compensation related expenses, stating, in pertinent part, as follows:

> In prior years, the Company had expensed discretionary bonuses paid to its employees in the year the bonuses were paid because the Company did not consider the discretionary bonuses to be "probable," which is the standard required for accrual.  Upon review of ASC 270, *Interim Reporting*, and ASC 450, *Contingencies*, management determined that its application was incorrect because, even though the bonuses were discretionary, the bonuses should have been estimated and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.  **This created an error resulting in an overstatement of acquisition costs and other underwriting expenses, requiring a restatement of the Company's previously issued financial statements**.

## III.     Improper Accounting and Reporting of Deferred Acquisition Costs

113.    GAAP, in ASC Topic No. 944, *Financial Services – Insurance*, establishes specific limitations on the deferral of those costs incurred in acquiring insurance contracts and notes that any such deferred costs are to be expensed over time via amortization.

114.    In the 2016 Form 10-K, AmTrust admitted that its financial statements during the Class Period were presented in violation of GAAP by improperly accounting for deferred acquisition costs, stating, in pertinent part, as follows:

> The Company corrected errors in its calculation of deferred acquisition costs related to (a) the over-amortization of certain deferred acquisition costs in 2015, resulting in an overstatement of expenses in 2015, (b) the capitalization of certain salaries and

- 29 -

consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (c) the treatment of certain costs in the Company's U.K. operations as both underwriting expenses and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (d) the inclusion of deferred warranty administration fees and obligor liabilities associated with the administration services provided to our ESPs.

## IV.   Improper Accounting and Reporting of Foreign Currency Gains and Losses

115.   GAAP, in ASC Topic No. 830, *Foreign Currency Matters*, provides that gains and losses on monetary balances ensuing from changes in currency exchange rates are generally required to be included in determining net income for the period in which the exchange rate changes.

116.   In the 2016 Form 10-K, AmTrust admitted that its financial statements during the Class Period were presented in violation of GAAP by improperly accounting for foreign currency gains and losses, stating, in pertinent part, as follows:

> The Company corrected errors related to the re-measurement of monetary balances denominated in foreign currencies into their functional currencies that were recorded as other comprehensive income.  Given the monetary nature of some of these assets, the re-measurement impact should have been recorded as foreign currency transaction gain/(loss) in our income statements.

## V.   Improper Accounting and Reporting of Software Costs

117.   GAAP, in ASC Topic No. 350, *Intangibles – Goodwill and Other*, establishes specific limitations on the deferral of costs incurred when developing software for internal use.

118.   In the 2016 Form 10-K, AmTrust admitted that its financial statements during the Class Period were presented in violation of GAAP by improperly deferring software costs, stating, in pertinent part, as follows:

> The Company capitalized certain internally developed software costs that did not meet criteria for deferral under ASC 350, *Intangibles - Goodwill and Other*.  This error resulted in an over-capitalization of certain software expenses, and an understatement of expenses.

**VI.     Improper Accounting and Reporting of Interest Expense**

119.     GAAP, in ASC Topic No. 835, *Interest*, provides that an imputed, or estimated, rate of interest on debt is to be used to account for interest expense when the rate specified by a debt agreement varies markedly from its market rate of interest.

120.     In the 2016 Form 10-K, AmTrust admitted that its financial statements during the Class Period were presented in violation of GAAP by improperly accounting for interest expense, stating, in pertinent part, as follows:

> The Company corrected an error related to interest imputed on contingent consideration owed as a result of certain business acquisitions, which resulted in an understatement of interest expense in 2015.

**VII.    Improper Accounting and Reporting of Intercompany Transactions**

121.     GAAP, in ASC Topic No. 810, *Consolidation*, provides that intercompany profits and losses are to be eliminated from consolidated financial statements.

122.     In the 2016 Form 10-K, AmTrust admitted that its financial statements during the Class Period were presented in violation of GAAP by improperly accounting for intercompany transactions, stating, in pertinent part, as follows:

> The Company corrected an error related to internal brokerage commissions paid from one of its subsidiaries to another subsidiary, which should have been eliminated in consolidation, thereby causing an overstatement of commission income in 2015.

**VIII.   Improper Accounting and Reporting of Various Other Accounting Matters**

123.     In the 2016 Form 10-K, AmTrust admitted that its financial statements during the Class Period were presented in violation of various other provisions of GAAP, including the failure to accrue liabilities, write-off uncollectible receivables, record amortization expenses, record unrealized losses on investments, record premiums and claims in the correct time period, as well as other matters, stating, in pertinent part, as follows:

The Company corrected other errors that impacted the 2014 and 2015 consolidated financial statements, including unaccrued liabilities, uncollectible other receivables, accrued commissions, unrecognized amortization expense, unrealized loss on investments and proper year end cut-off related to premiums and claims.

*     *     *

The Company historically recorded certain receivables (premium and other) net of commissions and now records the receivables on a gross basis, with the associated commission payable in other accrued expenses and liabilities. In addition, the Company corrected a classification error involving short term investments and cash/cash equivalents, and fixed assets and other investments in the Consolidated Balance Sheets.

**The AmTrust Defendants Admit that AmTrust's Financial Misstatements During the Class Period Were Material**

124.    As noted above, AmTrust has restated the financial statements it issued to investors and filed with the SEC during the Class Period to correct a myriad of financial reporting misstatements contained therein. In doing so, AmTrust determined that the financial statements it issued to investors during the Class Period were materially misstated.

125.    Indeed, in the 2016 Form 10-K, the AmTrust Defendants *affirmatively represent* that the financial statements AmTrust issued to investors and filed with the SEC during the Class Period were materially misstated, stating, in pertinent part, as follows:

The restatement of our financial statements and related disclosures primarily relates to the correction of two errors reported in our historical consolidated financial statements. In accordance with accounting guidance presented in ASC 250-10 and SEC Staff Accounting Bulletin No. 99, *Materiality*, **management assessed the materiality of these errors and concluded that they were material to the Company's previously issued financial statements**. The two primary errors relate to: (1) upfront recognition of the portion of warranty contract revenue associated with administration services, instead of recognizing the revenue over the life of the contract, and (2) bonuses that were expensed in the year paid but that should have been accrued as earned based on ASC 270, *Interim Reporting* and ASC 450, *Contingencies*. We also identified other adjustments described in Note 3. "Restatement of Previously Issued Consolidated Financial Statements" that we have corrected as part of this Restatement.

*     *     *

- 32 -

**The Restatement presents the effect of an adjustment to opening retained earnings as of January 1, 2014, which adjustment reflects the impact of the Restatement on periods prior to 2014**.  The cumulative effect of those adjustments decreased previously reported stockholders' equity by $88.4 million as of December 31, 2013.

126.   The quantitative impact of the AmTrust Defendants' financial misrepresentations on certain income related metrics reported by AmTrust in its annual financial statements during the Class Period is as follows:

<u>2016 Annual Results</u>

- Acquisition costs and other underwriting expenses were understated by *5.81%*;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *16.95%*;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *15.96%*;

- Net income was overstated by *12.05%*;

- Net income attributable to AmTrust common stockholders was overstated by *14.28%*; and

- Diluted Earnings per Share (EPS) was overstated by *14.42%*.

<u>2015 Annual Results</u>

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *16.79%*;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *17.04%*;

- Net income was overstated by *11.56%*;

- Net income attributable to AmTrust common stockholders was overstated by *12.62%*;

- Diluted Earnings per Share (EPS) was overstated by *12.45%*;

- Comprehensive income was overstated by *22.94%*; and

- Comprehensive income attributable to AmTrust Financial Services, Inc. was overstated by *23.55%*.

<u>2014 Annual Results</u>

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***13.34%***;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***13.64%***;

- Net income was overstated by ***7.55%***;

- Net income attributable to AmTrust common stockholders was overstated by ***7.78%***;

- Diluted Earnings per Share (EPS) was overstated by ***7.51%***;

- Comprehensive income was overstated by ***7.68%;*** and

- Comprehensive income attributable to AmTrust Financial Services, Inc. was overstated by ***7.67%***.

<u>2013 Annual Results</u>

- Service and fee income was overstated by ***15.42%***;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***18.42%***;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***18.98%***;

- Net income was overstated by ***15.69%***;

- Net income attributable to AmTrust common stockholders was overstated by ***15.84%***; and

- Diluted Earnings per Share (EPS) was overstated by ***15.58%***.

<u>2012 Annual Results</u>

- Service and fee income was overstated by ***24.17%***;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***19.43%***;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***21.67%***;

- Net income was overstated by ***14.06%***;

- Net income attributable to AmTrust common stockholders was overstated by **14.68%**; and

- Diluted Earnings per Share (EPS) was overstated by **13.59%**.

127.   The 2016 Form 10-K reveals the financial statements AmTrust issued to investors prior to the Class Period were also materially misstated. While AmTrust has not published restated financial data for periods prior to 2012, on information and belief, the Company's financial misstatements prior to the Class Period were sufficient to overstate the amount of the undistributed net income it accumulated from its inception through December 31, 2011 by approximately 6.4%.

128.   Additionally, the 2016 Form 10-K revealed that the Company's originally reported quarterly operating results during 2015 and 2016 were each materially misstated as illustrated in the following chart:

% Overstated (Understated) as Originally Reported

|  | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|---|---|---|
| **Service and fee income** | 10.54% | 12.04% | 11.71% | 12.40% | 11.95% | 11.23% | 9.53% |
| **Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries, and non-controlling interest** | 9.29% | 19.51% | 15.34% | 32.61% | 16.92% | 6.94% | 23.96% |
| **Income before income taxes, equity in earnings of unconsolidated subsidiaries, and non-controlling interest** | 18.11% | 89.81% | (3.00%) | 18.84% | 22.77% | 7.18% | 30.26% |
| **Net Income** | 14.81% | 44.76% | (1.71%) | 16.15% | 16.82% | 5.28% | 24.05% |
| **Net Income - AmTrust common stockholders** | 15.86% | 54.52% | (1.80%) | 18.78% | 19.38% | 6.00% | 28.39% |
| **Diluted Earnings per Share (EPS)** | 15.85% | 50.00% | (0.91%) | 270.00% | 21.74% | 6.85% | 27.66% |

129.   These above noted misstatements of AmTrust's income-related financial measures materially distorted the Company's operating performance at all relevant times.

130.   In addition, AmTrust has admitted that its originally reported assets, liabilities, stockholders' equity, segment reporting, cash flows and related financial disclosures were materially misstated at all relevant times.

131.    Thus, there can be no dispute that Defendants' representations about AmTrust's operations and financial performance relating to the periods covered by the financial statements included in the Offering Materials were inaccurate statements of material fact.

132.    In addition, the SEC, in CSAB Topic 1M *Financial Statements, Materiality*, provides that materiality in the context of a financial misstatement requires not only an assessment of the magnitude of the misstatement in percentage terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial misstatement (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

133.    Thus, CSAB Topic 1M provides: "there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material."  In this regard, CSAB Topic 1M notes that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."

134.    When the Company issued press releases announcing that: (i) it had identified material weaknesses in its internal control over financial reporting; and (ii) AmTrust's previously issued financial statements required restatement and should no longer be relied upon, the price of its common stock declined by a combined ***38%*** and its market capitalization collapsed by approximately ***$1.6 billion***, further evidencing the materiality of the Company's financial misstatements.

**AmTrust Admits Its Internal and Disclosure Controls Were Ineffective**

135.    Throughout the Class Period, AmTrust's Forms 10-K, signed by Defendants Zyskind, Pipoly, and the Director Defendants, repeatedly represented that the AmTrust Defendants were responsible for establishing and maintaining adequate internal control over AmTrust's financial reporting, stating, in pertinent part and in all material respects, as follows:

We, as management of the Company, are responsible for establishing and maintaining adequate internal control over financial reporting. Pursuant to the rules and regulations of the SEC, internal control over financial reporting is a process designed by, or under the supervision of, our principal executive and principal financial officers, or persons performing similar functions, and effected by our Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

• Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the company;

• Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

• Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

136.    Now, AmTrust has admitted that the foregoing statements were inaccurate statements of material fact when made.

137.    Internal control over financial reporting is broadly defined as a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance that, among other things, the entity's financial reporting is reliable and accurate. Item 308 of Regulation S-K, *Internal Control Over Financial Reporting*, required that AmTrust's Forms 10-K and 10-Q at all relevant times disclose, among other things, the assessment made by its management concerning the effectiveness of AmTrust's internal control over financial reporting. 17 C.F.R. 229.308.

138.    Disclosure controls and procedures are designed to ensure that information required to be disclosed by SEC registrants pursuant to SEC rules and regulations is appropriately recorded, processed, summarized and reported. Item 307 of Regulation S-K, *Disclosure Controls and*

*Procedures*, required that AmTrust's Forms 10-K and 10-Q at all relevant times disclose the conclusions of its principal executive and financial officers regarding the effectiveness of the Company's disclosure controls and procedures.  17 C.F.R. 229.307.

139.   As detailed herein, AmTrust's statements in its SEC filings that its disclosure and internal controls were operating effectively were untrue statements of material fact.

140.   In the 2016 Form 10-K, AmTrust acknowledged the existence of "material weaknesses" in its internal control over financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.  Indeed, the 2016 Form 10-K represents that "[t]hese material weaknesses contributed to material misstatements" in the financial statements AmTrust issued to investors and filed with the SEC during the Class Period.

141.   AmTrust has acknowledged that the material weaknesses affected "the design, implementation and operation of controls over the preparation, analysis and review of significant balances and closing adjustments necessary to achieve appropriately stated consolidated account balances and disclosures" and that its internal controls were "ineffective" in assessing the risk of material misstatement relating to *eight* distinct areas of corporate accounting and financial reporting: (i) foreign exchange; (ii) deferred acquisition costs; (iii) goodwill impairment; (iv) warranty administration services revenue; (v) capitalized costs; (vi) period-end expense accruals; (vii) the statement of cash flows; and (viii) the statement other comprehensive income.

142.   AmTrust has also acknowledged that it did not appropriate sufficient resources to *thirteen* corporate accounting and financial reporting functions: (i) financial statement consolidation; (ii) financial statement preparation; (iii) subsidiary closing and consolidation adjustments;

(iv) segregation of duties related to the recording of journal entries; (v) foreign exchange; (vi) deferred acquisition costs; (vii) goodwill impairment; (viii) warranty revenue; (ix) capitalized costs; (x) period-end expense accruals; (xi) the statement of cash flows; (xii) the statement of other comprehensive income; and (xiii) financial disclosures.

143.    The 2016 Form 10-K represents, in pertinent part, as follows:

*Ineffective assessment of the risks of material misstatement in financial reporting*

We did not effectively assess the risk of material misstatement in certain processes and change the internal control over financial reporting as a result of the significant increase in the size and complexity of the Company that was, in part, due to numerous acquisitions undertaken by the Company. A significant portion of these processes were managed and controlled by a centralized group within the Company and the material weakness affected: the design, implementation and operation of controls over the preparation, analysis and review of significant balances and closing adjustments necessary to achieve appropriately stated consolidated account balances and disclosures. **Specifically, management did not appropriately assess the risks associated with the financial reporting of foreign exchange, deferred acquisition costs, goodwill impairment, warranty administration services revenue, capitalized costs, period-end expense accruals and the statements of cash flows and other comprehensive income**. As a result, we did not design, implement and operate process level controls to effectively address the complexity of the underlying financial reporting.

*Insufficient resources in the Corporate Accounting and Corporate Financial Reporting Groups*

We did not have a sufficient complement of personnel, in certain geographic locations, with an appropriate level of knowledge and experience to help ensure proper selection and application of U.S. GAAP in the accounting for the areas stated above. In addition, we were not able to effectively **design and execute our process level controls around the consolidation process and preparation of financial statements, specifically subsidiary close and consolidation adjustments, segregation of duties related to the creation and posting of a discrete number of journal entries, foreign exchange, deferred acquisition costs, goodwill impairment, warranty administration services revenue, capitalized costs, period-end expense accruals and the statements of cash flows and other comprehensive income, and associated disclosures**.

144.    The 2016 Form 10-K further disclosed that AmTrust has taken, among others, the following actions to help remediate the material deficiencies noted above:

- Employing a new Chief Financial Officer of International Operations and hiring a new Global Head of Investment Accounting;

- Hiring new accounting and finance professionals;

- Designing new oversight controls that will operate at a level of precision sufficient to detect an error resulting from control failures;

- Enhancing the global Sarbanes-Oxley internal control over financial reporting risk assessment processes;

- Providing for a company-wide focus on finance, internal audit, Sarbanes-Oxley compliance and legal internal controls; and

- Completing and communicating an updated accounting policy manual.

145.    The 2016 Form 10-K also represents that AmTrust's disclosure controls were "ineffective," stating, in pertinent part, as follows:

> Our management, with the participation and under the supervision of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), has evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this Annual Report on Form 10-K. Based upon that evaluation, our CEO and CFO have concluded that, as of December 31, 2016, due to the identification of material weaknesses in our internal control over financial reporting as further described below, our disclosure controls and procedures were not effective to provide reasonable assurance that the information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

## ALLEGATIONS UNDER THE SECURITIES ACT[6]

### AmTrust's Public Offerings

146.    On June 11, 2015, the Company filed a registration statement on Form S-3 (File No. 333-204870) (the "2015 Registration Statement"). The 2015 Registration Statement stated that AmTrust may offer, from time to time, debt securities, common stock, preferred stock, depositary shares, warrants or units.

147.    On November 10, 2015, the Company filed its preliminary prospectus supplement pursuant to Rule 424(b)(5) (the "2015 Preliminary Prospectus") in which the Company announced its offering of 5,000,000 shares of common stock pursuant to the 2015 Registration Statement.

148.    On November 12, 2015, the Company filed a prospectus supplement pursuant to Rule 424(b)(2) (the "2015 Prospectus Supplement," and together with the 2015 Registration Statement and the 2015 Preliminary Prospectus, the "November 2015 Offering Materials"). The 2015 Prospectus Supplement stated that the Company was offering 5,000,000 shares of common stock at $64.00 per share yielding a total of $320,000,000 in proceeds for AmTrust. The Company granted its underwriters, Citigroup and Morgan Stanley, the option to purchase up to an additional 750,000 shares. The 2015 Preliminary Prospectus and 2015 Prospectus Supplement: (i) provided summary historical financial data of the Company's annual financial results for the years ended December 31, 2010 through December 31, 2014 and the nine month periods ended September 30, 2014 and 2015; and (ii) incorporated by reference AmTrust's Annual Report on Form 10-K for the year ended December 31, 2014; AmTrust's Quarterly Report on Form 10-Q for the quarter ended March 31,

---

[6]    As alleged elsewhere herein, the Offering Materials (defined below) incorporated by reference various Company filings that contained false and materially misleading statements and otherwise failed to disclose material information required to be stated therein. These misstatements and omissions are detailed herein in other sections and incorporated by reference in this section. However, any allegations of fraud in those sections are expressly disclaimed, and not incorporated by reference, in this section or for any claims arising under the Securities Act.

2015; and AmTrust's Reports on Form 8-K filed with the SEC on February 27, 2015, March 19, 2015, April 13, 2015, May 21, 2015, June 18, 2015, September 10, 2015 and September 16, 2015.

149.    On September 20, 2016, AmTrust filed a preliminary prospectus supplement pursuant to Rule 424(b)(5) (the "Series F Preliminary Prospectus") announcing that the Company would conduct an offering of depositary shares and that it had entered into an underwriting agreement with Morgan Stanley, UBS, RBC, and KBW.  Pursuant to the agreement, the Company granted the underwriters an option to purchase up to an additional 1,500,000 Series F Depositary Shares solely to cover over-allotments, if any.

150.    On September 21, 2016, the Company filed a prospectus supplement pursuant to Rule 424(b)(2) (the "Series F Prospectus Supplement," and together with the 2015 Registration Statement and the Series F Preliminary Prospectus, the "Series F Offering Materials").[7]  The Series F Prospectus Supplement stated that the Company was offering 10,000,000 depositary shares, each of which represented 1/40th interest in a share of its 6.95% Non-Cumulative Preferred Stock, Series F. The offering price per depositary share was $25.00, for gross proceeds of $250.0 million.  This offering was set to be underwritten by Morgan Stanley, UBS, RBC, KBW with William Blair, ING, JMP Securities and Scotiabank acting as co-managers.  The Company granted the underwriters a 30-day option to purchase up to an additional 1,500,000 depositary shares from AmTrust under the same terms and conditions.  The Series F Preliminary Prospectus and Series F Prospectus Supplement: (i) provided summary historical financial data of the Company's annual financial results for the years ended December 31, 2011 through December 31, 2015 and the six month periods ended June 30, 2015 and 2016; and (ii) incorporated by reference AmTrust's Annual Report on Form 10-K for the year ended December 31, 2015; AmTrust's Quarterly Report on Form 10-Q

---

[7]    The November 2015 Offering Materials and the Series F Offering Materials are collectively referred to herein as the "Offering Materials."

for the quarter ended March 31, 2015; and AmTrust's Reports on Form 8-K filed with the SEC on January 21, 2016, February 29, 2016, March 15, 2016, April 4, 2016, April 20, 2016, May 10, 2016, May 12, 2016, May 19, 2016, July 15, 2016, July 20, 2016, July 29, 2016 and August 4, 2016.

151.    On September 27, 2016, the Company announced that it had closed its previously announced underwritten public offering of 11,500,000 of its depositary shares, each representing a 1/40th interest in a share of its newly designated 6.95% Non-Cumulative Preferred Stock, Series F, at a public offering price of $25.00 per depositary share, for gross proceeds of $287.5 million.  The depositary shares include 1,500,000 depositary shares sold pursuant to the over-allotment option granted by the Company to the underwriters, which was exercised in full.  Total net proceeds of the offering were approximately $278.2 million, after deducting the underwriting discount and estimate offering expenses payable by the Company.

### The Offering Materials Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein

152.    The Offering Materials were negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Specifically, as set forth below, the Company's financial statements and/or financial results set forth and/or incorporated by reference in the Offering Materials violated GAAP, inaccurately certified that the Company's internal controls over financial reporting were effective and materially misstated the Company's financial results with respect to numerous metrics.

153.    **2015 Registration Statement:** The 2015 Registration Statement incorporated by reference the following of the Company's Class Period SEC filings:

(a)    AmTrust's Annual Report on Form 10-K for the year ended December 31, 2014 ("2014 10-K"); and

(b)   AmTrust's Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 ("1Q15 Form 10-Q").

**2014 Form 10-K**

154.   On March 2, 2015, AmTrust filed its 2014 Form 10-K with the SEC, which included the Company's audited financial statements, and was signed by Defendants Zyskind, Pipoly, and the Director Defendants.  For the full year 2014, the Company reported total service and fee income of $409.7 million;  net income of $446.6 million;  net income attributable to AmTrust common stockholders of $434.3 million; diluted earnings per share (EPS) of $5.45; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $448.4 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $471.9 million.

155.   The statements referenced above in ¶154 regarding the Company's financial performance contained untrue statements of material fact because, as AmTrust has now admitted:

(a)   its financial statements were presented in violation of GAAP; and

(b)   its service and fee income was overstated by *12.15%*; net income was overstated by *7.55%*; net income attributable to AmTrust common stockholders was overstated by *7.78%*; diluted Earnings Per Share (EPS) was overstated by *7.51%*; income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *13.34%*; and income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *13.64%*.

156.   The 2014 Form 10-K included signed certifications by Defendants Zyskind and Pipoly, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX certifications") attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure

controls and procedures, and the disclosure of any material changes to the Company's internal controls over financial reporting.  These certifications set forth as follows:

1. I have reviewed this Annual Report on Form 10-K of AmTrust Financial Services, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the

registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

157.   The 2014 Form 10-K also represented that AmTrust's "consolidated financial statements . . . have been prepared in conformity with accounting principles generally accepted in the United States of America."

158.   Concerning the Company's "Controls and Procedures," the 2014 Form 10-K stated, in pertinent part, as follows:

**Controls and Procedures**

**Disclosure Controls and Procedures**

Our management, with participation and under the supervision of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report.  Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act is timely recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

\*        \*        \*

**Management Report on Internal Control Over Financial Reporting**

We, as management of the Company, are responsible for establishing and maintaining adequate internal control over financial reporting . . . Management has evaluated the effectiveness of our internal control over financial reporting as of

- 46 -

December 31, 2014, based on the control criteria established in a report entitled *Internal Control – Integrated Framework (1992)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on such evaluation, we have concluded that our internal control over financial reporting is effective as of December 31, 2014***.

159.    The statements referenced above in ¶¶156-158 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP; the design, strength and effectiveness of AmTrust's disclosure controls and procedures; the disclosure of any material changes to the Company's internal controls over financial reporting; and the Company's accounting were untrue statements of material fact because, as AmTrust has now admitted:

(a)    AmTrust's financial reporting did not comply with GAAP and its consolidated financial statements were not prepared in conformity with GAAP; and

(b)    AmTrust's disclosure controls and internal controls were poorly designed and "ineffective" in assessing the risk of material misstatements relating to the following eight distinct areas of corporate accounting and financial reporting: (i) foreign exchange; (ii) deferred acquisition costs; (iii) goodwill impairment; (iv) warranty administration services revenue; (v) capitalized costs; (vi) period-end expense accruals; (vii) the statement of cash flows; and (viii) the statement other comprehensive income.

160.    With respect to AmTrust's accounting for warranty fee revenue, the 2014 Form 10-K stated, in pertinent part, as follows:

> *Warranty Fee Revenue* – The Company promotes and markets extended service plans ("ESP") to consumers through retailers and certain other marketing organizations usually with terms of coverage ranging from one to three years, commencing at the expiration of the manufacturers' warranty, if applicable. The Company generally insures the obligations under ESPs through contractual liability insurance issued by one of its insurance company subsidiaries. Under the terms of service agreements with various retailers, the Company provides for marketing and administrative services related to ESP. These agreements are generally for one-year terms and can be canceled by either party with thirty days advance notice. The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of ESP. ***However, the Company defers a portion of***

- 47 -

*service revenue based upon an estimate of administrative services to be provided in future periods*.

161.     The statement referenced above in ¶160 that the "Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods" was an untrue statement of material fact because the Company has now admitted that it recognized the majority of its warranty contract fee revenue related to administration services at the time of the sale of ESP and that a restatement of this revenue was necessary.

**1Q15 Form 10-Q**

162.     On May 11, 2015, AmTrust filed its 1Q15 Form 10-Q with the SEC, which was signed by Defendants Zyskind and Pipoly.  For the quarter, the Company reported total service and fee income of $112.9 million; net income of $164.1 million; net income attributable to AmTrust common stockholders of $154.7 million; diluted earnings per share (EPS) of $1.85; income before other income, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $169 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $205.4 million.

163.     The statements referenced above in ¶162 regarding the Company's financial performance were untrue statements of material fact because, as AmTrust has now admitted:

　　　　　(a)     its financial statements were presented in violation of GAAP; and

　　　　　(b)     its service and fee income was overstated by *10.54%*; net income was overstated by *14.81*%; net income attributable to AmTrust common stockholders was overstated by *15.86%*; diluted Earnings Per Share (EPS) was overstated by *15.85%*; income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *9.29%*; and income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *18.11%*.

- 48 -

164.    The 1Q15 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, and the disclosure of any material changes to the Company's internal controls over financial reporting. These certifications repeated in substance the same representations as set forth in ¶156.

165.    The 1Q15 Form 10-Q also represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

166.    The statements referenced above in ¶¶164 and 165 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP; the design, strength and effectiveness of AmTrust's disclosure controls and procedures; the disclosure of any material changes to the Company's internal controls over financial reporting; and the Company's accounting were untrue statements of material fact for the reasons set forth in ¶159.

167.    **The November 2015 Offering Materials:** The November 2015 Offering Materials incorporated by reference the 2014 Form 10-K and 1Q15 Form 10-Q, as well as the following AmTrust filings with the SEC:

        (a)    AmTrust's Quarterly Report on Form 10-Q for the quarter ended June 30, 2015 ("2Q15 Form 10-Q"); and

        (b)    AmTrust's Quarterly Report on Form 10-Q for the quarter ended September 30, 2015 ("3Q15 Form 10-Q").

**2Q15 Form 10-Q**

168.    On August 10, 2015, AmTrust filed its 2Q15 Form 10-Q with the SEC, which was signed by Defendants Zyskind and Pipoly. For the quarter, the Company reported: total service and fee income of $107.7 million; net income of $80.7 million; net income attributable to AmTrust

- 49 -

common stockholders of $70.7 million; diluted earnings per share (EPS) of $0.84; income before other income, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $135 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $81.2 million.

169.    The statements referenced above in ¶168 regarding the Company's financial performance were untrue statements of material fact because, as AmTrust has now admitted,

(a)    its financial statements were presented in violation of GAAP; and

(b)    its service and fee income was overstated by *12.04%*; net income was overstated by *44.76%;* net income attributable to AmTrust common stockholders was overstated by *54.52%*; diluted Earnings Per Share (EPS) was overstated by *50.00%*; income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *19.51%*; and income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *89.81%*.

170.    The 2Q15 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting; the design, strength and effectiveness of AmTrust's disclosure controls and procedures; and the disclosure of any material changes to the Company's internal controls over financial reporting.  These certifications repeated in substance the same representations as set forth in ¶156.

171.    The 2Q15 Form 10-Q also represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements. . . ."

172.    The statements referenced above in ¶¶170 and 171 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP; the design, strength and

- 50 -

effectiveness of AmTrust's disclosure controls and procedures; the disclosure of any material changes to the Company's internal controls over financial reporting; and the Company's accounting were untrue statements of material fact for the reasons set forth in ¶159.

**3Q15 Form 10-Q**

173.   On November 9, 2015, AmTrust filed its 3Q15 Form 10-Q with the SEC, which was signed by Defendants Zyskind and Pipoly.  For the quarter, the Company reported: total service and fee income of $126.1 million; net income of $193 million; net income attributable to AmTrust common stockholders of $182.7 million; diluted earnings per share (EPS) of $2.17; income before other income, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $145.1 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $166.9 million.

174.   The statements referenced above in ¶173 regarding the Company's financial performance contained untrue statements of material fact because, as AmTrust has now admitted,

(a)   its financial statements were presented in violation of GAAP; and

(b)   its service and fee income was overstated by *11.71%*; net income was understated by *(1.71%)*; net income attributable to AmTrust common stockholders was understated by *(1.80%)*; diluted Earnings per Share (EPS) was understated by *(0.91%)*; income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *15.34%*; and income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was understated by *(3.00%)*.

175.   The 3Q15 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, and the disclosure of any material

changes to the Company's internal controls over financial reporting. These certifications repeated in substance the same representations as set forth in ¶156.

176.    The 3Q15 Form 10-Q also represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements. . . ."

177.    The statements referenced above in ¶¶175 and 176 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP; the design, strength and effectiveness of AmTrust's disclosure controls and procedures; the disclosure of any material changes to the Company's internal controls over financial reporting; and the Company's accounting were untrue statements of material fact for the reasons set forth in ¶159.

178.    **The Series F Offering Materials:** The Series F Offering Materials incorporated by reference the following AmTrust filings with the SEC:

(a)    AmTrust's Annual Report on Form 10-K for the year ended December 31, 2015 ("2015 Form 10-K");

(b)    AmTrust's Quarterly Report on Form 10-Q for the quarter ended  March 31, 2016 ("1Q16 Form 10-Q"); and

(c)    AmTrust's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 ("2Q16 Form 10-Q").

**2015 Form 10-K**

179.    On February 29, 2016, AmTrust filed the 2015 Form 10-K with the SEC, which included the Company's audited financial statements, and was signed by Defendants Zyskind, Pipoly, and the Director Defendants.  For the full year 2015, the Company reported: total service and fee income of $478.2 million; net income of $510.5 million; net income attributable to AmTrust common stockholders of $472 million; diluted earnings per share (EPS) of $2.80; income before

other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $535.9 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $551.5 million.

180.    The statements referenced above in ¶179 regarding the Company's financial performance contained untrue statements of material fact because, as AmTrust has now admitted:

(a)    its financial statements were presented in violation of GAAP;

(b)    its service and fee income was overstated by *11.69%*; net income was overstated by *11.56%*; net income attributable to AmTrust common stockholders was overstated by *12.62%*; diluted Earnings Per Share (EPS) was overstated by *12.45%*; income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *16.79%*; and income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *17.04%*.

181.    The 2015 Form 10-K included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, and the disclosure of any material changes to the Company's internal controls over financial reporting.  These certifications repeated in substance the same representations as set forth in ¶156.

182.    The 2015 Form 10-K also represented that AmTrust's "consolidated financial statements . . . have been prepared in conformity with accounting principles generally accepted in the United States of America."

183.    Concerning the Company's "Controls and Procedures," the 2015 Form 10-K repeated in substance the representations set forth in ¶158.

184.    The statements referenced above in ¶¶181-183 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP; the design, strength and effectiveness of AmTrust's disclosure controls and procedures; the disclosure of any material changes to the Company's internal controls over financial reporting; and the Company's accounting were untrue statements of material fact for the reasons set forth in ¶159.

185.    With respect to AmTrust's accounting for warranty fee revenue, the 2015 Form 10-K stated, in pertinent part, as follows:

> *Warranty Fee Revenue* – The Company promotes and markets extended service plans ("ESP") to consumers through retailers and certain other marketing organizations usually with terms of coverage ranging from one to three years, commencing at the expiration of the manufacturers' warranty, if applicable. The Company generally insures the obligations under ESPs through contractual liability insurance issued by one of its insurance company subsidiaries. Under the terms of service agreements with various retailers, the Company provides for marketing and administrative services related to ESP. These agreements are generally for one-year terms and can be canceled by either party with thirty days advance notice. The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of ESP. ***However, the Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods.***

186.    The statement referenced above in ¶185 that the "Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods" was an untrue statement of material fact as set forth in ¶161 above.

## 1Q16 Form 10-Q

187.    On May 10, 2016, AmTrust filed the 1Q16 Form 10-Q with the SEC, which was signed by Defendants Zyskind and Pipoly. For the quarter, the Company reported total service and fee income of $144.2 million; net income of $113 million; net income attributable to AmTrust common stockholders of $100.3 million; diluted earnings per share (EPS) of $0.56; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated

subsidiaries and non-controlling interest of $168 million; and income before provision for income

taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $135 million.

188.    The statements referenced above in ¶187 regarding the Company's financial

performance contained untrue statements of material fact because, as AmTrust has now admitted:

(a)    its financial statements were presented in violation of GAAP; and

(b)    its service and fee income was overstated by *11.95%*; net income was

overstated by *16.82%*; net income attributable to AmTrust common stockholders was overstated by

*19.38%*; diluted Earnings Per Share (EPS) was overstated by *21.74%*; income before other income,

income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was

overstated by *16.92%*; and income before income taxes, equity in earnings of unconsolidated

subsidiaries and non-controlling interest was overstated by *22.77%*.

189.    The 1Q16 Form 10-Q included signed SOX certifications by Defendants Zyskind and

Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and

effectiveness of AmTrust's disclosure controls and procedures, and the disclosure of any material

changes to the Company's internal controls over financial reporting.  These certifications repeated in

substance the same representations as set forth in ¶156.

190.    The 1Q16 Form 10-Q also represented that "[t]he accompanying unaudited interim

consolidated financial statements have been prepared in accordance with U.S. generally accepted

accounting principles ("GAAP") for interim financial statements . . . ."

191.    The statements referenced above in ¶¶189 and 190 regarding the accuracy of the

Company's financial reporting and its purported compliance with GAAP; the design, strength and

effectiveness of AmTrust's disclosure controls and procedures; the disclosure of any material

changes to the Company's internal controls over financial reporting; and the Company's accounting were untrue statements of material fact for the reasons set forth in ¶159.

**2Q16 Form 10-Q**

192.     On August 9, 2016, AmTrust filed its 2Q16 Form 10-Q with the SEC, which was signed by Defendants Zyskind and Pipoly.  For the quarter, the Company reported total service and fee income of $138.3 million; net income of $152.2 million; net income attributable to AmTrust common stockholders of $134.8 million; diluted earnings per share (EPS) of $0.78; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $169.7 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $175.3 million.

193.     The statements referenced above in ¶192 regarding the Company's financial performance were untrue statements of material fact because, as AmTrust has now admitted:

(a)     its financial statements were presented in violation of GAAP; and

(b)     its service and fee income was overstated by *11.23%*; net income was overstated by *5.28%*; net income attributable to AmTrust common stockholders was overstated by *6.00%*; diluted Earnings Per Share (EPS) was overstated by *6.85%*; income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *6.94%*; and income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *7.18%*.

194.     The 2Q16 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, and the disclosure of any material

changes to the Company's internal controls over financial reporting. These certifications repeated in substance the same representations as set forth in ¶156.

195.    The 2Q16 Form 10-Q also represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements. . . ."

196.    The statements referenced above in ¶¶194 and 195 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP; the design, strength and effectiveness of AmTrust's disclosure controls and procedures; the disclosure of any material changes to the Company's internal controls over financial reporting; and the Company's accounting were untrue statements of material fact for the reasons set forth in ¶159.

**The Offering Materials Included BDO's Inaccurate Audit Opinions**

**BDO's Relationship with AmTrust**

197.    BDO served as AmTrust's public accounting firm from the time the Company first became subject to the Exchange Act's periodic reporting requirements in 2006 until its "dismissal" by AmTrust's Audit Committee effective with the Company's filing of the 1Q16 Form10-Q on May 10, 2016.

198.    BDO issued materially inaccurate unqualified audit reports on AmTrust's financial statements and its system of internal controls over financial reporting for each of the years ended December 31, 2012-15.[8]  BDO's audit reports were incorporated by reference into AmTrust's materially inaccurate Offering Materials, as noted below.  BDO consented to the inclusion of its audit reports and references to it as an "Expert," in the Offering Materials.

---

[8]    BDO issued unqualified audit opinions for prior years as well but those are outside the scope of this claim.

199.    Ranked as the 5th largest public accounting network globally, BDO's website claims it provides "world-class resources and exceptional service to each and every one of our clients," with more than 5,000 U.S. professionals who audit more than 300 publicly traded U.S. companies, helping them "navigate the SEC rules and regulations."

200.    Accordingly, investors reasonably expected BDO to dedicate "world-class" resources to AmTrust and provide the Company with "exceptional service" in rendering its opinions on AmTrust's financial statements, which it did not, as detailed herein.

201.    BDO's website further claims, in pertinent part, that:

> BDO's global network extends across 158 countries, with over 67,000 people working out of more than 1,401 offices. That means local resources backed by a truly global network - no matter where you do business. This is just one part of BDO's commitment to delivering exceptional client service.

202.    Notwithstanding BDO's claims that it is the 5th largest public accounting network globally, with over 67,000 people working out of more than 1,401 offices in 158 countries, AmTrust filed a Form 8-K with the SEC on September 16, 2014 disclosing a highly unusual demand by the New York State insurance regulator, the NYDFS, calling into question the quality of services then rendered by BDO to AmTrust. According to the Form 8-K, the NYDFS issued a letter to AmTrust asking it to take the following action:

> *In light of AmTrust's growth and increased geographic footprint, **AmTrust will engage an external auditing firm with corresponding global resources and skills beginning with the audit for the annual period ending December 31, 2015. Before the engagement is undertaken, the selection of the auditing firm shall be subject to the review and prior approval of the Department**.*

**BDO Issued Unqualified Audit Opinions on AmTrust's Financial Statements and Internal Controls**

203.    AmTrust's inaccurate financial statements for the years ended December 31, 2012, 2013 and 2014, incorporated by reference from the 2014 Form 10-K were included in the November 2015 Offering Materials. BDO's inaccurate unqualified audit opinion on such financial statements,

dated March 2, 2015, as well as BDO's inaccurate unqualified audit opinion on AmTrust's system of internal controls over financial reporting (collectively, the "2015 BDO Opinion"), were also included in the November 2015 Offering Materials:

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders
AmTrust Financial Services, Inc.
New York, New York

We have audited the accompanying consolidated balance sheets of AmTrust Financial Services, Inc. as of December 31, 2014 and 2013 and the related consolidated statements of income, comprehensive income, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2014. In connection with our audits of the financial statements, we have also audited the financial statement schedules listed in the accompanying index. These financial statements and schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements and schedules. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of AmTrust Financial Services, Inc. at December 31, 2014 and 2013, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America.

Also, in our opinion, the financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole present fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), AmTrust Financial Services, Inc.'s internal control over financial reporting as of December 31, 2014, based on criteria established in Internal Control - Integrated Framework (2013) issued by the

Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated March 3, 2014 expressed an unqualified opinion thereon.

/s/ BDO USA, LLP
New York, New York
March 2, 2015

204.    AmTrust's inaccurate financial statements for the years ended December 31, 2013, 2014 and 2015, incorporated by reference from the 2015 Form 10-K, were included in the Series F Offering Materials.   BDO's materially inaccurate unqualified audit opinion on such financial statements, dated February 29, 2016, as well as BDO's materially inaccurate unqualified audit opinion on AmTrust's system of internal controls over financial reporting (collectively, the "2016 BDO Opinion"), were included in the Series F Offering Materials:

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders
AmTrust Financial Services, Inc.
New York, New York

We have audited the accompanying consolidated balance sheets of AmTrust Financial Services, Inc. as of December 31, 2015 and 2014 and the related consolidated statements of income, comprehensive income, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2015.  In connection with our audits of the financial statements, we have also audited the financial statement schedules listed in the accompanying index.  These financial statements and schedules are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements and schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements and schedules.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of AmTrust Financial Services, Inc. at

December 31, 2015 and 2014, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2015, in conformity with accounting principles generally accepted in the United States of America.

Also, in our opinion, the financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole present fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), AmTrust Financial Services, Inc.'s internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated February 29, 2016 expressed an unqualified opinion thereon.

/s/ BDO USA, LLP
New York, New York
February 29, 2016

205.    As detailed herein, AmTrust has now admitted that each of the above noted financial statements were materially misstated, presented in violation of numerous provisions of GAAP, and "should no longer be relied upon."  In addition, AmTrust has admitted that "material weaknesses" in its system of internal controls over financial reporting "contributed to material misstatements" in the financial statements included in the Offering Materials.  Moreover, AmTrust has now issued a press release advising investors to no longer rely on the 2015 BDO Opinion and the 2016 BDO Opinion.

206.    Thus, there can be no dispute that financial statements included in the Offering Materials, which the 2015 BDO Opinion and the 2016 BDO Opinion each represented "present fairly, in all material respects . . . in conformity with accounting principles generally accepted in the United States of America," were materially misstated when issued.  Likewise, there can be no dispute that the system of internal control over financial reporting upon which the financial statements included in the Offering Materials were based – which the 2015 BDO Opinion and the 2016 BDO Opinion deemed to be "unqualified," – was riddled with material weaknesses, which AmTrust has now stated affected "the design, implementation and operation of controls over the

- 61 -

preparation, analysis and review of significant balances and closing adjustments necessary to achieve appropriately stated consolidated account balances and disclosures" and were "ineffective" in assessing the risk of material financial misstatements.

207.    Moreover, the 2015 BDO Opinion and the 2016 BDO Opinion each falsely, and expressly, represented that BDO's audits on the financial statements included in the Offering Materials were conducted "in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  These factual representations were materially inaccurate when issued because, as detailed herein, BDO's audits were conducted in contravention of numerous Public Company Accounting Oversight Board ("PCAOB") standards.

208.    Established by the Sarbanes-Oxley Act of 2002 to oversee the audits of public companies, the PCAOB issues auditing, quality control, ethics, independence and other standards relating to the preparation of audit reports by registered public accounting firms.  To the extent that they have not been superseded or amended by PCAOB, the auditing standards (and interpretations thereto) issued by the American Institute of Certified Public Accountants have been adopted by the PCAOB.  These auditing standards are codified and referred to herein as "AU §__."  The auditing standards promulgated by the PCAOB are referred to herein as "AS No. ___."[9]

209.    According to the PCAOB, the purpose of an audit is to provide investors with an opinion expressed by a duly registered auditor as to whether the examined financial statements are presented fairly, in all material respects, in conformity with GAAP.  Pursuant to the dictates of PCAOB, an audit conducted in accordance with its standards enables the auditor to form its opinion,

---

[9]    In January 2017, the PCAOB standards previously referred to as "AU §__," were reorganized and are now referred to as the "AS §__."  References herein to AICPA standards adopted by the PCAOB during the Class Period are referred to as "AU §__."

and auditors may only express an unqualified opinion if the audit has been conducted in accordance with its standards and the auditor has applied all necessary procedures. *See, e.g.*, AU §§110, 508.

210.    When financial statements are materially affected by a departure from applicable accounting standards or there is a material restriction in the scope of an audit (whether imposed by the client or not), the auditor is to qualify or disclaim the opinion and provide its reasoning for doing so in its report. *See, e.g.*, AU §508.

211.    In connection with its audits of AmTrust's financial statements for the years ended December 31, 2012-15, BDO failed to comply with the standards issued by the PCAOB, thereby rendering statements embedded in the 2015 BDO Opinion and the 2016 BDO Opinion untrue. Moreover, when BDO issued opinions on AmTrust's financial statements they failed to disclose that its audits were not performed in a scope sufficient to enable it to render an opinion. Lastly, BDO, as alleged herein, ignored AmTrust's wrongful accounting. In doing so, it had reason to not believe that the financial statements included in the Offering Materials were fairly presented in conformity with GAAP, contrary to its representations in the unqualified 2015 BDO Opinion and the 2016 BDO Opinion.

BDO Falsely Represented Its Audits Were Conducted in Accordance with PCAOB Standards

212.    Pursuant to AS No. 8, *Audit Risk*, in order to form an appropriate basis for expressing an opinion on the financial statements, the auditor must plan and perform the audit so as to obtain reasonable assurance about whether the financial statements are free of material misstatement. This reasonable assurance is obtained by reducing audit risk to an appropriately low level through applying due professional care and obtaining sufficient appropriate audit evidence.

213.    BDO failed to conduct its audits of the financial statements included in the Offering Materials in accordance with PCAOB standard AS No. 8 by failing to apply due professional care and obtaining sufficient appropriate audit evidence.

214.    AU §230, *Due Professional Care in the Performance of Work*, requires the auditor exercise professional skepticism throughout the audit process and diligently perform, in good faith and with integrity, the gathering and objective evaluation of audit evidence.

215.    AU §326, *Evidential Matter*, and AS No. 15, *Audit Evidence*, require auditors to obtain sufficient competent evidential matter to afford a reasonable basis for an opinion on financial statements under audit.  This evidential matter includes the findings of procedures employed by the auditor to assess the risk of material misstatements, tests an entity's internal controls, and tests the recognition, measurement, presentation, and disclosure of the elements in an entity's financial statements, which it accomplishes by performing inspection, observation, inquiry, confirmation, recalculation, reperformance, and analytical procedures.

216.    As noted herein, on April 11, 2017, *The Wall Street Journal* published an article reporting that a former BDO auditor, assigned to the AmTrust audits for at least three years, provided the government with information pursuant to the SEC's Whistleblower Program. According to the April 2017 WSJ Article, this information, which includes e-mails and internal documents, has resulted in investigations by both the SEC and the FBI.

217.    The April 2017 WSJ Article further states that the former BDO auditor whistleblower claims, among other things, that BDO "tried to bury poor practices in its AmTrust audits," was "often rushed during its audits because AmTrust was late or inconsistent in providing figures, or lacked documentation," and on several occasions "BDO signed off on its AmTrust audit[s] before completing some important checks."

218.    In addition, the April 2017 WSJ Article states that the former BDO auditor whistleblower claims that "BDO staffers allegedly covered for their lapse [in completing important procedures] by loading unfinished documents into an internal software system to show the right time stamp, then return later to complete some of the work."

219.    These facts demonstrate than BDO failed to conduct its audits in accordance with PCAOB standards, specifically, AU §230, AU §326, and AS No. 15.

220.    In addition, pursuant to AS No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, effective internal control over financial reporting provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes.  AS No. 5 required BDO to test important "entity-level controls" to help form a basis for its conclusion about the effectiveness of AmTrust's internal controls over financial reporting.  According to AS No. 5, "entity-level controls" include controls over the "period-end financial reporting process" and those controls that are designed to prevent, or timely detect, financial statement misstatements.

221.    Further, AS No. 12, *Identifying and Assessing Risks of Material Misstatement*, required BDO to perform risk assessment procedures sufficient to provide it with a reasonable basis for identifying and assessing the risks of material misstatement in AmTrust's financial statements. These procedures include those necessary to understand and evaluate the appropriateness of a company's selection and application of accounting principles.

222.    As detailed herein, AmTrust has admitted that its system of internal controls over financial reporting was riddled with material weaknesses that rendered it "ineffective" in assessing the risk of material misstatement relating to *eight* distinct areas of corporate accounting and financial reporting.  In addition, AmTrust has admitted to material weaknesses in its system of internal

- 65 -

controls over financial reporting relating to "the design, implementation and operation of controls over the preparation, analysis and review of significant balances and closing adjustments necessary to achieve appropriately stated consolidated account balances and disclosures," including important entity-level controls associated with period-end financial reporting processes.

223.    Further, AmTrust has admitted that it financial statements were presented in violation of numerous provisions of GAAP, including the selection and application of its revenue recognition practices.

224.    These facts demonstrate that BDO failed to conduct its audits in accordance with PCAOB standards AS No. 5, AU §326, AS No. 15 and AS No. 12.

225.    In addition to the foregoing, BDO also failed to conduct its audits in accordance with the following PCAOB standards:

    (a)    AS No. 10, *Supervision of the Audit Engagement*, required BDO to supervise the work of audit team members so that its audits were performed as directed and the audit findings support the conclusions it reached about AmTrust's financial statements and internal control over financial reporting.  This process required BDO audit team members to bring significant accounting and auditing issues arising during BDO's audits to the attention of the engagement partner or other audit team members performing supervisory activities so they could evaluate such issues and determine that appropriate actions are taken in accordance with PCAOB standards.  BDO failed to properly supervise its audits in accordance with AS No. 10 because audit team members were not given ample time to complete important audit procedures prior to BDO's sign off on the 2015 BDO Opinion and the 2016 BDO Opinion.  AS No. 10 further notes that the "engagement partner" is responsible for the audit and its performance.  BDO failed to properly supervise its audits in accordance with AS No. 10 because its engagement partner was unable to review important audit

procedures that went uncompleted by engagement team members prior to BDO's sign off on the 2015 BDO Opinion and the 2016 BDO Opinion;

(b) AS No. 14, *Evaluating Audit Results*, required BDO to evaluate the results of its audits to determine whether the audit evidence it obtained was sufficient and appropriate to support the 2015 BDO Opinion and the 2016 BDO Opinion. This process included evaluating risks associated with: (i) discrepancies in AmTrust's accounting records; (ii) unsupported or unauthorized balances or transactions; (iii) conflicting or missing evidence; (iv) undue time pressures; (v) unusual delays by management in providing requested information; and (vi) accounting policies that appear inconsistent with industry practice. BDO failed to conduct its audits in accordance with AS No. 14 by ignoring the above noted risks, as detailed herein; and

(c) AU §508, *Reports on Audited Financial Statements*, requires the audit report to state whether the financial statements are presented in accordance with GAAP. The 2015 BDO Opinion and the 2016 BDO Opinion falsely represented that the financial statements included in the Offering Materials were presented in conformity with GAAP, when they were not, as AmTrust has now admitted. In addition, AU§508 provides that an auditor can express an unqualified opinion only if the audit has been conducted in accordance with the standards of the PCAOB and the auditor has been able to apply all necessary procedures. BDO violated AU§508 when it issued its unqualified 2015 BDO Opinion and 2016 BDO Opinion prior to completing important audit procedures.

226. Thus, the factual representations embedded in the 2015 BDO Opinion and the 2016 BDO Opinion that BDO's audits on the financial statements included in the Offering Materials were conducted "in accordance with the standards of the Public Company Accounting Oversight Board (United States)," were untrue when issued because, as detailed herein, BDO's audits were negligently conducted in contravention of numerous PCAOB standards.

- 67 -

227.     In failing to perform its audits in accordance with the standards issued by the PCAOB, BDO was negligent because it did not possess the requisite bases necessary, pursuant to PCAOB standards, for its opinions.   Moreover, the opinions of BDO failed to disclose that AmTrust's financial statements were not presented in conformity with GAAP.

BDO Failed to Disclose that Its Audits Were Limited in Scope

228.     As noted above, AU§508 provides that an unqualified opinion may only be expressed when the auditor has been able to apply all necessary audit procedures.  AU§508 further states that restrictions on the scope of an audit, whether imposed by the client or by other circumstances such as the timing of necessary audit procedures, the inability to obtain sufficient appropriate evidential matter, or an inadequacy in the accounting records, may require the auditor to qualify or to disclaim an opinion.  In such instances, the reasons for the auditor's qualification or disclaimer of opinion should be described in the report.

229.     According to the April 2017 WSJ Article, the BDO whistleblower claims that on several occasions BDO signed off on AmTrust audits prior to completing "important" procedures. In doing so, BDO was required to qualify the 2015 BDO Opinion and the 2016 BDO Opinion and set forth the nature of its scope restrictions therein.  In failing to do so, the 2015 BDO Opinion and the 2016 BDO Opinion omitted material facts about BDO's inquiry into whether the financial statements included in the Offering Materials were fairly presented in conformity with GAAP.

BDO Inaccurately Stated That AmTrust's Financial Statements Conformed with GAAP

230.     BDO disbelieved the financial statements included in the 2015 Registration Statement and the 2016 Registration Statement were fairly presented in conformity with GAAP as it represented in the unqualified 2015 BDO Opinion and 2016 BDO Opinion because it ignored Amtrust's wrongful accounting.

- 68 -

231.   As noted herein, according to the April 2017 WSJ Article, the BDO whistleblower claims that BDO "tried to bury poor practices in its AmTrust audits."  In doing so, BDO had reason ***not*** to believe the financial statements included in the Offering Materials were fairly presented in conformity with GAAP.  Thus, BDO had reason to disbelieve its representations in the 2015 BDO Opinion and the 2016 BDO Opinion were untrue when made.

## COUNT I

### For Violation of Section 11 of the Securities Act
### Against All Defendants

232.   For the purposes of this Count, Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark incorporate by reference those allegations concerning the parties, the Offering Materials, and the Securities Act Class only.  Any allegations of fraud are hereby expressly disclaimed and not incorporated by reference in this Count.  Specifically, Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark incorporate the allegations in ¶¶1-2, 10-57 and 64-231 only.

233.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against all Defendants.

234.   For the purposes of this Count, Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark do not allege that any of these defendants had scienter, which is not an element of a Section 11 claim.

235.   The Offering Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

236.   AmTrust is the registrant for the Offerings.  The defendants named in this Count were responsible for the contents and dissemination of the 2015 Registration Statement.

237.    As issuer of the shares, AmTrust is strictly liable to Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and the Securities Act Class for any misstatements and omissions.

238.    By reason of the conduct herein alleged, each defendant named in this Count violated Section 11 of the Securities Act.

239.    Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark purchased or otherwise acquired AmTrust common stock or Series F Depositary Shares, pursuant and/or traceable to the Registration Statement for the Offerings, and, at the time of their purchases, Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and other members of the Securities Act Class were unaware of the facts concerning the wrongful conduct alleged herein.

240.    Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and the Securities Act Class have sustained damages.  The value of the AmTrust common stock and Series F Depositary Shares have declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against AmTrust and the Underwriter Defendants

241.    For the purposes of this Count, Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark incorporate by reference those allegations concerning the parties, the Prospectuses, and the Securities Act Class only, consisting of those allegations contained and incorporated in Count I. Any allegations of fraud are hereby expressly disclaimed and not incorporated by reference in this Count.  Specifically, Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark incorporate the allegations in ¶¶1-2, 10-57 and 64-231 only.

242.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act against AmTrust and the Underwriter Defendants.

243.   For the purposes of this Count, Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark do not allege that any of these defendants had scienter, which is not an element of a Section 12(a)(2) claim.

244.   By means of the defective Prospectuses, AmTrust and the Underwriter Defendants promoted and sold AmTrust common stock and Series F Depositary Shares to Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and other members of the Securities Act Class.

245.   The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.   Defendants AmTrust, and the Underwriter Defendants owed Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and the other members of the Securities Act Class who purchased AmTrust common stock or Series F Depositary Shares pursuant to the Prospectuses the duty to make a reasonable and diligent investigation into the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.   These defendants, in the exercise of reasonable care, knew or should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

246.   Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark purchased or otherwise acquired AmTrust common stock and/or Series F Depositary Shares.

247.   By reason of the conduct alleged herein, AmTrust, and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.   As a direct and proximate result of such violations, Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and the other members of the Securities Act

Class who purchased AmTrust common stock and/or Series F Depositary Shares pursuant to the Prospectuses sustained substantial damages in connection with their purchases of the securities.

248.    Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and members of the Securities Act Class hereby tender their securities to their respective sellers and seek rescission of their exchanges to the extent that they continue to own such securities.   Securities Act Class members who have sold their AmTrust common stock and/or Series F Depositary Shares seek damages to the extent permitted by law.

**COUNT III**

**For Violation of Section 15 of the Securities Act**
**Against the Officer Defendants, and the Director Defendants**

249.    Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark incorporate by reference the allegations concerning the background of the defendants named in this Count, as well as the allegations concerning the preparation, signing and dissemination of the Offering Materials and the allegations set forth in Counts I and II, above.

250.    This Count is brought pursuant to Section 15 of the Securities Act, against the Officer Defendants and the Director Defendants

251.    As alleged herein, a primary violation of the Securities Act occurred, in that Defendants engaged in conduct in violation of Section 11 of the Securities Act.

252.    The Officer Defendants and the Director Defendants were each controlling persons of AmTrust when the Offering Materials became effective because of their senior executive positions with AmTrust and their direct involvement in AmTrust's day-to-day operations.

253.    By virtue of the foregoing, the Officer Defendants and the Director Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of AmTrust, including the content of the Offering Materials.

- 72 -

254.     The Officer Defendants and the Director Defendants negligently, and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Offering Materials, lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

255.     Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and members of the Class purchased AmTrust common stock and/or Series F Depositary Shares pursuant to the Offering Materials, and were damaged thereby.

256.     Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Offering Materials when they purchased or acquired their securities.

257.     By reason of the foregoing, the Officer Defendants and the Director Defendants are liable to plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and members of the Class for violations of Section 15 of the Securities Act.

## EXCHANGE ACT ALLEGATIONS

### AmTrust Knowingly Falsified Its Financial Statements

258.     As set forth further below, AmTrust's materially misstated financial reporting for five fiscal years was a result of intentional misconduct.  Indeed, AmTrust has now represented that:

- Based upon a review conducted by the Audit Committee and its advisors, the Company's financial statements and any related statements by Defendants about AmTrust's operating performance set forth in SEC filings, press releases, investor presentations and conference calls during the Class Period should "no longer be relied upon";

- The AmTrust Defendants' representations about the Company's financial operating performance during the Class Period were materially misstated due to numerous and varied accounting improprieties;

- 73 -

- The AmTrust Defendants' materially false and misleading misrepresentations about the Company's operations occurred over more than a five year period;

- On June 5, 2017, Defendant Pipoly, the senior AmTrust executive directly responsible for the Company's public financial disclosures during the Class Period, ceased serving as AmTrust's CFO; and

- The Company's disclosure controls and internal control over financial reporting were riddled with material weaknesses that contributed to the material misstatements of its Class Period financial statements.

259.    Further, the AmTrust Defendants were ***aware*** of the impropriety of their accounting for warranty fee revenue, as demonstrated by the fact that Warrantech, which AmTrust acquired in 2010, had ***previously been admonished by the SEC*** for improperly accelerating the recognition of revenue on service contracts, the primary accounting manipulation that caused the Company to restate its financial results at the end of the Class Period.

260.    Prior to its acquisition by AmTrust in August 2010, Warrantech was a publicly traded company that filed periodic reports with the SEC pursuant to the Exchange Act.  Warrantech's filings with the SEC, which are still publicly available on the SEC's website, reveal that in March of 2003, the staff of the Division of Corporation Finance of the SEC selected its periodic reports for review.  As a result of such review, Warrantech was required to restate its previously issued financial statements to correct its recognition of service revenue.  According to Warrantech's SEC filings, the SEC required Warrantech to record service revenue on a straight-line basis over the life of the service contracts.  Prior thereto, Warrantech recognized revenue on such contracts at the time of sale.

261.    Warrantech's Form 10-K for the year ended March 31, 2006, stated in pertinent part, as follows:

> **Historically, the Company has recognized the major portion of the revenues from the dealer-obligor contracts upon a sale to the consumer** by the dealer/retailer and has deferred a minor portion of those revenues.
>
> With the issuance of EITF 00-21, the Company and its accountants, with the guidance of the SEC Staff in early 2004, have determined that, in order to continue to

recognize income under the dealer-obligor contracts in the same manner as it has done historically, the Company must develop adequate evidence of the fair value of the two elements of its services - the sale and structuring of the contracts and the claims adjudication services. Without this evidence, the Company would be required to recognize all of the income associated with the dealer-obligor contracts over the life of the contracts. This would have the effect of deferring to later periods the substantial portion of these revenues which the Company has previously recognized up front. This would then have the further effect of substantially deferring the current year's income to future periods and may in fact cause the Company to recognize a current net loss.

The SEC Staff offered its guidance that the Company's evidence to date has not been sufficient to meet the standards of EITF Abstracts Issue No. 00-21 "Revenue Arrangements with Multiple Deliverables".

**Based on the SEC Staff's 2004 guidance, the Company recognizes all of the income from the Dealer-Obligor Contracts over the life of the contracts**.

262.    Thereafter, after its acquisition by AmTrust, Warrantech's policy of revenue recognition on service agreements was ***changed back*** to the time of sale even though it never obtained sufficient historical evidence indicating the costs of performing services under its agreements were incurred on other than a straight-line basis as required by GAAP in ASC Topic No. 605-20-3, stating, in pertinent part, as follows:

**Sellers of extended warranty or product maintenance contracts** have an obligation to the buyer to perform services throughout the period of the contract and, therefore, **revenue shall be recognized in income over the period in which the seller is obligated to perform**. That is, revenue from separately priced extended warranty and product maintenance contracts shall be deferred and recognized in income on a straight-line basis over the contract period except in those circumstances in which sufficient historical evidence indicates that the costs of performing services under the contract are incurred on other than a straight-line basis. In those circumstances, revenue shall be recognized over the contract period in proportion to the costs expected to be incurred in performing services under the contract.

263.    Accordingly, the AmTrust Defendants knew, or reckless disregarded, that AmTrust's policy of revenue recognition on warranty fee revenue was improper because such policy had been previously vetted by Warrantech and the SEC when Warrantech was an independent public company, as detailed in Warrantech's SEC filings. Moreover, Joel San Antonio, Warrantech's

Chairman and CEO prior to its acquisition by AmTrust who signed Warrantech's Form 10-K for the

year ended March 31, 2006 detailing the change in Warrantech's revenue recognition policy, served

as Chairman of AMT Warranty, a subsidiary of AmTrust, from August 2010 through March 2012.

264.   These facts, including: (i) AmTrust's access to Warrantech's  pre-acquisition SEC

filings discussing the proper accounting for service revenue; (ii) AmTrust's due diligence related to

its acquisition of Warrantech; (iii) the knowledge of the revenue recognition requirements by San

Antonio, a senior executive; and (iv) AmTrust's affirmative decision to reverse Warrantech's

revenue recognition policy after it had been vetted by the SEC, demonstrate the AmTrust

Defendants' scienter.

265.   The financial significance of the change in Warrantech's  policy of accounting for

service revenue is demonstrated by the disclosure in its Form 10-K for the year ended March 31,

2006, which states, in pertinent part, as follows:

> [Recognizing revenue on dealer-obligor contracts over the life of the contracts]
> would have the effect of deferring to later periods the substantial portion of these
> revenues which the Company has previously recognized up front.  This would then
> have the further effect of substantially deferring the current year's income to future
> periods and may in fact cause the Company to recognize a current net loss.
>
> *       *       *
>
> Now that the Company is required to recognize revenues from all service contracts
> over the life of the service contracts, **the Company believes that it is unlikely that
> the Company will be able to report operating profits until at least 2008** when the
> Company expects that the revenues recognized from prior periods will begin to equal
> the revenue being deferred to future periods.  However, there can be no assurance
> that the Company will be profitable at that time.  In the meantime, the revenue
> recognition policies adopted by the Company do not have an impact on the
> Company's cash flows which are an important measure of the Company's financial
> condition and are reflected in the Statements of Cash Flows which are part of these
> financial statements.

266.   Additionally, throughout the Class Period, as the Company was rapidly growing and

reporting positive financial results, AmTrust's accounting practices were called into question in a

series of media reports and direct correspondence from research analyst groups that followed the

Company.  These reports put the AmTrust Defendants on notice of many of the same financial

improprieties which AmTrust has now acknowledged took place during the Class Period.  Aware of

claims about potential financial improprieties, the AmTrust Defendants embarked on a campaign to

publicly dismiss these assertions as being "inaccurately critical" of AmTrust's accounting practices.

The AmTrust Defendants even went so far as to commence litigation against groups that were

attempting to expose their fraudulent conduct.

**(i)    GeoInvesting Report**

267.    On December 12, 2013, GeoInvesting, LLC ("GeoInvesting") issued a public report

titled "AmTrust Financial Services: A House Of Cards?" (the "GeoInvesting Report"), which,

following a review of numerous public documents concerning the Company, including SEC filings

and statutory financial filings by AmTrust subsidiaries with various insurance commissioners, raised

questions about AmTrust's rapid growth and accounting practices.  Specifically, the GeoInvesting

Report stated:

> It seems suspicious that a company could take on so many different types of risk
> while beating consensus estimates for 14 consecutive quarters.  We find it difficult to
> believe that AFSI could quickly enter areas where they had no previous experience
> and at such a pace without ever missing a step.  This has led us to take a deeper look
> into AFSI's books and accounting.

268.    The GeoInvesting Report determined that AmTrust "appears to be inflating

earnings/net equity via offshore entities, making it difficult for regulators to see the complete picture

and/or get accurate information."  GeoInvesting opined that through various "GAAP Accounting

Shenanigans," including, *inter alia*, understating losses on foreign subsidiaries in its consolidated

financial statements by improperly accounting for intercompany transactions, "AFSI ha[d] not

disclosed a total of $276.9 million in losses ceded to Luxembourg subsidiaries."  In addition, the

GeoInvesting Report raised questions regarding the effectiveness of the Company's internal controls over its financial reporting.

269.   Following the release of the GeoInvesting Report, on December 12, 2013, AmTrust held a conference call with investors to discuss the various issues raised therein.  Defendants Zyskind and Pipoly were critical of the GeoInvesting Report.  Specifically, Defendant Zyskind referred to GeoInvesting's analysis as containing "factual inaccuracies" and "factual misstatements."  Defendant Pipoly attempted to quell the concerns of investors regarding the Company's accounting practices by declaring that "all of our foreign companies are reporting in our consolidation under US GAAP."

270.   As discussed below, however, the Company has now *admitted* that the GeoInvesting Report suspicions were well-founded as, during the Class Period, AmTrust improperly accounted for intercompany transactions.  In addition, AmTrust has conceded that material internal control deficiencies affected "the design, implementation and operation of controls over the preparation, analysis and review of significant balances and closing adjustments necessary to achieve appropriately stated consolidated account balances and disclosures" during the Class Period.

(ii)      **February 2014 *Barron's* Article**

271.   On February 8, 2014, just two months following the publication of the GeoInvesting Report, *Barron's* published an article entitled, "*Turning Losses Into Gains*" (the "Feb. 2014 *Barron's* Article"), which suggested that AmTrust's remarkable financial performance was not a byproduct of either the Company's technology systems or its shrewd deal making, as AmTrust had previously suggested, but, rather, its "bookkeeping."  The Feb. 2014 *Barron's* Article stated, in pertinent part, as follows:

> The insurer and its fans credit the company's exceptional profits to high-tech efficiency and smart deal making -- but comparison with other insurers suggests that

AmTrust's exceptionalism also extends to its bookkeeping.  After long interviews with AmTrust executives, we still have questions about some cost deferrals and reinsurance maneuvers that critics highlighted.

272.    Similar to the GeoInvesting Report, the Feb. 2014 *Barron's* Article raised questions as to whether the Company's consolidated financial statements were appropriately accounting for foreign subsidiary losses, as well as its accounting practices with respect to deferred acquisition costs.  The article noted that even one of AmTrust's own investment bankers, FBR Capital Markets, "acknowledged confusion" regarding AmTrust's accounting practices.

273.    The article stated that AmTrust claimed its accounting for intercompany losses was "done according to U.S. Generally Accepted Accounting Principles under the eyes of the audit firm BDO USA."  In addition, Defendant Pipoly described the Company's deferral accounting to *Barron's* as "very conservative."

274.    The Feb. 2014 *Barron's* Article also examined the Company's complex web of deals with related parties that involved various members of the Karfunkel family and pointed out that critics of the Company have expressed doubts as to whether the Company's businesses were performing as well as had been reported.  Defendant Zyskind rebutted the concerns raised in the article, stating that "[u]ltimately, time will prove us right."

275.    As set forth below, however, AmTrust has now *admitted* that, during the Class Period, it improperly accounted for both intercompany transactions and deferred acquisition costs. In addition, the Company has acknowledged that its internal controls were "ineffective" in assessing the risk of material misstatement relating to "subsidiary clos[ing] and consolidation adjustments" and "deferred acquisition costs."

### (iii)    May 2014 *Barron's* Article

276.    Just over three months later, on May 31, 2014, *Barron's* issued another article regarding AmTrust's accounting, entitled, "*Balance Sheet Risk Makes AmTrust Shares Vulnerable*"

(the "May 2014 *Barron's* Article").  The subtitle of the May 2014 *Barron's* Article was "Property and casualty insurer AmTrust has shone by growing faster with seemingly better margins than rivals. But its accounting raises questions."

277.    The May 2014 *Barron's* Article highlighted, *inter alia*, the Company's remarkable footing compared to its peers and challenged that certain of its accounting practices were the contributing force.  The article stated, in pertinent part, as follows:

> AmTrust Financial Services has turned heads in the property and casualty insurance business with its dramatic growth, exceptional margins, and acquisitive ways. Revenue doubled in its latest quarter to $1.1 billion, lifting the stock 10% to $42.70. Wall Street has awarded the family-run business a multiple of 4.3 times its tangible book value, in an industry where the average is around 1.4 times.  That's just one of several ways AmTrust seems to be defying insurance industry norms.

278.    The May 2014 *Barron's* Article also charged that "investors could have more confidence in AmTrust's capital footing if the insurance group's financial statements squared with each other.  ***But they don't***."  The article further alleged that "[m]ultimillion-dollar incongruities appear in AmTrust's various securities and insurance filings, for example, in inconsistent loss reserves that have the effect of flattering earnings and capital."

279.    In addition, the May 2014 *Barron's* Article also questioned if the Company was underreserved as a result of certain "puzzling accounting disparities" with respect to intercompany transactions.  In response, AmTrust's head of Investor Relations told *Barron's* that the Company's books were correctly stated, and "denie[d] there's a problem."  Moreover, shortly after the publication of the May 2014 *Barron's* Article, AmTrust issued a statement rebuking it, describing to the article as, "replete with significant factual inaccuracies."

280.    As set forth below, however, the claims of the GeoInvesting and *Barron's* Articles have been vindicated as AmTrust has acknowledged that, during the Class Period, the Company improperly accounted for intercompany transactions.  In addition, the Company admitted that its

- 80 -

internal controls were "ineffective" in assessing the risk of material misstatement relating to "subsidiary clos[ing] and consolidation adjustments."

**(iv)**      **The NYDFS Instructs AmTrust to Hire a New Auditor**

281.      ACP Re, Ltd. ("ACP Re") is a privately-held Bermuda reinsurance holding company owned by ACP Re Holdings, LLC, which is now 99.9% owned by the Michael Karfunkel Family 2005 Trust. In September 2014, a subsidiary of ACP Re merged with Tower Group International, Ltd., a Bermuda-based insurance and reinsurance holding company. The insurance regulator tasked with approving the deal was the NYDFS.

282.      In the NYDFS's September 12, 2014 letter approving the transaction, excerpts of which were filed by AmTrust on Form 8-K with the SEC on September 16, 2014, the NYDFS told AmTrust to engage a global audit firm to review its financial results for the period ended December 31, 2015. The letter stated as follows:

> Moreover, [the 2005 Michael Karfunkel Grantor Retained Annuity Trust, which owns more than 10% of the issued and outstanding common stock of both ACP and AmTrust], as a controlling shareholder of AmTrust, which has recently experienced a significant growth in its gross written premium and will likely experience further future growth from its participation in the transactions resulting in connection with the merger of Tower into a subsidiary of ACP, has indicated to the Department that it will cause AmTrust to take the following actions:
>
> 

\*      \*      \*

>
> In light of AmTrust's growth and increased geographic footprint, ***AmTrust will engage an external auditing firm with corresponding global resources and skills beginning with the audit for the annual period ending December 31, 2015. Before the engagement is undertaken, the selection of the auditing firm shall be subject to the review and prior approval of the Department***.

283.      Accordingly, although AmTrust was *not* a direct party to the transaction that the NYDFS was approving, the NYDFS took the extraordinary action to instruct the Company to hire a new auditor in place of BDO, subject to its approval.

- 81 -

### (v)    AmTrust Commences Litigation Against Its Critics

284.    Instead of admitting to the slew of ongoing accounting improprieties that it had been publicly accused of, AmTrust doubled down on its efforts to deny, downplay and conceal them.

285.    On December 11, 2014, AmTrust filed a summons with notice in New York State Supreme Court, New York County, Case No. 653816/2014, against several outfits that had criticized the Company's accounting practices.

286.    The defendants include Alistair Capital Management, LLC. ("Alistair"), an SEC registered investment advisory firm, its founder Casey H. Nelson, and GeoInvesting.  AmTrust's claims arose "out of defendants' attempt to . . . manipulate its stock price through the dissemination of actionable false and misleading statements concerning plaintiff's business, as well as other conduct, as part of an organized scheme to harm that business."  AmTrust sought, *inter alia*, "reputational damages, monetary damages, special damages, punitive damages, costs, fees, and injunctive relief based upon claims for defamation, trade libel, civil conspiracy . . . ."

### (vi)   Defendant Pipoly Highlights the Importance of Service and Fee Income to the Company

287.    On March 16, 2015, Defendant Pipoly appeared on TheStreet, Inc.'s website to discuss AmTrust's earnings and business prospects.[10]  During the broadcast, Defendant Pipoly highlighted the importance of AmTrust's service and fee income, which the Company has now admitted was cumulatively overstated by more than **$214 million**, or 13.35% during Class Period.

288.    Indeed, Defendant Pipoly characterized AmTrust's service and fee income as what "differentiated" AmTrust's business model from that of its peers, highlighting "the power that fee

---

[10]   TheStreet, Inc. is a publicly-held financial news company that provides individual and institutional investors with finance and business information.

revenue stream brings to the bottom line" as well as AmTrust's return on equity, profit margins and EBITDA.  The following exchange, in pertinent part, took place:

> Janet Al-Saad, Reporter, TheStreet, Inc.:
>
> So investors have really applauded [AmTrust's] strategy and how [AmTrust] delivered upon that strategy.  [AmTrust's] share price has been up significantly over the past year, but, on a price-to-earnings ratio basis, [AmTrust is] still trading at a bit of a discount to your peers.  **Is there anything that investors are missing, or what are they not understanding about [AmTrust] stock?**  Why is it trading like that?
>
> Defendant Pipoly:
>
> I think when you look at the price to earnings aspect, I think what people really recognize, or need to recognize in the investment community, is that **we are a differentiated model in the sense that, you know, 11% to 12% of our revenue on an annual basis comes from fee generation, which I think the industry standard is kind of 2% to 3%.  So when you look at the power that fee revenue stream brings to the bottom line in terms of accretion to ROE [return on equity], just the margin that we operate on it from an EBITDA prospective, it's a strong and growing source of revenue.  Last year [2014], it was over $400 million of fee revenue, so again, that is clearly a differentiator from us relative to the industry**.

289.    Thus, given its financial significance, Defendant Pipoly, AmTrust's CFO and Executive Vice President, knew of, or was recklessly blind to, critical facts associated with the impropriety of AmTrust's accounting for service and fee income during the Class Period, further contributing to an inference of scienter against him.

### (vii)    December 2014 Alistair Capital Letter to AmTrust's Audit Committee

290.    On December 18, 2014, Alistair issued a public letter to the members of AmTrust's Audit Committee warning them of "numerous instances of improper accounting and indications of material weaknesses of internal controls over financial reporting" at the Company (the "Alistair Letter").  Alistair noted that it was its "belief that these deficiencies put shareholders, creditors, and policyholders at grave risk."

291.    The Alistair Letter referenced both of the 2014 *Barron's* articles, as well as reports published by the other research groups raising "serious questions with respect to AmTrust's accounting practices" and offered its view that "[AmTrust's] management's responses to these articles have done little to refute the troubling assertions set forth therein.  In fact, the Company's responses appear to corroborate the detailed and specific allegations that AmTrust's accounting is severely flawed."

292.    The Alistair Letter noted that instead of attempting to refute these various allegations, AmTrust has "chosen to pursue litigation scare tactics designed to silence those who raise difficult questions about the Company's practices."  In addition, the Alistair letter charged that "[i]n light of the lengths to which management has gone in an attempt to silence its critics, one has to wonder what the Company is hiding.  As members of AmTrust's Board of Directors, and specifically its Audit Committee, we believe it is your duty to find out."

293.    The Alistair Letter also challenged the Company's reporting of accrued expenses and noted that the amounts of accrued expenses reported in the Company's balance sheets, cash flow statements and financial statements' footnotes "appear to be irreconcilable with one another."

294.    Again, the Alistair Letter unambiguously warned AmTrust's Audit Committee that "[s]uch discrepancies could imply that AmTrust is failing to recognize expenses, and thus overstating net income."  Despite the AmTrust Defendants' vehement denials during the Class Period, the Company later admitted that this is precisely what occurred during the Class Period.

295.    In addition, the Alistair Letter further noted that "AmTrust's footnote [disclosure] detailing the components of 'Accrued Expenses and Other Liabilities' does not even match the amount reported on the balance sheet for 2013."  The Alistair Letter charged that "[w]ith the

existence of multiple discrepancies within the same filing for 'Accrued Expenses and Other Liabilities,' we struggle to see how one could confidently rely on AmTrust's financial statements."

296.    Indeed, AmTrust would later admit that Alistair's charges were founded and it did, in fact, improperly account for accrued expenses during the Class Period.  In addition, the Company ultimately admitted that its internal controls were "ineffective" in assessing the risk of material misstatement relating to "period-end expense accruals" during the Class Period.

297.    The Alistair Letter also called AmTrust's accounting for deferred acquisition costs into question.  The Alistair Letter warned the Company's Audit Committee that its examination of AmTrust's financial statements suggested a "high likelihood of improper accounting" for deferred acquisition costs and "urge[d] the Audit Committee to investigate AmTrust's [deferred acquisition cost] and other cost capitalization policies."

298.    Indeed, AmTrust would later admit that it did in fact improperly account for deferred acquisition costs during the Class Period.  In addition, the Company admitted that its internal controls were "ineffective" in assessing the risk of material misstatement relating to "deferred acquisition costs" and other "capitalized costs" during the Class Period.

299.    The Alistair Letter was made public and reported in the media, including on SeekingAlpha.com shortly following its transmittal to AmTrust's Audit Committee.

(viii)    **April 2016 *Barron's* Article**

300.    On April 23, 2016, *Barron's* issued yet another article challenging AmTrust's accounting practices, entitled, "Is AmTrust Stock Worth the Premium?" (the "April 2016 *Barron's* Article").  The subtitle of the April 2016 *Barron's* Article was "The property & casualty insurer has grown rapidly.  But questions persist about its reserve adequacy and accounting."

301.    The April 2016 *Barron's* Article questioned both the Company's book value and accounting practices, explaining, in pertinent part, as follows: "[w]hile today's share price values

AmTrust at a seemingly modest nine times last year's earnings, it's still two times reported book value in an industry that typically trades close to book.  Yet those valuations are only as good as AmTrust's accounting, which we still question."  Specifically, the April 2016 *Barron's* Article questioned the adequacy of the Company's reserves, as well as its accounting for intercompany transactions.

302.    As set forth below, AmTrust later acknowledged that, during the Class Period, it improperly accounted for intercompany transactions.  In addition, the Company admitted that its internal controls were "ineffective" in assessing the risk of material misstatement relating to "subsidiary clos[ing] and consolidation adjustments."

303.    Accordingly, during the Class Period, various financial publications repeatedly put the AmTrust Defendants on notice of potential irregularities in AmTrust's financial reports.  In fact, one research organization directly corresponded with AmTrust's Audit Committee about potential irregularities associated with the very same internal control deficiencies and accounting matters the Company has now admitted were materially misstated during the Class Period.  Indeed, AmTrust's Audit Committee had a duty, pursuant to Rule 10-3(b)(3) of the Exchange Act, to investigate complaints about accounting and internal control related matters.

304.    To the contrary, however, rather than investigate such matters, the AmTrust Defendants turned a blind eye to such denouncements; repeatedly reassured investors about the propriety of AmTrust's accounting; and publicly discredited those that questioned the Company's accounting practices as being made by short sellers using "inaccuracies and deception to manipulate our stock price."

305.    The multiple reports from media sources and research analyst groups put the AmTrust Defendants on notice of potential accounting improprieties.  Notwithstanding this information, the

AmTrust Defendants either intentionally misrepresented the nature of AmTrust's financial reporting to the public or failed to undertake an investigation of the matters explicitly brought to their attention during the Class Period.  Additionally, the multiplicity of the Company's GAAP violations; the more than five year duration of AmTrust's financial improprieties; the extent to which its improprieties overstated AmTrust's financial results; the fact that Warrantech had previously been admonished by the SEC for improperly accelerating the recognition of revenue on service contracts – the primary accounting manipulation that caused the restatement; the Company's pervasive material disclosure and internal control deficiencies; the abrupt termination of Defendant Pipoly, AmTrust's CFO; and the ongoing investigations by the FBI, SEC and the NYDFS, collectively, evidence fraudulent financial reporting rather than honest recordkeeping mistakes.

**AmTrust Dismisses BDO from Its Auditing Duties**

306.    On April 4, 2016, AmTrust filed a press release with the SEC on Form 8-K reporting that as of April 1, 2016,  the Company's Audit Committee had "approved the dismissal of BDO [] as the Company's independent registered public accounting firm. . . ."  The press release also noted that BDO's dismissal was "effective as of the date of BDO's completion of audit service for the fiscal quarter ending March 31, 2016, and the filing of the Company's first quarter 2016 Form 10-Q."

307.    In addition, the Company reported that KPMG LLP ("KPMG") had been hired as its new independent auditor "beginning with the second fiscal quarter of 2016, and for the fiscal year ending December 31, 2016."

**FBI, SEC, and NYDFS Investigations of AmTrust's Accounting Are Reported by *The Wall Street Journal***

308.    Moreover, the April 2017 WSJ Article recounted details of governmental investigations into problematic accounting practices at AmTrust.  According to the April 2017 WSJ Article, a former BDO auditor directly assigned to the audits of AmTrust's financial statements for

at least three years has provided the government with information pursuant to the SEC's Whistleblower Program.  Such information, which includes e-mails and internal documents gathered by the former BDO auditor, has resulted in investigations by both the SEC and the FBI. Additionally, the April 2017 WSJ Article claims that the NYDFS, one of AmTrust's state insurance regulators, is conducting a "non-routine" examination of the Company.  While the April 2017 WSJ Article states that the Company claims it is unaware of any investigation by the FBI, it also notes that AmTrust does not deny the existence of investigations by the SEC or the NYDFS.

309.    According to the April 2017 WSJ Article, the former BDO auditor and SEC whistleblower claimed to have witnessed "seemingly unsupported adjustments to financial schedules by a senior AmTrust executive, and AmTrust's reliance on 'plugs,' or undocumented adjustments, in completing some financial schedules."

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

### Fourth Quarter 2012 and Full Year 2012 Financial Results

310.    The Class Period begins on February 14, 2013.  On that date, the Company announced its financial results for fourth quarter 2012 and full year, the period ended December 31, 2012 in a press release, which it filed with the SEC on Form 8-K (the "2/14/13 Press Release").  For the quarter, the Company reported total service and fee income of $54.1 million; net income of $55.3 million; diluted earnings per share (EPS) of $0.79; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $65.3 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $69.3 million.

311.    The statements referenced above in ¶310 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the

AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon due to the following violations of GAAP: (i) the improper reporting of warranty revenue on extended service plans; (ii) the improper reporting of accrued compensation expense; (iii) the improper reporting of acquisition costs; (iv) the improper reporting of foreign exchange gains and losses; (v) the improper reporting of software costs; (vi) the improper reporting of interest expense; (vii) the improper reporting of intercompany transactions; and (viii) the improper reporting of other accounting matters.  While AmTrust has not published restated financial data on a quarterly basis prior to the quarter ended March 31, 2015 quantifying these misstatements, on information and belief, the income-related financial measures in ¶310 were materially misstated due to the fact that, as revealed by the 2016 Form 10-K, these metrics were materially misstated on an annual basis for the financial years ended December 31, 2012, 2013, 2014, 2015, and 2016, and were the product of fraudulent accounting improprieties, which was known to the AmTrust Defendants or recklessly disregarded by them.

312.    For the full year 2012, the Company reported total service and fee income of $172.2 million; net income of $178 million; net income allocated to AmTrust common shareholders of $177.3 million; diluted earnings per share (EPS) of $2.57; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $237.4 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $222.5 million.

313.    The statements referenced above in ¶312 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting

improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon due to the following violations of GAAP: (i) the improper reporting of warranty revenue on extended service plans; (ii) the improper reporting of accrued compensation expense; (iii) the improper reporting of acquisition costs; (iv) the improper reporting of foreign exchange gains and losses; (v) the improper reporting of software costs; (vi) the improper reporting of interest expense; (vii) the improper reporting of intercompany transactions; and (viii) the improper reporting of other accounting matters.

314.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶312 were materially misstated and the product of fraudulent accounting improprieties, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by *24.17%*;

- Net income was overstated by *14.06%*;

- Net income allocated to AmTrust common stockholders was overstated by *14.68%*;

- Diluted Earnings per Share (EPS) was overstated by *13.59%*.

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *19.43%*; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *21.67%*.

315.    Following the issuance of the 2/14/13 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance.  Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 2/14/13 Press Release.  In his prepared remarks, Defendant Zyskind stated, in pertinent part, as follows:

> On Specialty Risk and Extended Warranty, we are starting to see a lot of opportunities that we didn't see in the past.  The acquisition of Warrantech, which is

now a few years, is really starting to bear fruits.  **We have tremendous momentum.**
**We have a lot of opportunities to grow that business**.

                         \*         \*         \*

**I would just like to say, we think we have a very, very strong business model**.

316.     The statements referenced above in ¶315 touting the Company's Specialty Risk and Extended Warranty business segment were materially false and misleading and/or omitted material information when made because they failed to disclose that the Company was inflating its results, including within its Specialty Risk and Extended Warranty business, which the AmTrust Defendants knew or recklessly disregarded.  Specifically, the Company was recognizing the majority of its warranty contract fee revenue related to administration services at the time of the sale of ESP.  Instead, as AmTrust acknowledged in the 2/27/17 Press Release "its warranty contracts should <u>not</u> be accounted for using the multiple-element guidance, but instead *deferred over the life of the contract*."  Ultimately, in the 2016 Form 10-K, the Company admitted that although it had "historically recognized the *majority* of revenue related to administration services at the time of sale of ESP," it would need to change "its application of the revenue recognition guidance to record revenue related to administrative services on a straight-line basis over the terms of the ESP contract."  Further, AmTrust admitted that the impact of this accounting practice "created an overstatement of service and fee income" during the Class Period.

317.     On March 1, 2013, AmTrust filed its annual report for the year ended December 31, 2012 with the SEC on Form 10-K (the "2012 Form 10-K"), which included the Company's audited financial statements and was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 2/14/13 Press Release.  The 2012 Form 10-K included signed SOX certifications attesting to the accuracy of the Company's financial reporting, the design,

strength and effectiveness of AmTrust disclosure controls and procedures, the disclosure of any

material changes to the Company's controls over financial reporting, and the disclosure of all fraud.

318.   As part of these SOX certifications, the Zyskind and Pipoly each represented as

follows:

> 1. I have reviewed this Annual Report on Form 10-K of AmTrust Financial Services, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report)

that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

319.    The 2012 Form 10-K represented that AmTrust's "consolidated financial statements . . . have been prepared in conformity with accounting principles generally accepted in the United States of America."

320.    Concerning the Company's "Controls and Procedures," the 2012 Form 10-K stated, in pertinent part, as follows:

**Controls and Procedures**

**Disclosure Controls and Procedures**

Our management, with participation and under the supervision of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act is timely recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

*        *        *

**Management Report on Internal Control Over Financial Reporting**

We, as management of the Company, are responsible for establishing and maintaining adequate internal control over financial reporting . . .  Management has evaluated the effectiveness of our internal control over financial reporting as of December 31, 2012, based on the control criteria established in a report entitled *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on such evaluation, we have concluded that our internal control over financial reporting is effective as of December 31, 2012***.

321.   The statements referenced above in ¶¶318-320 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made because the following true facts that were concealed from investors were known by AmTrust, Zyskind, and Pipoly, or recklessly disregarded by them during the Class Period:

(a)   that AmTrust's financial results were the product of fraudulent accounting and should not be relied upon due to the following violations of GAAP: (i) the improper reporting of warranty revenue on extended service plans; (ii) the improper reporting of accrued compensation expense; (iii) the improper reporting of acquisition costs; (iv) the improper reporting of foreign exchange gains and losses; (v) the improper reporting of software costs; (vi) the improper reporting of interest expense; (vii) the improper reporting of intercompany transactions; and (viii) the improper reporting of other accounting matters;

(b)   that AmTrust's disclosure controls and internal controls were "ineffective" in assessing the risk of material misstatements relating to the following eight distinct areas of corporate accounting and financial reporting: (i) foreign exchange; (ii) deferred acquisition costs; (iii) goodwill impairment; (iv) warranty administration services revenue; (v) capitalized costs; (vi) period-end

expense accruals; (vii) the statement of cash flows; and (viii) the statement other comprehensive income; and

(c)     that the certifications issued by Defendants Zyskind and Pipoly associated with the Company's internal and disclosure controls were materially false and misleading.

322.     Regarding AmTrust's accounting for warranty fee revenue, the 2012 Form10-K stated, in pertinent part, as follows:

> *Warranty Fee Revenue* – The Company promotes and markets extended service plans ("ESP") to consumers through retailers and certain other marketing organizations usually with terms of coverage ranging from one to three years, commencing at the expiration of the manufacturers' warranty, if applicable.  The Company generally insures the obligations under ESPs through contractual liability insurance issued by one of its insurance company subsidiaries.  Under the terms of service agreements with various retailers, the Company provides for marketing and administrative services related to ESP.  These agreements are generally for one-year terms and can be cancelled by either party with thirty days advance notice.  The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of ESP.  ***However, the Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods***.

323.     The statement referenced above in ¶322 that the "Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods" was materially false and misleading and/or failed to disclose that the Company was improperly recognizing the majority of its warranty contract fee revenue related to administration services at the time of the sale of ESP, which the AmTrust Defendants knew or recklessly disregarded.  Instead, as AmTrust acknowledged in the 2/27/17 Press Release "its warranty contracts should <u>not</u> be accounted for using the multiple-element guidance, but instead *deferred over the life of the contract*."  Ultimately, in the 2016 Form 10-K, the Company admitted that although it had "historically recognized the *majority* of revenue related to administration services at the time of sale of ESP," it would need to change "its application of the revenue recognition guidance to record revenue related to administrative services on a straight-line basis over the terms of the ESP contract."  Further,

AmTrust admitted that the impact of this accounting practice "created an overstatement of service and fee income" during the Class Period.

**First Quarter 2013 Financial Results**

324.    On May 1, 2013, AmTrust announced its financial results for the first quarter, the period ended March 31, 2013 in a press release, which it filed with the SEC on Form 8-K (the "5/1/13 Press Release").  For the quarter, the Company reported total service and fee income of $60.5 million; net income of $64.2 million; diluted earnings per share (EPS) of $0.91; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $86.6 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $79.5 million.

325.    The statements referenced above in ¶324 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶311.

326.    Following the issuance of the 5/1/13 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance.  Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 5/1/13 Press Release.  In his prepared remarks, Defendant Zyskind stated, in pertinent part, as follows:

> *We are very pleased to report that AmTrust had a very strong quarter.  We continue to see positive trends in all segments of our business.  We feel very strong about this quarter and we believe that this is an indication that the year, the remainder of 2013, will be a very strong year.*

*       *       *

*In addition, our Specialty Risk and Extended Warranty, that's a business that is very, very stable, that doesn't have the ups and downs of a hard or soft market, but that's something with time more and more as we continue growing, as we continue being a disciplined player in that arena . . . are more and more being seen as a global player.*

327.    During the call, Defendant Pipoly stated, in pertinent part, as follows:

*Our net income from the quarter not only benefited from continued momentum in our book of business; it also reflects continued [growth] in our fee revenue operations.*

328.    The statements referenced above in ¶¶326-327 highlighting the Company's positive financial performance and the strength of the Company's Specialty Risk and Extended Warranty business segment were materially false and misleading and/or omitted material information when made because they failed to disclose that the Company was inflating its results, including with its Specialty Risk and Extended Warranty business and other of its business segments, which the AmTrust Defendants knew or recklessly disregarded.  Specifically, the Company was among other things, recognizing the majority of its warranty contract fee revenue related to administration services at the time of the sale of ESP.  Instead, as AmTrust acknowledged in the 2/27/17 Press Release "its warranty contracts should <u>not</u> be accounted for using the multiple-element guidance, but instead deferred over the life of the contract."  Ultimately, in the 2016 Form 10-K, the Company admitted that although it had "historically recognized the majority of revenue related to administration services at the time of sale of ESP," it would need to change "its application of the revenue recognition guidance to record revenue related to administrative services on a straight-line basis over the terms of the ESP contract."  Further, AmTrust admitted that the impact of this accounting practice "created an overstatement of service and fee income" during the Class Period.

329.    On May 9, 2013, AmTrust filed its quarterly report for the period ended March 31, 2013 with the SEC on Form 10-Q (the "1Q13 Form 10-Q"), which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 5/1/13 Press

Release.  The 1Q13 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

330.    The 1Q13 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements. . . ."

331.    The statements referenced above in ¶¶329 and 330 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Second Quarter 2013 Financial Results**

332.    On August 6, 2013, AmTrust announced its financial results for the second quarter, the period ended June 30, 2013 in a press release, which it filed with the SEC on Form 8-K (the "8/6/13 Press Release").  For the quarter, the Company reported total service and fee income of $88.1 million; net income of $80.1 million; diluted earnings per share (EPS) of $1.14; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $78.8 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $105 million.

333.    The statements referenced above in ¶332 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the

AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶311.

334.    Following the issuance of the 8/6/13 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance.  Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 8/6/13 Press Release.  In his prepared remarks, Defendant Zyskind stated, in pertinent part, as follows:

> *I'm pleased to announce that we have had a very strong second quarter and first six months of the year.  All of our segments continued to perform very well, our Small Commercial Business, our Specialty Risk and Extended Warranty, and our Specialty Program . . . .  There's really not much more to add to what is in the press release.  We had a strong quarter in every line of business. Our return on equity is very high.  We believe that these first six months of the year will continue, and we will continue to see strong growth in both revenue and profits for the remainder of 2013 and into 2014.*

335.    The statements referenced above in ¶334 highlighting the Company's positive financial performance and the strength of the Company's Specialty Risk and Extended Warranty business segment were materially false and misleading for the reasons set forth in ¶328.

336.    On August 9, 2013, AmTrust filed its quarterly report for the period ended June 30, 2013 with the SEC on Form 10-Q (the "2Q13 Form 10-Q"), which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 8/6/13 Press Release.  The 2Q13 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

337.    The 2Q13 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

338.    The statements referenced above in ¶¶336 and 337 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Third Quarter 2013 Financial Results**

339.    On November 5, 2013, AmTrust announced its financial results for the third quarter, the period ended September 30, 2013 in a press release, which it filed with the SEC on Form 8-K (the "11/5/13 Press Release").  For the quarter, the Company reported total service and fee income of $90.0 million; net income of $59.7 million; net income attributable to AmTrust common stockholders of $58.2 million; diluted earnings per share (EPS) of $0.74; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $99.1 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $90.4 million.

340.    The statements referenced above in ¶339 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶311.

- 100 -

341.    Following the issuance of the 11/5/13 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 11/5/13 Press Release.

342.    During the call, Defendant Zyskind was asked by an analyst about the momentum in AmTrust's warranty business. Defendant Zyskind's exchange with the analyst is set forth, in pertinent part, as follows:

**Mark Hughes - SunTrust Robinson Humphrey – Analyst**:

Then, finally, in the Warranty business, the GM contract that you won, have you sustained momentum in terms of new business opportunities? How should we see that premium playing out over the next few quarters?

**Barry Zyskind - AmTrust Financial Services Inc. – President and CEO**:

I think -- I don't want to comment on any individual accounts, but what I tell you is, we continue growing with all our accounts. We continue getting new accounts. *I think we are very, very well positioned in the Specialty Risk and Extended Warranty.* It's a business that we've been doing, really, since our inception, over 15 years ago, and even before we bought the Company, it was a company that focused on insuring technology.

343.    In addition, during the call, the Individual Defendants were asked by an analyst about the significant increase in service and fee income. Defendant Zyskind's exchange with the analyst is set forth, in pertinent part, as follows:

**Bijan Moazami - Guggenheim Securities LLC – Analyst**:

Perfect. One last question. $240 million of service and fee incomes, growing in a dramatic way. What's your plan for this section, Barry, going forward?

**Barry Zyskind - AmTrust Financial Services Inc. – President and CEO**:

I think right now our goal is to continue growing it. I think it's a great thing to have a strong insurance franchise and a *very strong fee business*. It gives you a lot of flexibility . . . . So, I think right now, the way we look at it, we think it's a great business. It's closely intertwined and relate[s] to what we do overall. Every day we

wake up, we want to continue growing our insurance business, and we want to grow our fee business.

344.    The statements referenced above in ¶¶342-343 by Defendant Zyskind representing that the Company was "very, very well positioned in the Specialty Risk and Extended Warranty" and highlighting the strength of the Company's Specialty Risk and Extended Warranty business segment and stating that AmTrust had a "very strong fee business" were materially false and misleading for the reasons set forth in ¶328.

345.    On November 8, 2013, AmTrust filed its quarterly report for the period ended September 30, 2013 with the SEC on Form 10-Q (the "3Q13 Form 10-Q"), which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 11/5/13 Press Release.  The 3Q13 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.  These certifications repeated in substance the same representations as set forth in ¶318.

346.    The 3Q13 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

347.    The statements referenced above in ¶¶345 and 346 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**December 16, 2013 Conference Call**

348.    On December 12, 2013, GeoInvesting published an article accusing the Company of various "Accounting Shenanigans," including, *inter alia*, understating losses on foreign subsidiaries in its consolidated financial statements through the improper accounting for intercompany transactions.   In addition, the GeoInvesting Report questioned the effectiveness of AmTrust's internal controls.

349.    On December 16, 2013, AmTrust issued a press release stating that later the same day, it would hold a conference call to "comment on the Company's recent stock activity and provide an update on the outlook for year-end 2013 and 2014."  On the conference call held the same day, Defendants Zyskind and Pipoly responded to the issues raised in the GeoInvesting Report.

350.    Defendant Zyskind referred to the GeoInvesting Report as containing "factual inaccuracies" and "factual misstatements."   Defendant Zyskind also stated, in pertinent part, as follows:

> I would like to conclude by reminding everyone that while we can come to work every day and our focus is on continuing to create shareholder value, *the short sellers use inaccuracies and deception to manipulate our stock price in an effort to capitalize in the short term by destroying well-deserved shareholder value and having the process unfairly hurt our loyal shareholders.  We felt it necessary to correct the record and to illustrate how we see our business.  I can assure you that this Company has never been in a better and stronger position, and that we look forward to 2014 with supreme confidence that we will grow our top line and bottom line, and that our shareholders will be very pleased with our results.*
>
> *First, I will address in general these factual misstatements, and then I will turn the call over to Ron Pipoly, our Chief Financial Officer, for additional details.  This report offered by investors that have a short position in our stock was inaccurately critical of two of our businesses: our Luxembourg reinsurance business and our investment in life science*.

351.    Defendant Pipoly further commented on AmTrust's accounting requirements assuring investors its foreign companies were complying with GAAP.  Pipoly stated, in pertinent part, as follows:

Regardless of local accounting requirements, ***all of our foreign companies are reporting in our consolidation under US GAAP***.

352.    The statements referenced above in ¶¶350 and 351 explicitly denying the claims made in the GeoInvesting Report and maintaining the accuracy of the Company's financial reporting and its purported compliance with GAAP, were materially false and misleading and/or omitted material information when made because AmTrust, Zyskind, and Pipoly concealed from investors the true fact that AmTrust's financial results were materially misstated and should not be relied upon due to the Company's various violations of GAAP, as set forth in ¶311, including, *inter alia*, the improper reporting of intercompany transactions, which were known by AmTrust, Zyskind, and Pipoly, or recklessly disregarded by them during the Class Period.

**February 10, 2014 *Barron's* Article**

353.    As noted above, the Feb. 2014 *Barron's* Article also raised questions about AmTrust's accounting practices.  *Supra* ¶271.  Specifically, the Feb. 2014 *Barron's* Article probed whether the Company's consolidated financial statements appropriately accounted for foreign subsidiary losses, and questioned its accounting practices with respect to deferred acquisition costs. Both Defendant Zyskind and Pipoly were quoted in the Feb. 2014 *Barron's* Article rebuking the concerns raised therein.  Defendant Zyskind was quoted as stating that "***[u]ltimately, time will prove us right***."  In addition, Defendant Pipoly described AmTrust's deferral accounting as being "***very conservative***."

354.    The statements referenced above in ¶353 in which the AmTrust Defendants persisted in denying the impropriety of its accounting practices, specifically claiming that its deferral accounting was "very conservative," maintaining that "time will prove us right" and defending the accuracy of the Company's financial statements with respect to foreign subsidiary losses, were materially false and misleading and/or omitted material information when made because AmTrust,

Zyskind, and Pipoly concealed from investors the true fact that AmTrust's financial results were materially misstated and should not be relied upon due to the Company's various violations of GAAP, as set forth in ¶321, including, *inter alia*, the improper reporting of intercompany transactions and deferred acquisition costs, which were known by AmTrust, Zyskind, and Pipoly, or recklessly disregarded by them during the Class Period.

**Fourth Quarter 2013 and Full Year 2013 Financial Results**

355.    On February 13, 2014, the Company announced its financial results for fourth quarter 2013 and full year ended December 31, 2013 in a press release, which it filed with the SEC on Form 8-K (the "2/13/14 Press Release").   For the quarter, the Company reported total service and fee income of $93.0 million; net income of $66.5 million; net income attributable to AmTrust common stockholders of $64.7 million; diluted earnings per share (EPS) of $0.82; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $100.7 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $84.9 million.

356.    The statements referenced above in ¶355 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon due to the following violations of GAAP: (i) the improper reporting of warranty revenue on extended service plans; (ii) the improper reporting of accrued compensation expense; (iii) the improper reporting of acquisition costs; (iv) the improper reporting of foreign exchange gains and losses; (v) the improper reporting of software costs; (vi) the improper reporting of interest expense; (vii) the improper reporting of intercompany transactions; and (viii) the improper reporting of other accounting matters.   While AmTrust has not published restated financial data on a

quarterly basis prior to the quarter ended March 31, 2015 quantifying these misstatements, on information and belief, the income-related financial measures in ¶355 were materially misstated, due to the fact that, as revealed by the 2016 Form 10-K, these metrics were materially misstated on an annual basis for the financial year ended December 31, 2013, and were the product of fraudulent accounting improprieties, which was known to AmTrust, Zyskind, and Pipoly, or recklessly disregarded by them.

357.    For the full year 2013, the Company reported: total service and fee income of $331.6 million; net income of $289.2 million; net income attributable to AmTrust common stockholders of $286.9 million; diluted earnings per share (EPS) of $3.67; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $355.8 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $375.7 million.

358.    The statements referenced above in ¶351 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon due to the following violations of GAAP: (i) the improper reporting of warranty revenue on extended service plans; (ii) the improper reporting of accrued compensation expense; (iii) the improper reporting of acquisition costs; (iv) the improper reporting of foreign exchange gains and losses; (v) the improper reporting of software costs; (vi) the improper reporting of interest expense; (vii) the improper reporting of intercompany transactions; and (viii) the improper reporting of other accounting matters.

359.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶357 were materially misstated and the product of fraudulent accounting, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by **15.42%**;

- Net income was overstated by **15.69%**;

- Net income attributable to AmTrust common stockholders was overstated by **15.84%**;

- Diluted Earnings per Share (EPS) was overstated by **15.58%**.

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by **18.42%**; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by **18.98%**.

360.    Following the issuance of the 2/13/14 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance.  Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 2/13/14 Press Release.  With respect to AmTrust's accounting practices – which were recently called into question by the GeoInvesting Report and the Feb. 2014 *Barron's* Article – Defendant Zyskind stated, in pertinent part, as follows:

> *For the record, AmTrust strictly adheres to generally accepted accounting principles* and Luxembourg is not, as I mentioned previously, significant in terms of AmTrust performance.

361.    Specifically, commenting on the allegations of the GeoInvesting Report that the Company improperly accounted for its foreign subsidiaries and the Feb. 2014 *Barron's* Article, Defendant Pipoly stated, in pertinent part, as follows:

> *And there's no hiding of losses or moving of bad policies or whatever thesis you want to put out there.  The fact of the matter is that we account for Luxembourg appropriately; and in our opinion, it's a very low risk way of making a nice profit.*

362.    The statements referenced above in ¶¶360 and 361 regarding the AmTrust Defendants' explicit denial of accounting improprieties were materially false and misleading and/or omitted material information when made because the following true facts that were concealed from investors were known by AmTrust, Zyskind, and Pipoly or recklessly disregarded by them during the Class Period:

(a)    that AmTrust's financial results were materially misstated and should not be relied upon due to the various aforementioned violations of GAAP, as set forth in ¶321, including the improper reporting of intercompany transactions; and

(b)    that AmTrust's disclosure controls and internal controls were "ineffective" in assessing the risk of material misstatements relating to eight distinct areas of corporate accounting and financial reporting, as set forth in ¶321.

363.    On March 3, 2014, AmTrust filed its 2013 Form 10-K, which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 2/13/14 Press Release.  The 2013 Form 10-K included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

364.    The 2013 Form 10-K represented that AmTrust's "consolidated financial statements . . . have been prepared in conformity with accounting principles generally accepted in the United States of America."

365.    Concerning the Company's "Controls and Procedures," the 2013 Form 10-K stated, in pertinent part, as follows:

**Controls and Procedures**

**Disclosure Controls and Procedures**

Our management, with participation and under the supervision of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report.  Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act is timely recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

\*       \*       \*

**Management Report on Internal Control Over Financial Reporting**

We, as management of the Company, are responsible for establishing and maintaining adequate internal control over financial reporting . . .  Management has evaluated the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the control criteria established in a report entitled *Internal Control – Integrated Framework (1992)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on such evaluation, we have concluded that our internal control over financial reporting is effective as of December 31, 2013***.

366.    The statements referenced above in ¶¶363 and 365 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information for the reasons set forth in 321.

367.    With respect to AmTrust's accounting for warranty fee revenue, the 2013 Form 10-K stated, in pertinent part, as follows:

*Warranty Fee Revenue* – The Company promotes and markets extended service plans ("ESP") to consumers through retailers and certain other marketing organizations usually with terms of coverage ranging from one to three years, commencing at the expiration of the manufacturers' warranty, if applicable. The Company generally insures the obligations under ESPs through contractual liability insurance issued by one of its insurance company subsidiaries. Under the terms of service agreements with various retailers, the Company provides for marketing and administrative services related to ESP. These agreements are generally for one-year terms and can be canceled by either party with thirty days advance notice. The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of ESP. ***However, the Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods***.

368.     The statement referenced above in ¶367 that the "Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods" was materially false and misleading and/or failed to disclose that the Company was improperly recognizing the majority of its warranty contract fee revenue related to administration services at the time of the sale of ESP, which the AmTrust Defendants knew or recklessly disregarded. Instead, as AmTrust acknowledged in the 2/27/17 Press Release "its warranty contracts should <u>not</u> be accounted for using the multiple-element guidance, but instead deferred over the life of the contract." Ultimately, in the 2016 Form 10-K, the Company admitted that although it had "historically recognized the majority of revenue related to administration services at the time of sale of ESP," it would need to change "its application of the revenue recognition guidance to record revenue related to administrative services on a straight-line basis over the terms of the ESP contract." Further, AmTrust admitted that the impact of this accounting practice "created an overstatement of service and fee income" during the Class Period.

**First Quarter 2014 Financial Results**

369.     On May 1, 2014, AmTrust announced its financial results for the first quarter, the period ended March 31, 2014 in a press release, which it filed with the SEC on Form 8-K (the "5/1/14 Press Release"). For the quarter, the Company reported total service and fee income of

$91.0 million; net income of $101.7 million; net income attributable to AmTrust common stockholders of $99.9 million; diluted earnings per share (EPS) of $1.27; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $121.2 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $110.7 million.

370.    The statements referenced above in ¶369 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶313.

371.    Following the issuance of the 5/1/14 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance.  Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 5/1/14 Press Release.  In his prepared remarks, Defendant Pipoly stated, in pertinent part, as follows:

> We are very pleased with the strong results we reported in the first quarter.  We experienced substantial growth in all of our divisions. Combination of both organic growth and through acquisitions, both contributed to the rise in the top and bottom line results . . . ***Our Extended Warranty and Specialty division experienced growth in revenues and profit while maintaining margins with new products and the benefit of the Car Care acquisition***.  Economic improvement drove increased consumer demand for warranty.  In addition, we are benefiting from the introduction of new products, our relationships, and the development of innovative distribution sources.

372.    The statements referenced above in ¶371 highlighting the Company's positive financial performance and the strength of the Company's Specialty Risk and Extended Warranty business segment were materially false and misleading and/or omitted material information when made because they failed to disclose that the Company was inflating its financial results, including within its Specialty Risk and Extended Warranty business and other of its business segments, which

- 111 -

the AmTrust Defendants knew or recklessly disregarded.  Specifically, the Company was recognizing the majority of its warranty contract fee revenue related to administration services at the time of the sale of ESP.  Instead, as AmTrust acknowledged in the 2/27/17 Press Release "its warranty contracts should <u>not</u> be accounted for using the multiple-element guidance, but instead deferred over the life of the contract."  Ultimately, in the 2016 Form 10-K, the Company admitted that although it had "historically recognized the majority of revenue related to administration services at the time of sale of ESP," it would need to change "its application of the revenue recognition guidance to record – revenue related to administrative services on a straight-line basis over the terms of the ESP contract."  Further, AmTrust admitted that the impact of this accounting practice "created an overstatement of service and fee income" during the Class Period.

373.     On May 12, 2014, AmTrust filed its quarterly report for the period ended March 31, 2014 with the SEC on Form 10-Q (the "1Q14 Form 10-Q"), which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 5/1/14 Press Release.  The 1Q14 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.  These certifications repeated in substance the same representations as set forth in ¶318.

374.     The 1Q14 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

375.     The statements referenced above in ¶¶373 and 374 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and

effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Second Quarter 2014 Financial Results**

376.   On August 7, 2014, AmTrust announced its financial results for the second quarter, the period ended June 30, 2014 in a press release, which it filed with the SEC on Form 8-K (the "8/7/14 Press Release").  For the quarter, the Company reported total service and fee income of $99.5 million; net income of $104.2 million; net income attributable to AmTrust common stockholders of $106.3 million; diluted earnings per share (EPS) of $1.33; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $128.1 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $118.2 million.

377.   The statements referenced above in ¶376 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶311.

378.   Following the issuance of the 8/7/14 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance.  Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 8/7/14 Press Release.  In his prepared remarks, Defendant Zyskind stated, in pertinent part, as follows:

*As always, we are very pleased with our Specialty Risk and Extended Warranty [segment].*

379.     The statement referenced above in ¶378 highlighting the strength of the Company's Specialty Risk and Extended Warranty business segment were materially false and misleading for the reasons set forth in ¶328.

380.     On August 11, 2014, AmTrust filed its quarterly report for the period ended June 30, 2014 with the SEC on Form 10-Q (the "2Q14 Form 10-Q"), which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 8/7/14 Press Release.  The 2Q14 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

381.     The 2Q14 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements. . . ."

382.      The statements referenced above in ¶¶380 and 381 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Third Quarter 2014 Financial Results**

383.     On November 3, 2014, AmTrust announced its financial results for the third quarter, the period ended September 30, 2014 in a press release, which it filed with the SEC on Form 8-K (the "11/4/14 Press Release").  For the quarter, the Company reported total service and fee income of $117.6 million; net income of $157.2 million; net income attributable to AmTrust common stockholders of $156.6 million; diluted earnings per share (EPS) of $1.97; income before other, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $133.3 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $145.2 million.

384.     The statements referenced above in ¶383 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶311.

385.     Following the issuance of the 11/4/14 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance.  Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 11/4/14 Press Release.  During the call, Defendants were asked by an analyst about AmTrust's earned premium trends in its specialty risk and extended warranty business.  Defendant Pipoly and Zyskind's exchange with the analyst was, in pertinent part, as follows:

> **Randy Binner - FBR & Co. - Analyst**
>
> Then on the earn pattern in the -- in specialty and warranty, which is about -- 70% of that is your international business, the earned premium trend continued to be good and I think I had asked about that last quarter.  I think it's a function of Sagicor being larger and then some of the older international warranty business being earned in

over a longer period of time.  Is that what was driving the better earned this quarter in international?

**Ron Pipoly - AmTrust Financial Services, Inc. - EVP, CFO**

Randy, it is Ron.  Yes, that was.

**Randy Binner - FBR & Co. - Analyst**

Okay, is it anything other than those two things?

**Ron Pipoly - AmTrust Financial Services, Inc. - EVP, CFO**

No, it is not.

**Barry Zyskind - AmTrust Financial Services, Inc. - CEO, President**

Randy, this is Barry.  *It is also an accumulation of many years of warranty writing. So as you are growing in that line of business, you have a lot of deferred revenue, you have a lot of unearned premium.  But as you grow and you have many years, so now you are earning multiple years at the same time*.

386.   Defendants were also asked about AmTrust's fee revenue generation in the prior quarter.  Defendant Pipoly's exchange with the analyst set forth, in pertinent part, as follows:

**Randy Binner - FBR & Co. - Analyst**

Then, gentlemen, back to fees.  I guess there is a good amount of questioning there, but was there -- there was nothing unusual this quarter timing wise or seasonality wise in that good revenue number there. Is that correct?

**Ron Pipoly - AmTrust Financial Services, Inc. - EVP, CFO**

*Randy, it's Ron.  No, there was not*.

387.   The statements referenced above in ¶¶385-386 regarding "deferred revenue" in AmTrust's warranty business and its positive results with respect to its fee revenue was materially false and misleading at the time they were made because they failed to disclose that the Company was inflating the results, including within its Specialty Risk and Extended Warranty business, which the AmTrust Defendants knew or recklessly disregarded.   Specifically, the Company was recognizing the majority of its warranty contract fee revenue related to administration services at the

- 116 -

time of the sale of ESP.  Instead, as AmTrust acknowledged in the 2/27/17 Press Release "its warranty contracts should not be accounted for using the multiple-element guidance, but instead deferred over the life of the contract."  Ultimately, in the 2016 Form 10-K, the Company admitted that although it had "historically recognized the majority of revenue related to administration services at the time of sale of ESP," it would need to change "its application of the revenue recognition guidance to record revenue related to administrative services on a straight-line basis over the terms of the ESP contract."  Further, AmTrust admitted that the impact of this accounting practice "created an overstatement of service and fee income" during the Class Period.

388.    On November 10, 2014, AmTrust filed its quarterly report for the period ended September 30, 2014 with the SEC on Form 10-Q (the "3Q14 Form 10-Q"), which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 11/4/14 Press Release.  The 3Q14 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

389.    The 3Q14 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

390.    The statements referenced above in ¶¶388 and 389 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and

the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Fourth Quarter 2014 and Full Year 2014 Financial Results**

391.    On February 11, 2015 the Company announced its financial results for fourth quarter 2014, and full year, the period ended December 31, 2014, in a press release, which it filed with the SEC on Form 8-K (the "2/11/15 Press Release").   For the quarter, the Company reported total service and fee income of $101.7 million; net income of $83.5 million; net income attributable to AmTrust common stockholders of $71.6 million; diluted earnings per share (EPS) of $0.88; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $65.9 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $98 million.

392.    The statements referenced above in ¶391 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon due to the following violations of GAAP: (i) the improper reporting of warranty revenue on extended service plans; (ii) the improper reporting of accrued compensation expense; (iii) the improper reporting of acquisition costs; (iv) the improper reporting of foreign exchange gains and losses; (v) the improper reporting of software costs; (vi) the improper reporting of interest expense; (vii) the improper reporting of intercompany transactions; and (viii) the improper reporting of other accounting matters.   While AmTrust has not published restated financial data on a quarterly basis prior to the quarter ended March 31, 2015 quantifying these misstatements, on information and belief, the income-related financial measures in ¶391 were materially misstated, due to the fact that, as revealed by the 2016 Form 10-K, these metrics were materially misstated on an

annual basis for the financial year ended December 31, 2014, and were the product of fraudulent accounting improprieties, which was known to AmTrust, Zyskind, and Pipoly, or recklessly disregarded by them.

393.    For the full year 2014, the Company reported: total service and fee income of $409.7 million; net income of $446.6 million; net income attributable to AmTrust common stockholders of $434.3 million; diluted earnings per share (EPS) of $5.45; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $448.4 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $471.9 million.

394.    The statements referenced above in ¶393 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon due to the following violations of GAAP: (i) the improper reporting of warranty revenue on extended service plans; (ii) the improper reporting of accrued compensation expense; (iii) the improper reporting of acquisition costs; (iv) the improper reporting of foreign exchange gains and losses; (v) the improper reporting of software costs; (vi) the improper reporting of interest expense; (vii) the improper reporting of intercompany transactions; and (viii) the improper reporting of other accounting matters.

395.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶393 were materially misstated and the product of fraudulent accounting, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by *12.15%*;

- Net income was overstated by *7.55%*;

- Net income attributable to AmTrust common stockholders was overstated by *7.78%*;

- Diluted Earnings per Share (EPS) was overstated by *7.51%*;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *13.34%*; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *13.64%*.

396.   On March 2, 2015, AmTrust filed the 2014 Form 10-K, which included the Company's audited financial statements and was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 2/11/15 Press Release.  The 2014 10-K included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.  These certifications repeated in substance the same representations as set forth in ¶318.

397.   The 2014 Form 10-K represented that AmTrust's "consolidated financial statements . . . have been prepared in conformity with accounting principles generally accepted in the United States of America."

398.   Concerning the Company's "Controls and Procedures," the 2014 Form 10-K repeated in substance the same representations set forth in ¶320.

399.   The statements referenced above in ¶¶396-398 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and

the Company's accounting were materially false and misleading and/or omitted material information for the reasons set forth in ¶321.

400.    With respect to AmTrust's accounting for warranty fee revenue, the 2014 Form 10-K stated, in pertinent part, as follows:

> *Warranty Fee Revenue* – The Company promotes and markets extended service plans ("ESP") to consumers through retailers and certain other marketing organizations usually with terms of coverage ranging from one to three years, commencing at the expiration of the manufacturers' warranty, if applicable. The Company generally insures the obligations under ESPs through contractual liability insurance issued by one of its insurance company subsidiaries. Under the terms of service agreements with various retailers, the Company provides for marketing and administrative services related to ESP. These agreements are generally for one-year terms and can be canceled by either party with thirty days advance notice. The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of ESP. ***However, the Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods***.

401.    The statement referenced above in ¶400 that the "Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods" was materially false and misleading at the time it was made for the reasons set forth in 323.

**First Quarter 2015 Financial Results**

402.    On May 5, 2015, AmTrust announced its financial results for the first quarter, the period ended March 31, 2015 in a press release, which it filed with the SEC on Form 8-K (the "5/5/15 Press Release"). For the quarter, the Company reported total service and fee income of $112.9 million; net income of $164.1 million; net income attributable to AmTrust common stockholders of $154.7 million; diluted earnings per share (EPS) of $1.85; income before other income, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $169 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $205.4 million.

403.    The statements referenced above in ¶402 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon due to the following violations of GAAP: (i) the improper reporting of warranty revenue on extended service plans; (ii) the improper reporting of accrued compensation expense; (iii) the improper reporting of acquisition costs; (iv) the improper reporting of foreign exchange gains and losses; (v) the improper reporting of software costs; (vi) the improper reporting of interest expense; (vii) the improper reporting of intercompany transactions; and (viii) the improper reporting of other accounting matters.

404.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶402 were materially misstated and the product of fraudulent accounting improprieties, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by *10.54%*;

- Net income was overstated by *14.81*%;

- Net income attributable to AmTrust common stockholders was overstated by *15.86%*;

- Diluted Earnings per Share (EPS) was overstated by *15.85%*;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *9.29%*; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *18.11%*.

405.    On May 11, 2015, AmTrust filed the 1Q15 Form 10-Q, which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 5/5/15 Press Release.  The 1Q15 Form 10-Q included signed SOX certifications by Defendants

Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.  These certifications repeated in substance the same representations as set forth in ¶318.

406.    The 1Q15 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

407.    The statements referenced above in ¶¶405 and 406 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Second Quarter 2015 Financial Results**

408.    On August 4, 2015, AmTrust announced its financial results for the second quarter, the period ended June 30, 2015 in a press release, which it filed with the SEC on Form 8-K (the "8/4/15 Press Release").  For the quarter, the Company reported total service and fee income of $107.7 million; net income of $80.7 million; net income attributable to AmTrust common stockholders of $70.7 million; diluted earnings per share (EPS) of $0.84; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $135 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $81.2 million.

409.    The statements referenced above in ¶408 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the

AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶403.

410.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶408 were materially misstated and the product of fraudulent accounting, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by **12.04%**;

- Net income was overstated by **44.76%;**

- Net income attributable to AmTrust common stockholders was overstated by **54.52%**;

- Diluted Earnings per Share (EPS) was overstated by **50.00%**;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by **19.51%**; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by **89.81%**.

411.    Following the issuance of the 8/4/15 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance.  Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 8/4/15 Press Release.  On the conference call, Defendants were asked by an analyst about the potential impact of changes in foreign currencies on net income going forward.  Defendant Pipoly's exchange with the analyst was, in pertinent part, as follows:

**Mark Hughes - SunTrust - Analyst**

And then if you take a look at the Q3 or Q4 and what the potential currency impact is on a go-forward basis if it was $40 million this quarter.  How meaningful will that be next couple of quarters?

**Ronald Pipoly - AmTrust Financial Services, Inc. - CFO**

Well, I think it's in again -- if you look at the currency in the quarter, the effect of it was $47 million.  But if you look in the first quarter, it was a $38 million gain.  So, on a six-month basis, it's essentially $7 million.  It's an odd phenomenon in the sense of what we've seen from a currency perspective, the volatility and the inconsistency between a period and currency rate versus an average exchange rate.  I mean just to give you an example, at the end, at March 31, the exchange rate with the dollar and the pound was $1.47.  Just fast forward to June 30, and that exchange rate was $1.57.  ***That's why you see that that level of volatility and that's what you see flowing through on our income statement from foreign currency, but again it's essentially all a non-cash event and to the extent that the currency stabilized and the extent that the average exchange rate for a quarter is relatively consistent with the exchange rate at period end***. . . .

412.    The statement referenced above in ¶411 concerning the "volatility" that was "flowing through out income statement from foreign currency" was materially false and misleading at the time it was made, because AmTrust Defendants failed to disclose that during the Class Period, the Company's financial statements were presented in violation of GAAP by improperly accounting for foreign currency gains and losses, as the AmTrust Defendants knew or recklessly disregarded.  Instead, as AmTrust would come to acknowledge in the 2016 Form 10-K, "[t]he Company corrected errors related to the re-measurement of monetary balances denominated in foreign currencies into their functional currencies that were recorded as other comprehensive income."  As the Company recognized in the 2016 Form 10-K, "the re-measurement impact should have been recorded as foreign currency transaction gain/(loss) in our income statements" during the Class Period.

413.    In addition, Defendants were asked by an analyst about the Company's fee income in the prior quarter.  Defendant Pipoly's exchange with the analyst was, in pertinent part, as follows:

**Matt Carletti - JMP Securities – Analyst**:

Okay.  That's really helpful.  And then kind of follow on, just broader fee income question.  I know there is a natural seasonality to the business, particularly Case New Holland and some of the other ones.  Last Q3 was a particularly strong quarter.  In terms of fee income, it was $18 million above the next nearest quarter, was that mostly seasonality that something we can expect to repeat in this third quarter or is there something more one time in nature that drove that quarter high?

- 125 -

**Ronald Pipoly - AmTrust Financial Services, Inc. – CFO**:

There was nothing really in the third quarter of last year that was one time in nature and it's kind of seasonal and you saw the natural kind of decline quarter-over-quarter from the AMT warranty because it benefits in the first quarter of 2015 because of the holiday season in the kind of the lag in some of the reporting. So, there is nothing that was a one-time event in the third quarter of 2014 that occurred that we don't expect, again as Barry said, ***we're seeing strong trends from an extended warranty perspective here in both internationally and domestically as well***. ***So, we're absolutely encouraged with what we see from a fee revenue perspective***.

414.  The statements referenced above in ¶413 that the AmTrust Defendants were "seeing strong trends from an extended warranty perspective" and were "absolutely encouraged with what we see from a fee revenue perspective" were materially false and misleading and/or omitted material information for the reasons set forth in ¶327.

415.  On August 10, 2015, AmTrust filed the 2Q15 Form 10-Q, which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 8/4/15 Press Release. The 2Q15 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

416.  The 2Q15 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

417.  The statements referenced above in ¶¶415 and 416 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and

the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Third Quarter 2015 Financial Results**

418.    On November 3, 2015, AmTrust announced its financial results for the third quarter, the period ended September 30, 2015 in a press release, which it filed with the SEC on Form 8-K (the "11/3/15 Press Release").  For the quarter, the Company reported total service and fee income of $126.1 million; net income of $193 million; net income attributable to AmTrust common stockholders of $182.7 million; diluted earnings per share (EPS) of $2.17; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $145.1 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $166.9 million.

419.    The statements referenced above in ¶418 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶403.

420.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶418 were materially misstated and the product of fraudulent accounting, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by ***11.71%***;

- Net income was understated by ***(1.71%)***;

- Net income attributable to AmTrust common stockholders was understated by ***(1.80%)***;

- Diluted Earnings Per Share (EPS) was understated by ***(0.91%)***;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***15.34%***; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was understated by ***(3.00%)***.

421. On November 9, 2015, AmTrust filed the 3Q15 Form 10-Q, which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 11/3/15 Press Release. The 3Q15 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

422. The 3Q15 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

423. The statements referenced above in ¶¶421 and 422 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Fourth Quarter 2015 and Full Year 2015 Financial Results**

424. On February 10, 2016, the Company announced its financial results for fourth quarter 2015 and full year, the period ended December 31, 2015 in a press release, which it filed with the SEC on Form 8-K (the "2/10/16 Press Release"). For the quarter, the Company reported total service and fee income of $131.4; net income of $72.6 million; net income attributable to AmTrust

common stockholders of $63.9 million; diluted earnings per share (EPS) of $0.37;[11] income before

other income (expense), provision for income taxes, equity in earnings of unconsolidated

subsidiaries and non-controlling interest of $86.6 million; and income before provision for income

taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $98 million.

425.    The statements referenced above in ¶424 regarding the Company's financial results

were materially false and misleading and/or omitted material information when made because the

AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting

improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and

should not be relied upon for the reasons set forth in ¶394.

426.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial

measures in ¶424 were materially misstated and the product of fraudulent accounting, which

AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by *12.40%*;

- Net income was overstated by *16.15%*;

- Net income attributable to AmTrust common stockholders was overstated by 18.78%;

- Diluted Earnings per Share (EPS) was overstated by *270.00%*;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *32.61%*; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *18.84%*.

427.    For the full year 2015, the Company reported total service and fee income of

$478.2 million; net income of $510.5 million; net income attributable to AmTrust common

---

[11]    On December 15, 2015, the Company announced a two-for-one stock split on its outstanding common stock.  The stock split occurred on February 2, 2016 based on the shareholders of record at the close of business on January 19, 2016.

stockholders of $472 million; diluted earnings per share (EPS) of $2.80; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $535.9 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $551.5 million.

428.    The statements referenced above in ¶427 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶394.

429.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶427 were materially misstated and the product of fraudulent accounting improprieties, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by *11.69%*;

- Net income was overstated by *11.56%*;

- Net income attributable to AmTrust common stockholders was overstated by *12.62%*;

- Diluted Earnings per Share (EPS) was overstated by *12.45%*;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *16.79%*; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *17.04%*.

430.    Following the issuance of the 2/10/16 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the

2/10/16 Press Release. With respect to AmTrust's specialty risk and extended warranty segment, Defendant Zyskind stated, in pertinent part, as follows:

> ***Moving to our specialty risks and extended warranty segment, we are most pleased with the segment***. . . .

431. The statements referenced above in ¶430 touting the Company's Specialty Risk and Extended Warranty business segment were materially false and misleading and/or omitted material information for the reasons set forth in 328.

432. On February 29, 2016, AmTrust filed the 2015 Form 10-K, which included the Company's audited financial statements and was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 2/10/16 Press Release. The 2015 Form 10-K included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

433. The 2015 Form 10-K represented that AmTrust's "consolidated financial statements . . . have been prepared in conformity with accounting principles generally accepted in the United States of America."

434. Concerning the Company's "Controls and Procedures," the 2015 Form 10-K repeated in substance the representations set forth in ¶320.

435. The statements referenced above in ¶¶432-434 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and

the Company's accounting were materially false and misleading and/or omitted material information for the reasons set forth in ¶321.

436.    With respect to AmTrust's accounting for warranty fee revenue, the 2015 Form 10-K stated, in pertinent part, as follows:

> *Warranty Fee Revenue* – The Company promotes and markets extended service plans ("ESP") to consumers through retailers and certain other marketing organizations usually with terms of coverage ranging from one to three years, commencing at the expiration of the manufacturers' warranty, if applicable. The Company generally insures the obligations under ESPs through contractual liability insurance issued by one of its insurance company subsidiaries. Under the terms of service agreements with various retailers, the Company provides for marketing and administrative services related to ESP. These agreements are generally for one-year terms and can be canceled by either party with thirty days advance notice. The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of ESP. ***However, the Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods.***

437.    The statement referenced above in ¶436 that the "Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods" was materially false and misleading  and /or omitted material information for the reasons set forth in ¶323.

**First Quarter 2016 Financial Results**

438.    On May 3, 2016, AmTrust announced its financial results for the first quarter, the period ended March 31, 2016 in a press release (the "5/3/16 Press Release"), which it filed with the SEC on Form 8-K/A. For the quarter, the Company reported total service and fee income of $144.2 million; net income of $113 million; net income attributable to AmTrust common stockholders of $100.3 million; diluted earnings per share (EPS) of $0.56; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $168 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $135 million.

439.    The statements referenced above in ¶438 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶403.

440.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶438 were materially misstated and the product of fraudulent accounting, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by **_11.95%_**;

- Net income was overstated by **_16.82%_**;

- Net income attributable to AmTrust common stockholders was overstated by **_19.38%_**;

- Diluted Earnings per Share (EPS) was overstated by **_21.74%_**;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by **_16.92%_**; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by **_22.77%_**.

441.    On May 10, 2016, AmTrust filed the 1Q16 Form 10-Q, which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 5/3/16 Press Release.  The 1Q16 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

442.    The 1Q16 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

443.    The statements referenced above in ¶¶441 and 442 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Second Quarter 2016 Financial Results**

444.    On August 2, 2016, AmTrust announced its financial results for the second quarter, the period ended June 30, 2016 in a press release, which it filed with the SEC on Form 8-K (the "8/2/16 Press Release").  For the quarter, the Company reported total service and fee income of $138.3 million; net income of $152.2 million; net income attributable to AmTrust common stockholders of $134.8 million; diluted earnings per share (EPS) of $0.78; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and

non-controlling interest of $169.7 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $175.3 million.

445.    The statements referenced above in ¶444 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶403.

446.    Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶444 were materially misstated and the product of fraudulent accounting, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by *11.23%*;

- Net income was overstated by *5.28%*;

- Net income attributable to AmTrust common stockholders was overstated by *6.00%*;

- Diluted Earnings per Share (EPS) was overstated by *6.85%*;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *6.94%*; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *7.18%*.

447.    On August 9, 2016, AmTrust filed its 2Q16 Form 10-Q, which was signed by Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the 8/2/16 Press Release.  The 2Q16 Form 10-Q included signed SOX certifications by Defendants Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶318.

448.     The 2Q16 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements . . . ."

449.     The statements referenced above in ¶¶447-448 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

**Third Quarter 2016 Financial Results**

450.     On November 3, 2016, AmTrust announced its financial results for the third quarter, the period ended September 30, 2016 in a press release, which it filed with the SEC on Form 8-K (the "11/3/16 Press Release").  For the quarter, the Company reported total service and fee income of $146.6 million; net income of $118.1 million; net income attributable to AmTrust common stockholders of $103.6 million; diluted earnings per share (EPS) of $0.60; income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $178.4 million; and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $151.7 million.

451.     The statements referenced above in ¶450 regarding the Company's financial results were materially false and misleading and/or omitted material information when made because the AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶403.

452.     Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶450 were materially misstated and the product of fraudulent accounting, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Service and fee income was overstated by **9.53%**;

- Net income was overstated by **24.05**%;

- Net income attributable to AmTrust common stockholders was overstated by **28.39%**;

- Diluted Earnings per Share (EPS) was overstated by **27.66%;**

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by **23.96%**; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by **30.26%**.

453.     Defendant Zyskind was quoted in the 11/3/16 Press Release, stating, in pertinent part, as follows:

> *We delivered a solid performance in the third quarter, with strong investment results, higher service and fee income, and growth in gross written premiums, compared with the same period a year ago .... The top-line results of our specialty risk and extended warranty segment reflect the impact of the decline in the British pound relative to the third quarter a year ago, and we are pleased with the underlying performance of this segment*.

454.     Following the issuance of the 11/3/16 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance.  Defendants Zyskind and Pipoly participated in the call and reiterated the Company's financial results as set forth in the 8/2/16 Press Release.  In his prepared remarks, Defendant Zyskind stated, in pertinent part, as follows:

> *We achieved a strong performance in the third quarter compared with the same quarter a year ago.*

455.     Defendants further touted the performance of the Company's Specialty Risk and

Extended Warranty segment.  Defendant Zyskind stated, in pertinent part, as follows:

> *In our Specialty Risk and Extended Warranty segment, growth remains on track. We are pleased with the performance of this segment* with gross written premium growth of about 3.8%.  But growth of more than 8% when we exclude the foreign exchange impact in the decline of the British pound.  *In the US, our Extended Warranty business grew organically and also benefited from recent acquisitions including contributions from Warranty Solutions.*

456.     The statements referenced above in ¶¶454-455 highlighting the Company's positive

financial performance and the strength of the Company's Specialty Risk and Extended Warranty

business segment were materially false and misleading for the reasons set forth in ¶328.

457.     On November 10, 2016, AmTrust alerted the SEC that it would not be able to timely

file its quarterly report on Form 10-Q for the period ended September 30, 2016.  On Form 12b-25

filed with the SEC, AmTrust stated, in pertinent part, as follows:

> Registrant is unable to file, without unreasonable effort or expense, its Quarterly Report on Form 10-Q for the period ended September 30, 2016 (the "Form 10-Q"). Additional time is needed for the Registrant to compile and analyze supporting documentation in order to complete the Form 10-Q, specifically related to unrealized gains (losses) on investments and foreign currency items in the Registrant's Consolidated Statement of Comprehensive Income, and in order to permit the Registrant's independent registered public accounting firm to complete its review of the unaudited consolidated financial statements included in the Form 10-Q.  In addition, the Registrant identified certain control deficiencies related to the items specified above, and management is reviewing and evaluating these deficiencies. The Registrant undertakes the responsibility to file its Form 10-Q no later than the fifth calendar day after its prescribed due date.

458.     On November 14, 2016, AmTrust filed its 3Q16 Form 10-Q, which was signed by

Defendants Zyskind and Pipoly and reiterated the Company's financial results as set forth in the

11/3/16 Press Release.  The 3Q16 Form 10-Q included signed SOX certifications by Defendants

Zyskind and Pipoly, attesting to the accuracy of the Company's financial reporting, the design,

strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any

material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.  These certifications repeated in substance the same representations as set forth in ¶318.

459.    The 3Q16 Form 10-Q represented that "[t]he accompanying unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial statements. . . ."

460.    The statements referenced above in ¶¶458 and 459 regarding the accuracy of the Company's financial reporting and its purported compliance with GAAP, the design, strength and effectiveness of AmTrust's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, the disclosure of all fraud, and the Company's accounting were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶321.

461.    On November 16, 2016, AmTrust held its 2016 investor conference.  During the conference, attended by several AmTrust executives including Defendants Zyskind and Pipoly, Defendants were asked by an analyst about the recently delayed filing of the Company's 3Q16 Form 10-Q.  Defendant Pipoly's exchange with the analyst set forth, in pertinent part, as follows:

**Randy Binner - FBR Capital Markets – Analyst:**

The other one, and this is, I think, again, for Ron, is, while it was a minor issue and the 10-Q has been filed, I think that as far as what investors see from the outside, that's a noteworthy item.  And so could you cover what caused that delay?  What the nature of it was?  And if it's something that's resolved or that we would not see again?

**Ron Pipoly - AmTrust Financial Services, Inc. - EVP and CFO:**

*I mean, this particular issue was resolved*.  And really, what it was the result of is, is that we needed to have -- or KPMG needed to have additional time to evaluate the level of precision around a secondary control.  And again, so we were having discussions in terms of whether the level of precision was there necessary in that secondary level of control to make sure that if it wasn't a precise enough control that it'd rise to the level of having a material weakness, which it did not.  But it took a few days to evaluate it to make sure that we're both on the same page.  And we

would have made the filing on Friday morning at 6:03 a.m., but the SEC was closed in observance of Veterans Day.  So EDGAR wasn't available for the filing, and that' why we filed it on Monday morning.  ***So as it relates to this particular control around the precision level of the control, it's been resolved***.  And we will continue to move forward with the transition to KPMG, and we will work closely with the SOX team and additional people we've brought in to make sure that the control structure is in place.

**Randy Binner - FBR Capital Markets – Analyst:**

But this secondary control, you didn't actually -- there was not an actual event where it got triggered, it was more of a -- it was a hypothetical that if something had happened, you didn't have the review process?

**Ron Pipoly - AmTrust Financial Services, Inc. - EVP and CFO:**

***Yes, as you go through the quarter, you're evaluating controls, and it's a significant part of an overall audit approach. So it was really designed around the precision of a secondary level of control***.

462.    The statements referenced above in ¶461 which represented that the issue with the Company's internal controls and procedures which delayed the filing of the 3Q16 Form 10-Q had supposedly been "resolved" were materially false and misleading and/or omitted material information when made, because the AmTrust Defendants knew, or recklessly disregarded that, during the Class Period, the Company's internal control deficiencies were not resolved.   In particular, as later admitted by the Company, AmTrust's disclosure controls and internal controls were "ineffective" in assessing the risk of material misstatements relating to the following eight distinct areas of corporate accounting and financial reporting: (i) foreign exchange; (ii) deferred acquisition costs;  (iii) goodwill  impairment;  (iv) warranty  administration  services  revenue; (v) capitalized costs; (vi) period-end expense accruals; (vii) the statement of cash flows; and (viii) the statement other comprehensive income.

**The Company's Financial Statements Filed During
the Class Period Were Materially False and Misleading**

463.    The financial statements issued during the Class Period for the fiscal years ended

2012, 2013, 2014, 2015, and 2016 described herein were materially false and misleading because the

AmTrust Defendants, *inter alia*, failed to disclose that these results were the product of a range of

fraudulent accounting improprieties which were known to the AmTrust Defendants, or recklessly

disregarded by them, and should not be relied upon due to, inter alia, the following violations of

GAAP: (i) the improper reporting of warranty revenue on extended service plans; (ii) the improper

reporting of accrued compensation expense; (iii) the improper reporting of acquisition costs; (iv) the

improper reporting of foreign exchange gains and losses; (v) the improper reporting of software

costs; (vi) the improper reporting of interest expense; (vii) the improper reporting of intercompany

transactions; and (viii) the improper reporting of other accounting matters.

**The February 27, 2017 Disclosure of "Immaterial Corrections"**

464.    On February 27, 2017, before the opening of trading, AmTrust issued the 2/27/17

Press Release.  For the year ended December 31, 2016, the Company reported net income of

$482.2 million; net income attributable to AmTrust common stockholders of $415 million; diluted

earnings per share (EPS) of $2.38; income before other income (expense), provision for income

taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest of $601 million;

and income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and

non-controlling interest of $579.9 million.

465.    The statements referenced above in ¶464 regarding the Company's financial results

were materially false and misleading and/or omitted material information when made because the

AmTrust Defendants failed to disclose that these results were a product of fraudulent accounting

improprieties which were known to the AmTrust Defendants, or recklessly disregarded by them, and should not be relied upon for the reasons set forth in ¶403.

466.   Specifically, as later revealed by the 2016 Form 10-K, the income-related financial measures in ¶464 were materially misstated and the product of fraudulent accounting, which AmTrust, Zyskind, and Pipoly knew, or recklessly disregarded, as follows:

- Net income was overstated by *12.05%*;

- Net income attributable to AmTrust common stockholders was overstated by *14.28%*;

- Diluted Earnings per Share (EPS) was overstated by *14.42%*;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *16.95%*; and

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *15.96%*.

467.   Also in the 2/27/17 Press Release, the Company identified and purportedly corrected several accounting errors during the three months ended December 31, 2016, relating to prior periods in 2016 and 2015.   The Company did not issue a formal restatement of its financial statements for any prior quarterly or annual periods.

468.   In addition, the Company announced that it would be delaying the filing of its annual report on Form 10-K for the year ended December 31, 2016.   AmTrust stated that it expected to make certain corrections to its financial statements in *each year* dating back to fiscal year ended December 31, 2012.   The Company also reported that it had identified material weaknesses in its internal controls over financial reporting that existed as of December 31, 2016.   The 2/27/17 Press Release stated, in pertinent part, as follows:

> On or before March 1, 2017, AmTrust intends to file a Form 12b-25 with the Securities and Exchange Commission providing the Company an automatic 15-day extension to file its Form 10-K for the year ended December 31, 2016.   As previously disclosed, the Company appointed a new independent registered public

accounting firm on April 1, 2016.  Additional time is needed for the Company to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016, and, as a consequence, for the Company's auditor, KPMG LLP, to complete its audit procedures and audit of the consolidated financial statements included in the Form 10-K.  The Company expects to file the Annual Report on Form 10-K within the 15-day extension period provided by Rule 12b-25.

***In addition, the Company expects to make immaterial corrections to errors in its financial statements for fiscal years ended December 31, 2015 and 2014 and certain financial information for fiscal years ended December 31, 2013 and 2012 for inclusion in the Form 10-K and these processes have not been completed***.  The Company is still evaluating corrections to its historical quarterly financial statements within these fiscal years.  For a further explanation, please see footnote (1) below.

In connection with the foregoing, the Company expects to disclose in the Form 10-K that, as part of its evaluation of its internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002, ***the Company identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016, specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization***.  As the Company completes the preparation of its financial statements and the related audit process for fiscal year 2016, additional adjustments and/or material weaknesses could be identified.  While the Company believes that significant progress has been made in enhancing internal controls as of December 31, 2016 and in the period since, the material weaknesses have not been fully remediated due to insufficient time to fully implement and assess the design and operating effectiveness of the related controls.  The Company will continue the process to enhance internal controls throughout 2017.

*       *       *

(1) The Company identified and corrected errors during the three months ended December 31, 2016 related to prior periods in 2016 and 2015.  These errors included accruing for bonuses paid (which also impacted prior periods), adjusting foreign currency transactions gain and loss and deferring a portion of warranty contract revenue associated with administration services previously recognized upfront, based on management's interpretation of accounting guidance related to multiple-element revenue recognition.  In 2016, management reviewed this accounting treatment and concluded that its warranty contracts should <u>not</u> be accounted for using the multiple-element guidance, but instead deferred over the life of the contract.  The Company assessed the materiality of these errors and determined that a one-time adjustment in 2016 would have been material to 2016 and, as a result, management elected to revise the 2015 and prior financial statements upon its conclusion that ***the impact of the errors was <u>not</u> material to the 2015 and prior period financial statements***.  The resulting revisions to the Company's consolidated statements of income, for the three

- 143 -

months and year ended December 31, 2015, will be reflected in all future releases that contain such consolidated financial statements. . . .

469.     The statements referenced above in ¶468 that the errors were "immaterial" was materially false and misleading and/or omitted material information when made because the AmTrust Defendants knew, or recklessly disregarded and later admitted the true fact that AmTrust's financial results *were materially* misstated for these fiscal years and should not be relied upon due to the Company's various violations of GAAP, as set forth in ¶394.

470.     Following the issuance of the 2/27/17 Press Release, AmTrust held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Zyskind and Pipoly participated in the call. In his prepared remarks, Defendant Zyskind commented on the Company's delayed 10-K filing, in pertinent part, as follows:

> This is the first time that KPMG has assisted the Company with our year-end financial reporting. *It is simply taking us more time to complete the work required for KPMG to complete its audit. We're very comfortable with where they are in their work*. It is quite common for a company to have a filing extension following an auditor transition, though we expect to remain a timely filer by filing within the 15-day extension period.
>
> I'd like to take this opportunity to thank BDO, our former auditor, for the years of service to AmTrust. I will also thank the KPMG team for all their effort and for working so diligently. I believe we've been able to show that AmTrust is a great business with underwriting discipline, strong claims processing, and outstanding actuarial expertise.

471.     The statement referenced above in ¶470 that the reason for the delay in the Company's filing of the 2016 Form 10-K was that it was "simply taking us more time to complete the work required for KPMG to complete its audit" was materially false and misleading and/or omitted material information when made because the AmTrust Defendants knew, or recklessly disregarded: (i) that the Company's improper accounting for warranty contract revenue associated with administrative services and other accounting treatments had been materially misstated for at least the prior five years; (ii) that because the Company had issued materially misstated financial

results for the last five fiscal years, the 2016 Form 10-K would likely include restated financial statements correcting those issued by the Company to investors and filed with the SEC for each of the years ended December 31, 2012, 2013, 2014, 2015 and 2016, as well as each interim period during 2015 and 2016, which were materially misstated; (iii) that their statements regarding the delayed 10-K filing created a duty to disclose the true reasons and extent of the delay; and (iv) in light of the foregoing, the AmTrust Defendants' statements regarding the delayed 10-K filing were lacking in a reasonable basis at all relevant times.

472.   Commenting on the "revised" financials, Defendant Pipoly stated, in pertinent part, as follows:

> I will note, as disclosed in our press release this morning, the amount of service and fee income in the prior period has been revised downward by approximately $50 million for the full-year 2015.  This revision relates to how we are now recognizing a portion of our warranty contract revenue associated with administrative services.  We had been applying one interpretation of the revenue recognition guidance in the accounting standards in recognizing some administrative service fee revenue upfront.  We have changed our interpretation of the guidance and now are deferring revenue associated with warranty contracts for which services are performed over the life of contract.  The full table in the press release shows the impacts of these changes in revenue recognition to our consolidated statements of income for the fourth quarter and year ended December 31, 2015.  ***We have determined that the area was not material to the consolidated financial statements taken as a whole.***

473.   The statement referenced above in ¶472 regarding the Company's recognition of warranty contract revenue and its representations that these changes were "not material to the consolidated financial statements taken as a whole" was materially false and misleading and/or omitted material information when made because the AmTrust Defendants knew, or recklessly disregarded, that this improper accounting practice took place over a longer period of time than represented, *i.e.*, for each of the years ended December 31, 2012, 2013, 2014, 2015 and 2016, as well as each interim period during 2015 and 2016.  In addition, the AmTrust Defendants failed to disclose

the material impact of this accounting practice, as AmTrust ultimately recognized in the 2016 Form 10-K, was that it "created an overstatement of service and fee income" during the Class Period.

474.    Also during the conference call, the Officer Defendants were asked by an analyst why there was another delay in the filing of a financial statement in connection with an assessment of internal controls, given that the Company had just recently delayed the filing of the 3Q16 Form 10-Q to assess its internal controls and had considered the issue to be "resolved."  *See supra* ¶461.  That exchange with the analyst set forth, in pertinent part, as follows:

**Mark Hughes - SunTrust Robinson Humphrey – Analyst**:

Thank you.  Good morning.  The SOX-related issues, the internal controls, you had a slight delay in filing the 3Q 10-Q.  What was the opportunity to handle that over the last three months rather than having another delay here?  I'm just trying to understand why the extra 15 days was relevant when it seems like you've been working at this pretty steadily for quite some time now.

**Ron Pipoly - AmTrust Financial Services, Inc. – EVP, CFO**:

Mark, it's Ron.  In terms of the transition, we've -- as I mentioned earlier, we added PWC.  We brought them in to help us assess our control environment, add additional controls, help us implement those controls, test those controls.  And as we pivoted off the third quarter, which was -- that delay in filing was related to one particular issue around OCI ["other comprehensive income"] in the precision level of a control from an OCI perspective, we continue to push forward in terms of testing the controls.  And as a Company, right now we sit with 800 SOX controls, slightly above that, so it's a significant task to get everybody through all of those controls, to test them, to test them in the appropriate manner.  *So as we move forward, we just need and KPMG needs additional time to complete the work around the control environment, as well as finalize their audit and review of the Form 10-K*.  So, again, as we move forward, I think we've gained a lot of experience as part of this transition and I think we know better in terms of how to plan and delegate resources between the SOX aspect of our operations, as well as the substantive side of the audit.

**Barry Zyskind – AmTrust Financial Services, Inc. – Chairman, CEO, President:**

And this is Barry, just to add.  A quarter review is much different than a year-end audit.  Obviously, it's a lot of work on the year-end audit and all the different operations and the foreign operations, so it takes a lot of work and a lot of controls.  We definitely have made a lot of progress, but I just want to say one comment is that

when a company does transition from a non-Big Four, even though BDO is a very high-quality firm, to a Big Four firm, *it is a very common thing for companies once they are reassessing their controls into the new environment, into Big Four environment, that there is things that maybe in previous years were not material weaknesses that do manifest itself into a material weakness, and you remedy it and you move on, so that's something that we're doing, but it's not uncommon*.

475.    The statements referenced above in ¶474 which represented that the delay in reporting results was due only to the assessment of OCI and because KPMG needed more time to complete its assessment of the control environment were materially false and misleading and/or omitted material information when made, because the AmTrust Defendants knew, or recklessly disregarded that during the Class Period, AmTrust's disclosure controls and internal controls were "ineffective" in assessing the risk of material misstatements relating to the following eight distinct areas of corporate accounting and financial reporting: (i) foreign exchange; (ii) acquisition costs; (iii) goodwill impairment; (iv) warranty administration services revenue; (v) capitalized costs; (vi) period-end expense accruals, (vii) the statement of cash flows; and (viii) the statement other comprehensive income, as would be revealed by the 2016 Form 10-K. Moreover, the AmTrust Defendants' statements regarding the Company's internal controls and delayed 10-K filing created a duty to disclose the truth regarding the Company's internal controls and the true reasons and extent of the delay.

476.    Later in the call, the AmTrust Defendants were asked by an analyst to comment on whether certain items that AmTrust had revised were material. Defendant Pipoly's exchange with the analyst was, in pertinent part, as follows:

**Mark Hughes - SunTrust Robinson Humphrey – Analyst**:

Thank you. In the discussion about the restatement related to the differing accounting treatment for warranty, you also reference a bonus accrual, foreign-currency transactions as areas that, I guess, were restated or where there are weaknesses. Could you expand on that? Was that material? What were the differences there?

- 147 -

**Ron Pipoly - AmTrust Financial Services, Inc. – EVP, CFO**

The difference is again going back to kind of a component of what would flow through your P&L as a foreign currency gain or loss as opposed to what would flow through as a component of your OCI.  So, again, those two amounts were not significant.  As it related to 2015, one was actually -- it would've been a positive in 2015 of about $10 million, and from a bonus perspective there was about $3 million, *so really neither one of those amounts are material*.

477.    The statements referenced above in ¶476 regarding the purported immateriality of the accounting errors flagged by AmTrust in the 2/27/17 Press Release were materially false and misleading and/or omitted material information when made because the AmTrust Defendants knew, or recklessly disregarded, that AmTrust's financial results were materially misstated during the Class Period, were the product of fraudulent accounting and should not be relied upon due to the AmTrust Defendants' various violations of GAAP, as set forth in ¶394, as the Company would ultimately admit.

478.    The AmTrust Defendants were also asked by an analyst about the reasons for revising certain deferred warranty contract revenue.  Defendant Pipoly's exchange with the analyst was, in pertinent part, as follows:

**Mark Hughes - SunTrust Robinson Humphrey – Analyst**:

Right.  So the key issue was the warranty revenue, and there it was -- you had an established practice that KPMG just disagreed on, but you had already disclosed it, et cetera, so that was just a straight disagreement?

**Ron Pipoly - AmTrust Financial Services, Inc. - EVP, CFO**:

Correct.  *We had a different interpretation of whether the administrative fees would qualify for multi-element revenue recognition.*  That's the way we had previously handled it.

479.    The statement referenced above in ¶478 regarding the Company's recognition of warranty contract revenue was materially false and misleading and/or omitted material information when made for the reasons set forth in ¶323.

480.     After the AmTrust Defendants' partial disclosures of adverse facts concerning the Company's accounting problems, AmTrust's common stock plummeted.  In reaction to this news, the price of AmTrust's stock fell precipitously, falling $5.32 per share, or 19.2%, from $27.66 per share on Friday, February 24, 2017 to $22.34 per share on Monday, February 27, 2017.  This wiped out over $900 million in Company market capitalization in just one trading day.  The Company's stock price, however, remained artificially inflated because the AmTrust Defendants failed to disclose the full extent of their accounting improprieties which later resulted in the restatement and that this fraudulent accounting would warrant numerous government investigations.

**The March 16, 2017 Announcement of a Restatement**

481.     On March 16, 2017, after the market closed, AmTrust issued the 3/16/17 Press Release, in which the Company stated that additional time was still necessary to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016.  AmTrust also disclosed that its consolidated financial statements for the years ended December 31, 2014 and 2015 (including each of the four quarters of 2015) and the first three quarters of 2016 needed to be restated and should no longer be relied upon. In addition, AmTrust reported that the audit reports issued by BDO on AmTrust's consolidated financial statements for the years ended December 31, 2014 and 2015, as well as the effectiveness of AmTrust's internal control over financial reporting on those dates, should also no longer be relied upon.

482.     The 3/16/17 Press Release stated, in pertinent part, as follows:

NEW YORK, March 16, 2017 (GLOBE NEWSWIRE) -- AmTrust Financial Services, Inc. (Nasdaq: AFSI) (the "Company" or "AmTrust") today stated that additional time is needed for the Company to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016, and, as a consequence, for the Company's auditor, KPMG LLP, to complete its audit procedures and audit of the consolidated financial

statements included in the Form 10-K.  Accordingly, the Company will file its Form 10-K for the year ended December 31, 2016 as soon as practicable.

In connection with the preparation and audit of the financial statements to be included in the Company's Form 10-K for the year ended December 31, 2016, the Audit Committee of the AmTrust Board of Directors, in consultation with management and its current and former independent auditors, concluded that the Company's previously issued consolidated financial statements for 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 should be restated and should no longer be relied upon.  In addition, the Company's earnings and press releases and similar communications, to the extent that they relate to the periods covered by these financial statements, as well as the Company's fourth quarter and fiscal 2016 earnings release dated February 27, 2017, should no longer be relied upon.  Additionally, the reports of BDO USA LLP, the Company's former independent auditor, on the Company's consolidated financial statements for 2014 and 2015, including its opinions on the effectiveness of internal control over financial reporting for such periods, likewise should no longer be relied upon.

*       *       *

The Company is restating its financial statements and related disclosures primarily to correct two errors reported in its historical consolidated financial statements. These errors relate to: (1) upfront recognition of a portion of warranty contract revenue associated with administration services, based on the interpretation of ASC 605, Revenue Recognition, used in the previously filed financial statements related to multiple-element revenue recognition, instead of deferring recognition of the revenue over the life of the contract; and (2) bonuses that were expensed in the year paid but that should have been accrued in the year earned based on ASC 710, Compensation, and ASC 270, Interim Reporting.  The first error will be reflected entirely within the results of operations for our Specialty Risk and Extended Warranty segment, while the second error will be reflected within the results of operations of all of our segments.  The Company will also make other miscellaneous adjustments that had been previously identified but not corrected because they were not material, individually or in the aggregate, to its previously issued consolidated financial statements.  In addition, the Company expects to have certain other non-cash corrections related to deferred acquisitions costs and the capitalization of software development costs in 2016.

483.    Defendant Zyskind was quoted in the 3/16/17 Press Release stating, in pertinent part,

as follows:

The 10-K delay and restatement largely relate to the timing of recognition of revenue, as previously announced, in the Company's service and fee business, which we expect will remain profitable in each of the fiscal years 2014, 2015 and 2016.

- 150 -

484.   In reaction to this news, AmTrust's share price fell $4.03, or almost 19%, from $21.61 per share on Thursday, March 16, 2017 to $17.58 per share on Friday, March 17, 2017, on very unusual high trading volume of more than 13 million shares trading.  The Company's stock price, however, remained artificially inflated because the AmTrust Defendants' statements in ¶¶482-483 were materially false and misleading and/or omitted material information because they failed to disclose the full extent of their accounting improprieties which were so severe that they warranted numerous government investigations.

**April 4, 2017**

485.   On April 4, 2017, AmTrust filed the 2016 Form 10-K. In the 2016 Form 10-K, the Company admitted the extent of its financial improprieties during the Class Period, in particular the acknowledgment that its financial misstatements were the result of a wide range of accounting errors and violations of GAAP.  As stated in the 2016 Form 10-K, AmTrust restated the financial statements it issued to investors and filed with the SEC during the Class Period to correct the Company's improper accounting and reporting of: (i) warranty revenue on extended service plans; (ii) accrued compensation expense; (iii) acquisition costs; (iv) foreign exchange gains and losses; (v) software costs; (vi) interest expense; (vii) intercompany transactions; and (viii) various other accounting matters.  In addition, in the 2016 Form 10-K, AmTrust admitted to the existence of "material weaknesses in internal control over financial reporting."

486.   Defendants' statements in ¶485 were materially false and misleading and/or omitted material information because they failed to disclose the full extent of their accounting improprieties which were so severe that they warranted numerous government investigations.

**The April 11, 2017 Revelation of Government Investigations**

487.   On April 11, 2017, *The Wall Street Journal* reported that the FBI, SEC and the NYDFS are each conducting investigations into AmTrust's accounting practices.  According to the

article, a former BDO auditor-turned-whistleblower was assisting the FBI in its investigation. The whistleblower claims that BDO approved its audit of the Company before finalizing "some important checks." BDO staffers allegedly covered for such lapses by "loading unfinished documents into an internal software system to show the right time stamp, then returned later to complete some of the work."

488.     In reaction to the revelation of the federal and state investigations concerning the Company's accounting practices, AmTrust's shares fell $3.57 per share, or 18.9%, from $18.87 per share on Monday, April 10, 2017 to $15.30 per share on Tuesday, April 11, 2017, on very unusual and high trading volume of more than 23 million shares traded.

## ADDITIONAL SCIENTER ALLEGATIONS

### (a)      AmTrust's Internal Control Deficiencies

489.     Throughout the Class Period, the SOX Certifications signed by the Officer Defendants, accompanying each of the quarterly and annual financial reports issued by the Company, stated that they were "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting." What is more, the SOX Certifications specified that Defendants Zyskind and Pipoly "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." The personal participation of Defendants Zyskind and Pipoly in designing and evaluating the Company's internal controls supports their knowledge of the meaningful internal control deficiencies.

490.     Moreover, the discrepancies between the admissions of the Company at the end of the Class Period and the repeated certifications which continued throughout the duration of the Class

Period is glaring.  In the 2016 Form 10-K, AmTrust admitted that its internal controls were "ineffective" in assessing the risk of material misstatement relating to *eight* distinct areas of corporate accounting and financial reporting: (i) foreign exchange; (ii) deferred acquisition costs; (iii) goodwill impairment; (iv) warranty administration services revenue; (v) capitalized costs; (vi) period-end expense accruals; (vii) the statement of cash flows; and (viii) the statement of other comprehensive income.  Given Defendants Zyskind and Pipoly's personal participation in designing and evaluating AmTrust's internal controls, there is a strong inference that they had extensive knowledge about these matters and they intentionally or recklessly certified that these internal controls were effective.

491.    Furthermore, the AmTrust Defendants were made aware of at least some of the problems with AmTrust's internal controls during the Class Period.  As discussed above, on December 18, 2014, Alistair issued a letter to the members of AmTrust's Audit Committee warning them of "numerous instances of improper accounting and indications of material weaknesses of internal controls over financial reporting" at the Company."  Alistair stated that it was its "belief that these deficiencies put shareholders, creditors, and policyholders at grave risk."  This letter was made public and reported in the media, including on SeekingAlpha.com shortly thereafter.  Also, on November 10, 2016, AmTrust delayed the filing of the 3Q16 Form 10-Q due to, *inter alia*, the identification of "certain control deficiencies."   Still, the AmTrust Defendants concealed the truth from the public.  Just six days later, at the Company's November 16, 2016 investor conference, in responding to an analyst's question regarding the delayed filing, Defendant Pipoly told investors that "*as it relates to this particular control around the precision level of the control, it's been resolved*."

492.    The multiple reports from media sources and research analyst groups put the AmTrust Defendants on notice of potential accounting improprieties.  Notwithstanding this information, the

AmTrust Defendants either intentionally misrepresented the effectiveness of its internal controls to the public or failed to undertake an adequate investigation of the matters explicitly brought to their attention during the Class Period.  These allegations support the inference that the AmTrust Defendants were aware of, or recklessly disregarded, that AmTrust had meaningful control deficiencies at the same time when they were certifying that the controls were effective.

      **(b)**    **The Nature of AmTrust's Fraud**

493.    The AmTrust Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The multi-year fraudulent activity alleged herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the officers at the highest levels of the Company, including Defendants Zyskind and Pipoly.

494.    For example, Defendants Zyskind and Pipoly were executive officers of AmTrust and, at a minimum, would have been aware of key facts related to the Company's operations. Defendant Pipoly, as the Company's CFO, would have been aware of the numerous and varied accounting improprieties which the Company has now admitted took place over a five year period, including, *inter alia*, the Company's improper accounting practices with respect to the recognition of revenues from ESP contracts and the corresponding impact on the Company's reported financial operating performance.  Specifically, during the Class Period, the gross written premiums reported for the Specialty Risk and Extended Warranty Segment made up a significant portion of the Company's revenue.  As a percentage of AmTrust's total gross written premiums, the premiums reported for the Specialty Risk and Extended Warranty business were as follows: 40.7% (2012), 36.7% (2013), 32.5% (2014), 31.8% (2015), and 31.7% (2016).  Accordingly, scienter can be imputed to Defendants AmTrust and Pipoly on this basis.

495.     In addition, the aggressive campaign by the AmTrust Defendants to placate the market in reaction to inquiries by the media, research groups, and investors that questioned AmTrust's accounting practices during the Class Period provides cogent support for the inference of scienter.  The AmTrust Defendants even went to so far as to commence litigation against certain of these entities in an effort to do all they could to prevent the truth about the Company's accounting improprieties from being revealed.

496.     In addition, AmTrust has admitted that the financial statements it issued during the Class Period "should no longer be relied upon," were presented in violation of GAAP, and contained material misstatements.  AmTrust's undisputed violations of GAAP further support an inference of scienter.

497.     The sheer magnitude and duration of AmTrust's improper financial reporting provides additional evidence that the AmTrust  Defendants knew of the alleged fraud or recklessly disregarded it.  AmTrust has now admitted that its previously issued financial statements for each of the fiscal calendar years in the periods ended December 31, 2012, 2013, 2014, 2015, and 2016, as well as interim periods during 2015 and 2016, were materially misstated and should no longer be relied upon.  In particular, numerous income related metrics in the Company's annual financial statements during the Class Period were materially misstated as follows:

<u>2016 Annual Results</u>

- Acquisition costs and other underwriting expenses were understated by *5.81%*;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *16.95%*;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *15.96%*;

- Net income was overstated by *12.05%*;

- Net income attributable to AmTrust common stockholders was overstated by *14.28%*; and

- Diluted Earnings per Share (EPS) was overstated by *14.42%*.

<u>2015 Annual Results</u>

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *16.79%*;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *17.04%*;

- Net income was overstated by *11.56%*;

- Net income attributable to AmTrust common stockholders was overstated by *12.62%*;

- Diluted Earnings per Share (EPS) was overstated by *12.45%*;

- Comprehensive income was overstated by *22.94%*; and

- Comprehensive income attributable to AmTrust Financial Services, Inc. was overstated by *23.55%*.

<u>2014 Annual Results</u>

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *13.34%*;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by *13.64%*;

- Net income was overstated by *7.55%*;

- Net income attributable to AmTrust common stockholders was overstated by *7.78%*;

- Diluted Earnings per Share (EPS) was overstated by *7.51%*;

- Comprehensive income was overstated by *7.68%;* and

- Comprehensive income attributable to AmTrust Financial Services, Inc. was overstated by *7.67%*.

<u>2013 Annual Results</u>

- Service and fee income was overstated by *15.42%*;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***18.42%***;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***18.98%***;

- Net income was overstated by ***15.69%***;

- Net income attributable to AmTrust common stockholders was overstated by ***15.84%***; and

- Diluted Earnings per Share (EPS) was overstated by ***15.58%***.

<u>2012 Annual Results</u>

- Service and fee income was overstated by ***24.17%***;

- Income before other income, income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***19.43%***;

- Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest was overstated by ***21.67%***;

- Net income was overstated by ***14.06%***;

- Net income attributable to AmTrust common stockholders was overstated by ***14.68%***; and

- Diluted Earnings per Share (EPS) was overstated by ***13.59%***.

**(c)     Ongoing Investigations by the SEC, FBI and NYDFS**

498.     In addition, as reported in the April 2017 WSJ Article, a former BDO auditor assigned to audit the Company's financial statements has provided the government with information relating to AmTrust's accounting practices under the SEC's Whistleblower Program. This information has resulted in investigations by both the SEC and the FBI. Furthermore, the NYDFS is conducting a "non-routine" examination of the Company. These multiple government investigations in connection with AmTrust's fraudulent accounting practices further support a finding of the AmTrust Defendants' scienter.

(d)      **Prior Experience With Accounting Improprieties**

499.     The scienter of the AmTrust Defendants is further demonstrated by the fact that Warrantech, which was acquired by AMT Warranty, AmTrust's subsidiary – and the entity in which AmTrust's warranty contract revenue associated with administration services was improperly recorded and had to restated – had previously been admonished by the SEC for improperly accelerating the recognition of revenue on service contracts.  Specifically, in March of 2003, the staff of the Division of Corporation Finance of the SEC required Warrantech to restate its previously issued financial statements to correct its recognition of service revenue.  According to Warrantech's SEC filings, the SEC required Warrantech to record service revenue on a straight-line basis over the life of the service contracts.  This is the primary accounting impropriety which led AmTrust to restate its financial results at the end of the Class Period.

500.     Significantly, Warrantech's Chairman and CEO at the time of the SEC admonition became Chairman of AMT Warranty, AmTrust's subsidiary, from August 2010 through March 2012 (after AmTrust acquired Warrantech in 2010).   Accordingly, AmTrust knew, or recklessly disregarded, that AmTrust's policy of revenue recognition on warranty fee revenue was improper because such policy had been previously vetted by Warrantech and the SEC when Warrantech was a public company, as detailed in Warrantech's SEC filings.  In any event, the AmTrust Defendants would have learned of the SEC's admonition of Warrantech's revenue recognition on warranty fee revenue practice as part of the due diligence review of Warrantech's SEC filings before AmTrust acquired it.

501.     Moreover, Defendants Zyskind and Pipoly's extensive financial experience provide additional support for their scienter.  Zyskind has been AmTrust's President and Chief Executive Officer since 2000 and, prior to that, held various senior management positions with the Company.

Before joining AmTrust, Zyskind was an investment banker at Janney Montgomery Scott, LLC in New York. He earned an MBA from New York University's Leonard N. Stern School of Business.

502.    Defendant Pipoly served as AmTrust's CFO from 2005 until he was replaced on June 5, 2016. Prior to joining AmTrust, Defendant  Pipoly was Vice President and Controller at PRS Insurance Group ("PRS"), the parent company of Credit General, a property and casualty insurer. PRS was liquidated in 2001 by Ohio regulators following the revelation that Robert Lucia, its CEO, had stolen $30 million through a series of related party transactions. In connection with the fraud, Lucia was federally indicted, pled guilty, and was sentenced to 10 months in prison and a fine of over $56,000.

503.    Defendant Pipoly's role in the fraud at Credit General, including the unlawful payments to Mr. Lucia, was documented by U.S. Bankruptcy Judge Mary F. Walwrath, who presided over the proceeding on the appointment of an interim trustee for PRS. Specifically, Judge Walwrath noted that "[w]hen confronted with the Hradisky report evidencing over $3.5 million in transfers to Mr. Lucia and his family, ***Mr. Pipoly did not pursue an investigation of those transfers. He did not even ask Mr. Lucia for an explanation***." *In re PRS Insurance Grp., Inc.*, 274 B.R. 381, 387-88 (Bankr. D. Del. 2001).

504.    During his tenure as AmTrust's CFO, Defendant Pipoly also served as an Interim Chief Financial Officer of Maiden Holdings, Ltd. ("Maiden Holdings") from July 2007 to November 2007. Maiden Holdings is a publicly-held Bermuda insurance holding company formed by Michael Karfunkel, George Karfunkel and Barry Zyskind. For the period ending December 31, 2007, Maiden Holdings and its independent registered public accounting firm PricewaterhouseCoopers concluded that "we had deficiencies that in combination represented a material weakness in our

internal control over financial reporting due to under-resourcing of the finance department and the concentration of duties in our Chief Financial Officer." These deficiencies included:

- The "failure to give appropriate consideration to U.S. GAAP accounting rules or to have documentation of the basis for our opinion and conclusion regarding the application of U.S. GAAP";

- The "lack of an independent preparer and reviewer for various accounting tasks including the preparation of the financial statements and disclosures"; and

- The "lack of formality regarding certain controls surrounding the control environment."

505. These past issues with GAAP violations and internal control weaknesses in AmTrust's related entity should have put the AmTrust Defendant on high alert to review and monitor the Company's internal controls and GAAP compliance during the Class Period.

**(e)     The AmTrust Defendants' Motive to Commit Fraud**

506. Moreover, the AmTrust Defendants possessed substantial motives for misrepresenting AmTrust's operating results by carrying out various accounting improprieties throughout the Class Period. One such motive was the AmTrust Defendants' desire to maximize proceeds from the numerous securities offerings carried out during the Class Period. As set forth above, during the Class Period, AmTrust offered for sale common and preferred stock, as well as conducted debt offerings to the investing public in order to raise capital.

507. The AmTrust Defendants were also motivated to inflate the value of the Company – in particular, its warranty administration business – as they were looking to sell that business during the Class Period. Defendant Zyskind alluded to the Company's desire to spin off this portion of the business during AmTrust's November 16, 2016 Investor Day presentation addressing the prospect of selling this business by responding to a question, stating "[w]e're always open. We're always looking at that." Then, on February 27, 2017, Defendant Zyskind again suggested that it was shopping this portion of the business stating, in pertinent part: "[w]hen we look at recent valuations

on similar businesses in the market, we believe we have a valuable asset that, ***based on our
discussions with third parties***, is comfortably worth in excess of $2 billion."  Recently, during the
Company's August 8, 2017 conference call, Defendant Zyskind explicitly acknowledged that
AmTrust was looking to sell the warranty business explaining that "[the Company] continue[d]
identifying opportunities to unlock value we have created, such as in our service and fee business.
We continue to explore our options here, including the potential sale of a stake in parts of this highly
valuable business."

508.    The AmTrust Defendants were also motivated to engage in a fraudulent course of
conduct in order to allow Company insiders to sell shares of their personally held AmTrust shares at
artificially inflated prices during the Class Period.  Defendant Pipoly, as well as other senior
Company executives, sold more than ***$43 million*** worth of AmTrust common stock during the Class
Period, when the AmTrust Defendants were in possession of negative material non-public
information, at times and in amounts that were unusual, as set forth below:

| Name | Title | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| Pipoly (Ronald E Jr) | Chief Financial Officer | 19-Feb-2013 | 26,070 | $16.97 | $442,278 |
| | | 18-Mar-2013 | 25,792 | $17.54 | $452,392 |
| | | 19-Mar-2013 | 60 | $17.59 | $1,055 |
| | | 17-Apr-2013 | 26,834 | $16.50 | $442,761 |
| | | 17-May-2013 | 27,140 | $16.16 | $438,582 |
| | | 17-Jun-2013 | 26,400 | $17.67 | $466,356 |
| | | 17-Jul-2013 | 25,560 | $19.80 | $506,088 |
| | | 17-Sep-2013 | 27,900 | $18.51 | $516,290 |
| | | 17-Oct-2013 | 27,860 | $18.60 | $518,057 |
| | | 18-Nov-2013 | 27,260 | $20.34 | $554,332 |
| | | 17-Dec-2013 | 28,700 | $16.78 | $481,586 |
| | | 17-Jan-2014 | 28,800 | $16.59 | $477,648 |
| | | 02-Jan-2015 | 28,786 | $28.02 | $806,440 |
| | | 02-Jan-2015 | 962 | $28.32 | $27,244 |
| | | 04-Jan-2016 | 4,000 | $30.08 | $120,300 |
| | | 04-Feb-2016 | 4,000 | $27.35 | $109,400 |
| | | 04-Mar-2016 | 4,000 | $25.61 | $102,440 |

| Name | Title | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| | | 04-Apr-2016 | 4,000 | $26.40 | $105,600 |
| | | 04-May-2016 | 4,000 | $25.61 | $102,440 |
| | | 03-Jan-2017 | 4,000 | $27.18 | $108,720 |
| | | 03-Feb-2017 | 4,000 | $26.73 | $106,920 |
| | | 03-Mar-2017 | 4,000 | $22.67 | $90,680 |
| | | | **360,124** | | **$6,977,608** |
| Caviet (Max G) | Officer | 25-Apr-2014 | 13,900 | $18.58 | $258,262 |
| | | 27-May-2014 | 12,860 | $22.62 | $290,893 |
| | | 25-Jun-2014 | 13,170 | $21.07 | $277,426 |
| | | 25-Jul-2014 | 13,260 | $20.78 | $275,543 |
| | | 25-Aug-2014 | 12,954 | $22.05 | $285,636 |
| | | 25-Sep-2014 | 13,582 | $19.36 | $262,880 |
| | | 27-Oct-2014 | 5,878 | $25.11 | $147,597 |
| | | 27-Oct-2014 | 6,574 | $24.58 | $161,589 |
| | | 25-Nov-2014 | 11,212 | $26.32 | $295,044 |
| | | 25-Nov-2014 | 1,000 | $26.67 | $26,670 |
| | | 26-Dec-2014 | 11,350 | $26.82 | $304,350 |
| | | 26-Dec-2014 | 800 | $27.12 | $21,692 |
| | | 26-Jan-2015 | 12,300 | $25.91 | $318,632 |
| | | 25-Feb-2015 | 12,100 | $27.23 | $329,423 |
| | | 25-Mar-2015 | 12,300 | $29.11 | $358,053 |
| | | 26-Mar-2015 | 62 | $28.24 | $1,751 |
| | | 26-Mar-2015 | 67,200 | $27.97 | $1,879,584 |
| | | 26-Mar-2015 | 800 | $28.38 | $22,700 |
| | | 27-Mar-2015 | 67,600 | $27.72 | $1,873,534 |
| | | 27-Mar-2015 | 400 | $28.01 | $11,202 |
| | | | **289,302** | | **$7,402,458** |
| DeCarlo (Donald T) | Director | 23-Sep-2013 | 29,646 | $19.06 | $565,053 |
| | | 21-May-2014 | 43,378 | $22.22 | $963,859 |
| | | 15-Sep-2016 | 2,200 | $26.53 | $58,366 |
| | | 03-Oct-2016 | 3,114 | $26.19 | $81,556 |
| | | 01-Nov-2016 | 3,200 | $25.89 | $82,848 |
| | | 01-Dec-2016 | 3,420 | $25.75 | $88,065 |
| | | 03-Jan-2017 | 4,620 | $27.19 | $125,618 |
| | | 01-Feb-2017 | 4,830 | $26.67 | $128,816 |
| | | 01-Mar-2017 | 3,600 | $23.50 | $84,600 |
| | | | **98,008** | | **$2,178,780** |
| Gulkowitz (Abraham) | Director | 24-Nov-2015 | 14,250 | $30.92 | $440,610 |
| | | 20-Dec-2016 | 15,126 | $27.70 | $418,990 |
| | | | **29,376** | | **$859,600** |

| Name | Title | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| Longo (Christopher M) | Chief Technology Officer | 11-Jun-2013 | 80 | $16.64 | $1,331 |
| | | 11-Jun-2013 | 17,800 | $16.63 | $296,014 |
| | | 11-Jul-2013 | 80 | $19.45 | $1,556 |
| | | 11-Jul-2013 | 17,400 | $19.31 | $335,994 |
| | | 12-Aug-2013 | 17,300 | $21.42 | $370,566 |
| | | 11-Sep-2013 | 19,200 | $17.31 | $332,256 |
| | | 11-Sep-2013 | 50 | $17.40 | $870 |
| | | 11-Oct-2013 | 19,100 | $17.81 | $340,171 |
| | | 14-Oct-2013 | 80 | $17.75 | $1,420 |
| | | 11-Nov-2013 | 19,000 | $20.15 | $382,755 |
| | | 11-Dec-2013 | 18,920 | $19.49 | $368,751 |
| | | 13-Jan-2014 | 19,400 | $17.78 | $344,835 |
| | | 13-Jan-2014 | 19,400 | $16.78 | $325,435 |
| | | 11-Feb-2014 | 19,560 | $15.30 | $299,170 |
| | | 11-Mar-2014 | 19,000 | $18.73 | $355,870 |
| | | 11-Apr-2014 | 19,100 | $18.17 | $346,952 |
| | | 12-May-2014 | 18,600 | $21.97 | $408,549 |
| | | 11-Jun-2014 | 23,160 | $21.28 | $492,845 |
| | | 11-Jul-2014 | 23,210 | $20.38 | $472,904 |
| | | 11-Jul-2014 | 100 | $20.60 | $2,060 |
| | | 11-Aug-2014 | 22,850 | $22.04 | $503,500 |
| | | 11-Sep-2014 | 23,000 | $21.01 | $483,230 |
| | | 11-Sep-2014 | 80 | $21.11 | $1,688 |
| | | 13-Oct-2014 | 23,000 | $21.31 | $490,130 |
| | | 11-Nov-2014 | 22,110 | $25.26 | $558,388 |
| | | 11-Nov-2014 | 100 | $25.39 | $2,539 |
| | | 11-Dec-2014 | 80 | $28.88 | $2,310 |
| | | 11-Dec-2014 | 13,212 | $28.53 | $376,938 |
| | | 11-Dec-2014 | 8,378 | $28.84 | $241,622 |
| | | 12-Jan-2015 | 15,400 | $25.01 | $385,154 |
| | | 12-Jan-2015 | 6,600 | $25.53 | $168,498 |
| | | 12-Jan-2015 | 200 | $25.84 | $5,167 |
| | | 11-Feb-2015 | 21,720 | $27.75 | $602,621 |
| | | 11-Mar-2015 | 21,360 | $27.56 | $588,575 |
| | | 11-Mar-2015 | 400 | $27.83 | $11,132 |
| | | 12-Mar-2015 | 120 | $27.90 | $3,348 |
| | | 13-Apr-2015 | 1,350 | $29.69 | $40,082 |
| | | 13-Apr-2015 | 20,130 | $29.48 | $593,332 |
| | | 13-Apr-2015 | 100 | $29.44 | $2,944 |
| | | 11-May-2015 | 21,608 | $28.93 | $625,011 |
| | | 15-Jun-2015 | 20,000 | $30.65 | $612,900 |
| | | 15-Jul-2015 | 20,000 | $33.18 | $663,600 |
| | | | **552,338** | | **$12,443,012** |

| Name | Title | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| Saks David H | Officer | 27-Jun-2014 | 14,000 | $20.71 | $289,940 |
| | | 24-Feb-2016 | 10,000 | $24.51 | $245,100 |
| | | 02-Jun-2016 | 10,000 | $26.54 | $265,400 |
| | | | **34,000** | | **$800,440** |
| Saxon (Michael J) | Chief Operating Officer | 14-Feb-2013 | 11,376 | $16.04 | $182,471 |
| | | 15-Feb-2013 | 600 | $16.64 | $9,984 |
| | | 15-Feb-2013 | 400 | $16.64 | $6,656 |
| | | 14-Mar-2013 | 2,400 | $18.01 | $43,212 |
| | | 14-Mar-2013 | 11,376 | $17.75 | $201,924 |
| | | 14-Mar-2013 | 1,380 | $18.00 | $24,840 |
| | | 15-Apr-2013 | 4,320 | $16.87 | $72,857 |
| | | 15-Apr-2013 | 11,376 | $16.99 | $193,278 |
| | | 14-May-2013 | 200 | $15.89 | $3,177 |
| | | 14-May-2013 | 11,376 | $15.89 | $180,765 |
| | | 14-May-2013 | 4,320 | $15.89 | $68,623 |
| | | 14-Jun-2013 | 11,376 | $16.99 | $193,278 |
| | | 14-Jun-2013 | 4,334 | $17.33 | $75,087 |
| | | 15-Jul-2013 | 11,376 | $19.53 | $222,173 |
| | | 15-Jul-2013 | 3,950 | $20.07 | $79,277 |
| | | 14-Aug-2013 | 11,376 | $21.74 | $247,257 |
| | | 14-Aug-2013 | 3,770 | $22.15 | $83,487 |
| | | 16-Sep-2013 | 4,320 | $18.41 | $79,531 |
| | | 16-Sep-2013 | 12,514 | $18.26 | $228,443 |
| | | 14-Oct-2013 | 12,514 | $17.52 | $219,245 |
| | | 14-Oct-2013 | 4,420 | $18.09 | $79,936 |
| | | 14-Nov-2013 | 11,066 | $20.20 | $223,478 |
| | | 14-Nov-2013 | 3,630 | $20.64 | $74,905 |
| | | 20-Mar-2014 | 41,076 | $18.85 | $774,283 |
| | | 21-Apr-2014 | 41,076 | $18.20 | $747,583 |
| | | 20-May-2014 | 41,076 | $21.81 | $895,868 |
| | | 20-Jun-2014 | 41,076 | $21.29 | $874,508 |
| | | 21-Jul-2014 | 41,076 | $20.87 | $857,051 |
| | | 24-Jun-2016 | 9,000 | $24.43 | $219,870 |
| | | 20-Jul-2016 | 9,000 | $24.59 | $221,310 |
| | | 23-Aug-2016 | 9,000 | $25.61 | $230,490 |
| | | 21-Sep-2016 | 9,000 | $26.60 | $239,400 |
| | | 20-Oct-2016 | 9,000 | $26.85 | $241,650 |
| | | 22-Nov-2016 | 9,000 | $26.06 | $234,540 |
| | | 20-Dec-2016 | 9,000 | $27.92 | $251,280 |
| | | 17-Jan-2017 | 9,000 | $27.03 | $243,270 |

| Name | Title | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| | | 22-Feb-2017 | 9,000 | $27.51 | $247,590 |
| | | 04-Apr-2017 | 9,000 | $22.08 | $198,720 |
| | | | **449,150** | | **$9,271,296** |
| | | | | | |
| Schlachter (Harry) | Officer and Treasurer | 12-Dec-2013 | 4,200 | $18.74 | $78,687 |
| | | 12-Mar-2014 | 3,200 | $18.65 | $59,680 |
| | | 12-Mar-2014 | 1,000 | $18.77 | $18,770 |
| | | 12-Jun-2014 | 3,590 | $21.26 | $76,305 |
| | | 12-Jun-2014 | 610 | $21.35 | $13,024 |
| | | 12-Sep-2014 | 4,200 | $21.02 | $88,263 |
| | | 12-Dec-2014 | 4,200 | $28.76 | $120,792 |
| | | 12-Mar-2015 | 4,200 | $28.20 | $118,419 |
| | | | **25,200** | | **$573,940** |
| | | | | | |
| Ungar (Stephen B) | General Counsel | 08-May-2015 | 12,000 | $29.32 | $351,840 |
| | | 15-Jul-2015 | 3,000 | $33.22 | $99,645 |
| | | 17-Aug-2015 | 3,000 | $31.39 | $94,155 |
| | | 15-Sep-2015 | 3,000 | $29.85 | $89,535 |
| | | 15-Oct-2015 | 3,000 | $33.10 | $99,300 |
| | | 16-Nov-2015 | 800 | $29.72 | $23,772 |
| | | 16-Nov-2015 | 2,200 | $30.19 | $66,418 |
| | | 15-Dec-2015 | 400 | $31.17 | $12,468 |
| | | 15-Dec-2015 | 2,600 | $30.48 | $79,235 |
| | | 15-Jan-2016 | 3,000 | $27.58 | $82,725 |
| | | 16-Feb-2016 | 3,000 | $25.27 | $75,810 |
| | | 15-Mar-2016 | 3,000 | $25.64 | $76,920 |
| | | 15-Apr-2016 | 3,000 | $25.10 | $75,300 |
| | | 16-May-2016 | 3,000 | $26.64 | $79,920 |
| | | 15-Jun-2016 | 3,000 | $25.10 | $75,300 |
| | | 18-Jul-2016 | 5,000 | $24.95 | $124,750 |
| | | 15-Aug-2016 | 5,000 | $25.93 | $129,650 |
| | | 15-Sep-2016 | 5,000 | $26.50 | $132,500 |
| | | 17-Oct-2016 | 5,000 | $27.82 | $139,100 |
| | | 15-Nov-2016 | 5,000 | $25.74 | $128,700 |
| | | 15-Dec-2016 | 5,000 | $27.50 | $137,500 |
| | | 17-Jan-2017 | 5,000 | $27.05 | $135,250 |
| | | 15-Feb-2017 | 5,000 | $27.48 | $137,400 |
| | | 15-Mar-2017 | 5,000 | $21.74 | $108,700 |
| | | | **93,000** | | **$2,555,893** |

509. The timing of AmTrust stock sales by Defendant Pipoly was suspicious and unusual.

Defendant Pipoly had **_never_** sold any of his personally held AmTrust stock prior to June 18, 2012.

- 165 -

During the Class Period, however, Defendant Pipoly sold 52% of his personally held shares for proceeds of $6,977,608.

510.    Defendant Zyskind was further motivated to engage in this fraudulent course of conduct so that he could earn substantial incentive-based compensation during the Class Period.  For example, according to the Company's proxy statements filed with the SEC on Schedule 14A for 2014 and 2015, Defendant Zyskind netted significant "annual incentive awards," earning $7.68 million in cash and $6 million in cash plus 116,596 restricted stock units, respectively. According to the Company's March 29, 2016 proxy statement, this incentive based compensation was derived based upon the actual performance and weighting of the following three performance metrics:

*Operating Earnings*
A non-GAAP financial measure that we believe is a useful indicator of trends in our underlying operations because it provides a more meaningful representation of our earnings power than net income, the comparable GAAP financial measure.  For purposes of this annual incentive program, the Compensation Committee calculates operating income as net income attributable to AmTrust common stockholders less (a) after-tax realized investment gain (loss), (b) non-cash amortization of intangible assets, (c) non-cash impairment of goodwill, (d) non-cash interest on convertible senior notes, net of tax, (e) loss on extinguishment of debt, (f) foreign currency transaction gain (loss), (g) gain resulting from a decrease in the ownership percentage of an equity investment in an unconsolidated subsidiary (related party), net of tax, (h) acquisition gain, net of tax, and (i) gain on sale of a subsidiary, net of tax.

*Combined Ratio*
A standard insurance industry financial metric that represents a measure of our underwriting profitability where a value of less than 100% generally indicates an underwriting profit.  The sum of the net loss ratio (the ratio of net losses and loss adjustment expenses incurred to net premiums earned) and the net expense ratio (the ratio of the sum of acquisition costs and other underwriting expenses to net premiums earned) based on our GAAP income statement.

*Return on Equity*
A commonly used annual metric that measures our profitability by reflecting, as a ratio, the amount of GAAP earnings generated within stockholders' equity. Calculated by dividing annual net income by the average of beginning and ending stockholders' equity.

511.    According to the proxy statement filed by AmTrust on March 31, 2015, "[b]ased on our actual performance and the weighting of the three performance metrics detailed in the table

- 166 -

above, Mr. Zyskind was eligible for an annual incentive payout of $11,580,000, or *193%* of his target opportunity."   The March 29, 2016 proxy statement stated that, "[b]ased on our actual performance and the weighting of the three performance metrics detailed in the table above, Mr. Zyskind was eligible for an annual incentive payout of $9.0 million, or *150%* of his target opportunity."

512.    Thus, Defendant Zyskind directly benefitted from the various improper accounting practices and violations of GAAP employed by the AmTrust Defendants during the Class Period. Certain of his incentive-based compensation for 2014 and 2015 is potentially subject to being clawed back as a result of the actual performance of the Company during the Class Period, as restated.  As noted in AmTrust's proxy statement filed with the SEC on April 11, 2017:

> *[B]ased on the restated financial statements and related disclosures for 2014 and 2015 reported in our Form 10-K for the year ended December 31, 2016, up to $3,120,000 in annual incentives previously paid to Mr. Zyskind for our fiscal years ended December 31, 2014 and December 31, 2015, could potentially be subject to repayment under the no-fault recapture provisions of the 2010 Omnibus Incentive Plan, as amended and restated.*

**(f)    AmTrust's Audit Committee's Conflicted Chairman**

513.    The AmTrust Defendants' scienter in connection with the Company's material misstatements during the Class Period is also supported by the fact that its Audit Committee chairman had a significant conflict of interest and was incentivized to turn a blind eye to the Company's accounting improprieties.  Specifically, during the Class Period, Defendant Gulkowitz served as the chairman of AmTrust's Audit Committee while simultaneously serving as the co-founder and partner of Brookville Advisory ("Brookville").  As disclosed in a Form D filed with the SEC, the Hod Foundation, a private foundation owned and controlled by AmTrust co-founder Michael Karfunkel (and father-in-law of Defendant Zyskind), was the beneficial owner of, at minimum, 10% of FrontPoint Brookville Credit Opportunities L.P., which is managed by Brookville

and/or Gulkowitz.  As such, it appears that Defendant Gulkowitz personally benefitted from the investment by an AmTrust related entity in a Brookville investment fund, and as a result, his independence as chairman of the Audit Committee was compromised.

(g)    **The AmTrust Defendants' Positions and Access to Information**

514.    As alleged herein, Defendants AmTrust, Zyskind, and Pipoly acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants AmTrust, Zyskind, and Pipoly, by virtue of their receipt of information reflecting the true facts regarding AmTrust, their control over, and/or receipt and/or modification of AmTrust's admittedly materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

515.    Because of their positions within AmTrust, Defendants Zyskind and Pipoly had access to non-public information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

516.    Defendants Zyskind and Pipoly, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the

day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, income taxes, financial statements, and financial condition, as alleged herein. As noted by Pam Beaulieu, Vice President of Underwriting and Workers' Compensation at AmTrust during the Company's November 16, 2016 Investor Day presentation, "*I'm sure you've heard about our monthly calls with Barry Zyskind and company and the senior management from our reserve calls* . . . ." In addition, DeLynn Trivision, AmTrust's Senior Vice President, U.S. Sales, stated during the same presentation, "*we have an executive team that is very in tune to the business and what we do on a daily basis*."

517.     It is appropriate to treat the AmTrust Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of the AmTrust Defendants identified above. Each of the above officers of AmTrust, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. The Officer Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

518.     As officers and controlling persons of a publicly-held company whose securities were registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ and NYSE, and which is governed by the provisions of the federal securities laws, the Officer Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly-traded securities would be based upon truthful and accurate information.   The AmTrust Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

519.     The Officer Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.   Because of their executive and managerial positions and/or Board membership with AmTrust, the Officer Defendants each had access to the adverse undisclosed information about AmTrust's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about AmTrust and its business materially false and misleading.

520.     The Officer Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.   Each Officer Defendant was provided with copies of the documents alleged herein to be misleading before

or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Officer Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

521.    Each AmTrust Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of AmTrust securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding AmTrust's financial reporting, business, operations and management and the intrinsic value of AmTrust securities; (ii) enabled Defendant Pipoly, as well as other senior Company executives to sell more than *$43 million* worth of AmTrust securities during the Class Period, when the AmTrust Defendants were in possession of negative non-public information; and (iii) caused Plaintiffs and the Classes to purchase AmTrust's publicly-traded securities at artificially inflated prices.

### (h)    Defendant Pipoly's Removal as CFO

522.    Shortly following the Class Period, on June 5, 2017, AmTrust issued a press release filed with the SEC on Form 8-K announcing that Defendant Pipoly was being replaced as the Company's CFO, a position he had held for twelve years.  The release stated that "the position of Executive Vice President – Chief Financial Officer of the Company will transition from Ronald Pipoly to Adam Karkowsky. . . .  Mr. Karkowsky will serve as the Company's principal financial officer and principal accounting officer."  According to an amended and restated employment agreement filed with the SEC on Form 8-K on June 13, 2017, Mr. Pipoly will now serve as AmTrust's Executive Vice President – Finance.

523.    The replacement of Defendant Pipoly as the Company's CFO after twelve years in that position supports a finding of scienter, particularly when his so called "transition" only took

place after AmTrust switched auditors in 2016 (leading to the disclosure of a plethora of accounting improprieties, material weaknesses in its system of internal controls over financial reporting, as well as a delay in filing the Company's 2016 Form 10-K and its 3Q16 Form 10-Q), and the announcement of multiple governmental investigations into AmTrust's accounting practices.

524. Taken collectively, the following factors, among others, strongly support the inference of the AmTrust Defendants' scienter:

- The Company's substantial and undisputed violations of GAAP dating back to at least 2012;

- The Company's admitted internal control deficiencies;

- Defendants Zyskind and Pipoly's role in designing and monitoring the Company's internal controls;

- The magnitude of the Company's misstatements in its financial reporting;

- The AmTrust Defendants' prior experience with accounting improprieties;

- Defendant Zyskind and Pipoly's participation in management of the Company on a daily basis;

- Defendant Zyskind's incentive to inflate the Company's financial performance to achieve lucrative incentive-based compensation;

- The Company's conflicted audit committee chairman;

- Defendant Pipoly's and other executives' insider sales;

- The abrupt termination of Defendant Pipoly, AmTrust's CFO; and

- The on-going investigations by the FBI, SEC and The New York Department of Financial Services.

**NO SAFE HARBOR**

525. The "Safe Harbor" warnings accompanying AmTrust's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's

financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

526.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of AmTrust who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

527.    Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's securities traded in efficient markets;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiffs and other members of the Class purchased AmTrust securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

528.     At all relevant times, the markets for AmTrust securities were efficient for the following reasons, among others:

(a)     As a regulated issuer, AmTrust filed periodic public reports with the SEC; and

(b)     AmTrust regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

529.     During the Class Period, as detailed herein, the AmTrust Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AmTrust securities and operated as a fraud or deceit on Class Period purchasers of AmTrust securities by misrepresenting the value of the Company's business and prospects.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of AmTrust securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of AmTrust securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

530.     Specifically, on February 27, 2017, before the market opened, Defendants disclosed that AmTrust would be delaying the filing of its annual report on Form 10-K for the year ended December 31, 2016, and that it expected to make certain corrections to its financial statements in each year dating back to fiscal year ended December 31, 2012.  The Company specifically identified several accounting errors during the three months ended December 31, 2016, relating to prior periods in 2016 and 2015.  The Company also reported that it had "identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016."  In response, the

price of AmTrust common stock fell from $27.66 per share the previous trading day, to close at $22.34 per share, down approximately $5.32 per share, or 19.2%, from its close the prior trading day, on very unusual high trading volume of more than 8.8 million shares trading.  The price of AmTrust Series C Preferred stock fell from its close at $26.04 per share the previous trading day, to close at $24.96 per share, a 4.1% decline.. The price of AmTrust Series E Preferred stock fell from its close at $26.39 per share the previous trading day, to close at $25.15 per share, a  4.7% decline. The price of AmTrust Series F Preferred stock dropped from its close at $25.05 per share the previous trading day, to close at $24.25 per share, a 3.2% decline.

531.    Then, on March 16, 2017, after the market closed, AmTrust reported that the release of the 2016 Form 10-K would again be delayed.  The Company also disclosed that its Audit Committee had determined that its consolidated financial statements for the years ended December 31, 2014 and 2015 (including each of the four quarters of 2015) and the first three quarters of 2016 "*should be restated and should no longer be relied upon*."  In addition, AmTrust reported that its "earnings and press releases and similar communications, to the extent that they relate to the periods covered by these financial statements, as well as the Company's fourth quarter and fiscal 2016 earnings release dated February 27, 2017, *should no longer be relied upon*."  AmTrust also stated that the audit reports issued by BDO for the years ended December 31, 2014 and 2015, including the effectiveness of AmTrust's internal control over financial reporting on those dates, "*likewise should no longer be relied upon*."  In response, the price of AmTrust common stock fell from $21.61 per share the previous day, to close at $17.58 per share, down approximately $4.03 per share, or 18.6% from its close the prior day, on very unusual high trading volume of more than 13 million shares trading.  The price of AmTrust Series C Preferred Stock fell from its close at $24.81 per share the previous trading day, to close at $23.25 per share, a  6.3% decline. The price of AmTrust Series E

Preferred Stock fell from its close at $25.22 per share  the previous trading day, to close at $23.52 per share, a 6.7% decline  The price of AmTrust Series F Preferred Stock dropped from its close at $23.25 per share  the previous trading day, to close at $21.54 per share, a 7.4% decline.

532.    Finally, the April 2017 WSJ Article reported that the FBI, SEC and the NYDFS were each investigating AmTrust's fraudulent accounting practices.  According to the article, a former BDO auditor turned whistleblower was assisting the FBI in its investigation.  In response, the price of AmTrust common stock fell from $18.87 per share the previous day, to close at $15.30 per share, down approximately $3.57 per share, or 18.9% from its close the prior day, on very unusual high trading volume of more than 23 million shares trading.  The price of AmTrust Series C Preferred Stock fell from its close at $24.90 per share  the previous trading day, to close at $22.53 per share, a 9.5% decline.  The price of AmTrust Series E Preferred stock fell from its close at $25.20 per share the previous trading day, to close at $22.89 per share, a 9.2% decline. from its close the prior trading day.  The price of AmTrust Series F Preferred stock dropped from its close at $23.72 per share the previous trading day, to close at $21.31 per share, a 10.2% decline.

533.    The declines in the prices of AmTrust securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in AmTrust securities negate any inference that the loss suffered by Plaintiffs and the other Exchange Act Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Exchange Act Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of AmTrust securities and the

subsequent significant decline in the value of AmTrust securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## COUNT IV

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against the AmTrust Defendants

534.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except those that disclaim the intentional or fraudulent nature of the conduct alleged herein.

535.    This Count is asserted against the AmTrust Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

536.    During the Class Period, the AmTrust Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

537.    The AmTrust Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

538.    The AmTrust Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of AmTrust securities during the Class Period in an effort to maintain artificially high market prices for AmTrust's securities in violation of Section

10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

539.    Each of the Officer Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Officer Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Officer Defendants, by virtue of their responsibilities and activities as senior officers and/or a director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial results and guidance; (iii) each of the Officer Defendants were advised of and had access to other members of the Company's management team, internal reports and other data and information at all relevant times; and (iv) each of the Officer Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

540.    The AmTrust Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the truth regarding the ongoing fraudulent accounting at AmTrust and supporting the artificially inflated prices of AmTrust's securities.  As demonstrated by AmTrust and the Officer Defendants' misstatements of the Company's business and operations during the Class Period, AmTrust and the Officer Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

- 178 -

541.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of AmTrust's securities were artificially inflated during the Class Period. In ignorance of the fact that the market prices of AmTrust's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the AmTrust Defendants, or upon the integrity of the markets in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the AmTrust Defendants, but not disclosed in public statements by the AmTrust Defendants during the Class Period, Plaintiffs and the other members of the Exchange Act Class purchased AmTrust securities during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

542.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Exchange Act Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Exchange Act Class and the marketplace known the truth regarding the significant problems alleged herein, which were not disclosed by AmTrust and the Officer Defendants, Plaintiffs and the other members of the Exchange Act Class would not have purchased or otherwise acquired their AmTrust securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

543.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of the AmTrust Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of AmTrust securities during the Class Period.

## COUNT V

### For Violations of §20(a) of the Exchange Act
### Against the Officer Defendants

544.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except those that disclaim the intentional or fraudulent nature of the conduct alleged herein.

545.     This Count is asserted against the Officer Defendants for violations of Section 20(a) of the Exchange Act.

546.     The Officer Defendants acted as controlling persons of AmTrust within the meaning of Section 20(a) of the Exchange Act.

547.     By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Officer Defendants were provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.     Awarding compensatory damages in favor of Plaintiffs and the other members of the Classes against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding Plaintiffs Albano, Jupiter Capital, ILRLT and Newmark and the Securities Act Class their rescission or a rescissory measure of damages; and

E.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

<strong>JURY DEMAND</strong>

Plaintiffs demand a trial by jury.

DATED:  August 18, 2017                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           SAMUEL H. RUDMAN
                                           DAVID A. ROSENFELD
                                           ROBERT D. GERSON
                                           AVITAL O. MALINA


                                           _____
                                                */s/ Samuel H. Rudman*
                                               SAMUEL H. RUDMAN

                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)
                                           srudman@rgrdlaw.com
                                           drosenfeld@rgrdlaw.com
                                           rgerson@rgrdlaw.com
                                           amalina@rgrdlaw.com

                                           *Lead Counsel for Lead Plaintiff and the Class*

POMERANTZ LLP
JEREMY A. LIEBERMAN
600 Third Avenue, 20th Floor
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com

GAINEY MCKENNA & EGLESTON
THOMAS J. McKENNA
440 Park Avenue South, 5th Floor
New York, NY  10016
Telephone: 212/983-1300
212/983-0380 (fax)
tjmckenna@gme-law.com

KAHN SWICK & FOTI, LLC
KIM E. MILLER
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

*Additional Counsel for Plaintiffs*

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**New England Carpenters Guaranteed Annuity Fund**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 01/23/2015 | 34,110 | $25.81 |
| 02/11/2015 | 1,200 | $27.75 |
| 03/30/2015 | 1,200 | $28.11 |
| 05/05/2015 | 1,000 | $30.34 |
| 05/06/2015 | 1,000 | $29.49 |
| 05/08/2015 | 1,600 | $29.05 |
| 05/11/2015 | 730 | $28.98 |
| 05/12/2015 | 270 | $28.91 |
| 05/15/2015 | 2,000 | $29.79 |
| 05/20/2015 | 900 | $30.18 |
| 05/22/2015 | 1,600 | $29.99 |
| 05/29/2015 | 1,600 | $30.21 |
| 08/10/2015 | 716 | $32.74 |
| 08/11/2015 | 660 | $32.45 |
| 08/12/2015 | 1,224 | $32.45 |
| 08/12/2015 | 1,800 | $31.87 |
| 08/19/2015 | 1,000 | $32.15 |
| 08/21/2015 | 200 | $30.03 |
| 08/21/2015 | 300 | $30.09 |
| 08/21/2015 | 400 | $31.07 |
| 08/28/2015 | 200 | $29.21 |
| 08/28/2015 | 500 | $29.24 |
| 09/01/2015 | 900 | $28.20 |
| 09/01/2015 | 1,200 | $28.34 |
| 09/08/2015 | 1,800 | $29.21 |
| 09/14/2015 | 618 | $29.99 |
| 09/15/2015 | 82 | $29.99 |
| 10/02/2015 | 900 | $30.89 |
| 11/04/2015 | 1,400 | $32.48 |
| 11/11/2015 | 2,580 | $30.96 |
| 11/11/2015 | 3,600 | $31.42 |
| 11/12/2015 | 800 | $30.42 |
| 11/12/2015 | 1,000 | $29.55 |
| 11/12/2015 | 1,400 | $29.72 |
| 11/12/2015 | 2,400 | $29.26 |
| 11/12/2015 | 2,400 | $29.35 |
| 11/13/2015 | 1,500 | $29.47 |
| 01/06/2016 | 1,100 | $29.57 |
| 01/08/2016 | 600 | $28.27 |
| 01/14/2016 | 600 | $27.39 |
| 01/14/2016 | 640 | $28.04 |
| 01/20/2016 | 800 | $26.58 |
| 02/03/2016 | 714 | $27.22 |
| 02/04/2016 | 1,500 | $27.25 |
| 02/09/2016 | 1,200 | $26.15 |
| 02/10/2016 | 400 | $26.00 |

| Date | Quantity | Price |
|------|----------|-------|
| 02/10/2016 | 500 | $25.50 |
| 02/10/2016 | 1,000 | $26.16 |
| 02/11/2016 | 900 | $24.46 |
| 02/12/2016 | 900 | $24.54 |
| 02/17/2016 | 1,600 | $25.54 |
| 02/23/2016 | 700 | $25.01 |
| 02/24/2016 | 45 | $24.60 |
| 02/26/2016 | 500 | $25.10 |
| 02/29/2016 | 500 | $24.63 |
| 02/29/2016 | 900 | $24.94 |
| 03/01/2016 | 350 | $25.31 |
| 03/02/2016 | 600 | $25.50 |
| 03/02/2016 | 2,500 | $25.90 |
| 03/03/2016 | 720 | $25.80 |
| 03/03/2016 | 1,000 | $25.56 |
| 03/08/2016 | 530 | $25.34 |
| 03/10/2016 | 200 | $25.45 |
| 03/11/2016 | 700 | $26.09 |
| 03/14/2016 | 800 | $25.13 |
| 03/14/2016 | 900 | $25.25 |
| 03/15/2016 | 600 | $25.71 |
| 03/16/2016 | 1,000 | $25.10 |
| 04/04/2016 | 760 | $25.41 |
| 04/04/2016 | 1,600 | $24.96 |
| 04/04/2016 | 1,600 | $25.09 |
| 04/04/2016 | 2,700 | $24.76 |
| 04/05/2016 | 1,200 | $25.01 |
| 04/05/2016 | 2,300 | $24.80 |
| 04/06/2016 | 1,200 | $24.51 |
| 04/07/2016 | 1,000 | $24.10 |
| 04/07/2016 | 1,700 | $23.88 |
| 04/07/2016 | 2,400 | $24.47 |
| 04/08/2016 | 1,300 | $24.43 |
| 04/12/2016 | 1,900 | $24.38 |
| 04/15/2016 | 1,500 | $25.17 |
| 04/18/2016 | 1,012 | $24.99 |
| 04/19/2016 | 900 | $25.17 |
| 04/19/2016 | 1,100 | $25.20 |
| 04/19/2016 | 1,488 | $25.34 |
| 04/25/2016 | 1,850 | $24.82 |
| 04/28/2016 | 1,850 | $25.01 |
| 04/29/2016 | 1,200 | $24.84 |
| 06/08/2016 | 1,400 | $26.51 |
| 06/14/2016 | 2,200 | $25.04 |
| 07/05/2016 | 1,665 | $24.22 |
| 07/06/2016 | 935 | $24.21 |
| 07/06/2016 | 1,200 | $24.27 |
| 07/07/2016 | 700 | $24.20 |
| 07/11/2016 | 1,000 | $24.81 |
| 07/13/2016 | 5 | $24.35 |
| 07/13/2016 | 1,030 | $24.48 |
| 07/13/2016 | 2,300 | $24.67 |
| 07/18/2016 | 1,350 | $24.90 |
| 07/19/2016 | 444 | $24.64 |
| 07/20/2016 | 456 | $24.84 |

| 07/21/2016 | 1,100 | $24.73 |
| 07/21/2016 | 1,200 | $24.46 |
| 07/21/2016 | 1,300 | $24.46 |
| 07/22/2016 | 880 | $24.48 |
| 07/25/2016 | 1,110 | $24.25 |
| 07/25/2016 | 1,750 | $24.50 |
| 07/26/2016 | 1,600 | $24.11 |
| 07/28/2016 | 226 | $24.09 |
| 09/28/2016 | 1,160 | $25.91 |
| 10/20/2016 | 600 | $26.48 |
| 10/27/2016 | 672 | $25.98 |
| 10/28/2016 | 278 | $25.97 |
| 11/01/2016 | 290 | $25.90 |
| 11/02/2016 | 104 | $25.60 |
| 11/04/2016 | 520 | $25.08 |
| 11/04/2016 | 560 | $24.99 |
| 11/04/2016 | 2,000 | $24.93 |
| 11/08/2016 | 960 | $24.81 |
| 11/11/2016 | 107 | $24.05 |
| 11/11/2016 | 440 | $25.48 |
| 11/17/2016 | 59 | $25.92 |
| 11/17/2016 | 251 | $25.91 |
| 11/17/2016 | 1,300 | $25.86 |
| 11/22/2016 | 162 | $25.63 |
| 11/22/2016 | 600 | $25.65 |
| 11/22/2016 | 880 | $25.83 |
| 11/23/2016 | 7 | $25.65 |
| 11/30/2016 | 700 | $25.55 |
| 11/30/2016 | 880 | $25.62 |
| 12/01/2016 | 900 | $25.74 |
| 12/02/2016 | 400 | $25.35 |
| 01/05/2017 | 1,170 | $27.31 |
| 01/05/2017 | 1,200 | $27.25 |
| 01/11/2017 | 96 | $27.27 |
| 01/12/2017 | 454 | $27.24 |
| 01/12/2017 | 1,070 | $27.13 |
| 01/13/2017 | 1,090 | $27.13 |
| 01/20/2017 | 490 | $26.64 |
| 01/25/2017 | 130 | $26.75 |
| 01/27/2017 | 40 | $26.34 |
| 01/30/2017 | 760 | $26.33 |
| 01/31/2017 | 470 | $26.27 |
| 02/03/2017 | 720 | $26.71 |
| 02/28/2017 | 1,754 | $22.24 |
| 03/03/2017 | 3,400 | $22.99 |
| 03/09/2017 | 1,450 | $21.95 |
| 03/09/2017 | 1,610 | $21.71 |
| 03/09/2017 | 2,050 | $21.93 |
| 03/10/2017 | 614 | $21.25 |
| 03/27/2017 | 3,852 | $18.33 |
| 03/28/2017 | 908 | $18.40 |
| 03/28/2017 | 1,684 | $18.36 |
| 03/29/2017 | 980 | $18.53 |
| 03/29/2017 | 1,836 | $18.70 |
| 03/29/2017 | 3,360 | $18.57 |

| 03/30/2017 | 280 | $18.39 |
|---|---|---|
| 03/30/2017 | 1,362 | $18.47 |
| 03/30/2017 | 1,908 | $18.47 |
| 03/31/2017 | 1,970 | $18.51 |
| 03/31/2017 | 2,620 | $18.63 |
| 03/31/2017 | 3,090 | $18.58 |
| 04/03/2017 | 1,270 | $18.34 |
| 04/03/2017 | 1,700 | $18.25 |
| 04/03/2017 | 3,320 | $18.37 |
| 04/03/2017 | 3,490 | $18.34 |
| 04/07/2017 | 120 | $18.85 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 02/06/2015 | 1,500 | $26.77 |
| 02/13/2015 | 1,400 | $27.78 |
| 03/13/2015 | 2,800 | $28.52 |
| 04/13/2015 | 1,000 | $29.54 |
| 04/28/2015 | 2,000 | $30.07 |
| 05/04/2015 | 3,000 | $30.37 |
| 06/11/2015 | 1,200 | $30.89 |
| 07/10/2015 | 1,072 | $33.26 |
| 07/13/2015 | 928 | $33.34 |
| 07/29/2015 | 1,800 | $33.64 |
| 08/03/2015 | 2,000 | $34.75 |
| 08/03/2015 | 2,200 | $35.01 |
| 08/03/2015 | 3,000 | $34.70 |
| 08/04/2015 | 1,200 | $35.44 |
| 11/18/2015 | 1,040 | $29.88 |
| 11/18/2015 | 1,100 | $29.83 |
| 11/18/2015 | 2,800 | $29.84 |
| 11/19/2015 | 700 | $30.22 |
| 11/20/2015 | 2,000 | $30.66 |
| 11/23/2015 | 400 | $30.92 |
| 11/24/2015 | 1,800 | $30.90 |
| 12/07/2015 | 860 | $31.89 |
| 12/10/2015 | 600 | $30.57 |
| 08/03/2016 | 277 | $25.36 |
| 08/03/2016 | 401 | $25.42 |
| 08/03/2016 | 672 | $25.57 |
| 08/03/2016 | 1,220 | $25.50 |
| 08/03/2016 | 2,000 | $25.04 |
| 08/25/2016 | 530 | $26.02 |
| 08/25/2016 | 830 | $26.01 |
| 08/25/2016 | 1,700 | $26.23 |
| 08/29/2016 | 156 | $26.01 |
| 08/30/2016 | 1,134 | $26.11 |
| 09/09/2016 | 100 | $26.55 |
| 09/12/2016 | 580 | $26.22 |
| 09/13/2016 | 540 | $26.42 |
| 09/13/2016 | 660 | $26.51 |

| 10/12/2016 | 200 | $27.77 |
| 10/12/2016 | 650 | $27.56 |
| 10/13/2016 | 540 | $27.60 |
| 10/13/2016 | 540 | $27.68 |
| 10/13/2016 | 1,170 | $27.59 |
| 10/17/2016 | 326 | $27.95 |
| 11/03/2016 | 157 | $25.95 |
| 12/08/2016 | 450 | $26.78 |
| 12/08/2016 | 540 | $27.75 |
| 12/08/2016 | 1,500 | $27.54 |
| 12/09/2016 | 650 | $27.76 |
| 12/12/2016 | 647 | $28.06 |
| 12/13/2016 | 44 | $28.09 |
| 12/15/2016 | 949 | $27.58 |
| 12/19/2016 | 890 | $27.95 |
| 12/21/2016 | 880 | $27.91 |
| 02/24/2017 | 1,050 | $27.65 |
| 02/27/2017 | 1,210 | $23.62 |
| 03/16/2017 | 1,000 | $21.78 |
| 03/16/2017 | 1,110 | $21.66 |
| 03/16/2017 | 1,990 | $21.68 |
| 03/16/2017 | 2,418 | $21.65 |
| 03/16/2017 | 4,718 | $21.65 |
| 03/16/2017 | 5,500 | $21.75 |
| 04/04/2017 | 1,470 | $22.30 |
| 04/04/2017 | 1,600 | $22.26 |
| 04/04/2017 | 1,620 | $21.52 |
| 04/04/2017 | 3,190 | $22.13 |
| 04/05/2017 | 951 | $21.51 |
| 04/06/2017 | 1,790 | $20.03 |

**New England Carpenters Pension Fund**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 01/23/2015 | 31,634 | $25.81 |
| 02/11/2015 | 1,000 | $27.75 |
| 03/30/2015 | 1,000 | $28.11 |
| 05/05/2015 | 1,000 | $30.34 |
| 05/06/2015 | 1,000 | $29.49 |
| 05/08/2015 | 1,600 | $29.05 |
| 05/11/2015 | 512 | $28.98 |
| 05/12/2015 | 188 | $28.91 |
| 05/15/2015 | 1,800 | $29.79 |
| 05/20/2015 | 1,000 | $30.18 |
| 05/22/2015 | 1,400 | $29.99 |
| 05/29/2015 | 1,400 | $30.21 |
| 08/10/2015 | 716 | $32.74 |
| 08/11/2015 | 590 | $32.45 |
| 08/12/2015 | 1,094 | $32.45 |
| 08/12/2015 | 1,600 | $31.87 |
| 08/19/2015 | 1,000 | $32.15 |
| 08/21/2015 | 200 | $30.03 |

| | | |
|---|---|---|
| 08/21/2015 | 300 | $30.09 |
| 08/21/2015 | 400 | $31.07 |
| 08/28/2015 | 300 | $29.21 |
| 08/28/2015 | 500 | $29.24 |
| 09/01/2015 | 800 | $28.34 |
| 09/01/2015 | 1,000 | $28.20 |
| 09/08/2015 | 1,600 | $29.21 |
| 09/14/2015 | 618 | $29.99 |
| 09/15/2015 | 82 | $29.99 |
| 10/02/2015 | 800 | $30.89 |
| 11/04/2015 | 1,300 | $32.48 |
| 11/11/2015 | 2,600 | $30.96 |
| 11/11/2015 | 3,200 | $31.42 |
| 11/12/2015 | 700 | $30.42 |
| 11/12/2015 | 1,000 | $29.55 |
| 11/12/2015 | 1,300 | $29.72 |
| 11/12/2015 | 2,000 | $29.26 |
| 11/12/2015 | 6,600 | $29.35 |
| 11/13/2015 | 100 | $29.47 |
| 01/06/2016 | 1,100 | $29.57 |
| 01/08/2016 | 600 | $28.27 |
| 01/14/2016 | 500 | $27.39 |
| 01/14/2016 | 560 | $28.04 |
| 01/20/2016 | 800 | $26.58 |
| 02/03/2016 | 625 | $27.22 |
| 02/04/2016 | 1,400 | $27.25 |
| 02/09/2016 | 1,100 | $26.15 |
| 02/10/2016 | 400 | $26.00 |
| 02/10/2016 | 450 | $25.50 |
| 02/10/2016 | 900 | $26.16 |
| 02/11/2016 | 800 | $24.46 |
| 02/12/2016 | 900 | $24.54 |
| 02/17/2016 | 1,500 | $25.54 |
| 02/23/2016 | 700 | $25.01 |
| 02/24/2016 | 36 | $24.60 |
| 02/26/2016 | 400 | $25.10 |
| 02/29/2016 | 450 | $24.63 |
| 02/29/2016 | 800 | $24.94 |
| 03/01/2016 | 350 | $25.31 |
| 03/02/2016 | 500 | $25.50 |
| 03/02/2016 | 2,500 | $25.90 |
| 03/03/2016 | 530 | $25.80 |
| 03/03/2016 | 1,000 | $25.56 |
| 03/08/2016 | 520 | $25.34 |
| 03/10/2016 | 200 | $25.45 |
| 03/11/2016 | 500 | $26.09 |
| 03/14/2016 | 700 | $25.13 |
| 03/14/2016 | 900 | $25.25 |
| 03/15/2016 | 550 | $25.71 |
| 03/16/2016 | 900 | $25.10 |
| 04/04/2016 | 740 | $25.41 |
| 04/04/2016 | 1,500 | $24.96 |
| 04/04/2016 | 1,500 | $25.09 |
| 04/04/2016 | 2,500 | $24.76 |
| 04/05/2016 | 1,100 | $25.01 |

| 04/05/2016 | 2,100 | $24.80 |
|---|---|---|
| 04/06/2016 | 1,100 | $24.51 |
| 04/07/2016 | 1,000 | $24.10 |
| 04/07/2016 | 1,400 | $23.88 |
| 04/07/2016 | 2,300 | $24.47 |
| 04/08/2016 | 1,200 | $24.43 |
| 04/12/2016 | 1,800 | $24.38 |
| 04/15/2016 | 1,400 | $25.17 |
| 04/18/2016 | 931 | $24.99 |
| 04/19/2016 | 800 | $25.17 |
| 04/19/2016 | 1,100 | $25.20 |
| 04/19/2016 | 1,369 | $25.34 |
| 04/25/2016 | 1,750 | $24.82 |
| 04/28/2016 | 1,750 | $25.01 |
| 04/29/2016 | 1,000 | $24.84 |
| 06/08/2016 | 1,300 | $26.51 |
| 06/14/2016 | 2,000 | $25.04 |
| 07/05/2016 | 1,601 | $24.22 |
| 07/06/2016 | 899 | $24.21 |
| 07/06/2016 | 1,100 | $24.27 |
| 07/07/2016 | 600 | $24.20 |
| 07/11/2016 | 1,000 | $24.81 |
| 07/13/2016 | 5 | $24.35 |
| 07/13/2016 | 1,000 | $24.48 |
| 07/13/2016 | 2,000 | $24.67 |
| 07/18/2016 | 1,250 | $24.90 |
| 07/19/2016 | 420 | $24.64 |
| 07/20/2016 | 430 | $24.84 |
| 07/21/2016 | 1,000 | $24.73 |
| 07/21/2016 | 1,100 | $24.46 |
| 07/21/2016 | 1,200 | $24.46 |
| 07/22/2016 | 830 | $24.48 |
| 07/25/2016 | 1,030 | $24.25 |
| 07/25/2016 | 1,620 | $24.50 |
| 07/26/2016 | 1,500 | $24.11 |
| 07/28/2016 | 198 | $24.09 |
| 09/28/2016 | 1,080 | $25.91 |
| 10/20/2016 | 500 | $26.48 |
| 10/27/2016 | 672 | $25.98 |
| 10/28/2016 | 278 | $25.97 |
| 11/01/2016 | 250 | $25.90 |
| 11/02/2016 | 95 | $25.60 |
| 11/04/2016 | 490 | $25.08 |
| 11/04/2016 | 510 | $24.99 |
| 11/04/2016 | 2,000 | $24.93 |
| 11/08/2016 | 740 | $24.81 |
| 11/11/2016 | 102 | $24.05 |
| 11/11/2016 | 410 | $25.48 |
| 11/17/2016 | 54 | $25.92 |
| 11/17/2016 | 228 | $25.91 |
| 11/17/2016 | 1,200 | $25.86 |
| 11/22/2016 | 149 | $25.63 |
| 11/22/2016 | 550 | $25.65 |
| 11/22/2016 | 820 | $25.83 |
| 11/23/2016 | 6 | $25.65 |

| | | |
|---|---|---|
| 11/30/2016 | 620 | $25.55 |
| 11/30/2016 | 860 | $25.62 |
| 12/01/2016 | 800 | $25.74 |
| 12/02/2016 | 400 | $25.35 |
| 01/05/2017 | 1,080 | $27.31 |
| 01/05/2017 | 1,100 | $27.25 |
| 01/11/2017 | 93 | $27.27 |
| 01/12/2017 | 437 | $27.24 |
| 01/12/2017 | 990 | $27.13 |
| 01/13/2017 | 1,010 | $27.13 |
| 01/20/2017 | 450 | $26.64 |
| 01/25/2017 | 120 | $26.75 |
| 01/27/2017 | 35 | $26.34 |
| 01/30/2017 | 665 | $26.33 |
| 01/31/2017 | 480 | $26.27 |
| 02/03/2017 | 660 | $26.71 |
| 02/28/2017 | 1,624 | $22.24 |
| 03/03/2017 | 3,200 | $22.99 |
| 03/09/2017 | 1,350 | $21.95 |
| 03/09/2017 | 1,480 | $21.71 |
| 03/09/2017 | 1,850 | $21.93 |
| 03/10/2017 | 511 | $21.25 |
| 03/27/2017 | 3,560 | $18.33 |
| 03/28/2017 | 840 | $18.40 |
| 03/28/2017 | 1,560 | $18.36 |
| 03/29/2017 | 900 | $18.53 |
| 03/29/2017 | 1,700 | $18.70 |
| 03/29/2017 | 3,120 | $18.57 |
| 03/30/2017 | 258 | $18.39 |
| 03/30/2017 | 1,259 | $18.47 |
| 03/30/2017 | 1,763 | $18.47 |
| 03/31/2017 | 1,820 | $18.51 |
| 03/31/2017 | 2,430 | $18.63 |
| 03/31/2017 | 2,870 | $18.58 |
| 04/03/2017 | 1,170 | $18.34 |
| 04/03/2017 | 1,570 | $18.25 |
| 04/03/2017 | 3,080 | $18.37 |
| 04/03/2017 | 3,230 | $18.34 |
| 04/07/2017 | 112 | $18.85 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 02/06/2015 | 1,300 | $26.77 |
| 02/13/2015 | 1,200 | $27.78 |
| 03/13/2015 | 2,600 | $28.52 |
| 04/13/2015 | 1,000 | $29.54 |
| 04/28/2015 | 2,000 | $30.07 |
| 05/04/2015 | 2,600 | $30.37 |
| 06/11/2015 | 1,200 | $30.89 |
| 07/10/2015 | 910 | $33.26 |
| 07/13/2015 | 790 | $33.34 |

| | | |
|---|---|---|
| 07/29/2015 | 1,700 | $33.64 |
| 08/03/2015 | 1,600 | $35.01 |
| 08/03/2015 | 2,000 | $34.75 |
| 08/03/2015 | 3,000 | $34.70 |
| 08/04/2015 | 1,200 | $35.44 |
| 11/18/2015 | 960 | $29.88 |
| 11/18/2015 | 2,600 | $29.84 |
| 11/18/2015 | 4,000 | $29.83 |
| 11/19/2015 | 600 | $30.22 |
| 11/20/2015 | 2,000 | $30.66 |
| 11/23/2015 | 300 | $30.92 |
| 11/24/2015 | 1,600 | $30.90 |
| 12/07/2015 | 840 | $31.89 |
| 12/10/2015 | 600 | $30.57 |
| 08/03/2016 | 256 | $25.36 |
| 08/03/2016 | 372 | $25.42 |
| 08/03/2016 | 622 | $25.57 |
| 08/03/2016 | 1,090 | $25.50 |
| 08/03/2016 | 1,900 | $25.04 |
| 08/25/2016 | 487 | $26.02 |
| 08/25/2016 | 763 | $26.01 |
| 08/25/2016 | 1,600 | $26.23 |
| 08/29/2016 | 141 | $26.01 |
| 08/30/2016 | 1,029 | $26.11 |
| 09/09/2016 | 90 | $26.55 |
| 09/12/2016 | 540 | $26.22 |
| 09/13/2016 | 510 | $26.42 |
| 09/13/2016 | 610 | $26.51 |
| 10/12/2016 | 180 | $27.77 |
| 10/12/2016 | 600 | $27.56 |
| 10/13/2016 | 490 | $27.60 |
| 10/13/2016 | 500 | $27.68 |
| 10/13/2016 | 1,090 | $27.59 |
| 10/17/2016 | 308 | $27.95 |
| 11/03/2016 | 145 | $25.95 |
| 12/08/2016 | 420 | $26.78 |
| 12/08/2016 | 440 | $27.75 |
| 12/08/2016 | 1,450 | $27.54 |
| 12/09/2016 | 600 | $27.76 |
| 12/12/2016 | 600 | $28.06 |
| 12/13/2016 | 42 | $28.09 |
| 12/15/2016 | 878 | $27.58 |
| 12/19/2016 | 820 | $27.95 |
| 12/21/2016 | 820 | $27.91 |
| 02/24/2017 | 970 | $27.65 |
| 02/27/2017 | 1,120 | $23.62 |
| 03/16/2017 | 980 | $21.66 |
| 03/16/2017 | 1,000 | $21.78 |
| 03/16/2017 | 1,760 | $21.68 |
| 03/16/2017 | 2,267 | $21.65 |
| 03/16/2017 | 4,424 | $21.65 |
| 03/16/2017 | 5,000 | $21.75 |
| 04/04/2017 | 1,360 | $22.30 |
| 04/04/2017 | 1,500 | $21.52 |
| 04/04/2017 | 1,500 | $22.26 |

| | | |
|---|---|---|
| 04/04/2017 | 2,930 | $22.13 |
| 04/05/2017 | 881 | $21.51 |
| 04/06/2017 | 1,660 | $20.03 |