UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMTRUST FINANCIAL SERVICES, INC. SECURITIES LITIGATION | C.A. No. 1:17-cv-01545-(LAK) |

**OPENING BRIEF IN SUPPORT OF AMTRUST'S, THE OFFICER DEFENDANTS',
AND THE DIRECTOR DEFENDANTS' MOTION TO DISMISS**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Tel: (212) 351-2662
Fax: (212) 351-6362

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 4

    A.   AmTrust Grows Into One Of The Largest Property And Casualty Insurers In
        North America ................................................................................................... 4

    B.   Between 2013 And 2016, AmTrust's Financial And Actuarial Processes Were
        Scrutinized And Approved By Regulators And Independent Auditors, And A
        Securities Class Action Against The Company Was Dismissed. ..................... 5

    C.   After Hiring A New Independent Auditor In 2016, AmTrust Announced That It
        Would Restate Certain Limited Financial Statement Items. ........................... 7

    D.   Shareholders File A Slew Of Putative Class Action Lawsuits. ...................... 8

ARGUMENT ..................................................................................................................... 11

    A.   Plaintiffs' Section 11 & 12(a)(2) Claims (Counts I & II) Should Be Dismissed
        Because Plaintiffs Fail To Allege Actionable Misstatements Of Material Fact. .......... 11

    B.   The 10(b) Claim (Count IV) Against AmTrust and the Officer Defendants
        Should Be Dismissed Because Plaintiffs Fail To Adequately Allege Scienter Or
        Actionable Misstatements. ............................................................................. 19

    C.   The Secondary Liability Claims (Counts III & V) Should Be Dismissed For
        Failure To Adequately Plead Primary Liability, A Distinct Basis For Secondary
        Liability, Or Culpable Participation Of Alleged Control Persons. .............. 34

CONCLUSION .................................................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ...........................................................................21, 22

*In re AgriBio Tech Sec. Litig.*,
  2000 WL 1277603 (D. Nev. Mar. 2, 2000) ............................................................16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...........................................................................35

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008)...................................................................26

*Bay v. Palmisano*,
  2002 WL 31415713 (E.D. La. Oct. 24, 2002) ...................................................16, 30

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998)...........................................................................34

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)...................................................................29

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) ...........................................................................26

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)..................................................................21, 28, 29

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008)...................................................................26

*Dempsey v. Vieau*,
  2016 WL 3351081 (S.D.N.Y. June 15, 2016) ............................................................13

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)........................................................21, 22, 24, 29

*Dura Pharm. Inc. v. Broudo*,
  544 U.S. 336, 125 S. Ct. 1627 (2005)...................................................................19

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)........................................................................19, 31

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
   2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) .....................................................................12

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011) ..........................................................................13, 14, 15

*Fait v. Regions Fin. Corp.*,
   712 F. Supp. 2d 117 (S.D.N.Y. 2010),
   *aff'd*, 655 F.3d 105 (2d Cir. 2011) ...................................................................2, 17, 18

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010) ...............................................................................23

*Garber v. Legg Mason, Inc.*,
   347 F. App'x 665 (2d Cir. 2009) .......................................................................................18

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...............................................................................22

*Harris v. AmTrust Fin. Servs., Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015),
   *aff'd*, 649 F. App'x 7 (2016) ................................................................................ *passim*

*In re Hutchinson Tech., Inc. Sec. Litig.*,
   536 F.3d 952 (8th Cir. 2008) ............................................................................................27

*In re IndyMac Mortg.-Backed Sec. Litig.*,
   718 F. Supp. 2d 495 (S.D.N.Y. 2010) ...............................................................................14

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ..............................................................................................20

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135, 131 S. Ct. 2296 (2011) ...............................................................................18

*Kalin v. Xanboo, Inc.*,
   526 F. Supp. 2d 392 (S.D.N.Y. 2007) ...............................................................................35

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ..............................................................................................24

*Kalnit v. Eichler*,
   85 F. Supp. 2d 232 (S.D.N.Y. 1999) .................................................................................34

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991) ................................................................................................1

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012),
   *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home*
   *Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013) ...............................17

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
   650 F.3d 167 (2d Cir. 2011) ...............................................................34, 35

*In re Lehman Bros. Sec. & ERISA Litig.*,
   2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) ...........................................34

*Lenartz v. Am. Superconductor Corp.*,
   879 F. Supp. 2d 167 (D. Mass. 2012) ......................................................17

*Lin v. Interactive Brokers Grp., Inc.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008) ......................................................12

*Lipow v. Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015) ......................................................29

*In re Loewen Grp. Inc.*,
   2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) ......................................16, 30

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014),
   *aff'd*, 616 F. App'x 442 (2d Cir. 2015) .................................................32, 33

*McKenna v. Smart Techs. Inc.*,
   2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012) .............................................35

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ...............................................................27

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ...............................................................11, 12

*In re MRU Holdings Sec. Litig.*,
   769 F. Supp. 2d 500 (S.D.N.Y. 2011) ......................................................32

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty.*
   *Ret. Ass'n v. MDC Partners, Inc.*,
   2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ..........................................13

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ........................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   --- U.S. ---, 135 S. Ct. 1318 (2015) .................................................. *passim*

*In re Petrobras Sec. Litig.*,
  152 F. Supp. 3d 186 (S.D.N.Y. 2016)......................................................................34

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015)......................................................................34

*Proter v. Medifast, Inc.*,
  2013 WL 1316034 (D. Md. Mar. 28, 2013)......................................................22, 31

*Pub. Emps.' Ret. Sys. v. Merrill Lynch & Co. Inc.*,
  714 F. Supp. 2d 475 (S.D.N.Y. 2010)....................................................................35

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)............................................................................31, 32

*S. Cherry St., LLC v. Hennessee Grp., LLC*,
  573 F.3d 98 (2d Cir. 2009)..............................................................................24, 25

*San Leandro Emergency Med. Grp. Profit Sharing Plan v.*
  *Philip Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996)...................................................................................20

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016)....................................................................33

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015),
  *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)................................18

*In re Sec. Capital Assurance Ltd. Sec. Litig.*,
  2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011)........................................................35

*Shaffer Smith, 2424, LLC v. Foster*,
  168 F. Supp. 3d 654 (S.D.N.Y. 2016)..................................................24, 26, 27, 33

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87, 115 S. Ct. 1232 (1995)......................................................................13

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)............................................................................21, 32

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)..................................................................................20

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014)......................................................................35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308, 127 S. Ct. 2499 (2007) ............................................................ *passim*

*Thor Power Tool Co. v. Comm'r*,
  439 U.S. 522, 99 S. Ct. 773 (1979) ................................................................13

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
  2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016) ................................................31, 34

*Zulfer v. Playboy Enters., Inc.*,
  2013 WL 12132075 (C.D. Cal. Apr. 24, 2013) ................................................17

**Statutes**

15 U.S.C. § 78u–4 ................................................................................................19, 32

Securities Act § 11 ........................................................................................ *passim*

Securities Act § 12 ........................................................................................ *passim*

Securities Act § 15 ................................................................................................9, 34, 35

Securities Exchange Act § 10 ........................................................................ *passim*

Securities Exchange Act § 20 ................................................................................7, 9, 34, 35

**Rules**

Federal Rule of Civil Procedure 9 ................................................................................19, 20

Federal Rule of Civil Procedure Rule 12(b)(6) ................................................................1

SEC Rule 10b-5 ................................................................................................9, 19

**Other Authorities**

Webster's Third New International Dictionary (2002) ................................................15

Defendant AmTrust Financial Services, Inc. ("AmTrust" or the "Company"), together with Defendants Barry D. Zyskind and Ronald E. Pipoly, Jr. (collectively, the "Officer Defendants"), and Defendants Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, and Jay J. Miller (collectively, the "Director Defendants," and collectively with AmTrust and the Officer Defendants, "Defendants"), hereby move to dismiss this putative securities class action.

## INTRODUCTION

For all of the 547 paragraphs in the Consolidated Amended Complaint ("Complaint"), the allegations boil down to this:  AmTrust voluntarily switched auditors from the world's fifth-largest public accounting firm to one of the proverbial "Big 4," and the new auditor's different approach to two accounting issues led AmTrust to restate its financial statements for two years and part of a third (the "Restatement").  Based solely on this narrative, Plaintiffs ask this Court to leap to the conclusion that Defendants misstated material facts in SEC filings and undertook a years-long securities fraud intended to inflate AmTrust's stock price and mislead investors, in violation of Sections 11 and 12(a)(2) of the Securities Act and Section 10(b) of the Securities Exchange Act.

The facts asserted in the Complaint simply do not support its claims.  AmTrust's accounting practices were disclosed to and reviewed by BDO USA, LLP ("BDO"), an auditor of international repute, who even the Complaint concedes could "reasonably [be] expected [] to dedicate 'world-class' resources to AmTrust and provide the Company with 'exceptional service.'" ¶ 200.[1]  The Complaint acknowledges that AmTrust received unqualified audit opinions

---

[1]  Citations to the Complaint (Dkt. 55) are styled as "¶ [paragraph number]."  Citations to AmTrust's annual reports are styled as "[year] 10-K"; its quarterly reports as "10-Q [date]"; its current reports as "8-K ([date])"; and changes in beneficial ownership as "Form 4 [date]."  Citations to Warrantech's SEC filings are styled as "Warrantech [Form type] [date]."  Citations to "Ex. ___" are to the exhibits attached to the Declaration of Lawrence J. Zweifach, submitted herewith; these include excerpted copies of cited SEC filings.  On a Rule 12(b)(6) motion, a district court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2506 (2007), including "public disclosure documents required by law to be filed, and actually filed, with the SEC," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

from BDO for each of the years at issue. ¶ 198. AmTrust disclosed key accounting policies at issue in its SEC filings, ¶¶ 160, 185, and never once received *any* comment from the SEC's Division of Corporate Finance concerning these accounting methods, even though the Division did not hesitate to issue comment letters regarding other disclosures. Rather than attempting to shield its accounting judgments from scrutiny, the Company invited additional review by voluntarily switching to a Big 4 auditor. And when the new auditor offered different opinions about certain subjective accounting judgments, AmTrust restated its financial statements consistent with the new auditor's views. Against this backdrop, this action must be dismissed in its entirety.

Plaintiffs' Section 11 and 12(a)(2) claims fail to allege any actionable misstatements of material fact. Although Plaintiffs attempt to dress up their claims through prolix and redundant allegations, the reality is simple: AmTrust issued its Restatement as a result of its new auditor's "different interpretation" of accounting standards pertaining to the timing for recognizing warranty contract revenue and for accruing expenses in connection with discretionary bonuses. *E.g.*, ¶ 478. The appropriate treatment of these issues rests on accounting judgments about which auditors can (and did) disagree, and reported figures resulting from such judgments are non-actionable opinions under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, --- U.S. ---, 135 S. Ct. 1318 (2015); *see also, e.g.*, *Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 123 (S.D.N.Y. 2010) (Kaplan, J.) (figures "stated on [a] balance sheet reflect[ing] judgments as to values that [are] not objectively determinable" were "a matter of opinion"), *aff'd*, 655 F.3d 105, 110-11 (2d Cir. 2011). The only other "adjustments" in the Restatement are minor, and the Complaint does not even attempt to plead that they were independently material.

For the same reasons and more, Plaintiffs' 10(b) claim against AmTrust and the Officer Defendants cannot survive.  Plaintiffs' failure to allege a single misstatement of material fact dooms their 10(b) claim.  It should also be dismissed for the independent reason that Plaintiffs fail to plead a "strong inference" that these Defendants intended "to deceive, manipulate, or defraud," in making any purported misstatement.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-21, 127 S. Ct. 2499, 2507-08 (2007) (citations omitted).  To allege scienter, Plaintiffs rely heavily on articles that, as early as December 2013, purportedly put Defendants on notice that specific accounting policies were flawed.  But the articles make no mention of the only two accounting judgments that actually resulted in the Restatement.  The Complaint also ignores the unqualified audit opinions AmTrust received from two major accounting firms—BDO in 2013, 2014, and 2015, and KPMG in 2016—even after these purported red flags arose.

In September 2015, another court in this District found the first of the articles—a piece "published by a short seller that [the plaintiff in that case] concede[d] may have been wrong in certain respects and has been proven wrong in others by the passage of time"—to be entirely unreliable.  *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015) (Caproni, J.), *aff'd*, 649 F. App'x 7 (2d Cir. 2016); *id.* at 173 n.30 (noting that the complaint in that action "acknowledges that the GeoInvesting Report was 'mistaken' about its 'hypothesis'"). The other articles cited in the Complaint are equally unreliable.  To the extent Defendants rejected these short-sellers' self-interested accusations and speculation, that was reasonable, and "at least as compelling as any opposing inference" of fraud.  *Tellabs*, 551 U.S. at 324, 127 S. Ct. at 2510.

Finally, because the Complaint fails to state a claim for any primary violation of the Securities Act or the Exchange Act, and fails to allege the culpable involvement in any fraud by any alleged control persons, its control-person claims fail.

In short, the Complaint fails to adequately allege any violation of the securities laws. Plaintiffs' allegations, taken as true, demonstrate only: (1) that AmTrust voluntarily switched auditors from the number five to one of the "Big 4"—something no company would agree to do if it sought to conceal accounting fraud—and adjusted its accounting policies based on the views of its new auditor, even though its prior policies had been reviewed and approved by its former auditor in unqualified audit opinions; and (2) that AmTrust has been under short-seller attack.

Plaintiffs' Complaint, as a result, rests on the proposition that a valid securities fraud complaint needs only two ingredients: criticism of a company and a restatement.  Under that regime, any time a company issues a restatement, a plaintiff can compel costly litigation and disruptive discovery if it can find criticism in the public record, no matter how off-point or how thoroughly discredited, even where the restatement was a result of a change in judgment-based accounting policy.  Allowing such a claim to proceed here would ratchet up the risks of procuring the views of a new auditor, provide a powerful disincentive for any company contemplating an auditor switch, and undermine Congress's policy of limiting abusive securities actions that "impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs*, 551 U.S. at 313, 127 S. Ct. at 2504.  This action must be dismissed in its entirety.

## STATEMENT OF FACTS

### A.   AmTrust Grows Into One Of The Largest Property And Casualty Insurers In North America.

AmTrust was founded in 1998 as an insurance provider for small businesses, focusing on "niche specialty property and casualty markets."[2]  It was founded by brothers George and Michael Karfunkel, and by Barry Zyskind, current Chairman of the Board, CEO, and President.  Since its

---

[2]  *History*, AMTRUST FINANCIAL, https://amtrustfinancial.com/about-us/history (last visited Oct. 17, 2017).

founding, the Company has made over forty acquisitions and has grown both domestically and internationally, becoming one of the largest property and casualty insurers in North America.[3] The Company went public in 2006, and has grown into a multinational insurance and risk solutions provider. It currently has more than 8,000 employees working in 125 offices and serving 70 countries. ¶ 48; Ex. 19 (Transcript, Q4 2016 Earnings Call, (Feb. 27, 2017)) at 4; Ex. 4 (2016 10-K) at 1-2, 29.

From 2006, its first year as a public company, through 2015, AmTrust engaged BDO as its independent auditor. BDO is one of the five largest auditing firms in the world—and one of the top ten auditors in the United States by revenue—and its clients include numerous leading public companies.[4] It has been recognized as one of the ten best accounting firms in the world.[5]

## B. Between 2013 And 2016, AmTrust's Financial And Actuarial Processes Were Scrutinized And Approved By Regulators And Independent Auditors, And A Securities Class Action Against The Company Was Dismissed.

Throughout the asserted class period of 2013 through 2016, AmTrust's independent auditors regularly scrutinized the Company's financial statements, including its accounting for warranty revenue and discretionary bonuses. Both prior to and during this period, BDO provided unqualified opinions regarding AmTrust's financial statements and its internal controls. ¶¶ 197-98, 203; *see also, e.g.*, Ex. 3 (2015 10-K) at 94; Ex. 2 (2014 10-K) at 100. Not one of these audit

---

[3] *Id.*; *see also, e.g.*, Shobhit Seth, *Total Program Becomes Sixth Target for AmTrust Acquisition Spree (AFSI)*, INVESTOPEDIA (June 22, 2016 10:45 AM), http://www.investopedia.com/articles/personal-finance/062216/total-program-becomes-sixth-target-amtrust-acquisition-spree-afsi.asp; Peter Mantas, *AmTrust Financial: Why This Company Is Not Your Regular Insurance Company*, SEEKING ALPHA, (May 5, 2015), https://seekingalpha.com/article/3140116-amtrust-financial-why-this-company-is-not-your-regular-insurance-company.

[4] Raymond Doherty, *Deloitte overtakes PwC as world's largest firm*, ECONOMIA, (Feb. 22, 2017), http://economia.icaew.com/en/news/february-2017/deloitte-overtakes-pwc-as-worlds-largest-firm; *see also* ¶ 199.

[5] *Best Accounting Firms in Each Practice Area*, VAULT, http://www.vault.com/company-rankings/accounting/best-firms-in-each-practice-area/?sRankID=417 (last visited Oct. 17, 2017).

reports, as incorporated into AmTrust's 10-Ks, included any qualifications about the accounting issues identified in the articles Plaintiffs describe as "red flags." *See infra* Facts Pt. D.  Independent auditors also audited the financial statements of AmTrust's insurance company subsidiaries.

In addition, AmTrust and its subsidiaries are "subject to regulation and supervision by the department of insurance" in every state where they are authorized to do business, including "periodic comprehensive and risk-focused examinations of the financial condition" of insurance companies "every three to five years."  Ex. 2 (2014 10-K) at 25, 27.  AmTrust's subsidiaries "are required to file detailed financial statements and other reports with the departments of insurance in all states in which they are licensed," which "include details concerning claims reserves held by the insurer . . . and numerous other disclosures about the insurer's financial condition and operations."  *Id*. at 25.  Yet there is no allegation that any of these examinations validated the specific contentions raised in the articles.

On February 4, 2014, plaintiffs filed a putative securities class action in the Southern District of New York against AmTrust and the Officer Defendants based on a December 12, 2013 short-seller article by GeoInvesting, which the Complaint in *this* action describes as a red flag. ¶¶ 267-70.  The GeoInvesting article claimed that AmTrust was a "'house of cards' that 'fraudulently' made $289.9 million in losses 'disappear' in its consolidated financial statement by not 'recognizing . . . the losses ceded to its Luxembourg subsidiaries.'"  *Harris,* 135 F. Supp. 3d at 163.  The defendants moved to dismiss, arguing that the allegations that AmTrust had "used fraudulent accounting practices to manipulate its reported insured losses for the years 2010 through 2012," *id.* at 159-60—specifically that it had "'eliminated' the balance of $289.9 million in loss and loss adjustment expense by misclassifying them . . . on its consolidated income statement," *id.* at 164—were based on "'sheer speculation' unsupported by factual allegations," *id.* at 170.  The

court granted the motion to dismiss on September 29, 2015.  *Id.* at 159-60.  Judge Valerie Caproni concluded that the complaint failed to allege that AmTrust made any actionable misstatement, noting that "it is well-settled that GAAP provisions are subject to interpretation and 'tolerate a range of "reasonable" treatments.'"  *Id.* at 171 (citation omitted).  The instant case largely reprises the previous case except insofar as Plaintiffs now also rely on a restatement, which, however, has no connection to the accusations in the GeoInvesting report and other short seller articles.[6]

### C.   After Hiring A New Independent Auditor In 2016, AmTrust Announced That It Would Restate Certain Limited Financial Statement Items.

In April 2016, as a result of its growth, AmTrust replaced BDO with KPMG LLP.  *See* Ex. 10 (8-K (Apr. 1, 2016)).[7]  In February 2017, AmTrust announced that its fourth quarter 2016 results reflected a reserve increase of $65 million, Ex. 11 (8-K (Feb. 27, 2017)) at 1—that is, a 1.04% increase in net reserves, Ex. 19 (Transcript, Q4 2016 Earnings Call, (Feb. 27, 2017)) at 4, 8, 12—related primarily to the Company's ongoing assessment of prior year claims in its Specialty Program segment, Ex. 11 (8-K (Feb. 27, 2017)) at 1.  Separately, in its 2016 10-K, AmTrust restated certain line items in its financial statements for 2014 and 2015 and interim financial statements for the first three quarters of 2016 (collectively, the "Restated Financial Statements").  ¶ 485; Ex. 4 (2016 10-K) at F-23, F-24; *see also* Ex. 12 (8-K (Mar. 14, 2017)).  AmTrust also acknowledged material weaknesses in its internal controls.  ¶ 90.

---

[6]   In both the prior securities suit and this case, plaintiffs brought claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Section 11 of the Securities Act based on the same GeoInvesting article, and both complaints include the allegation that AmTrust used Luxembourg subsidiaries to underreport losses.  *Harris*, 135 F. Supp. 3d at 160.

[7]   In recognition of AmTrust's growth, the New York Department of Financial Services ("DFS"), in the course of approving the proposed acquisition by ACP Re, Ltd., a related party to AmTrust, of a company called Tower Group International, Ltd. ("Tower")—a transaction in which AmTrust was a participant—conditioned its approval on AmTrust's agreement to hire a "Big 4" auditor.  Ex. 9 (8-K (Sept. 12, 2014)); ¶¶ 281-82.  In September 2014, the DFS and nine other regulators approved the transaction.  Ex. 9 (8-K (Sept. 12, 2014)).  A year and a half later, the Company replaced BDO with KPMG.  Ex. 26 (Transcript, Q3 2014 Earnings Call, (Nov. 4, 2014)).

Two changes to the Company's accounting policies led to the Restatement.  Ex. 4 (2016 10-K) at F-23; *see* ¶¶ 85.  The first was the timing of "recognition of the portion of warranty contract revenue associated with administration services," which AmTrust had largely recognized at the time of sale instead of "over the life of the contract."  Ex. 4 (2016 10-K) at F-23.  The second related to the accrual of expenses for discretionary bonuses, which "were expensed in the year paid" rather than "accrued as earned."  *Id.*; ¶ 112.  There is no suggestion in the Restatement of fabricated revenue or other fraud.  To the contrary, the Company collected the reported revenue, and disclosed its revenue recognition policy in SEC filings.  ¶¶ 160, 185.  The Restatement, instead, resulted from changes in accounting policies relating to the timing of warranty revenue recognition and discretionary bonus accrual.[8]  AmTrust's stock price decreased after the Restatement.  ¶¶ 81, 87, 484.

**D.    Shareholders File A Slew Of Putative Class Action Lawsuits.**

Within days of AmTrust's stock price decline, various purported shareholders filed several putative securities class actions in the Southern District of New York, as well as one in the Central District of California.[9]  The plaintiffs in the California putative class action voluntarily dismissed

---

[8]  Once the Company decided to issue the Restatement, it also made a number of "other adjustments" to prior period financial statements.  *See* Ex. 4 (2016 10-K) at F-23.  While the Complaint criticizes the Company for these adjustments, and briefly cites them in its allegations of "materially inaccurate financial reporting," ¶¶ 113-23, its allegations are conclusory.  The Complaint cites some purportedly relevant GAAP guidance, but it does not explain how or why the disclosures subject to the "other adjustments" did not comply with GAAP.  Moreover, the Company did not identify these "other adjustments" as material, and the Complaint fails to adequately plead materiality with regard to them.  *See infra* Arg. Pt. A.2.

[9]  Several derivative actions followed, borrowing liberally from the securities complaints.  *See City of Lauderhill Police Officers Ret. Plan v. Zyskind*, No. 17-CV-00843 (D. Del. June 28, 2017); *David Shaev Profit Sharing Plan v. DeCarlo*, No. 652273/2017 (N.Y. Sup. Ct. Apr. 27, 2017); *West Palm Beach Police Pension Fund  v. Zyskind*, No. 17-CV-00553 (D. Del. May 11, 2017).  The derivative cases have been consolidated, and the defendants have moved to stay them pending the resolution of this action, or to dismiss them.  Defs.' Mot. to Stay This Derivative Action Pending the Resolution of the Related Secs. Action, *In re AmTrust Fin. Servs., Inc. Derivative Litig.*, No. 17-CV-00553 (D. Del. Sept. 25, 2017); Defs.' Mot. to Dismiss, *In re AmTrust Fin. Servs., Inc. Derivative Litig.*, No. 17-CV-00553 (D. Del. Sept. 25, 2017).  Following the filing of these motions, the derivative action plaintiffs informed the defendants that the plaintiffs intend to amend their complaint.

that action, *see* Notice of Voluntary Dismissal, *Miller v. AmTrust Fin. Servs., Inc.*, No. 17-CV-

1608 (C.D. Cal. Jun. 2, 2017), and the Southern District of New York cases have been consolidated

here, *see* Order, *In re AmTrust Fin. Servs., Inc. Secs. Litig.*, No. 17-CV-1545 (S.D.N.Y. June 19,

2017).

On August 21, 2017, Plaintiffs filed the Complaint at issue here.[10]  It asserts five causes of

action, all of which rest in substantial part on the Restatement:

(1)    Violation of Section 11 of the Securities Act ("Count I") against AmTrust, the Officer
       Defendants, and the Director Defendants for alleged "untrue statements of material
       facts" in the Restated Financial Statements, which were incorporated by reference
       into offering materials for a November 11, 2015 Common Stock Offering and a
       September 27, 2016 Series F Preferred Stock Offering, *see* ¶¶ 232-40;

(2)    Violation of Section 12(a)(2) of the Securities Act ("Count II") against AmTrust for
       alleged "untrue statements of material facts" in the Restated Financial Statements,
       which were incorporated by reference into prospectuses, *see* ¶¶ 241-48;[11]

(3)    Violation of Section 15 of the Securities Act ("Count III") against the Officer
       Defendants and the Director Defendants for alleged control-person liability in
       connection with the alleged Section 11 and 12(a)(2) violations, *see* ¶¶ 249-57;

(4)    Violation of Section 10(b) of the Exchange Act and Rule 10b-5 ("Count IV") against
       AmTrust and the Officer Defendants for alleged dissemination or approval of
       "materially false and misleading statements" in the Restated Financial Statements,
       certain public investor calls, and in response to certain articles in the press, *see*
       ¶¶ 534-43; and

(5)    Violation of Section 20(a) of the Exchange Act ("Count V") against the Officer
       Defendants for alleged control-person liability in connection with the alleged
       violation of Section 10(b) and Rule 10b-5, *see* ¶¶ 544-47.

Plaintiffs have strained to identify supposed "red flags" that, they claim, should have

warned Defendants about the accounting issues that eventually prompted the Restatement.  The

---

[10]   Plaintiffs include New England Carpenters Guaranteed Annuity and Pension Funds ("NECGA"), Sharon Albano,
       Jupiter Capital Management, Irving Lichtman Revocable Living Trust, and Stanley Newmark.  All Plaintiffs other
       than NECGA assert the Securities Act claims, and all Plaintiffs assert the Exchange Act claims.

[11]   The Complaint also asserts Counts I & II against the Underwriter Defendants (as defined in the Complaint), and
       it asserts Count I against BDO.  The Underwriter Defendants and BDO are separately represented.

Complaint cites four articles published between December 2013 and April 2016, and a letter that parroted allegations from two of the articles, claiming that these publications "put the AmTrust Defendants on notice of many of the same financial improprieties which AmTrust has now acknowledged took place during the Class Period." ¶ 266; *accord* ¶¶ 267-280, 290-305, 492. However, none of these articles addressed accounting for warranty revenue or discretionary bonus accrual—the two issues that led to the Restatement.

**<u>The GeoInvesting Article</u>**.  The first of the purported "red flags" is the same December 2013 GeoInvesting article that was the subject of the prior putative securities class action against AmTrust and the Officer Defendants, dismissed eighteen months before Plaintiffs filed this action. The GeoInvesting article describes claims—attributed to short sellers—that AmTrust was "inflating earnings/net equity via offshore entities," "marking up its portfolio of life settlement contracts" by "using egregiously aggressive assumptions" between 2009 and 2012, and sending losses to offshore captive reinsurance companies to conceal $277 million in losses, Ex. 20 (GeoInvesting Article (Dec. 12, 2013)) at 1, 13; *see also* ¶¶ 267-70.  It does not mention the warranty and discretionary bonus accounting issues that prompted the Restatement.  Judge Caproni criticized the article as a "negative report published by a short seller that [the l]ead [p]laintiff concede[d] may have been wrong in certain respects and has been proven wrong in others by the passage of time." *Harris*, 135 F. Supp. 3d at 159.  Several subsequent articles and a short-seller's letter made similar allegations to those in the GeoInvesting article.  *See* ¶¶ 280, 291, 292, 305.

**<u>The Three Barron's Articles</u>**.  The Complaint cites three *Barron's* articles by the same author.  The first, which dubbed the critical reporting about AmTrust stock the "short critique" because it originated with short sellers, was published on February 8, 2014, and questioned whether the "Company's consolidated financial statements were appropriately accounting for

foreign subsidiary losses, as well as its accounting practices with respect to deferred acquisition costs." ¶¶ 272-75; Ex. 21 (Barron's Article (Feb. 8, 2014)).  The second article, published on May 31, 2014, described the author's unsubstantiated suspicions about "whether [AmTrust] is underreserved" for losses, and supposed "puzzling accounting disparities" that had purportedly led to, among other things, the impossible result of negative loss reserves.  Ex. 22 (Barron's Article (May 31, 2014)); *see also* ¶¶ 276-80.  And the third article, published on April 23, 2016, speculated that AmTrust was improperly ceding losses to its Luxembourg affiliate to minimize its losses. Ex. 23 (Barron's Article (Apr. 23, 2016)); *see also* ¶¶ 300-05.  None of these articles addressed the two issues that led to the Restatement.

> *The Alistair Letter*.   On December 18, 2014, Alistair Capital Management, LLC ("Alistair")—identifying itself as an AmTrust short seller—sent a letter to AmTrust's Audit Committee, requesting that the committee investigate the allegations in the 2014 *Barron's* articles, as well as reports published by the research firm Off Wall Street.  *See* Ex. 24 at 1-2; ¶¶ 290-99. The author of the Alistair letter acknowledged that he had no inside information, but questioned, *inter alia*, perceived inconsistencies between balance sheet accounts reported by AmTrust and its affiliates, loss adjustment reserves related to acquisitions, and the efficacy of AmTrust's internal controls.   Ex. 24 at 1-2.   The Alistair letter did not mention the accounting treatment for recognizing warranty-related revenue or for discretionary bonus accruals.

## ARGUMENT

A.   **Plaintiffs' Section 11 & 12(a)(2) Claims (Counts I & II) Should Be Dismissed Because Plaintiffs Fail To Allege Actionable Misstatements Of Material Fact.**

To state claims under Sections 11 and 12(a)(2) of the Securities Act, plaintiffs must allege that the registration statement or prospectus in question contained an untrue statement or actionable omission of material fact.  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359-60 (2d

Cir. 2010).[12]  In *Omnicare*, the Supreme Court clarified that statements of opinion can give rise to liability in just three limited circumstances: (1) if the speaker does not actually hold the stated opinion, 135 S. Ct. at 1326; (2) if the opinion contains false "embedded statements of fact," *id.* at 1327; or (3) if the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, [] if those facts conflict with what a reasonable investor would take from the statement itself," *id.* at 1329; *see also In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *10-11 (S.D.N.Y. Aug. 19, 2015) (applying *Omnicare* to claims under §§ 11 & 12(a)(2)), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).

Here, Plaintiffs' Securities Act claims fail because the misstatements they purport to identify are either non-actionable opinions under *Omnicare* or are immaterial.[13]

### 1.     The Two Accounting Changes Driving The Restatement Are Non-Actionable Statements Of Opinion Rooted In Accounting Judgments.

The Complaint acknowledges that there were two fundamental accounting considerations driving the Restatement: (1) the timing of "recognition of a portion of warranty contract revenue associated with administration services," and (2) expense accrual in connection with discretionary bonuses.  ¶ 85; Ex. 4 (2016 10-K) at F-23.  Both of these timing issues reflect subjective accounting judgments and therefore constitute statements of opinion under *Omnicare* and its progeny.

"Accountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions.  'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable'

---

[12]   These statutory provisions provide due diligence and reasonable care defenses, except with respect to the issuer under Section 11.  *See Morgan Stanley*, 592 F.3d at 360 n.7.  Defendants intend to prove their exercise of due care and diligence should the case proceed.

[13]   Although the Complaint contains conclusory assertions that the Offering Materials omitted material information, *see, e.g.*, ¶¶ 152, 235, Plaintiffs fail to specify any cognizable omissions or identify a duty to speak.  *See Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 415 (S.D.N.Y. 2008).

treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544, 99 S. Ct. 773, 787 (1979). Thus, "[f]inancial accounting is not a science. It addresses many questions as to which the answers are uncertain and is a process that involves continuous judgments and estimates." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100, 115 S. Ct. 1232, 1239 (1995) (citation, alteration, and internal quotation marks omitted).

Statements reflecting "accounting judgments" are opinions that fall under *Omnicare*'s analytical framework. *See Dempsey v. Vieau*, 2016 WL 3351081, at *3 (S.D.N.Y. June 15, 2016); *accord Harris*, 135 F. Supp. 3d at 173. As the Second Circuit underscored, where reported results "depend[] on the particular [accounting] methodology and assumptions used," they are "subjective" opinions that "do not involve misstatements or omissions of material fact." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11, 113 (2d Cir. 2011) (citations omitted); *accord N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016) (relying on *Fait* and *Harris* in applying *Omnicare* to financial reporting). Accordingly, a complaint does not "plausibly allege false statements by taking aim at" such accounting assumptions. *Harris*, 135 F. Supp. 3d at 173. Thus, if AmTrust's allegedly misleadingly reported financial "performance was attributable to [even] 'unreasonable' [accounting] assumptions . . . , the Amended Complaint does not plausibly allege a misstatement of fact; at best it alleges a difference of opinion regarding the reasonableness of AmTrust's actuarial or accounting assumptions." *Id.*

Both of the issues that led to AmTrust's Restatement involved such subjective accounting judgments. Therefore, the resulting figures—even if later revised as a result of a change in accounting policy—were not statements of *fact*, but expressions of *opinion* that could be actionable only in the limited circumstances discussed above.

13

*First*, the Complaint claims that the Company's fully-disclosed decision not to account for certain warranty revenue on a straight-line basis resulted in actionable misstatements. *See* ¶ 262. But the Complaint acknowledges that AmTrust's Restatement of warranty revenue was "based on" the Company's "interpretation of ASC 605," ¶ 85, which expressly allows companies to recognize revenue "'on other than a straight-line basis'" where "'sufficient historical evidence indicates that the costs of performing services'" are other than straight-line. ¶ 262 (quoting ASC Topic No. 605-20-3).[14]  Thus, the Complaint admits that AmTrust's earlier statements about its "warranty contract revenue associated with administrative services" relied on the Company's subjective judgment about the sufficiency of the historical evidence relating to when it incurred the costs for performing those services. ¶¶ 85, 262.  Given that there is no "objective standard" for making such a judgment, the results are "subjective" and "do not involve misstatements or omissions of material fact." *Fait*, 655 F.3d at 110-11.[15]

Significantly, the relevant accounting guidance provides that when management finds that there *is* sufficient evidence that the costs of providing a service are not incurred on a straight-line basis, then "'revenue shall be recognized over the contract period in proportion to the costs expected to be incurred in performing services under the contract.'" ¶ 262 (quoting ASC Topic No. 605-20-3).  And here, the Complaint acknowledges that this is precisely what the Company

---

[14]  More generally, AmTrust's 10-Ks explain that the Company's "accounting policies . . . require us to make estimates and assumptions"—some which "result from judgments that can be subjective"—and that "[t]hese estimates and assumptions affect the reported amounts of our assets, liabilities, revenues and expenses and the related disclosures." Ex. 2 (2014 10-K) at 68; *see also* Ex. 3 (2015 10-K) at 62 (same); Ex. 1 (2013 10-K) at 71 (same).

[15]  The Complaint asserts in conclusory fashion that AmTrust "never obtained sufficient historical evidence." ¶ 262.  Such a generalized assertion—devoid of any source or specific facts in support—cannot serve as a basis for Plaintiffs' Securities Act claims. *See In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010) (Kaplan, J.) (noting that even a "confidential witness statement[]" that a bank's employee believed appraisal standards were "shoddy" was insufficient to allege whether or not "appraisals were made in accordance with" governing standards).

did: the Restatement adjusted not simply for service and fee income that had previously been recognized upfront, but also for *expenses* that had similarly been recognized upfront in light of management's assessment of the historical evidence.  ¶ 110.[16]  As discussed above, there is no question that the Company collected the reported revenue; it is simply the timing for recognition of this revenue that drove the Restatement.

In addition, the Complaint quotes language from SEC filings in which AmTrust disclosed that "a portion of service revenue" was deferred "based upon an *estimate* of administrative services to be provided in future periods."  ¶¶ 160, 185 (emphasis added) (quoting 2014 and 2015 10-Ks).[17] Plaintiffs cannot state a Securities Act claim simply by second-guessing management's judgment-based determinations and estimates.  *See Fait*, 655 F.3d at 110-12 (statements regarding fair value were "subjective ones rather than 'objective factual matters'" because they turned on "an *estimate* of the fair value of those assets" (emphasis added)).  The diversity of opinion between audit firms, moreover, highlights the subjective nature of the accounting judgments at issue, and confirms that the proper treatment of these revenues is a matter of opinion, not fact.  *See Harris*, 135 F. Supp. 3d at 173.  Plaintiffs therefore must plausibly allege one of the three limited circumstances under *Omnicare* by which opinions can be actionable—which the Complaint does not do.

---

[16]  The Complaint repeatedly references AmTrust's decision to apply "multiple-element" guidance, *e.g.*, ¶¶ 10, 75, 85, which likewise involves subjective accounting judgments, *see* EITF 00-21 (discussing, *inter alia*, the need to determine whether "delivery or performance of the undelivered item(s) is considered probable").

[17]  Plaintiffs oddly suggest that these statements were untrue "because the Company has now admitted that it recognized *the majority* of its warranty contract fee revenue related to administration services at the time of the sale."  *See, e.g.*, ¶¶ 160-61, 185-86 (emphasis added) (quoting 2014 and 2015 10-Ks).  But the 10-Ks never stated otherwise, as evidenced in the very excerpt Plaintiffs quote:

> The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of ESP.  However, the Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods.

¶¶ 160, 185 (quoting 2014 and 2015 10-Ks).  The only reasonable reading of this statement is that the majority of the revenue was recognized upfront, while "a portion" was deferred based on an accounting judgment.  *See, e.g.*, Webster's Third New International Dictionary 1768 (2002) (defining "portion," as used in this context, to mean "a limited amount or quantity" or "a part of a whole").

In any case, because AmTrust "repeatedly and precisely disclosed to investors its method for recognizing revenue, . . . plaintiffs have failed to allege sufficient facts to support a reasonable belief that [the Company's] financial statements were false and misleading" with respect to revenue recognition, whether their approach "deviated from GAAP" or not. *Bay v. Palmisano*, 2002 WL 31415713, at *3, *9 (E.D. La. Oct. 24, 2002) (granting motion to dismiss); *see also In re Loewen Grp. Inc.*, 2004 WL 1853137, at *13-14 (E.D. Pa. Aug. 18, 2004) (dismissing claims because, where "the method of accounting is disclosed" in 10-Ks, any allegedly misstated results arising therefrom are "not material" to investors); *In re AgriBio Tech Sec. Litig.*, 2000 WL 1277603, at *6 (D. Nev. Mar. 2, 2000). Here, AmTrust expressly disclosed its revenue recognition policy in SEC filings throughout the relevant period: "The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of [extended service plans]. However, the Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods." Ex. 3 (2015 10-K) at F-15; Ex. 2 (2014 10-K) at F-14; Ex. 1 (2013 10-K) at F-14; ¶ 160 (citing 2014 Form 10-K). Financial results that accurately reflected this disclosed approach to revenue recognition cannot constitute material misstatements.

*Second*, the Complaint includes minimal discussion of the only other item driving the Restatement: accrual of discretionary bonus expenses. However, the relevant portion of the Restatement confirms that the pre-Restatement approach was driven by a judgment that discretionary bonus payments were not sufficiently "probable" to warrant accrual under the applicable accounting standards, ¶ 112 (quoting 2016 10-K at F-23), consistent with relevant accounting guidance.[18] Given the discretionary nature of the bonuses, any assessment of whether

---

[18]   *See* ASC 450-20-25 ("An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: a. . . . [I]t must be *probable* that one or more future events will occur

a payment was "probable" demands a subjective judgment that can change over time as the business evolves and grows. Thus, in discussing FAS 115, which provides that companies are "required to write down the fair value of a security if it is *probable* that an investor will be unable to collect all amounts due according to the contractual terms of a debt security," Judge Keenan explained that "[n]ecessarily, application of this principle requires a subjective determination of when it is 'probable' the other party will default on its loan." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 180 (S.D.N.Y. 2012) (emphasis added), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013). The determination as to whether certain discretionary bonuses were "probable" and subject to accrual, too, is a matter of opinion, not fact.[19]

Here, as in *Fait*, rather than alleging "that defendants did not truly hold those opinions at the time they were made public," Plaintiffs affirmatively "disclaim[] any allegation that defendants knowingly or recklessly misstated" these figures for purposes of their Securities Act claim. *Fait*, 712 F. Supp. 2d at 124-25; *see* Compl. at 41 n.6. Nor do the surrounding circumstances even hint at subjective disbelief of the accounting judgments Defendants made. As the Complaint acknowledges, AmTrust received unqualified audit opinions throughout the relevant time period, disclosed its revenue recognition policy in SEC filings, and changed the relevant accounting policies only after it switched auditors. In short, "[P]laintiffs' pleadings do not come close to

---

confirming the fact of the loss[; and] b. The amount of loss can be *reasonably estimated*." (emphasis added)); *cf.* ASC 710-10-25 ("An employer shall accrue a liability for employees' compensation for future absences if all of the following conditions are met: . . . Payment of the compensation is probable [and t]he amount can be reasonably estimated."); *see also Zulfer v. Playboy Enters., Inc.*, 2013 WL 12132075, at *2 (C.D. Cal. Apr. 24, 2013) (taking judicial notice of ASC 450 and noting that "courts regularly take judicial notice of published accounting standards").

[19]   A number of the non-material adjustments discussed below also turn on subjective accounting judgments and are therefore opinion statements under *Omnicare*. *Compare, e.g.*, ¶ 123 (alleging misstatement of collectability of receivables), *with Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 184 (D. Mass. 2012) (finding same to be "a matter of judgment and estimate").

supplying a factual basis on which to conclude that [D]efendants disbelieved their own statements." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 544 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  Nor does the Complaint even attempt to plead the two other narrow circumstances in which opinion statements can be actionable under *Omnicare*.  The two issues driving the Restatement are not actionable.  *Fait*, 712 F. Supp. 2d at 123.[20]

### 2. Plaintiff Has Failed To Adequately Plead The Materiality Of The Remaining Alleged Misstatements.

Although the Complaint asserts that six additional categories of corrections were made in the Restatement, *see* ¶¶ 113-123, the Complaint fails to plead facts supporting that these "other adjustments" were material.  *Cf. Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (affirming dismissal where complaint contained no allegation regarding the "magnitude of [] expense increase," which was necessary to assess materiality).   The Restatement itself distinguishes between the two material issues—warranty revenue recognition timing and discretionary bonus accrual—and the other, non-material corrections.  Ex. 4 (2016 10-K), Explanatory Note (distinguishing between "[t]he two primary errors," which the Company "concluded . . . were material to the Company's previously issued financial statements," and the "other adjustments" described in the Restatement); *see also id.* at 90.  Plaintiffs provide no allegations undermining this distinction.[21]

---

[20]   Although Plaintiffs contend that management's Sarbanes-Oxley certifications contained material misstatements of fact, *see* ¶¶ 159, 166, 172, 177, 184, 191, 196, those certifications are opinion statements and therefore not actionable, *see infra* Arg. Pt. B.2.  And while the Complaint purports to identify material misstatements in BDO's audit opinions, ¶¶ 197-231, Defendants are not the "makers" of those statements and thus cannot be held liable for them.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43, 131 S. Ct. 2296, 2302 (2011).  Moreover, those opinion statements (and any factual statements purportedly embedded therein) are not actionable for the reasons set forth in BDO's motion papers.

[21]   While the Complaint implies that the inclusion of these other adjustments in the Restatement suggests their materiality, this is not so.  Once a company is addressing material issues through a Restatement, it is expected to include even non-material issues as well, as AmTrust did here.  *See, e.g.*, SAB 99 (while the Exchange Act "do[es] not require registrants to make major expenditures to correct small misstatements," where there is "little cost or delay involved in correcting a misstatement, failing to do so is unlikely to be 'reasonable'" (footnote omitted)).

Instead, Plaintiffs allege materiality only in the aggregate, by examining the total impact of *all* of the restated figures—including those resulting from the nonactionable accounting judgments discussed above relating to the revenue recognition and bonus accrual—on bottom-line numbers such as net income and diluted earnings per share.  ¶¶ 155, 163, 169, 174, 180, 188, 193. But the Complaint alleges no basis on which to assess the materiality of the six "other adjustments," once the non-actionable categories are eliminated, *see supra* Arg. Pt. A.1, rendering the materiality allegations conclusory with respect to the remaining adjustments.  In addition, while the Complaint cites some purportedly relevant GAAP guidance with respect to these other adjustments, it does not explain how or why the disclosures subject to the "other adjustments" did not comply with GAAP.  The Section 11 and 12(a)(2) claims should be dismissed in their entirety.

**B.     The 10(b) Claim (Count IV) Against AmTrust and the Officer Defendants Should Be Dismissed Because Plaintiffs Fail To Adequately Allege Scienter Or Actionable Misstatements.**

To state a claim for fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege that a defendant: (1) made a false statement or an omission of material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff justifiably relied, and (5) which proximately caused the plaintiff's economic loss.  *See Tellabs*, 551 U.S. at 318, 127 S. Ct. at 2507; *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 341, 125 S. Ct. 1627, 1631 (2005).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319, 127 S. Ct. at 2507 (citation omitted).  Securities fraud pleadings must satisfy Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), which require a plaintiff to plead with specificity each misstatement and the reasons it is misleading, and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.,* scienter.  15 U.S.C. § 78u-4(b)(1), (2); *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

Consequently, courts do not draw all inferences in favor of the plaintiff at the pleading stage, but rather examine the facts alleged and compare the culpable and nonculpable inferences to be drawn from those facts to determine whether "the inference of scienter . . . [is] cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324, 127 S. Ct. at 2510; *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

Here, the Complaint fails to satisfy the PSLRA and Rule 9(b)'s standard.  Its scienter allegations fall far below the stringent pleading requirements, and AmTrust's and the Officer Defendants' purported false statements are either immaterial, honestly-held good-faith opinions, or nonactionable puffery.  The Section 10(b) claim against AmTrust and the Officer Defendants must be dismissed.[22]

## 1.    The Complaint Fails To Adequately Plead Facts That Would Provide A Strong Inference That Defendants Acted With Scienter.

In the Second Circuit, scienter can be shown either by demonstrating (i) facts showing that defendants had both motive and opportunity to commit fraud; or (ii) facts that constitute direct or strong circumstantial evidence of intentional misbehavior or recklessness.  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000); *see also ECA*, 228 F.3d at 198.[23]  The Complaint fails to do either.

### (a) The Complaint Fails To Adequately Allege Motive And Opportunity.

The Complaint fails to state a plausible, cognizable motive for Defendants to commit accounting fraud.  Motives that are common to any corporate insider—for instance, the desire to maintain a high corporate credit rating, *see San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996), or otherwise sustain "the

---

[22]   The Director Defendants are not named in Counts IV & V.

[23]   The Supreme Court has never endorsed the Second Circuit's two-pronged test.  For purposes of preservation, Defendants note their disagreement that recklessness or mere motive and opportunity are sufficient to establish scienter.  *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 276 (3d Cir. 2009) (holding that "motive and opportunity" is not sufficient to show scienter "in light of *Tellabs*").

appearance of corporate profitability, or of the success of an investment," *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996), or the desire to maintain a high stock price in order to increase executive compensation, *see Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995), or prolong the benefits of holding corporate office, *see Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)—are not sufficient. *Novak*, 216 F.3d at 307-08. Plaintiffs must allege that Defendants benefitted from the fraud in some tangible, particularized way. *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 242 (S.D.N.Y. 2012) (Kaplan, J.).

None of the three potential motives alleged by Plaintiffs can sustain their Section 10(b) claim. First, Plaintiffs claim that Defendants were "motivated to inflate the value of the Company—in particular, its warranty administration business—as they were looking to sell that business during the Class Period." ¶ 507. Plaintiffs ignore that the Company's approach to warranty revenue recognition was disclosed in SEC filings. ¶¶ 160, 185. As a result, any potential purchaser would be well aware of this policy, and the price would accurately reflect AmTrust's accounting. No "inflat[ion]" of the value of the business, *see, e.g.*, ¶ 507, would have been possible. Plaintiffs also do not plead a single tangible detail or specific acquirer during the relevant period. In fact, the Complaint admits that this claimed motivation is pure speculation: AmTrust merely "*alluded* to the . . . desire to spin off" and "*suggested* that [AmTrust] was shopping this portion of the business" by noting that the Company had discussed with third parties the business's value. ¶ 507 (emphasis added). This acquisition opportunity, according to the Complaint, was nothing more than a vague possibility. *See also* ¶ 506 (asserting additional amorphous connections between the alleged fraud and debt offerings and securities offerings). An allegation that defendants were motivated to commit fraud based on *actual* transactions consummated with purportedly inflated stock is insufficient unless those transactions have some "unique connection"

to the fraud.  *Dobina*, 909 F. Supp. 2d at 242.  Plaintiffs' generalized attempt to connect the purported fraud to unspecified "potential" acquisitions is even more flawed.

Plaintiffs also claim that Zyskind was "motivated to engage in this fraudulent course of conduct so that he could earn substantial incentive-based compensation during the Class Period." ¶ 510.  But as this Court has noted, "our Circuit refuses to consider allegations of even lavish executive compensation as sufficiently alleging motive." *Dobina*, 909 F. Supp. 2d at 243; *see also Novak*, 216 F.3d at 307; *Acito*, 47 F.3d at 54.  Moreover, the Complaint notes that Zyskind's incentive-based compensation is "potentially subject to being clawed back as a result of" the Restatement.  ¶ 512.  Zyskind had no motive to obtain compensation by fraud that could be subject to claw-back upon discovery.  And there is no allegation that Zyskind, President and CEO of AmTrust, ¶ 23, ever attempted to prevent the shift from BDO to KPMG or resist the Restatement (nor, in fact, did he), even though the auditor switch and Restatement could result in a compensation claw-back.  *Cf. Proter v. Medifast, Inc*., 2013 WL 1316034, at *12 (D. Md. Mar. 28, 2013) (hiring new auditor militated against inference of scienter).

Finally, Plaintiffs assert that AmTrust and the Officer Defendants were motivated to commit fraud based on a series of alleged insider trades totaling $43 million during the five-year class period.  ¶ 508.  But "the mere fact that insider stock sales occurred does not suffice" to establish scienter; "instead [P]laintiffs must establish that the sales were 'unusual' or 'suspicious.'" *Glaser v. The9, Ltd*., 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (quoting *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009)) (citation, alteration, and internal quotation marks omitted).  To determine whether an insider sale can suggest a motive to defraud, courts look to a variety of factors, including: "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the

number of insider defendants' selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5–1 plans." *Id.* (collecting cases).

Apart from alleging that several insiders sold AmTrust stock during the four-year class period, ¶ 508, Plaintiffs fail to allege *any* facts pertaining to those factors. The Complaint does not state whether these shares were sold for a profit (or how much) nor whether the relevant insiders' holdings increased or decreased. The Complaint omits that Defendant Pipoly actually *increased* his AmTrust holdings from December 2013 to the present, Ex. 17 (Summary of Pipoly Stock Transactions and Supporting Form 4s), and that all but one of Director Defendant DeCarlo's sales were made pursuant to an established 10b5-1 plan. Ex. 18 (Summary of DeCarlo Stock Transactions and Supporting Form 4s). Nor does the Complaint connect the timing of any insider stock sales to the purported fraud.[24]

The Complaint also fails to acknowledge that Zyskind still beneficially owns roughly 44.9 million shares, Ex. 6 (2016 Schedule 14A) at 13, and Pipoly still owns more than a quarter million shares, Ex. 17 (Summary of Pipoly Stock Transactions and Supporting Form 4s). Nor does the Complaint allege that Zyskind sold *any* of his 44.9 million shares during the relevant period. Defendants' retention of substantial AmTrust stock "suggests that [they] were unaware of the [red flags] . . . or . . . legitimately believed in [the Company's] financial health in spite of the reports," and belies any suggestion that they acted in bad faith to inflate AmTrust's stock price. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 403 (S.D.N.Y. 2010). Indeed, Zyskind, Pipoly, and

---

[24]   The Complaint alleges that Pipoly's sales were "suspicious and unusual" because he had "never sold any of his personally held AmTrust stock prior to June 18, 2012." ¶ 509 (emphasis omitted). But Plaintiffs do not explain why that date—some eight months before the Class Period even begins—raises suspicions or matters at all.

other insiders control at least 49 percent of the Company; any decline in stock price as a result of the Restatement has harmed them as much as or more than any other shareholder.  ¶ 55.  Some of these same insiders, moreover, caused the Company to approve a $200 million increase to the existing stock repurchase plan.  Ex. 13 (10-Q (Aug. 9, 2016)) at 85.  As 49-percent owners in AmTrust, these insiders would have been deciding to overcharge *themselves* through the repurchases if they truly believed the Company's share price was inflated.[25]

As this Court has recognized, a plaintiff should not be permitted to proceed to discovery on a Section 10(b) claim merely because corporate insiders were motivated to see a company thrive.  *Dobina*, 909 F. Supp. 2d at 243-44; *see also Shaffer Smith, 2424, LLC v. Foster*, 168 F. Supp. 3d 654, 660 (S.D.N.Y. 2016).  Plaintiffs have alleged nothing more than that; they have failed to plead any cognizable, particularized motive for Defendants to commit accounting fraud.

### (b) The Complaint Fails To Adequately Allege Intentional Misbehavior Or Recklessness.

The Complaint does not plead any direct allegations of intent to defraud by any Defendant. Accordingly, Plaintiffs are left to argue scienter by circumstance.  While it is "possible" to do so, "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citing *Beck v. Mfrs. Hanover Tr. Co.*, 820 F.2d 46, 50 (2d Cir. 1986)).  Intentional misconduct is "deliberate illegal behavior," *Novak*, 216 F.3d at 308, while recklessness is "a state of mind approximating actual intent and not merely a heightened form of negligence."  *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 312) (emphasis removed).  Reckless conduct "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant

---

[25]   Nor would members of the Karfunkel family have invested $300 million of their own money in AmTrust post-Restatement if they had any doubts about the Company's financial health.  Ex. 27 (8-K (May 25, 2017)) at 2.

or so obvious that the defendant must have been aware of it." *Id.* (internal quotation marks and emphasis omitted). The Complaint fails to allege intentional misbehavior or recklessness even plausibly, let alone compellingly. *Tellabs*, 551 U.S. at 324, 127 S. Ct. at 2510.

None of Plaintiffs' allegations supports even a weak inference of scienter. Plaintiffs focus on a number of articles and a letter—none of which mentions the accounting policies that led to the Restatement—that purportedly served as "red flags" for accounting errors. *See, e.g.*, ¶¶ 267-80, 290-305; *supra* Facts Pt. B, D. AmTrust was aware of and responded to these materials, as the Complaint concedes. For example, Defendant Zyskind contended that GeoInvesting's analysis "contain[ed] 'factual inaccuracies' and 'factual misstatements." ¶¶ 269, 350. He explained that "the short sellers use inaccuracies and deception to manipulate our stock price in an effort to capitalize in the short term by destroying well-deserved shareholder value and having the process unfairly hurt our loyal shareholders." ¶ 350. The Complaint formulaically asserts that these statements were either false when made or that they demonstrate that AmTrust recklessly ignored the red flags that GeoInvesting's "crack" reporting unearthed. ¶ 352.

But as discussed above, *supra* Facts Pt. D, if Defendants discredited the GeoInvesting article (and the later articles largely parroting GeoInvesting's allegations, *e.g.*, ¶ 272) as ill-motivated and inaccurate, they were well-justified in doing so. Indeed, Judge Caproni derided the GeoInvesting article as a "negative report published by a short seller that [the] [l]ead [p]laintiff concede[d] may have been wrong in certain respects and has been proven wrong in others by the passage of time." *Harris*, 135 F. Supp. 3d at 159; *see also id.* at 173 n.30 (noting that the "GeoInvesting Report caused a temporary price drop (which presumably resulted in a pecuniary gain for its author)"). Plaintiffs fail even to mention Judge Caproni's decision in *Harris*, asserting only that the subsequent Restatement constituted an "admi[ssion] that the GeoInvesting Report

suspicions were well-founded." ¶ 270. This "impermissible hindsight pleading," *Shaffer*, 168 F. Supp. 3d at 660, provides no basis to question Defendants' discounting of the articles at the time they read them and responded. *See In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) ("Allegations that accounting errors were discovered months and years later do not give rise to a strong inference that the certifications were knowingly false when made[.]"). Furthermore, the GeoInvesting report did not even question the accounting policies that resulted in the Restatement.

GeoInvesting reflected outsider, short-seller-driven conjecture, directly inconsistent with reports AmTrust received from regulators and auditors who were reviewing the Company's financial records firsthand and issuing "unqualified audit opinions." ¶¶ 198, 203-204 (reproducing unqualified audit opinions); *see also In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 340-41 (W.D.N.Y. 2008) (finding it "noteworthy" for scienter analysis that the corporate defendant's outside auditors "did not question [the company's] accounting practices"). It is inconceivable that BDO and KPMG would have continued to issue unqualified audit opinions if these publicly available reports had any validity whatsoever. Moreover, the GeoInvesting article (and the others that followed it) do not even mention the two issues that actually led to the Restatement; thus, they cannot constitute "red flags" as to those issues. *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008).

Nor does the *Wall Street Journal* article allow for an inference of scienter. Citing only anonymous sources, that article reported that a BDO "whistleblower" was assisting federal investigations into AmTrust accounting practices, ¶ 92, and parroted the short-seller claim that AmTrust had "shifted" losses "to an offshore affiliate *from 2009 to 2012*," Ex. 25 (Wall Street Journal Article (Apr. 11, 2017)) (emphasis added), long before the putative class period here.

*See also* ¶¶ 12, 92-96, 216, 308-309, 487.  The Complaint makes no effort to connect the article to statements by Defendants or any intent to commit fraud.  *Cf. Shaffer*, 168 F. Supp. 3d at 660.  And courts have repeatedly recognized that the mere disclosure of a government investigation does not suffice to raise an inference of scienter or demonstrate that any resulting drop in the target company's stock price was caused by wrongdoing.  *See Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) (collecting cases); *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false and it does not . . . add an inference of scienter").

Plaintiffs also erroneously claim that AmTrust's acquisition of a company called Warrantech should have put AmTrust on notice that its accounting was purportedly improper. ¶¶ 5-7, 259-64, 499-500.  Plaintiffs' Warrantech narrative is built on nothing but speculation. According to the Complaint, in March of 2003, "the SEC required Warrantech to record service revenue on a straight-line basis over the life of the service contracts.  Warrantech had previously recognized revenue on such contracts at the time of sale."  ¶ 260.  AmTrust did not acquire Warrantech until seven years after the SEC's comment.  Ex 8 (8-K (Aug. 26, 2010)); Ex. 15 (Warrantech 2003 10-K) at 13; ¶¶ 259-60.  The Complaint does not allege that Defendants reviewed the SEC filing in question.  Nor does it allege any facts supporting that a seven-year-old SEC recommendation would have been uncovered during AmTrust's diligence or elevated to AmTrust management, especially given that the company had been taken private years before, making Warrantech's public-company filings less relevant.  Ex. 14 (Warrantech Form 15-12G (Jan. 31, 2007)) (taking Warrantech private).[26]

---

[26]  Plaintiffs' attempt to impute the knowledge of non-defendant Joel San Antonio to Defendants or AmTrust at large likewise falls flat.  San Antonio was CEO of Warrantech when that company changed its accounting practices in 2004 and later became Chairman of an AmTrust subsidiary when Warrantech was acquired.  ¶ 263.  But Plaintiffs allege no facts to suggest that San Antonio actually knew or recklessly disregarded that AmTrust's subjective

In any case, the Warrantech SEC filings recognize that it would be appropriate for a company to account for warranty revenue on other than a straight-line basis with "adequate evidence of the fair value of the two elements of its services—the sale and structuring of the contracts and the claims adjudication services."  ¶ 261; Ex. 16 (Warrantech 2006 10-K) at 17. Plaintiffs ask this Court to assume that the evidence Warrantech collected prior to 2003 was equivalent to that available to AmTrust in 2014 and later, and that the structure of AmTrust's warranty business during the relevant period mirrored Warrantech's of a decade earlier.  But the complaint is devoid of any factual allegations that support either dubious assumption.  Plaintiffs also again ignore that AmTrust's warranty revenue recognition policy was fully disclosed in SEC filings subsequent to the Warrantech acquisition, yet the SEC's Division of Corporate Finance never issued comment letters on this issue questioning the Company's approach, and AmTrust's auditors continued to render unqualified audit opinions—defeating the suggestion that any departure from Warrantech's methods is indicative of either intentional fraud or recklessness.

Plaintiffs' remaining contentions fall just as flat.  First, they assert that Defendants Zyskind and Pipoly have substantial financial experience, ¶¶ 501, 502, and therefore ask this Court to infer that Zyskind and Pipoly must have seen accounting improprieties and buried their heads in the sand (or worse) in order to profit from the scam.  But the Complaint fails to allege that any of the accounting policies AmTrust had implemented—of which BDO had long approved—were so clearly wrong that a non-accountant knew or should have known that the policies were arguably incorrect.  *See also supra* Arg. Pt. A.1.  Likewise, Plaintiffs' attempt to smear Pipoly and Zyskind—and the entire Karfunkel family—cannot possibly substitute for factual allegations

---

accounting judgments were improper, nor do Plaintiffs allege any facts to show that San Antonio's alleged knowledge of any (non-)impropriety can or should be imputed to Defendants or the Company generally.  ¶¶ 263-64.  Raw speculation does not suffice.  *Cf. Chill*, 101 F.3d at 269-70 (noting that even memoranda containing red flags of fraud sent from subsidiary officer to parent officer was insufficient to allege scienter).

supporting a finding of scienter.  *See* ¶¶ 503, 504.  None of the supposed improprieties to which Plaintiffs endeavor to tie Pipoly, Zyskind, and the Karfunkels have anything to do with the accounting fraud that allegedly occurred here.[27]

Finally, Plaintiffs' contentions regarding AmTrust's internal controls likewise fail to plead scienter sufficiently.  Scienter is not established just because internal controls *turned out to be weak*.  *See* ¶¶ 489, 494.  Plaintiffs must allege that Defendants intentionally or recklessly concealed their weakness.  *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 568 (S.D.N.Y. 2004); *see also Chill*, 101 F.3d at 269.  The Complaint does not meet this burden, as it fails to plead that Defendants were on notice of credible allegations of internal control weaknesses that Defendants  intentionally or recklessly failed to investigate and correct, especially considering the consistent unqualified audit opinions Defendants received.[28]

---

[27]  Plaintiffs also assert that this Court should "infer" AmTrust and the Officer Defendants' scienter because the "Audit Committee chairman had a significant conflict of interest and was incentivized to turn a blind eye to the Company's accounting improprieties."  ¶ 513.  The Chairman (against whom Plaintiffs do not assert a Section 10(b) claim) was allegedly the founder of, and a partner in, a company called Brookville Advisory ("Brookville").  According to a Form D filed with the SEC, a Karfunkel-controlled charitable foundation beneficially owned 10% of an entity Brookville allegedly managed called FrontPoint Brookville Credit Opportunities L.P. ("FrontPoint").  ¶ 513.  But the Form D Plaintiffs reference reflected beneficial owners as of May 2008—long before the Class Period began—and the charity is not disclosed as a beneficial owner in any subsequent Form D that FrontPoint filed.  Ex. 7 (Form Ds).  Even if the investment had extended through the Class Period, Plaintiffs fail to explain how a 10% investment in an entity allegedly managed by Brookville from a charity that exists outside of AmTrust's corporate structure could cause the Audit Chairman to be unable to perform his duties vis-à-vis AmTrust.  *See Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 166 (S.D.N.Y. 2015).  The allegations regarding the Audit Chairman's purported conflict of interest are without merit.  Nor is Plaintiffs' allegation that Pipoly stepped down as CFO after twelve years an indicator of fraud.  ¶ 522.  AmTrust acknowledged that it was restating prior financial statements on the advice of its new auditors; notwithstanding that the Restatement resulted from a change in accounting policy, a change in CFO is an entirely natural decision in light of such an event.  *See Tellabs*, 551 U.S. at 324, 127 S. Ct. at 2510.

[28]  In *Dobina*, this Court granted in part a motion to dismiss 10(b) claims, dismissing claims against the defendant company's auditors but allowing claims predicated on officers' statements regarding the quality of internal controls to proceed.  *See* 909 F. Supp. 2d at 258-59.  Unlike here, the plaintiffs in *Dobina* pleaded that the defendants were made aware of credible indications that internal controls were flawed, including from an employee who "allegedly informed [the officer defendants] about" "unexplained audit delays," which the defendants brushed off.  *Id*. at 246-47.  Likewise, "Tax Department audits turned up multiple control deficiencies, including at least one 'significant deficiency' [], that were expressly raised with [the individual defendants] and the Audit Committee."  *Id*. at 247.  Here, in contrast, to the extent Defendants were aware of unsourced accusations made in articles, Defendants acted reasonably in considering but rejecting them, especially in light of the unqualified audit opinions the Company subsequently received regarding its financial statements and internal

By contrast, the inferences that weigh against scienter are overwhelming.  For one, as discussed above, AmTrust expressly disclosed its revenue recognition practices in SEC filings after acquiring Warrantech.  *See supra* Arg. Pt. A.1.  Such disclosures would have made no sense if the Company believed its accounting was fraudulent.[29]  Notwithstanding these disclosures, not one of the "red flag" articles Plaintiffs cite mentions the warranty-recognition policy, suggesting that even those critics of the Company did not believe that the policy was a concern.  Likewise, of some 22 comment letters issued to AmTrust by the Division of Corporate Finance after AmTrust acquired Warrantech, not one mentioned Warrantech or warranty fee revenue recognition, Ex. 5 (SEC Comment Letters)—and the Company consistently received unqualified audit opinions from BDO following the acquisition of Warrantech, *see* ¶¶ 198, 203-204—despite the disclosures in AmTrust's 10-Ks regarding the Company's warranty revenue recognition policy.  A reasonable person viewing Plaintiffs' Warrantech allegations could, at most, infer that AmTrust decided not to follow Warrantech's accounting policy at the time of acquisition, but AmTrust had no reason to believe doing so was improper, let alone fraudulent.

Ultimately, the most compelling inference to draw from the allegations is that AmTrust believed that its accounting policies were proper and clearly explained.  AmTrust adopted accounting policies that were approved by the fifth-largest accounting firm in the world, ¶ 199, in unqualified audit opinions year after year.  There is no allegation of fictitious revenue; rather, the Company's prior and current auditors had different views as to the appropriate accounting treatment of warranty contract revenue the Company indisputably received.  AmTrust disclosed

---

controls.  As such, the allegations in the Complaint resemble those pled against the auditor in *Dobina*—who had never been made aware of any credible accusations—not the individual defendants.

[29]  Moreover, in light of these disclosures, AmTrust's reported results were neither actionably misstated nor material.  *Bay*, 2002 WL 31415713, at *9; *Loewen*, 2004 WL 1853137, at *13-14.

its warranty revenue recognition policy in SEC filings, yet the SEC never raised any concerns about it or about AmTrust's accrual of discretionary bonus expense—the focal points of the Restatement and Plaintiffs' claims here—in any of its comment letters.  *See supra* Arg. Pt. A.1; Ex. 5 (SEC Comment Letters).  And regulators consistently confirmed that AmTrust was financially sound.

When AmTrust switched auditors from BDO to KPMG, KPMG disagreed with accounting judgments BDO had long accepted, and AmTrust adjusted its accounting policies in light of KPMG's opinions.  The Officer Defendants retained significant holdings in AmTrust stock through the restatement, and incurred greater losses than any other investors as a result.  Indeed, if a company was engaged in a systemic and fraudulent practice of overstating revenue and net income, it surely would not have risked revealing such a scheme by retaining a new auditor, particularly when the company already had an auditor of international repute approving its accounting practices.  *See Harris*, 135 F. Supp. 3d at 177; *Proter*, 2013 WL 1316034, at *12.

In sum, the balance of inferences weighs decisively against scienter: the allegations of intent to defraud are speculative at best, while the facts as alleged undermine any intentional wrongdoing.  *See Tellabs*, 551 U.S. at 324, 127 S. Ct. at 2510.

### 2. The Complaint Fails To Plead Any Actionable, Material Misstatements.

To state a claim under Section 10(b), Plaintiffs must plead with particularity that Defendants made false statements of material fact, *ECA*, 553 F.3d at 196, and bear the burden of stating specifically what the purportedly fraudulent statements were, who made them, when and where they were made, and why the statements were fraudulent.  *Novak*, 216 F.3d at 306.  The statements cannot be honestly-held opinions or mere puffery.  *See, e.g.*, *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 2016 WL 1261135, at *11 (S.D.N.Y. Mar. 30, 2016) (applying *Omnicare* to Section 10(b) claims); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)

("expressions of puffery and corporate optimism do not give rise to securities violations").  Such statements must have been false when made.  *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

Plaintiffs allege three general categories of misstatements here, but none constitutes a misstatement of material fact.[30]  First, Plaintiffs cite financial statements relating to results that were later restated and Defendants' statements as to GAAP compliance.  *See, e.g.*, ¶¶ 3, 4, 11, 83, 88-91, 97-145.  But for the reasons discussed above, any alleged misstatements in the financial statements are either statements of opinion relating to accounting judgments, *see supra* Arg. Pt. A.1, or were non-material, *see supra* Arg. Pt. A.2.

Second, Plaintiffs attack purported misstatements in press releases and conference calls relating to, *inter alia*, the Restated Financial Statements and the purported red-flag articles.  *See, e.g.*, ¶¶ 287-88, 315, 326-327, 334, 342-43, 350, 353, 360-61, 371, 378, 385-86, 413, 430, 453-55.  But these are likewise either honestly held opinions, or, at most, non-actionable business puffery couched in qualifying language such as "we think," *e.g.*, ¶¶ 343, or "we believe," *e.g.*, ¶ 326.  General expressions of optimism are not actionable because "companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship, and the prospects of the business that they manage.'"  *Rombach*, 355 F.3d at 174 (quoting *Shields*, 25 F.3d at 1129-30).  Thus, statements such as "I think we are very, very well positioned," ¶ 342; "We feel very strong about this quarter,"

---

[30]  As discussed *supra* note 13, Plaintiffs fail to allege any cognizable omissions, let alone with particularity. 15 U.S.C. § 78u–4(b)(1)(B); *e.g.*, ¶¶ 13, 148 n.6, 237, 540.  Nor do they identify any duty to speak.  *See, e.g.*, *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 513 (S.D.N.Y. 2011).

¶ 326; and "we think we have a very, very strong business model," ¶ 315 (and many others), cannot give rise to a Section 10(b) claim.

Moreover, Plaintiffs fail to explain in what way these statements were false or misleading. *See Novak*, 216 F.3d at 306.   AmTrust *had* (and has) been successful and *did* (and does) have a strong business model, even after restating certain financials.[31]   The same is true regarding the statements Defendants made about the purported red-flag articles.   Their rebuttals of the red-flag articles were not false.   *See Shaffer*, 168 F. Supp. 3d at 658.   Indeed, Judge Caproni agreed with Zyskind's assessment that "the short sellers use inaccuracies and deception to manipulate our stock price," ¶ 350; *see Harris*, 135 F. Supp. 3d at 159.

Finally, the Complaint fails to allege false statements arising from Zyskind's and Pipoly's certifications in financial statements attesting to the accuracy of the Company's financial reporting and the design, strength, and effectiveness of internal controls and procedures.   The Certifications are statements of opinion; they expressly state that they are "based on" Zyskind's or Pipoly's "knowledge" and "most recent evaluation," *e.g.*, ¶¶ 156, 318;[32] *see In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (requiring plaintiffs to plead that defendant subjectively knew a certification "based on my knowledge" was incorrect when signed).   They are also inherently subjective because they certify only that the financial statements "fairly present" the Company's

---

[31]   For much the same reason, Defendants' statements regarding the delayed 10-Q and 10-K filings, and their description of the future restatement, are not actionable.   ¶¶ 461-62; 468-69, 474-78.   Defendants explained in November 2016 that the filings were delayed because "KPMG needed to have additional time to evaluate" AmTrust's internal controls.   ¶ 461.   In February 2017, Defendants noted that they likewise needed time in order to make "immaterial corrections to errors in [the Company's] financial statements . . . [and were] still evaluating corrections to [AmTrust's] historical quarterly financial statements."   ¶ 468.   Plaintiffs fail to allege facts demonstrating that any of these statements were false or misleading at the time made (let alone knowingly or recklessly so): Defendants were, with KPMG, reviewing internal controls and making immaterial corrections. That some corrections turned out to be material does not mean that Defendants' prior statements as to their understanding of the impending revisions were false. *Magnum*, 26 F. Supp. 3d at 295.   These statements were made just weeks before the Restatement was issued; Plaintiffs do not allege any colorable basis on which to conclude that Defendants intended to deceive the public right before they disclosed their purported fraud.

[32]   *Accord* ¶¶ 164, 170, 175, 181, 189, 194, 345, 363, 373, 380, 388, 396, 405, 415, 421, 432, 441, 447, 458.

financial condition and the "effectiveness" of its internal controls.   ¶¶ 156, 318.   Moreover, Plaintiffs fail to allege that Zyskind or Pipoly knew the statements were incorrect when made. *See, e.g.*, *Waterford*, 2016 WL 1261135, at *11; *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015).   And the articles that purportedly flag the internal controls as a concern were entirely unreliable, *see supra* Arg. Pt. B.1—and were in any case more than offset by subsequent unqualified audit opinions as to the Company's internal controls, *see supra* Arg. Pt. A.1—so they cannot serve as the basis for alleging that Zyskind or Pipoly did not subjectively believe their certifications at the time they were signed.

**C.    The Secondary Liability Claims (Counts III & V) Should Be Dismissed For Failure To Adequately Plead Primary Liability, A Distinct Basis For Secondary Liability, Or Culpable Participation Of Alleged Control Persons.**

The control-person causes of action, brought against the Officer and Director Defendants in Count III and against the Officer Defendants in Count V, fail for three independent reasons.

*First*, having failed to state primary violations of the Securities Act or the Exchange Act, Plaintiffs' control-person liability claims necessarily fail.  *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (Section 15 claim); *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (Section 20(a) claim).

*Second*, Plaintiffs' control-person claims should be dismissed because they rest on the "same conduct underl[ying]" Plaintiffs' primary liability claims.  *See* ¶¶ 249-257, 539, 544-547; *In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 198 (S.D.N.Y. 2016) (Section 15); *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999) (same for Section 20(a)).

*Third*, the Complaint fails to adequately allege culpable participation by the Defendants against whom the control-person claims have been brought.  "To state a claim for control person liability under Section 20(a), plaintiffs must allege . . . the defendant's culpable participation in the primary violation."  *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 5730020, at *4 (S.D.N.Y.

Oct. 22, 2013) (Kaplan, J.); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (identifying culpable participation as a *prima facie* element of the claim).[33]   Here, because the allegations fail to allege "particularized facts of the [Officer Defendants'] conscious misbehavior or recklessness," *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007); *supra* Arg. Pt. B.1.b, Plaintiffs' Section 20(a) claim must be dismissed.

The Complaint, meanwhile, expressly disclaims all scienter allegations for purposes of pleading violations of the Securities Act, including with respect to the Officer Defendants, who are the only defendants named in the Section 15 claim, Compl. at 41 n.6—and in any case fails to adequately plead their "culpable participation" for the reasons explained above.  The Section 15 claim therefore must be dismissed as well.  *See, e.g.*, *In re Sec. Capital Assurance Ltd. Sec. Litig.*, 2011 WL 4444206, at *7 (S.D.N.Y. Sept. 23, 2011) (identifying culpable participation among the elements required to be pled).[34]

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[33]   Although the question whether culpability is a pleading-stage element or an affirmative defense has divided courts in this District, the Second Circuit treats as a foregone conclusion that culpable participation is a *prima facie* element of a Section 20(a) claim, *see Lehman*, 650 F.3d at 186, and "the majority of district courts in this Circuit have required Section 20(a) plaintiffs to allege" culpability at the pleading stage, *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014).

[34]   While some courts have rejected the culpable participation requirement in the Section 15 context (and have noted that the "weight of the authority" suggests that culpability is not required), they have done so primarily on the basis that primary violations of the Securities Act do not include an intent element, *see McKenna v. Smart Techs. Inc.*, 2012 WL 1131935, at *20-21 (S.D.N.Y. Apr. 3, 2012); Defendants respectfully submit that those courts have erred.  *See Pub. Emps.' Ret. Sys. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) (noting that primary liability claims under the Securities Act are fundamentally different in kind from control-person claims); *see also Lehman*, 650 F.3d at 185-86 (describing Sections 15 and 20(a) as having "roughly parallel control person provisions," while deferring resolution of intra-Circuit split).

New York, New York
October 17, 2017

GIBSON, DUNN & CRUTCHER LLP


By: /s/ Lawrence J. Zweifach
    Mark A. Kirsch
    Lawrence J. Zweifach
    Caitlin J. Halligan
    Akiva Shapiro
    200 Park Avenue
    New York, New York 10166-0193
    Tel: (212) 351-2662
    Fax: (212) 351-6362
    lzweifach@gibsondunn.com

    Jason J. Mendro
    1050 Connecticut Avenue, NW
    Washington, D.C. 20036
    Tel: (202) 955-8500

*Attorneys for Defendants AmTrust Financial Services, Inc., Barry D. Zyskind, Ronald E. Pipoly Jr., Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, and Jay J. Miller*

# APPENDIX A: EXHIBIT LIST[1]

| Exhibit Number | Description |
|---|---|
| 1 | Excerpt of AmTrust Form 10-K (Dec. 31, 2013) |
| 2 | Excerpt of AmTrust Form 10-K (Dec. 31, 2014) |
| 3 | Excerpt of AmTrust Form 10-K (Dec. 31, 2015) |
| 4 | Excerpt of AmTrust Form 10-K (Dec. 31, 2016) (the "Restatement") |
| 5 | Letters from the United States Securities and Exchange Commission to representatives of AmTrust (ranging in date from Sept. 24, 2010 to Feb. 17, 2017) |
| 6 | Excerpt of AmTrust Schedule 14A (May 18, 2017) |
| 7 | FrontPoint Brookville Credit Opportunities, L.P. Form D (March 11, 2009) and Form D (March 4, 2010) |
| 8 | AmTrust Form 8-K (Aug. 20, 2010) |
| 9 | AmTrust Form 8-K (Sept. 12, 2014) |
| 10 | AmTrust Form 8-K (Apr. 1, 2016) |
| 11 | AmTrust Form 8-K (Feb. 27, 2017) |
| 12 | AmTrust Form 8-K (March 14, 2017) |
| 13 | Excerpt of AmTrust 2016 Q2 Form 10-Q (Aug. 9, 2016) |

---

[1] The listed exhibits are attached to the Declaration of Lawrence J. Zweifach, submitted herewith in support of AmTrust's, the Officer Defendants', and the Director Defendants' Motion to Dismiss.

| 14 | Warrantech Corporation's Form 15-12G (Jan. 31, 2007) |
|----|------------------------------------------------------|
| 15 | Excerpt of Warrantech Corporation's Form 10-K for the fiscal year ending March 31, 2003 |
| 16 | Excerpt of Warrantech Corporation's Form 10-K for the fiscal year ending March 31, 2006 |
| 17 | Chart summarizing transactions in stock of AmTrust by Ronald E. Pipoly, Jr. and true and correct copies of the underlying Statements of Changes in Beneficial Ownership filed on Form 4 ranging in date from November 18, 2013 to March 6, 2017 |
| 18 | Chart summarizing transactions in stock of AmTrust by Donald T. DeCarlo, and true and correct copies of the underlying Statements of Changes in Beneficial Ownership filed on Form 4 ranging in date from December 13, 2013 to March 6, 2017 |
| 19 | Transcript, AmTrust Q4 2016 Earnings Call (Feb. 27, 2017) |
| 20 | *AmTrust Financial Services: A House of Cards?*, GEOINVESTING (Dec. 12, 2013) |
| 21 | Bill Alpert, *An Insurer's Feat: Turning Losses Into Gains*, BARRON'S (Feb. 8, 2014) |
| 22 | Bill Alpert, *Balance Sheet Risk Makes AmTrust Shares Vulnerable*, BARRON'S (May 31, 2014) |
| 23 | Bill Alpert, *Is AmTrust Stock Worth the Premium?*, BARRON'S (Apr. 23, 2016) |
| 24 | Letter from Alistair Capital Management, LLC to Audit Committee of Board of Directors of AmTrust (Dec. 18, 2014) |
| 25 | Mark Maremont et al., *Secret Recordings Play Role in SEC Probe of Insurer AmTrust*, WALL STREET JOURNAL (Apr. 11, 2017) |
| 26 | Transcript, AmTrust Q3 2014 Earnings Call (Nov. 4, 2014) |
| 27 | Excerpt of AmTrust Form 8-K (May 25, 2017) |
| 28 | *In re AmTrust Fin. Servs., Inc. Secs. Litig.*, Consolidated Am. Compl. for Violations of the Federal Securities Laws, 17-cv-01545 (Aug. 21, 2017) (Dkt. 55) |