# EXHIBIT A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 84419 / October 12, 2018

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 3992 / October 12, 2018

ADMINISTRATIVE PROCEEDING
File No. 3-18868

|  |  |
|---|---|
| In the Matter of<br><br>Richard J. Bertuglia, CPA,<br>John W. Green, CPA, and<br>Lev Nagdimov, CPA,<br><br><br>Respondents. | ORDER INSTITUTING PUBLIC ADMINISTRATIVE PROCEEDINGS PURSUANT TO SECTION 4C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative proceedings be, and hereby are, instituted against Richard J. Bertuglia, CPA ("Bertuglia"), John W. Green, CPA ("Green"), and Lev Nagdimov, CPA ("Nagdimov") (collectively, "Respondents") pursuant to Section 4C[1] of the Securities Exchange Act of 1934

---

[1] Section 4C provides, in relevant part, that:

The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

("Exchange Act") and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.[2]

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section IV, Respondents consent to the entry of this Order Instituting Public Administrative Proceedings Pursuant to Section 4C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules Of Practice, Making Findings and Imposing Remedial Sanctions (the "Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[3] that:

## A.    SUMMARY

1.    This matter concerns improper professional conduct by Bertuglia, Green, and Nagdimov during an audit performed by BDO USA, LLP ("BDO") for AmTrust Financial Services, Inc. ("AmTrust" or the "Company").  In 2013, AmTrust engaged BDO to conduct an integrated audit of the Company's 2013 consolidated annual financial statements and internal control over financial reporting ("ICFR") in accordance with Public Company Accounting Oversight Board ("PCAOB") standards.  For the engagement, BDO staffed Bertuglia as the engagement partner, Green as the engagement quality review partner, and Nagdimov as a senior manager.

2.    Shortly before AmTrust filed its 2013 Form 10-K, Nagdimov instructed BDO's audit team to sign-off on all their work papers and audit programs — regardless of whether their work was finished — so the audit procedures would appear complete before the release date for BDO's audit report.  Nagdimov also directed the audit team to load blank or placeholder documents into BDO's electronic work paper files and sign-off on those documents, if necessary, to comply with his instructions.  The audit team generally obeyed Nagdimov's orders and created

---

[2] Rule 102(e)(1)(ii) provides, in pertinent part, that:

The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . to have engaged in unethical or improper professional conduct.

[3] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

misleading audit documentation that did not accurately reflect the dates when audit procedures were actually completed and audit evidence was actually obtained.  This practice of creating misleading audit documentation by signing incomplete work papers or audit programs is generally characterized as "predating" in this Order.

3.     This predating of audit documentation was intended to conceal the failure to complete necessary procedures and obtain sufficient audit evidence for certain journal entries, internal controls, premium revenue, premium receivable and share-based compensation before the release date for BDO's audit report.  After the audit report was released, the audit team performed these incomplete procedures during the 45-day documentation completion period following the report release date.  To preserve the original, predated sign-offs in BDO's electronic work paper files, the audit team documented the additional procedures performed and subsequent evidence obtained by overwriting or supplementing the existing audit documentation in the predated work papers.

4.     Despite these significant audit deficiencies, Bertuglia, the engagement partner, and Green, the engagement quality review partner, authorized the release of BDO's audit report before AmTrust filed its 2013 Form 10-K on March 3, 2014.  The audit report provided unqualified opinions on AmTrust's 2013 financial statements and ICFR.  At the time, Bertuglia and Green did not know the audit team had failed to complete necessary audit procedures, and obtain sufficient audit evidence, to support the report.  In fact, Bertuglia and Green did not discover these audit deficiencies until approximately one week *after* BDO's audit report was published in AmTrust's 2013 Form 10-K.  If Bertuglia and Green had properly exercised due professional care, they would have identified these deficiencies before they released the report.

5.     As a result of this conduct, Bertuglia, Green, and Nagdimov violated auditing standards established by the PCAOB.  As the engagement partner, Bertuglia was responsible for the audit and its performance, but he failed to exercise due professional care and properly supervise the engagement.  Specifically, Bertuglia failed to properly supervise the audit and the work of audit team members, who (i) violated numerous PCAOB standards, including audit documentation standards, and (ii) failed to complete necessary audit procedures, and obtain sufficient audit evidence, to support BDO's audit report.  Green also failed to exercise due professional care and fulfill his responsibilities as the engagement quality review partner when he provided his concurring approval to release BDO's audit report, and when he failed to review and assess the audit team's subsequent analysis of omitted procedures after the audit report release date.

6.     Nagdimov violated PCAOB audit documentation standards by directing the audit team to predate their incomplete work papers and audit programs.  Further, Nagdimov, who assisted Bertuglia's supervision of the audit, failed to exercise due professional care and properly supervise the engagement in Nagdimov's assigned areas.  Specifically, Nagdimov failed to properly supervise the audit and the work of audit team members, who (i) violated numerous PCAOB standards, including audit documentation standards, and (ii) failed to complete necessary procedures, and obtain sufficient audit evidence, to support BDO's audit report.

## B.    RESPONDENTS

7.     **Richard J. Bertuglia, CPA** is a resident of Dix Hills, New York and a former partner at BDO.  Bertuglia is a Certified Public Accountant licensed in the state of New York.  His license is currently in inactive status.  Bertuglia was an audit partner in BDO's New York City office from July 2000 until he retired from the firm in June 2017.  He was the engagement partner responsible for BDO's audits of AmTrust in 2011 through 2015, including BDO's integrated audit of AmTrust's financial statements and ICFR in 2013.

8.     **John W. Green, CPA** is a resident of Tucson, Arizona and a former partner at BDO.  Green is a Certified Public Accountant licensed in the state of New York and Arizona. Green joined BDO in August 2012 as an audit partner in the firm's New York City office until he left the firm in August 2016.  In 2012 and 2013, Green was the engagement quality review partner for BDO's integrated audits of AmTrust's financial statements and ICFR.

9.     **Lev Nagdimov, CPA** is a resident of Scarsdale, New York and a former senior manager at BDO.  Nagdimov is a Certified Public Accountant licensed in the state of New York. Nagdimov joined BDO in November 2003 and was staffed on BDO's audit engagement team for AmTrust from 2006 until he was terminated by the firm in November 2014.  In 2012 and 2013, Nagdimov was a senior manager for BDO's integrated audits of AmTrust's financial statements and ICFR.

## C.    RELATED ENTITIES

10.     **BDO USA, LLP**, formerly BDO Seidman LLP, is a Delaware limited liability partnership headquartered in Chicago, Illinois.  BDO is a PCAOB-registered public accounting firm and is the U.S. member firm of BDO International Limited, a U.K. company limited by guarantee, and forms part of the international BDO network of independent member firms.  BDO was AmTrust's independent auditor from 2006 through May 10, 2016.

11.     **AmTrust Financial Services, Inc.** is a Delaware corporation based in New York, New York that underwrites and provides property and casualty insurance.  During the relevant time period, AmTrust's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ Global Market.  AmTrust's Series A preferred stock and depository shares of Series B and Series C preferred stock traded on the New York Stock Exchange.  AmTrust filed periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.  On June 21, 2018, AmTrust's public shareholders approved an offer to purchase their common stock and take the company private.

4

D.    **FACTS**

**_Background_**

12.    AmTrust engaged BDO to conduct an integrated audit of the Company's 2013 consolidated annual financial statements and ICFR in accordance with PCAOB standards (the "Consolidated Audit").[4]  AmTrust also engaged BDO to audit many of its individual subsidiaries' financial statements in accordance with generally accepted auditing standards established by the American Institute of Certified Public Accountants (the "Subsidiary Audits").

13.    Bertuglia was BDO's engagement partner for the Consolidated Audit and the Subsidiary Audits.  He supervised the work of audit team members and supervised the audit's compliance with PCAOB standards.  During the Consolidated Audit, Bertuglia delegated his general day-to-day supervision of the engagement to his managers, and was primarily assisted by Nagdimov and a second manager (the "Second Manager").

14.    Green was the engagement quality review partner for the Consolidated Audit.  The objective of the engagement quality reviewer is to perform an evaluation of the significant judgments made by the engagement team and the related conclusions reached in forming the overall conclusion on the engagement and in preparing the engagement report in order to determine whether to provide concurring approval of issuance.[5]

15.    BDO maintained all of its audit documentation for the Consolidated Audit and the Subsidiary Audits in a single set of electronic work paper files retained in BDO's audit process tool ("APT").  The audit team planned to conduct the Consolidated Audit simultaneously with the individual Subsidiary Audits.  The team's audit plan for these simultaneous audits relied on audit procedures performed at the subsidiary level, including subsidiary-level materiality thresholds that supported both the Consolidated Audit and the Subsidiary Audits.

**_The Audit Team Falls Behind Schedule_**

16.    The audit team fell behind schedule during the fourth quarter of 2013.  On December 18, 2013, the Second Manager emailed a status report to Bertuglia and Nagdimov.  The report estimated that the audit team was 870 total hours behind schedule as a group, or roughly 14 weeks behind, based on current staffing and 60-hour work weeks.  To cure this deficit, Bertuglia staffed four more auditors to the engagement, including two managers.

17.    On January 7, 2014, SEC staff issued a subpoena to BDO requesting copies of the firm's documents, including prior work papers and audit files related to AmTrust.

---

[4] Auditing standards referenced in this Order relate to PCAOB standards in effect when the audit was performed.

[5] PCAOB Auditing Standard No. 7, _Engagement Quality Review_, par. 7.2.

18.     Bertuglia wanted the audit team to substantially complete their work on all major financial statement audit areas before AmTrust issued its earnings release on February 13, 2014. When AmTrust published the earnings release, however, the audit team had not completed their work on these major audit areas.  As time passed, Bertuglia concluded the audit team would not be able to complete all their audit work for the Consolidated Audit and Subsidiary Audits as planned by February 28, 2014, which was the expected filing date for AmTrust's 2013 Form 10-K. Bertuglia directed the audit team to focus their efforts on completing audit work for the Consolidated Audit, and delay any audit work that related solely to the Subsidiary Audits, because the subsidiaries' statutory financial statements were not required to be filed until after AmTrust's expected filing date for the 2013 Form 10-K.

19.     To accomplish this goal, Nagdimov and the Second Manager manually reviewed AmTrust's financial statement accounts, by subsidiary and lead account schedule, to identify accounts that exceeded the Consolidated Audit's tolerable misstatement ("consolidated materiality") and ensure that any untested balances did not exceed consolidated materiality.  By applying this approach, the audit team departed from their original audit plan, which relied on subsidiary-level materiality thresholds and related audit procedures to support both the Consolidated Audit and Subsidiary Audits.  The audit team failed to document this change to the audit plan in the work papers.

20.     Following the managers' review, Bertuglia told the audit team they had to complete their work in three audit areas before AmTrust filed its 2013 Form 10-K: (i) journal entry testing; (ii) internal controls testing; and (iii) testing of material account balances for the Consolidated Audit.  A few days later, on February 18, the audit team emailed a status update to Bertuglia, Nagdimov, and the Second Manager.  The update, which detailed the team's incomplete work, showed that several significant audit areas were still incomplete, including internal controls testing.

### *Nagdimov Instructs the Audit Team to Sign Incomplete Work*

21.     On February 21, Bertuglia met with the audit team again and told them they had to finish their incomplete audit work for journal entry testing, internal controls testing, and material account balances for the Consolidated Audit before AmTrust filed its Form 10-K.  After this meeting, Nagdimov instructed the audit team to ensure all their work papers and audit programs were loaded and signed in APT — regardless of whether the work was complete.  Several days later, Nagdimov issued a more direct instruction to the audit team: sign *everything* in APT, including work papers and audit programs.  He also told the audit team to load and sign blank or placeholder work papers, if necessary, to comply with his instructions.[6]

---

[6] BDO's APT software required users to load work papers into the program *before* they can sign those work papers in APT.  Upon sign-off, APT automatically registered an electronic timestamp for the signature.  The software allowed users to update their time-stamped sign-offs as needed, and the software also retained a log of all prior sign-offs for each work paper.  But users could still revise the content of work papers after they were signed, and these revisions did not automatically update or delete the original time-stamped sign-offs.

22.    The audit team generally followed Nagdimov's orders and signed all their work papers and audit programs, even if their work was incomplete.  They also loaded placeholder documents into APT, such as blank templates, preliminary schedules, and prior-period work papers, and signed-off on these placeholder documents.

### *Bertuglia and Green Release BDO's Audit Report Despite Missing Audit Work*

23.    The audit team expected AmTrust to file its Form 10-K on Friday, February 28, 2014.  That morning, Bertuglia and Green were reviewing work papers in APT when they noticed that several work papers were still incomplete, so they called Nagdimov.  Bertuglia claims that during this call, Nagdimov told Bertuglia and Green the audit team had completed their work but technical problems were preventing them from loading their updated work papers into APT. According to Bertuglia and Green, Nagdimov assured Bertuglia and Green that all necessary audit work for the Consolidated Audit was complete, including the three audit areas that Bertuglia instructed the audit team to finish before AmTrust's Form 10-K filing.

24.    Based on these verbal assurances, Bertuglia authorized the release of BDO's audit report and Green provided his concurring approval of issuance later that afternoon on  February 28, 2014 (the "First Report Release Date").   The audit report contained unqualified opinions on AmTrust's 2013 consolidated annual financial statements and ICFR.  When Bertuglia and Green released the report, they had not yet reviewed the missing work papers outside of APT or discussed the missing work with team members who were responsible for the procedures.

25.    Bertuglia and Green subsequently learned that AmTrust had decided to delay its Form 10-K filing until Monday, March 3, 2014, which was the actual filing deadline.  Bertuglia and Green continued to review and sign work papers over the weekend and on Monday, March 3. From Friday, February 28 through Monday, March 3, Bertuglia and Green collectively signed over 2,000 work papers, including work papers they did not actually review, but they did not revisit the incomplete work papers to confirm that necessary procedures were complete and sufficient audit evidence had been obtained.  On Monday, Bertuglia redated BDO's audit report to March 3, 2014 (the "Second Report Release Date"), and AmTrust filed its 2013 Form 10-K later that day.

### *The Audit Team Performs Necessary Procedures After the Report Release Dates*

26.    On March 7, 2014, the audit staff members emailed a status report to Bertuglia, Nagdimov and the Second Manager.  The report showed that necessary work for the Consolidated Audit remained incomplete and the audit team needed more time to finish their audit procedures. The incomplete work included certain testing of journal entries, internal controls, and material accounts for the Consolidated Audit — the same audit areas that Bertuglia repeatedly told the audit team to complete before AmTrust filed its Form 10-K.

27.    Several days later, Bertuglia reviewed the status report and was surprised by the list of incomplete work for the Consolidated Audit.  He promptly instructed the audit team to prepare

an updated summary of incomplete audit work and provide projected timelines for completing the remaining items.  This updated summary, which was emailed to Bertuglia on March 14, 2014, identified all of the incomplete audit work that had to be finished by the audit team, including work for the Consolidated Audit and the individual Subsidiary Audits.

28.    Bertuglia also notified Green of the incomplete work for the Consolidated Audit. They concluded that the audit team needed to complete the omitted procedures and assess their potential impact on BDO's audit report, as required by AU Section 390, *Consideration of Omitted Procedures After the Report Date* (AU § 390).  Neither Bertuglia nor Green discussed the omitted procedures or their approach under AU § 390 with anyone else at BDO.

29.    The audit team completed their work over the next month.  For the incomplete, predated work papers — particularly placeholder documents — the audit team generally overwrote and thus replaced the prior audit documentation with new documentation reflecting the procedures performed and evidence obtained.  This new documentation did *not* indicate that such audit work occurred *after* the report release dates, and it did *not* affect the original, predated sign-offs in APT. Moreover, the audit team did not update their sign-offs in APT when the predated work papers were completed.  As a result of this conduct, the audit team created misleading documentation of the timing of procedures that were performed *after* the report release dates because (i) the new documentation did not identify the procedures performed and audit evidence obtained after the report release dates, and (ii) the original, predated sign-offs did not accurately reflect the dates when procedures were performed or audit evidence was obtained.  The audit team's predated placeholder work papers included, among others, certain testing of journal entries, entity-level internal controls, and certain premium revenues.

30.    Bertuglia reviewed the completed audit work and concluded that the omitted procedures did not affect BDO's previously issued audit report.  Green also reviewed this work and reached the same conclusion, but he never reviewed the team's list of incomplete audit work nor the team's assessment of omitted procedures, and he never discussed any assessment of the omitted procedures with Bertuglia or anyone else on the audit team.  In fact, there is no documentation of *any* assessment of omitted procedures under AU § 390, and neither Bertuglia nor Green documented their own assessment or review.

### *Summary of Significant Audit Deficiencies*

31.    The audit team did not have sufficient audit evidence to support BDO's audit report when it was included in AmTrust's Form 10-K on March 3, 2014.  The following summary describes the significant audit deficiencies and documentation failures existing on that date: the Second Report Release date.[7]

---

[7] On February 28, 2014, SEC staff requested an electronic copy (i.e., a "snapshot") of BDO's audit work papers at the moment when BDO released its audit report for AmTrust's 2013 consolidated annual financial statements and ICFR. SEC staff identified the predated work papers and audit deficiencies by comparing these "snapshot" work papers on the Second Report Release date to BDO's final, archived work papers.

### a. Incomplete Journal Entry Testing

32.     BDO's audit plan identified improper journal entries as a fraud risk factor related to management's potential override of internal controls.  To address this risk, the audit team planned to perform journal entry testing for evidence of possible material misstatement due to fraud, as required under AU Section 316, *Consideration of Fraud in a Financial Statement Audit* ("AU § 316").  *See* AU § 316.58-62.  During the Consolidated Audit, the audit team failed to perform any journal entry testing for the second half of the year (July 2013 through December 2013) before the Second Report Release Date.  But the audit team loaded two placeholder work papers, signed them on February 27, 2014, and signed several incomplete audit steps for journal entry testing in the audit program.  Specifically, the audit team loaded and signed a BDO template for performing and documenting journal entry testing.  The audit team also loaded and signed a journal entry testing spreadsheet from the prior year's work papers.  Bertuglia also signed the BDO template placeholder work paper on February 28, 2014, even though it did not document any work performed, evidence obtained or conclusions reached.  After the Second Report Release Date, the audit team performed the incomplete procedures and documented them by overwriting existing documentation in the placeholder work papers, thus preserving the original, predated sign-off dates in APT.

### b. Incomplete Internal Controls Testing

33.     BDO's audit plan included testing of internal control processes for premium underwriting, treasury and investments, entity-level controls and share-based compensation. During the Consolidated Audit, the audit team failed to complete certain testing for these internal control areas before the Second Report Release Date.  But the audit team signed-off on an incomplete control testing work paper and loaded and signed a placeholder work paper.  The audit team also signed incomplete audit program steps for internal controls testing.  Nagdimov signed incomplete control testing work papers on February 27 and 28, 2014, and Bertuglia signed the predated placeholder work paper on March 3, 2014.  After the Second Report Release Date, the audit team performed the incomplete procedures and documented them by overwriting existing documentation in these work papers, thus preserving the original, predated sign-off dates in APT.

34.     In December 2013, an audit team member also loaded and signed blank BDO templates for share-based compensation and another internal control process as placeholder work papers.  After the Second Report Release Date, the team member documented his work in the templates, thus preserving the original, predated preparer sign-off dates in APT.

### c. Incomplete Substantive Testing for Material Accounts

35.     BDO's audit plan included substantive audit procedures for material accounts, including various procedures concerning premium revenue, premium receivable, and share-based compensation.  The planned audit procedures for premium revenue also included substantive

procedures for certain insurance programs.  During the Consolidated Audit, the audit team failed to complete certain substantive audit procedures for these material accounts.

36.     For certain premium revenue testing, an audit team member loaded and signed a placeholder work paper on February 25, 2014, and signed the incomplete audit step in BDO's audit program.  Green signed the placeholder work paper as the engagement quality review partner on March 3, 2014.   After the Second Report Release Date, the team member performed the incomplete procedures and documented them by overwriting existing documentation in the placeholder work papers, thus preserving the original, predated sign-off dates in APT.

37.     BDO's audit plan included substantive audit procedures for workers' compensation premium receivable, one of the Company's most significant lines of business.  The audit team member responsible for this work for three of the Company's largest insurance subsidiaries signed interim work papers in January 2014 but failed to complete all of the year-end procedures before the Second Report Release Date.  Shortly before the Second Report Release Date, Bertuglia signed one of these incomplete work papers and Green signed two of these incomplete work papers, despite the failure to document work performed, evidence obtained or conclusions reached for the year-end procedures.  After the Second Report Release Date, the team member performed the incomplete year-end procedures and documented them by overwriting existing documentation in these interim work papers, thus preserving the original preparer and reviewer sign-off dates in APT.

38.     BDO's audit plan also included substantive audit procedures for share-based compensation.  The audit team failed to complete some of these audit procedures before the Second Report Release Date.  These work papers were not improperly predated but the audit procedures were performed and documented *after* the Second Report Release Date.

### d.  Other Incomplete Audit Procedures for Risk of Fraud

39.     BDO's audit plan included several audit procedures to address the risk of fraud, as required under AU § 316, including vendor fraud testing.  During the Consolidated Audit, the audit team failed to complete audit procedures for vendor fraud testing before the Second Report Release Date.  An audit team member loaded and signed a placeholder work paper for this testing on February 27, 2014.  After the Second Report Release Date, the team member performed the audit procedures and documented them by overwriting existing documentation in the work paper, thus preserving the original, predated sign-off date in APT.

### Bertuglia's and Nagdimov's Violations of PCAOB Standards

### a.  Failure to Supervise and Exercise Due Professional Care
###     (AS 10 and AU § 230)

40.     Under PCAOB Auditing Standard No. 10, *Supervision of the Audit Engagement* ("AS 10"), "the engagement partner is responsible for the engagement and its performance.

Accordingly, the engagement partner is responsible for proper supervision of the work of engagement team members and for compliance with PCAOB standards . . . ." AS 10.3. Additionally, "[e]ngagement team members who assist the engagement partner with supervision of the work of other engagement team members also should comply with the requirements in this standard with respect to the supervisory responsibilities assigned to them." AS 10.4. The engagement partner and, as applicable, other engagement team members performing supervisory activities, should, among other things, "review the work of engagement team members to evaluate whether: (1) [t]he work was performed and documented; (2) [t]he objectives of the procedures were achieved; and (3) [t]he results of the work support the conclusions reached." AS 10.5.

41.     PCAOB Auditing Standard AU 230, *Due Professional Care in the Performance of Work* ("AU § 230"), requires auditors to exercise due professional care in the planning and performance of an audit and the preparation of an audit report. AU § 230.01. Due professional care requires the auditor to exercise professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of audit evidence. AU § 230.07. Due professional care also requires the auditor to consider the competency and sufficiency of evidence, and since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process. AU § 230.08. The exercise of due professional care allows the auditor to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud, or whether any material weaknesses exist on the date of management's assessment of ICFR. AU § 230.10. The auditor's objective is to obtain sufficient appropriate evidential matter to provide a reasonable basis for forming an opinion. AU § 230.11.

42.     As a result of the conduct described above, Bertuglia and Nagdimov failed to properly supervise the audit team and exercise due professional care during the Consolidated Audit. In particular, Bertuglia and Nagdimov failed to properly evaluate whether: (i) the audit complied with PCAOB standards, including audit documentation standards; (ii) necessary audit procedures were completed before the audit report was released; and (iii) the audit team obtained sufficient audit evidence to support BDO's audit report.

43.     Bertuglia authorized the release of BDO's audit report even though necessary audit procedures were not completed and the audit evidence obtained did not comply with PCAOB standards. Bertuglia also signed work papers that lacked sufficient evidence to support the audit team's conclusions. Bertuglia also failed to properly supervise the audit team's compliance with audit documentation standards for additional audit work that was performed after the audit report was released. As a result, Bertuglia violated AS 10 and AU § 230.

44.     Additionally, Nagdimov violated AS 10 and AU § 230 when he instructed the audit team to predate their incomplete work papers and audit programs. He also violated these standards when he failed to report the true status of the Consolidated Audit work to Bertuglia and Green before they released BDO's audit report.

11

### b. Failure to Properly Examine Journal Entries For Evidence of Possible Material Misstatement Due to Fraud  (AU § 316,  AU § 230 and AS 15)

45.     Under AU § 316, "the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 316.01.[8]   Additionally, AU § 316 prescribes certain audit procedures to specifically address the risk of management override of controls, including examining journal entries and other adjustments for evidence of possible material misstatement due to fraud.  *See* AU § 316.57-62.  Material misstatements of financial statements due to fraud often involve, among other things, the manipulation of financial reporting through recording journal entries and other adjustments at the end of a reporting period.  The auditor should "design procedures to test the appropriateness of journal entries recorded in the general ledger and other adjustments . . . made in the preparation of the financial statements."  AU § 316.58.  For example, the auditor should identify and select journal entries and other adjustments for testing and examine supporting documentation. AU § 316.61-62.  AU § 316 requirements concerning fraud risks also emphasize the need for auditors to exercise due professional care and professional skepticism.  AU § 316.13; *see also* AU § 230.01, .07-.08, and .10-.11.

46.     Under PCAOB Auditing Standard No. 15, *Audit Evidence* ("AS 15"), an "auditor must plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion." AS 15.4.

47.     As a result of the conduct described above, Bertuglia failed to comply with AU § 316 because the audit team did not complete journal entry testing before the audit report was released.[9]  Consequently, Bertuglia also failed to exercise due professional care and professional skepticism, failed to obtain reasonable assurance that AmTrust's 2013 consolidated annual financial statements were free of material misstatement, and failed to obtain sufficient appropriate audit evidence to provide a reasonable basis for the opinions in BDO's audit report, as required by AU § 230 and AS 15.

### c. Failure to Perform Sufficient Tests of Internal Controls and Substantive Audit Procedures to Obtain Sufficient Evidence to Support the Audit Opinions  (AS 5, AS 13, AS 14 and AS 15)

48.     PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS 5"), establishes requirements to test and evaluate internal control over financial reporting.  When auditing internal control over financial reporting in an integrated audit, AS 5 requires, among other things, the auditor to obtain sufficient evidence to support the auditor's opinion on internal control over

---

[8] *See also* AU Section 110, *Responsibilities and Functions of the Independent Auditor*, at para. 2.

[9] During the Consolidated Audit, Nagdimov was not responsible for supervising or reviewing year-end audit procedures for journal entry testing.

financial reporting as of year-end.  AS 5.7.  The auditor should also properly plan the audit of internal control over financial reporting and properly supervise the engagement team members. AS 5.9.  The auditor should test those controls that are important to the auditor's conclusion about whether the company's controls sufficiently address the assessed risk of misstatement to each relevant assertion.  AS 5.39.  The auditor must also test those entity-level controls that are important to the auditor's conclusion about whether the company has effective internal control over financial reporting.  AS 5.22.[10]

49.     PCAOB Auditing Standard No. 13, *The Auditor's Responses to the Risks of Material Misstatement* ("AS 13"), establishes requirements regarding designing and implementing appropriate responses to the risks of material misstatement.  AS 13.1.  The audit procedures performed in response to the assessed risks of material misstatement can be classified into two categories: (i) tests of controls; and (ii) substantive procedures.  AS 13.1-3, .8, and .10.  If the auditor plans to assess control risk at less than the maximum . . . , the auditor must obtain evidence that the controls selected for testing were designed and operating effectively during the entire period for which the auditor plans to rely on controls to modify the substantive procedures in the financial statement audit.  AS 13.16.  When substantive procedures are performed at an interim date, the auditor should cover the remaining period by performing substantive procedures, or substantive procedures combined with tests of controls, that provide a reasonable basis for extending the audit conclusions from the interim date to the period end.  AS 13.45.

50.     AS 14 establishes requirements regarding the auditor's evaluation of audit results and determination of whether he or she has obtained sufficient appropriate audit evidence.  AS 14.1.  When evaluating audit results, the auditor must conclude whether sufficient appropriate audit evidence has been obtained to support his or her opinion on the financial statements.  AS 14.33.

51.     AS 15 states than an "auditor must plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion." AS 15.4.

52.     As a result of the conduct described above, Bertuglia failed to comply with these standards because the audit team did not complete their testing of internal controls for the Consolidated Audit before the audit report was released.  Similarly, Nagdimov also failed to comply with these standards to the extent that he was responsible for supervising the internal controls testing that was incomplete when the audit report was released.

53.     Bertuglia and Nagdimov also failed to appropriately respond to the risks of material misstatement because the audit team did not complete substantive audit procedures that were designed to address the assessed risks of material misstatement, as required by AS 13. Consequently, Bertuglia and Nagdimov also failed to adequately evaluate audit evidence and obtain sufficient evidence as required by AS 14 and AS 15.

---

[10] *See also* AS 12, *Identifying and Assessing Risks of Material Misstatement* ("AS 12"), at para. 40.

### d. *Failure to Prepare and Retain Required Audit Documentation (AS 3 and AU § 230)*

54.     PCAOB Auditing Standard No. 3, *Audit Documentation* ("AS 3"), requires an auditor to prepare and retain documentation that provides a written record of the basis for the auditor's conclusions.  Audit documentation also facilitates the planning, performance, and supervision of the engagement, and is the basis for reviewing the quality of the work because it provides the reviewer with written documentation of the evidence supporting the auditor's significant conclusions. AS 3.1-.2 and .5.

55.     Audit documentation must clearly demonstrate that the work was in fact performed. AS 3.6.  Audit documentation must also contain sufficient information to enable an experienced auditor, having no previous connection with the engagement: (a) to understand the nature, timing, extent, and results of the procedures performed, evidence obtained, and conclusions reached, and (b) to determine who performed the work and the date such work was completed, as well as the person who reviewed the work and the date of such review.  AS 3.6.  If the auditor cannot determine or demonstrate that sufficient procedures were performed, sufficient evidence was obtained, or appropriate conclusions were reached, the auditor should comply with the provisions of AU §390, *Consideration of Omitted Procedures After the Report Date*. AS 3.9.

56.     Before the report release date,[11] the auditor must have completed all necessary auditing procedures and obtained sufficient evidence to support the representations in the auditor's report.  AS 3.15.  After the report release date, a complete and final set of audit documentation should be assembled for retention no more than 45 days later (the *documentation completion date*). AS 3.15.  Circumstances may require additions to audit documentation after the report release date. AS 3.16.  Audit documentation must not be deleted or discarded after the documentation completion date; however, information may be added.  Any documentation added must indicate the date the information was added, the name of the person who prepared the additional documentation, and the reason for adding it.  AS 3.16.  Furthermore, auditors should not discard any previously existing documentation in connection with obtaining and documenting evidence after the report release date.  AS 3.A56.  If the auditor obtains and documents evidence after the report release date, the auditor should refer to AU § 390, *Consideration of Omitted Procedures After the Report Date*, and AU § 561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*.  AS 3.A56.

57.     AU § 230 requires auditors to exercise due professional care in the planning and performance of an audit and the preparation of an audit report.  AU § 230.01.

58.     As a result of the conduct described above, Bertuglia and Nagdimov violated AS 3 and AU § 230 because: (i) the audit team improperly predated incomplete work papers and audit

---

[11] The *report release date* is the date the auditor grants permission to use the auditor's report for the company's financial statements.  AS 3.A41.

programs, which intentionally preceded the report release dates and did not accurately reflect the dates when audit procedures were actually completed or reviewed; (ii) the audit team failed to properly document the audit procedures they performed, and the evidence they obtained, *after* the report release dates; (iii) the audit team improperly discarded audit documentation that existed on the report release dates by overwriting such documentation in connection with obtaining and documenting evidence after the report release dates; (iv) the audit team failed to sign the predated work papers again when the audit work was actually completed; (v) the audit team failed to document their change in audit approach using the higher, consolidated materiality threshold; and (vi) the audit team failed to document their assessment of omitted procedures under AU § 390.

59.    Nagdimov violated AS 3 and AU § 230 because he instructed the audit team to predate their incomplete work papers and audit programs before the First Report Release Date. His improper instructions also extend to the audit documentation failures that occurred *after* the report release dates, which served to continue and further the misleading nature of the audit team's predated documentation in the work papers and audit programs.

60.    Bertuglia violated AS 3 and AU § 230 because he failed to remediate the audit team's predated documentation.  Bertuglia further violated these standards because he also signed some of the predated work papers, and because he signed work papers that he never actually reviewed.  In fact, Bertuglia signed numerous work papers in the file, including work papers he never actually reviewed, because he used his review signatures as a "management tracking tool" in APT to identify new work papers when they were added to the file.  His practice of signing work papers that he never reviewed violated AS 3 and AU § 230.

61.    Bertuglia also violated AS 3 and AU § 230 because he failed to remediate the audit team's documentation failures that occurred after the report release dates, and because he failed to document his assessment of omitted audit procedures under AU § 390.  Bertuglia's failure to document this analysis also violated BDO's audit policies in effect during the Consolidated Audit.

### *Green's Violations of PCAOB Standards*

#### a.   *Failure to Perform Appropriate Engagement Quality Review*
####     *(AS 7 and AU § 230)*

62.    PCAOB Auditing Standard No. 7, *Engagement Quality Review* ("AS 7"), establishes requirements for an engagement quality review and concurring approval of issuance for each audit engagement.  The objective of the engagement quality reviewer is to perform an evaluation of the significant judgments made by the engagement team and the related conclusions reached in forming the overall conclusion on the engagement, and in preparing the engagement report, in order to determine whether to provide concurring approval of issuance.  AS 7.2.  To evaluate such judgments and conclusions, the engagement quality reviewer should, to the extent necessary: (1) hold discussions with the engagement partner and other members of the engagement team, and (2) review documentation.  AS 7.9.  Additionally, in an audit, the engagement quality

reviewer should evaluate, among other things, the engagement team's assessment of, and audit responses to, (1) significant risks identified by the engagement team, including fraud risks, and (2) other significant risks identified by the engagement quality reviewer through performing the procedures required by this standard.  AS 7.10.

63.     The engagement quality reviewer should also evaluate whether the engagement documentation that he or she reviewed when performing the review (1) indicates that the engagement team responded appropriately to significant risks, and (2) supports the conclusions reached by the engagement team with respect to the matters reviewed.  AS 7.11.  In an audit, the engagement quality reviewer may provide concurring approval of issuance only if, after performing with due professional care the review required by this standard, he or she is not aware of a significant engagement deficiency.  AS 7.12.

64.     Documentation of the engagement quality review should contain sufficient information to enable an experienced auditor, having no previous connection with the engagement, to understand the procedures performed by the engagement quality reviewer and include information that identifies: (1) the engagement quality reviewer; (2) the documents reviewed by the engagement quality reviewer; and (3) the date the engagement quality reviewer provided concurring approval of issuance.  AS 7.19.  Documentation of the engagement quality review should also be included in the audit engagement documentation.  AS 7.20.

65.     AU § 230 requires auditors to exercise due professional care in the planning and performance of an audit and the preparation of an audit report.  Due professional care requires auditors to exercise professional skepticism and consider the competency and sufficiency of audit evidence to provide a reasonable basis for forming an opinion.  *See* AU § 230.01, .07-.08, and .10-.11.

66.     As a result of the conduct described above, Green violated AS 7 and failed to exercise due professional care under AU § 230 because he provided his concurring approval of issuance to release BDO's audit report even though work papers in significant risk areas did not have sufficient documentation of the performed procedures, appropriate audit evidence obtained, or conclusions reached by the audit team.  Green also failed to follow BDO's audit policies in effect during the Consolidated Audit, which required him to review the audit team's journal entry testing.

67.     Green further violated AS 7 and AU § 230 when he provided his concurring approval of issuance despite the omitted audit procedures, which constituted a significant engagement deficiency, because the audit team had failed to obtain sufficient evidence in accordance with PCAOB standards.[12]  Green also violated these standards when he failed to

---

[12] Under AS 7, a *significant engagement deficiency* exists in an audit when (1) the engagement team failed to obtain sufficient appropriate evidence in accordance with PCAOB standards, (2) the engagement team reached an inappropriate overall conclusion on the subject matter of the engagement, (3) the engagement report is not appropriate in the circumstances, or (4) the firm is not independent of its client.  AS 7.12.

review and evaluate the audit team's assessment of these omitted procedures under AU § 390, and when he failed to alert the audit team to the absence of necessary documentation that would allow Green to perform his review and evaluation of the audit team's AU § 390 assessment.  Finally, Green violated these standards when he signed work papers that he did not actually review.

## E.    VIOLATIONS

68.    As a result of the conduct described above, Respondents Bertuglia, Green, and Nagdimov engaged in improper professional conduct within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.  In relevant part, Section 4C(b) of the Exchange Act and Rule 102(e)(1)(iv) of the Commission's Rules of Practice define "improper professional conduct" as one of three classes of conduct: (1) intentional or knowing conduct, including reckless conduct, that results in a violation of applicable professional standards; (2) a single instance of highly unreasonable conduct in circumstances for which heightened scrutiny is warranted; or (3) repeated instances of unreasonable conduct that indicate a lack of competence to practice before the Commission.

## F.    FINDINGS

69.    Based on the foregoing, the Commission finds that Respondents Bertuglia and Green engaged in improper professional conduct pursuant to Sections 4C(a)(2) and 4C(b)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice based upon repeated instances of unreasonable conduct.

70.    Based on the foregoing, the Commission finds that Respondent Nagdimov engaged in improper professional conduct pursuant to Sections 4C(a)(2), 4C(b)(1) and 4C(b)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice based upon intentional or knowing conduct, including reckless conduct, and repeated instances of unreasonable conduct.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the agreed sanctions in Respondents' Offers.

Accordingly, it is hereby ORDERED, effective immediately, that:

A.    Pursuant to Section 4C of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice, Respondent Bertuglia is denied the privilege of appearing or practicing before the Commission as an accountant.

1.    After three years from the date of this Order, Respondent Bertuglia

may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

a.   a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934). Such an application must satisfy the Commission that Bertuglia's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

b.   a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934. Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

c.   an independent accountant.

Such an application must satisfy the Commission that:

i.   Bertuglia, or the public accounting firm with which he is associated, is registered with the PCAOB in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

ii.   Bertuglia, or the registered public accounting firm with which he is associated, has been inspected by the PCAOB and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate Bertuglia will not receive appropriate supervision;

iii.   Bertuglia has resolved all disciplinary issues with the PCAOB, and has complied with all terms and conditions of

18

any sanctions imposed by the PCAOB (other than reinstatement by the Commission); and

iv.     Bertuglia acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the PCAOB, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

2.     The Commission will consider an application by Bertuglia to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.  However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Bertuglia's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as an accountant.  Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

B.     Pursuant to Section 4C of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice, Respondent Green is denied the privilege of appearing or practicing before the Commission as an accountant.

1.     After one year from the date of this Order, Respondent Green may request that the Commission consider his reinstatement by submitting an application (attention:  Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

a.     a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934).  Such an application must satisfy the Commission that Green's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

b.     a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are

19

filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934.  Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

c.      an independent accountant.

Such an application must satisfy the Commission that:

  i.      Green, or the public accounting firm with which he is associated, is registered with the PCAOB in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

  ii.      Green, or the registered public accounting firm with which he is associated, has been inspected by the PCAOB and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate Green will not receive appropriate supervision;

  iii.      Green has resolved all disciplinary issues with the PCAOB, and has complied with all terms and conditions of any sanctions imposed by the PCAOB (other than reinstatement by the Commission); and

  iv.      Green acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the PCAOB, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

2.      The Commission will consider an application by Green to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.  However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Green's character, integrity, professional conduct, or

qualifications to appear or practice before the Commission as an accountant.  Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

C.      Pursuant to Section 4C of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice, Respondent Nagdimov is denied the privilege of appearing or practicing before the Commission as an accountant.

1.      After five years from the date of this Order, Respondent Nagdimov may request that the Commission consider his reinstatement by submitting an application (attention:   Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

a.      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934).   Such an application must satisfy the Commission that Nagdimov's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

b.      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934.   Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

c.      an independent accountant.

Such an application must satisfy the Commission that:

i.      Nagdimov, or the public accounting firm with which he is associated, is registered with the PCAOB in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

    ii.      Nagdimov, or the registered public accounting firm with which he is associated, has been inspected by the PCAOB and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate Nagdimov will not receive appropriate supervision;

    iii.     Nagdimov has resolved all disciplinary issues with the PCAOB, and has complied with all terms and conditions of any sanctions imposed by the PCAOB (other than reinstatement by the Commission); and

    iv.     Nagdimov acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the PCAOB, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

2.    The Commission will consider an application by Nagdimov to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.   However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.   The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Nagdimov's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as an accountant. Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

By the Commission.


Brent J. Fields
Secretary

22