USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 08/04/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re

AMTRUST FINANCIAL SERVICES, INC.
SECURITIES LITIGATION

17-cv-1545 (LAK)

This document applies to: All Cases

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION GRANTING CLASS CERTIFICATION AND ORDER**

Appearances:

David A. Rosenfeld
Samuel H. Rudman
Mark T. Millkey
Robert D. Gerson
Natalie C. Arenella
ROBBINS GELLER RUDMAN & DOWD LLP

Jeremy A. Lieberman
POMERANTZ LLP

Peretz Bronstein
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC

*Attorneys for Plaintiffs*

Timothy E. Hoeffner
Jason D. Gerstein
Fabiola Vega
MCDERMOTT WILL & SCHULTE LLP

*Attorneys for Defendant BDO USA, P.C*

LEWIS A. KAPLAN, *District Judge.*

In 2014, the accounting firm now known as BDO USA, P.C. served as independent auditor for AmTrust Financial Services, Inc., a publicly traded company. In a report filed with the SEC that year, BDO's auditors certified that their audit of the company's financials for fiscal year

2013 had been conducted in accordance with the standards of the Public Company Accounting Oversight Board and that they believed the audit provided a reasonable basis for their opinions.

Years later, however, news broke that suggested that BDO in fact had not followed the relevant standards for conducting that audit, including because its auditors had filed the audit report before completing important checks and had attempted to cover that up by time-stamping unfinished documents to make it look like the documents had been completed earlier than they had. Unsurprisingly, this revelation was followed by a significant decline in the price of AmTrust stock.

Plaintiffs have moved to certify a class of purchasers of AmTrust stock pursuing claims against BDO under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The motion will be granted.

## ***Background***

### *I. Factual History*

AmTrust Financial Services, Inc. ("AmTrust") is a multinational speciality property and casualty insurance company, shares of which are publicly traded on the NASDAQ and the New York Stock Exchange.[1] BDO USA, P.C. ("BDO") is an accounting firm that previously served as AmTrust's independent auditor.[2]

On March 3, 2014, AmTrust filed its 2013 Form 10-K – an annual financial report for the fiscal year that had ended on December 31, 2013 – with the U.S. Securities and Exchange

---

1 Third Consolidated Am. Compl. (Dkt 172) ¶¶ 24, 45 [hereinafter "TAC"]

2 *Id.* ¶ 29; *see also* Dkt 209 at 1 n.1.

Commission ("SEC").[3] The filing incorporated an unqualified audit report by BDO (the "2013 Audit Report") that in substance vouched for the accuracy of AmTrust's reported financials.[4] BDO there asserted that "[w]e conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)" and that "[w]e believe that our audits provide a reasonable basis for our opinion."[5]

In 2016, AmTrust hired KPMG LLP as its outside auditor, replacing BDO.[6] On February 27, 2017, before the market opened, AmTrust announced that it would delay the filing of its Form 10-K for fiscal year 2016.[7] The company said that it needed time to make certain "immaterial" corrections to financial statements dating back to fiscal year 2012.[8] It said also that it had "identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016, specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization."[9] The price of AmTrust common stock fell by 19.2

---

3 TAC ¶ 620.

4 *Id.*

5 *Id.*

6 *Id.* ¶¶ 345-46.

7 *Id.* ¶ 76.

8 *Id.* ¶¶ 76, 80.

9 *Id.* ¶ 78.

percent, and the price of Series F Preferred stock fell by 3.2 percent, between close on Friday, February 24, to close on Monday, February 27.[10]

On March 16, 2017, after the market closed, AmTrust announced that it would further delay the filing of its 2016 Form 10-K.[11] The company said also that its consolidated financial statements covering the fiscal years 2014 and 2015, as well as the first three quarters of 2016, needed to be restated and no longer should be relied upon.[12] Similarly, the company said that BDO's audit reports for fiscal years 2014 and 2015, including the reports on the effectiveness on AmTrust's internal control over financial reporting on those dates, no longer should be relied upon.[13] The press release explained that the forthcoming corrections "primarily" would pertain to (1) the improper upfront recognition of certain revenue from warranty contracts and (2) the improper expensing of bonuses in the year paid rather than the year earned.[14] The company said it would make also "other miscellaneous adjustments that had been previously identified but not corrected because they were not material."[15] The next trading day, the price of AmTrust common stock fell by 18.6 percent, and the price of Series F Preferred stock fell by 7.4 percent, from their previous closing prices.[16]

---

[10] *Id.* ¶ 571.

[11] *Id.* ¶ 84.

[12] *Id.* ¶ 85.

[13] *Id.* ¶ 86.

[14] *Id.* ¶ 87.

[15] *Id.*

[16] *Id.* ¶ 572.

On April 4, 2017, Amtrust filed its delayed 2016 Form 10-K.[17] It there reported that it had overstated its net income by 12.05 percent in 2016, 11.56 percent in 2015, 7.55 percent in 2014, 15.69 percent in 2013, and 14.06 percent in 2012.[18] The company admitted to the existence of "material weaknesses in internal control over financial reporting."[19]

On April 11, 2017, *The Wall Street Journal* published an article entitled "Secret Recordings Play Role in SEC Probe of Insurer AmTrust" (the "2017 WSJ Article").[20] The article reported that a whistleblower inside BDO had been providing information to the FBI and SEC in furtherance of investigations by those agencies into the accounting practices of AmTrust.[21] The BDO whistleblower reportedly told the newspaper that the FBI probe "was focused on whether the accounting firm tried to bury poor practices in its AmTrust audits."[22] The whistleblower alleged that BDO often had been rushed during its audits of AmTrust, "partly because AmTrust was late or inconsistent in providing figures, or lacked documentation."[23] "At least twice," BDO had "formally signed off on its AmTrust audit before completing some important checks," the article reported.[24]

---

[17] *Id.* ¶ 90.

[18] *Id.* ¶ 157.

[19] *Id.* ¶ 92.

[20] *Id.* ¶ 94; *see* Dkt 149-25.

[21] Dkt 149-25 at 2.

[22] *Id.*

[23] *Id.* at 5.

[24] *Id.*

To cover for such lapses, the article reported, BDO auditors allegedly had "load[ed] unfinished documents into an internal software system to show the right time stamp" and "then returned later to complete some of the work."[25] On the day of the article's publication, the price of AmTrust common stock fell by 18.9 percent, and the price of Series F Preferred stock fell by 10.2 percent, from their previous closing prices.[26]

On October 12, 2018, the SEC suspended three former BDO accountants from practice before the commission based on misconduct in connection with the 2013 Audit Report.[27] The SEC's report explained that after BDO had fallen significantly behind schedule on the audit, a senior manager on the audit instructed his team to load and sign blank or placeholder work papers into the firm's accounting software.[28] BDO's engagement and quality review partners then signed off on the audit opinion without reviewing those missing files, the report found.[29] The audit team completed the work over the next month but did not update their sign-offs in the software, so it continued to look as if the paperwork had been completed on time.[30] The SEC concluded that BDO "did not have sufficient audit evidence to support BDO's audit report when it was included in

---

[25] *Id.*

[26] TAC ¶ 573.

[27] October 12, 2018 SEC Order (Dkt 133-3).

[28] *Id.* ¶¶ 16-22.

[29] *Id.* ¶¶ 24-25.

[30] *Id.* ¶ 29.

AmTrust's Form 10-K on March 3, 2014."[31] It found that the three auditors had failed to follow procedures of the Public Company Accounting Oversight Board ("PCAOB") in multiple respects.[32]

## *II. Prior Proceedings*

In 2017, three individuals who had purchased AmTrust stock separately filed purported class-action lawsuits against AmTrust and its executives, alleging violations of federal securities laws.[33] The cases were consolidated before this Court, which appointed North Atlantic States Carpenters Guaranteed Annuity and Pension Funds (the "North Atlantic Funds") as lead plaintiff under the Private Securities Litigation Reform Act.[34] The lead plaintiff filed consolidated amended complaints that added as defendants BDO and certain banks that had unwritten the sale of AmTrust's securities. In 2020, this Court dismissed a third consolidated amended complaint with prejudice.[35] In 2024, the Second Circuit affirmed in part and vacated and remanded in part.[36]

As relevant here, the Second Circuit held that plaintiffs plausibly had alleged a claim against BDO under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and

---

31 *Id.* at ¶ 31.

32 *Id.* ¶¶ 40-67.

33 Case Nos. 17-cv-1545, 17-cv-2001, and 17-cv-3154.

34 Dkt 49; *see also* Dkt 205 (name change).

35 Dkt 196.

36 *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 55 (2d Cir. 2024).

Rule 10b-5 promulgated thereunder.[37] That claim is based on BDO's statements in the 2013 Audit Report that the audit (1) had been conducted in accordance with the standards promulgated by the Public Company Accounting Oversight Board ("PCAOB") and (2) provided a reasonable basis for BDO to conclude AmTrust's financials were fairly presented. Plaintiffs allege that these statements knowingly had been false in light of misconduct documented by the 2018 SEC opinion, and that those alleged misrepresentations inflated the value of AmTrust's stock price and thereby injured stockholders when the truth was revealed. The Second Circuit greenlit also claims against AmTrust, certain individuals associated with AmTrust, and the underwriting banks. But as explained in the next paragraph, those counts are not at issue here.

On September 18, 2025, plaintiffs moved for the certification of three subclasses under Federal Rule of Civil Procedure 23.[38] Subsequently, the plaintiffs agreed to settle their claims against the AmTrust defendants and the underwriting banks.[39] The Court approved a notice of the settlement as to two subclasses under Federal Rule of Civil Procedure 23(e)(1), and a settlement hearing is set for November 19, 2026.[40]

The only portion of plaintiff's motion for class certification that remains to be decided is a request to certify a subclass of plaintiffs pursuing a Section 10(b) and Rule 10b-5 claim against BDO. Specifically, plaintiffs seek to certify a subclass of "all purchasers of AmTrust

---

[37] *Id.* at 52-55.

[38] Dkts 251, 252.

[39] Dkt 291.

[40] Dkt 299.

common stock and Series F Preferred Stock between March 3, 2014 and April 10, 2017, inclusive (the 'BDO Subclass Period'), who were damaged thereby."[41] The North Atlantic Funds and the Irving Lichtman Revocable Living Trust (the "Living Trust") seek appointment as subclass representatives, and Robbins Geller Rudman & Dowd LLP seeks appointment as subclass counsel.

***Discussion***

Under Federal Rule of Civil Procedure 23, an action may be maintained as a class action only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.[42] In addition, as relevant here, questions of law or fact common to the class must "predominate over any questions affecting only individual members" and a court must find that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."[43] The party moving for certification must demonstrate compliance with these requirements by a preponderance of the evidence.[44]

---

41 Dkt 254 at 1.

42 Fed. R. Civ. P. 23(a).

43 Fed. R. Civ. P. 23(b)(3).

44 *Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).

## I. *Rule 23(a)*

### A. *Numerosity*

During the subclass period, an average of 1.17 million shares of AmTrust common stock, and 135,000 shares of Series F Preferred stock, were traded daily,[45] and plaintiffs assert without opposition that thousands of people belong to the proposed subclass.[46] Joinder of all class members need only be "impracticable,"[47] not impossible,[48] and "[n]umerosity is presumed for classes larger than forty members."[49] Furthermore, courts have recognized that evidence that a large volume of shares were outstanding and traded during the class period can suffice to demonstrate numerosity.[50] The Court has little difficulty concluding, without objection from BDO, that the numerosity requirement is satisfied here.[51]

---

45 Steinholt Report (Dkt 253-1) ¶¶ 28, 60.

46 Mem. of Law in Support (Dkt 252) at 12.

47 Fed. R. Civ. P. 23(a)(1).

48 *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

49 *Pa. Pub. Sch. Emps.'s Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014).

50 *In re Vivendi Universal, S.A. Secs. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (collecting cases).

51 The class also is "defined using objective criteria that establish[es] a membership within definite boundaries." *In re Petrobras Secs.*, 862 F.3d 250, 264 (2d Cir. 2017); *see also id.* at 269-70.

*B. Commonality*

To proceed as a class, a group of putative class members must have "suffered the same injury."[52] A plaintiff must demonstrate that the claims of each class member "depend upon a common contention" that is "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[53] The elements of a claim under Section 10(b) of the Exchange Act and the corresponding Rule 10b-5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[54]

Whether BDO's statements in the 2023 Audit Opinion were material, false, and made with a sufficiently culpable state of mind are pure common questions central to the validity of each class member's claim. Their resolution does not depend on proof specific to any such member. If plaintiffs prevail in proving those elements they will have demonstrated that each class member suffered the same injury to the extent that their reliance on the misstatements in connection with the purchase and sale of AmTrust stock caused them financial harm. Commonality is satisfied.

---

52 *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).

53 *Id.*

54 *Stoneridge Inv. Partners, LCC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

### *C. Typicality*

The claims or defenses of a class representative must be "typical of the claims or defenses of the class."[55] Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"[56] The claims need not be identical. Rather, they need "share [only] the same essential characteristics," so the requirement "is not highly demanding."[57] However, class certification is inappropriate where a proposed class representative is subject to "unique defenses" that "threaten to become the focus of the litigation."[58] As the forgoing standard suggests, a potential unique defense should not prevent certification if it "does not go to the heart of Plaintiff's case and will not require considerable time and effort to rebut."[59]

The proposed class representatives are the North Atlantic Funds, which purchased common stock during the class period,[60] and the Living Trust, which purchased Series F Preferred

---

55 Fed. R. Civ. P. 23(a)(3).

56 *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

57 *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002) (quoting 5 MOORE'S FEDERAL PRACTICE § 23.24[4]).

58 *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

59 *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015) (quoting *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 180 (S.D.N.Y. 2008)).

60 Dkt 85-1 at 4-13.

stock during the class period.[61] Each claims that it relied on BDO's false statements and was damaged thereby.[62] Their claims are typical.[63]

*1. North Atlantic Funds*

BDO argues that the North Atlantic Funds are atypical because the Funds made additional purchases of AmTrust stock after the 2017 WSJ Article revealed BDO's alleged fraud. BDO argues that the Funds will be unable to prove the reliance element of the Section 10(b) claim because its "continued buying activity . . . shows that the disclosure of any purported fraud was irrelevant to its investment decisions."[64]

But "[n]umerous courts have held [that] the fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [the representative] relied on the integrity of the market . . . before the information at issue was corrected or changed."[65] Notably, by the time the Funds made those purchases, AmTrust had replaced BDO with KMPG. In addition, the

---

61 Dkt 258 at 5.

62 *Id.*; TAC ¶ 19.

63 *See In re Bank of America Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012) ("In a securities class action, when 'plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims,' the claims and nature of evidence 'are generally considered sufficient to satisfy the typicality requirement.'" (quoting *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007)).

64 Mem. of Law in Opp'n (Dkt 262) at 27.

65 *Hasthantra v. CleanSpark, Inc.*, No. 21-cv-511 (LAP), 2025 WL 2717308, at *5 (S.D.N.Y. Sept. 24, 2025) (quoting *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 46 (S.D.N.Y. 2012)).

purchase transactions were few relative to the Funds' pre-disclosure purchases and there is no suggestion that the Funds were acting based on non-public information.[66] This purported defense does not "threaten to become the focus of the litigation."[67]

### *2. Living Trust*

BDO argues that the Living Trust is atypical because it sold all of its shares before the 2017 WSJ Article was published and therefore, as an "in-and-out trader," will be unable to demonstrate loss causation.

Sometimes the falsity of a misstatement is revealed "through a series of disclosing events."[68] Plaintiffs effectively argue that is what happened here. On February 27, 2017, AmTrust announced that it would delay its Annual Form 10-K filing because it needed to make certain corrections to its financial statements going back to fiscal year 2012. The company made a similar announcement on March 16, 2017. Plaintiffs will attempt to prove that these events represented the materialization of the risk that AmTrust's financial statements were unreliable and that the 2013

---

66 *See id.*

67 *Baffa*, 222 F.3d at 59.

68 *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 282 (S.D.N.Y. 2012) (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008)).

Audit Report concealed that very risk from investors.[69] That is an accepted way to prove loss causation as a matter of law.[70]

Living Trust's claim that it was economically harmed by BDO's alleged misstatement "share[s] the same essential characteristics" as that of the class.[71] In *In re Flag Telecom Holdings, Ltd. Securities Litigation*,[72] the Second Circuit noted that there may be times when it is "premature for courts to attempt to determine whether in-and-out traders have suffered losses at the class certification stage of the game."[73] The Court "cannot conclusively determine" at this stage that putative class members in the Living Trust's position "can never prove loss causation."[74] The proposed class already is limited to purchasers of AmTrust stock were "who were damaged" by the alleged securities law violations.[75] BDO's request to exclude those in the Living Trust's position otherwise is premature. The Court, of course, retains the "flexibility to certify subclasses as the case

---

69 *See DeCarlo*, 122 F.4th at 53 (explaining that the BDO's allegedly false certification in the 2013 Audit Report "subjected unknowing investors to the risk that AmTrust's financial statements were unreliable").

70 *See In re Vivendi S.A. Secs. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016).

71 *Bolanos*, 212 F.R.D. at 155 (quoting 5 MOORE'S FEDERAL PRACTICE § 23.24[4]).

72 574 F.3d 29 (2d Cir. 2009).

73 *Id.* at 39 (quoting *Roth v. Anon*, 238 F.R.D. 603, 608 (N.D. Ill. 2006)).

74 *Roth*, 238 F.R.D. at 609.

75 Dkt 254.

progresses and the nature of the proof to be developed at trial becomes clear."[76]

### *D. Adequacy*

Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class."[77] Under this standard, (1) class counsel must "be qualified, experienced and generally able to conduct the proposed litigation," and (2) the class representatives must not be likely to collude with the defendants or otherwise have "interests antagonistic to those of the remainder of the class."[78] Class certification may be denied "where the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."[79]

Proposed class counsel – Robbins Geller Rudman & Dowd LLP – has been recognized as "one of the most successful law firms in securities class actions, if not the preeminent one, in the country,"[80] and "has substantial experiences in securities class actions, including in this

---

[76] *Marisol A. v. Giuliani*, 126 F.3d at 379; *see* Fed. R. Civ. P. 23(c)(1)(C).

[77] Fed. R. Civ. P. 23(a)(4).

[78] *Eisen v. Carlisle and Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968).

[79] *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995) (alteration in original) (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987)).

[80] *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 158 (S.D.N.Y. 2012) (quoting *In re Enron Corp. Secs., Derivative & 'ERISA' Litig.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008)).

District."[81] Robbins Geller "has been found adequate in a multitude of cases,"[82] and nothing about the firm's years-long prosecution of this case suggests that it is anything other than qualified, experienced, and fully capable of litigating this case to trial.[83] Nor does the North Atlantic Funds' monitoring agreement with Robbins Geller, under which the Funds had the right not to pursue litigation or to retain different counsel,[84] undermine adequacy. "[C]ourts routinely appoint institutional investors with monitoring agreements as lead plaintiffs and class representatives,"[85] and although such agreements *can* incentivize frivolous suits, "no such danger exists where," as here, the claims already have survived a motion to dismiss.[86] Furthermore, the proposed class representatives are sophisticated investors who are unlikely to collude with defendants and appear capable of adequately representing the interests of all class members.

BDO argues that the executive director of the North Atlantic Funds demonstrated in his deposition a lack of familiarity with the subject-matter and conduct of the lawsuit that "is incompatible with the fiduciary role required of a class representative."[87] That charge is unfounded.

---

81 *Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 127 (S.D.N.Y. 2023).

82 *Id.* (citing *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2015)).

83 *See* Dkt 283 at 19-24. For the same reasons, the Court finds that appointment of Robbins Geller as class counsel is appropriate under Fed. R. Civ. P. 23(g).

84 Dkt 264-1 at ¶ 7; Dkt 264-2 at ¶ 8.

85 *City of Livonia Emps.'s Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 180 (S.D.N.Y. 2012).

86 *In re Symbol Techs., Inc. Secs. Litig.*, No. 05-cv-3923, 2015 WL 3915477, at *9 (S.D.N.Y. June 25, 2015).

87 Mem. of Law. in Opp'n at 29.

The Funds' representative accurately described the responsibilities of a class representative,[88] reviewed the motion for class certification before it was filed,[89] could explain the reasons for the beginning and end of the subclass period,[90] articulated BDO's alleged misconduct,[91] read the Second Circuit opinions,[92] and stated that he is prepared to attend trial in New York if necessary.[93]

BDO similarly argues that the Living Trust's knowledge of the case falls below the "modest standard" to which class representatives are held.[94] Again, however, the Living Trust's corporate representative, Irving Lichtman, demonstrated an understanding of fundamental underpinnings of this lawsuit and expressed a willingness to "fight" for members of the subclass, including to by traveling to New York for the trial if necessary.[95] He understood that BDO had represented that it had performed work that it had not in fact performed and that BDO's alleged misrepresentations allegedly had cause the price of AmTrust to fall.[96] BDO attempts to fault

---

88 Dkt 284-17 at 55:2-25.

89 *Id.* at 54:14-25.

90 *Id.* at 57:21-58:9.

91 *Id.* at 58:14-19, 75:3-15.

92 *Id.* at 65:19-24.

93 *Id.* at 70:21-23.

94 Mem. of Law in Opp'n at 30 (quoting *Kulig v. Midland Funding, LLC*, No. 13-cv-4715, 2014 WL 6769741, at *3 (S.D.N.Y. Nov. 20, 2014)).

95 Dkt 284-8 at 53:13-18, 160:15-20, 167:21-23.

96 *Id.* at 51:1-6, 51:19-23.

Lichtman for not knowing additional specifics, but "in complex actions named plaintiffs are not required to have expert knowledge of all the details of the case" and "a great deal of reliance on expert counsel is to be expected."[97]

## *II. Rule 23(b)(3) Predominance*

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[98] The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,"[99] and predominance is not negated by having to try separately certain "important matters . . . such as damages or some affirmative defenses peculiar to some individual class members."[100]

As noted above, the elements of a Rule 10b-5 claim under Section 10(b) of the Exchange Act are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security;

---

97 *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 525 (S.D.N.Y. 2018) (quotation marks omitted) (quoting *In re TCW/DW N. Am. Gov't Income Tr. Secs. Litig.*, 941 F. Supp. 326, 341 (S.D.N.Y. 1996)).

98 *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)).

99 *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

100 *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 7AA WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1778 (3d ed. 2005)); *see Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014).

(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[101] BDO argues that adjudication of the fourth and fifth elements – reliance and damages – would cause individual issues to predominate. The Court disagrees.

### *A. Reliance: Fraud-on-the-Market Theory*

#### *1. Legal background*

The reliance element of a Section 10(b) and Rule 10b-5 claim "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury."[102] Requiring each plaintiff to prove that he or she "was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation" effectively would prevent plaintiffs from proceeding with a class action in all Section 10(b) and Rule 10b-5 suits because individual questions of reliance would predominate over common ones.[103] To avoid that problem, however, plaintiffs may rely on an evidentiary presumption recognized by the Supreme Court in *Basic Inc. v. Levinson*.[104] The *Basic* framework presumes that "public material misrepresentations" are reflected in the price of any stock traded on an efficient market and that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of the price."[105]

---

101 *Stoneridge Inv. Partners, LCC*, 552 U.S. at 157.

102 *Halliburton*, 573 U.S. at 267 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013)).

103 *Id.* at 267-68.

104 485 U.S. 224 (1988).

105 *Id.* at 247.

To invoke the *Basic* presumption – also known as the "fraud-on-the market" theory – a plaintiff must prove that "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed."[106] A plaintiff must actually prove, not simply plead, these elements at the class-certification stage – with one exception.[107] Because the materiality of the alleged misstatement is an element of the offense, a failure to prove materiality never would cause individual issues to predominate over common ones; it would cause each class member's claim to fail.[108] So materiality need not be proven until trial.

A defendant may rebut application of the *Basic* presumption by "show[ing] that the misrepresentation in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false."[109] To avoid class certification, a defendant must actually prove by a preponderance of the evidence that the misstatement had no effect on the price.[110] A district court should assess "*all* probative evidence" of price impact – direct and indirect, qualitative and quantitative – and then, "aided by a good dose of common sense,"

---

106 *Halliburton*, 573 U.S. at 277-78.

107 *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 119 (2021).

108 *Amgen Inc.*, 568 U.S. at 467-68.

109 *Basic*, 485 U.S. at 248.

110 *Goldman*, 594 U.S. at 125-26.

"determine whether it is more likely than not that the alleged misrepresentations had a price impact."[111]

In this case, plaintiffs have not argued that the alleged misstatements in the 2013 Audit Report caused the price of AmTrust's stock to *increase*. But there is another theory of price impact known as the "inflation maintenance" theory.[112] Under that theory, "a misrepresentation causes a stock price 'to *remain* inflated by preventing preexisting inflation from dissipating from the stock price."[113] A drop in price that occurs after "the truth is finally disclosed" "operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price."[114]

Oftentimes, however, "the contents of the price-propping misrepresentation and the truth-revealing corrective disclosure" will not perfectly align.[115] A "considerable gap" between the genericness of an alleged misstatement and the specificity of a corrective disclosure weighs against a finding of price impact.[116] At the same time, a court should consider "whether a truthful – but equally generic – substitute for the alleged misrepresentation would have impacted the stock

---

[111] *Id.* at 122, 127.

[112] *Id.* at 119.

[113] *Id.* at 119-20 (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1315 (11th Cir. 2011)).

[114] *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.* (*Goldman II*), 77 F.4th 74, 80 (2d Cir. 2023).

[115] *Id.*

[116] *Id.* at 102-03.

price."[117] The question is "what would have happened if [the company] had spoken *truthfully*" instead of making the alleged misstatement.[118]

### 2. *Analysis*

#### i. *Prerequisites*

Plaintiffs have proven the elements that give rise to the *Basic* presumption. The 2013 Audit Report was included in AmTrust's publicly filed Form 10-K for fiscal year 2013. Plaintiffs plausibly have alleged that misstatements in that report were material and need not do more at this stage. And the class definition limits the class period to the time between the filing of the 2013 Audit Report and the publication of the 2017 WSJ Article, the earliest point at which any party contends that the full truth about the 2013 Audit Report was revealed publicly.

That just leaves the question of market efficiency. During the class period, AmTrust's common stock traded on the NASDAQ with an average weekly turnover of around 3.6 percent of outstanding shares, was the subject of more than 125 reports by analysts, was served by 189 market makers or supplemental liquidity providers, had a market capitalization ranging from $2.7 billion to $5.9 billion, and was subject to an average bid-ask spread of approximately $0.01 per share (or about 0.05 percent of the closing price).[119] During the class period, AmTrust's Series F Preferred stock was traded on the New York Stock Exchange with an average weekly turnover of

---

[117] *Id.* at 102.

[118] *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).

[119] Steinholt Report ¶¶ 25-26, 29, 31, 37, 52, 54.

around 5.9 percent of outstanding shares, was subject to an average bid-ask spread of $0.07 (or 0.3 percent of the closing price), and had a market capitalization of $287.5 million.[120]

These factors, and others noted in plaintiffs' papers,[121] are among those that courts consider in evaluating marketing efficiency,[122] and they weigh in favor of a finding of efficiency here. BDO's expert conceded market efficiency as to common stock and did not dispute it as to the Series F Preferred stock.[123] The Court concludes that AmTrust's common and Series F Preferred stocks traded in an efficient market.

*ii. Price impact*

BDO has failed to meet its burden to prove by a preponderance of the evidence that the misrepresentations did not actually affect the price of AmTrust's stock.

Start with the alleged misstatements. As the Second Circuit observed, "BDO's certification that the audit was conducted in accordance with PCAOB standards succinctly conveyed to investors that AmTrust's audited financial statements were reliable."[124] Yet in reality, according to plaintiffs, BDO's auditors had failed to follow proper procedures, thereby subjecting investors

---

120 *Id.* ¶¶ 59-62.

121 Mem. of Law in Support at 21-27.

122 *See Waggoner*, 875 F.3d at 94 (discussing *Cammer* and *Krogman* factors).

123 Dkt 284-11 at 28:7-29:9.

124 *De Carlo*, 122 F.4th at 53.

"to the risk that AmTrust's financial statements were unreliable."[125] Given the significant role that independent auditors play in vouching for a public company's financials,[126] truthful statements about BDO's audit – i.e., that it was *not* conducted in accordance with PCAOB standards and that BDO's auditors could *not* reasonably have believed the audit provided a reasonable basis for their opinions – very likely would have caused AmTrust's stock price to decline. As AmTrust's expert explains, "the value of an investment is based on the expected future cash flows of that investment."[127] Common sense suggests that information undermining the reliability of a company's financial performance and outlook is quite likely to depress the value of an investment.

The 2017 WSJ Article provides strong corroborating evidence of that common-sense hypothesis. As BDO's expert concedes,[128] that article revealed several pieces of information to the market, including that BDO's auditors multiple times had signed off on audit reports without completing important checks. And as the Second Circuit observed, that disclosure "revealed the specific deficiencies that rendered the audit opinion misleading," meaning there is a "clean match" between the alleged misstatements and the corrective disclosure.[129] On the day of the article's publication, there was a statistically significant drop in the prices of AmTrust's common stock and

---

[125] *Id.*

[126] *See United States v. Arthur Young Co.*, 465 U.S. 805, 817-18 (1984).

[127] Steinholt Report ¶ 8 n.7.

[128] Juneja Report (Dkt 263-1) ¶ 17.

[129] *DeCarlo*, 122 F.4th at 54 (quoting *Goldman II*, 77 F.4th at 80).

Series F Preferred stock.[130] The fact that the article included news that federal agencies were investigating AmTrust's account practices muddies the waters to some extent. But BDO has not undertaken to quantitatively desegregate the various causes of the price drop that followed the article's publication.[131] All signs point towards a finding of price impact.

BDO argues otherwise essentially for two reasons, neither of which is persuasive. First, BDO argues that analysts were "silen[t] regarding BDO's alleged misstatements" in the immediate aftermath of the 2017 WSJ Article.[132] What BDO means by that is that analysts did not "specifically discuss[] BDO's 2013 audit work or the audits for any other specific year" when covering the article.[133] Of course, we're talking about financial analysts, not plaintiffs lawyers. That market analysts (who generally are concerned with predicting the future) did not *specifically* mention the falsity of statements buried in BDO's years-old audit certifications provides weak evidence, at best, that truthful statements about the 2013 audit (i.e., that it was *not* conducted properly) would not have deflated the stock price. In fact, the analysts' focus on AmTrust's "accounting irregularities"[134] following the article's publication supports, rather than undermines, a finding of price impact because the risk of accounting irregularities is precisely what the alleged

---

130 Steinholt Report ¶¶ 49, 66.

131 Dkt 284-11 at 67:10-21.

132 Mem. of Law in Opp'n at 15-16.

133 *Id.* at 15.

134 *Id.*

misstatements covered up.[135] At bottom, analyst commentary is just one factor to consider and, in the circumstances, the reports cited by BDO fall far short of negating a finding of price impact.

Second, BDO argues that the 2017 WSJ Article had "nothing to do with the 2013 audit or the 2013 Audit Opinion."[136] That is so, BDO argues, because documents disclosed in discovery by the article's sole referenced source all predated the 2013 audit and expressly pertained to the 2012 audit. But the 2017 WSJ Article is probative of the question of price impact to the extent that it demonstrates how the market reacted to the *public* revelation of the falsity of the alleged misstatements. It matters what the article *said*, not what the article's authors knew but did not say.[137] A reader would have had no way of knowing the contents of the discovery-produced documents that BDO now cites, so nothing in them undermines the Second Circuit's observation of a "clean match" between the alleged misstatements and the corrective disclosure.[138]

In sum, BDO's auditors certified in the 2013 report that they had followed PCAOB protocols and that they believed the audit provided a reasonable basis for their opinions. These alleged misstatements concerned the reliability of AmTrust's financials, a matter that obviously is of great concerns to investors. Then, when the 2017 WSJ Article revealed that BDO at least twice

---

135 *De Carlo*, 122 F.4th at 53.

136 Mem. of Law in Opp'n at 19.

137 Perhaps BDO intends to use the discovery material to undermine a showing of loss causation based on the 2017 WSJ Article. But loss causation is a common question that need not be proven at the certification stage to satisfy Rule 23(b)(3). *See Halliburton*, 563 U.S. at 807.

138 BDO's argument overlooks also that even if the 2017 WSJ Article expressly had discussed only the 2012 audit, that still would provide no affirmative evidence of a lack of price impact. Evidence that the market reacted poorly to news that the 2012 audit was flawed would support, not undermine, a finding that similar concealment of *the same flaws* in the 2013 audit maintained inflation in the stock price.

had engaged in conduct that blatantly contradicted those assertions (signing off on audits without actually reviewing all the necessary paperwork), the price of AmTrust's stock dropped. The evidence nearly universally supports the conclusion that the alleged misstatements affected the price of AmTrust stock, so BDO cannot rebut the *Basic* presumption.

*B. Damages*

"Traditionally, economic loss in Section 10(b) cases has been determined by the use of the 'out-of-pocket' measure for damages."[139] The out-of-pocket measure determines the amount by which a misrepresentation inflated a stock price and awards each plaintiff the difference between the inflated price and the fair-value price, subject to certain damages caps established by law.[140] Plaintiffs propose using that approach here.[141] According to their expert, "the calculation of each Class member's damages will be a mechanical arithmetic exercise, applying the results of the class-wide analyses . . . to each Class member's trading data."[142] In light of this proposed and well-accepted method of calculating damages, there is no reason to conclude that individual damages issues will predominate over common questions.

---

139 *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012).

140 *See id.* at 38-39.

141 Steinholt Report ¶¶ 70-76.

142 *Id.* ¶ 76.

BDO objects that plaintiffs have not demonstrated that it is possible to "isolate fraud-related price movement" from losses caused by "other market events."[143] But courts long have held that plaintiffs "are not required at [the class certification] stage to demonstrate that any price impact was due to the prior misrepresentation alone."[144] "Rather, a plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability."[145] Plaintiffs have done so here, and there is no reason to believe that the calculation of damages, should that prove necessary, would be anything other than formulaic.

In any event, it is "well-established" within the Second Circuit that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification" under Rule 23(b)(3).[146] Rather, the need to calculate each class member's damages is merely one factor to consider in that analysis.[147] Here, common issues of liability predominate and justify class action treatment notwithstanding the need to calculate damages.

---

143 Mem. of Law in Opp'n at 22.

144 *In re Allergan PLC Secs. Litig*, No. 18-cv-12089, 2021 WL 4077942, at *15 (S.D.N.Y. Sept. 8, 2021) (alteration in original) (quoting *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018)).

145 *Id.*

146 *Roach*, 778 F.3d at 405 (quoting *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010)).

147 *Id.*

*III. Rule 23(b)(3) Superiority*

Under Rule 23(b)(3), a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."[148] Factors relevant to this inquiry include "class members' interests in individually controlling the prosecution or defense of separate actions," "the extent and nature of any litigation concerning the controversy already begun by or against class members," "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and "the likely difficulties in managing a class action."[149]

There appears to be no related litigation pending and this Court provides a desirable forum because both sets of stock traded on exchanges headquarters in this District. Furthermore, "[s]ecurities suits easily satisfy the Superiority Requirement of Rule 23(b)(3) because 'the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'"[150] That general rule holds true here.

---

148 Fed. R. Civ. P. 23(b)(3).

149 Fed. R. Civ. P. 23(b)(3)(A)-(D).

150 *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015) (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968)).

**Conclusion**

For the forgoing reasons, plaintiffs' motion for class certification and other relief (Dkt 251) is granted to the extent that:

1. The BDO Subclass, defined as all purchasers of AmTrust common stock and Series F Preferred Stock between March 3, 2014 and April 10, 2017, inclusive (the "BDO Subclass Period"), who were damaged thereby, is certified under Rules 23(a), (b)(3), and (c)(5) of the Federal Rules of Civil Procedure, provided, however, that BDO USA, P.C. and its partners and/or principals, at all relevant times, as well as members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which BDO has or had a controlling interest, are excluded from the BDO Subclass.

2. The North Atlantic Funds and the Living Trust are certified as Class Representatives for the BDO Subclass.

3. Robbins Geller Rudman & Dowd LLP is appointed Class Counsel for the BDO Subclass under Rule 23(g).

SO ORDERED.

Dated: August 4, 2026

Lewis A. Kaplan
United States District Judge